**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREENWOOD GAMING AND ENTERTAINMENT, INC., *Plaintiff*, v. POM OF PENNSYLVANIA, LLC, PACE-O-MATIC, INC., and MIELE MANUFACTURING, INC., *Defendants*. | Case No 2:22-CV-4434 |

## AMENDED COMPLAINT

Plaintiff Greenwood Gaming and Entertainment, Inc., d/b/a Parx Casino ("Parx Casino") commenced this action in the Court of Common Pleas of Philadelphia County, Pennsylvania by writ of summons and served pre-complaint discovery. After removal, Plaintiff now files this amended complaint, by and through its undersigned counsel, against Defendants Pace-O-Matic, Inc. ("Pace-O-Matic"), POM of Pennsylvania, LLC ("POM"), and Miele Manufacturing, Inc., for violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), false advertising, unfair competition, and tortious interference with prospective business relations. Parx Casino seeks preliminary and permanent injunctive relief as well as monetary damages.

### NATURE OF THE CASE

1.     This case concerns a long-running and ongoing scheme to evade the Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act"), violate the Pennsylvania Crimes Code, and undermine the regulated gaming industry in Pennsylvania through the manufacture, sale and distribution of Illegal Slot Machines. This scheme is accomplished through a criminal

1

racketeering enterprise managed and controlled by Defendants Pace-O-Matic, Inc., POM of Pennsylvania, LLC, and Miele Manufacturing, Inc. The enterprise is composed of the Defendants, along with so-called "Operators" as well as various clubs, taverns, restaurants, convenience stores, gas stations and other unlicensed establishments. Each of these enterprise participants has assigned roles and responsibilities. By the design of Defendants, the purpose and effect of the criminal enterprise is to evade the taxes and regulation imposed on slot machine operators by the Gaming Act, to undermine the legal businesses of regulated and licensed casinos and slot machine manufacturers who comply with the Gaming Act, and to defraud the government and citizens of the Commonwealth of Pennsylvania.

2.      In 2004, the General Assembly widened the scope of legalized gambling in Pennsylvania by passing the Gaming Act and authorizing slot machine operations. The General Assembly's stated intent was to protect the public through regulation and policing of all activities involving gaming, including slot machines and so-called interactive games. Another stated intent of the Gaming Act was to increase revenue to the Commonwealth, host counties and municipalities. The Pennsylvania Supreme Court has stated that the Gaming Act established the Pennsylvania Gaming Control Board to have general jurisdiction over "*all* gaming and related activities including the licensing of gaming facilities." *Station Square Gaming, LP v. Pa. Gaming Control Bd.*, 927 A.2d 232, 236 (Pa. 2007) (emphasis added). Except as specifically allowed and regulated by the Gaming Act, slot machines and other devices whose purpose is gambling remain illegal and criminal in Pennsylvania. Defendants' criminal enterprise was created to evade this regulation and the payment of related taxes.

3.      And, to date, Defendants' criminal enterprise has been wildly successful, generating tens or even hundreds of millions of dollars in illegal profits. In the process, Defendants have misled the public about their products by fraudulently passing them off as something they

are not. To be clear, Defendants' products are slot machines – devices built, sold, maintained and used for gambling purposes. As such, each instance of the unregulated manufacture, assembly, set up, maintenance, sale and operation of these products is a crime punishable by up to five years in prison. Defendants, including through their criminal enterprise, have and continue to commit this and related crimes thousands of times every day, by building, selling and operating tens of thousands of Illegal Slot Machines on an ongoing basis. Defendants and the other enterprise participants thus willfully violate the Crimes Code, both evading regulation and depriving the Commonwealth and host counties and municipalities of revenue, and engaging in money laundering with the proceeds of their criminal conduct. Simultaneously, they undermine, damage and unlawfully compete with the lawful and regulated gaming industry, including Plaintiff Parx Casino. Parx Casino brings this suit to recover its damages and to enjoin Defendants' and the criminal enterprise's continued criminal conduct.

## PARTIES

4.     Plaintiff Greenwood Gaming and Entertainment, Inc., d/b/a Parx Casino ("Parx Casino") is a Delaware corporation. Parx Casino is a Category 1 slot machine licensee and certificated table game operator that has its principal place of business in Bucks County at 2999 Street Road, Bensalem, PA 19020.

5.     As a slot machine licensee, Parx Casino is authorized to place and operate approved slot machines in approved locations subject to strict regulatory oversight under the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §1101 *et seq*., as amended (the "Gaming Act") with the Pennsylvania Gaming Control Board as the responsible regulatory entity.

6.     Defendant Pace-O-Matic, Inc. ("Pace-O-Matic") is a Wyoming corporation with a principal place of business at 3450 Corporate Way, Duluth, Georgia  30096.

7.      Pace-O-Matic designs and licenses software and game fills that are indispensable operating components of illegal slot machines misleadingly branded "Pennsylvania Skill" games (the "Illegal Slot Machines").

8.      Pace-O-Matic is registered to do business in Pennsylvania as a foreign corporation.

9.      Pace-O-Matic is not licensed under the Gaming Act, 4 Pa.C.S. § 1101 *et seq*., as amended.

10.      Defendant POM of Pennsylvania, LLC ("POM") is a Wyoming corporation with a principal place of business at 3870 Peachtree Industrial Blvd, Suite 340-194, Duluth, GA 30096.

11.      POM is an affiliate of Pace-O-Matic that works with Pace-O-Matic and Miele as further alleged below to market, sell, maintain and ultimately collect net gaming revenue generated from the Illegal Slot Machines.

12.      POM is registered to do business in Pennsylvania as a foreign corporation.

13.      POM is not licensed under the Gaming Act, 4 Pa.C.S. § 1101 *et seq*., as amended.

14.      Defendant Miele Manufacturing, Inc. ("Miele") is a Pennsylvania corporation whose principal place of business is located at 535 E. Third Street, Williamsport, PA 17701.

15.      Miele manufactures electronic machines, including the Illegal Slot Machines made to Pace-O-Matic's specifications. Together with POM and Pace-O-Matic, Miele manufactures, sells, distributes and maintains the Illegal Slot Machines for use by the public.

16.      Miele is not licensed under the Gaming Act, 4 Pa.C.S. § 1101 *et seq*., as amended.

17.      Miele's Amusements division, which is an amusement operator, operates Illegal Slot Machines  in Pennsylvania.

**JURISDICTION AND VENUE**

18.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §

1331 and 15 U.S.C. § 15(a) in that Parx Casino is asserting claims arising under the Racketeer Influenced and Corrupt Organizations Act 18, U.S.C. § 1962 and the Lanham Act, 15 U.S.C. § 1125(a)(1). This Court has supplemental jurisdiction over Parx Casino's state law claims, pursuant to 28 U.S. § 1367.

19.    Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(a) because a substantial part of the events giving rise to the claim occurred in this judicial district.

## FACTS

**A.    DEFENDANTS' SCHEME TO MANUFACTURE AND OPERATE ILLEGAL SLOT MACHINES IN PENNSYLVANIA FOR PROFIT**

### 1.    Pace-O-Matic, POM and Miele Manufacture, Sell and Distribute Illegal Slot Machines

20.    Pace-O-Matic is in the business of developing, producing and licensing gaming-related products for use by members of the public who play slot machines. Pace-O-Matic designs and licenses software and game fills for the Illegal Slot Machines.

21.    POM is responsible for licensing the Illegal Slot Machine software, game fills and trademarks.

22.    Miele is a manufacturing company that specializes in manufacturing electronic goods like stand-up game consoles, juke boxes and ATM machines. Relevant here, Miele manufactures a physical cabinet that is made to Pace-O-Matic's specifications for the Illegal Slot Machines.

23.    POM licenses the "Pennsylvania Skill" branded software, game fills, and trademarks to Miele.

24.    Miele then loads the "Pennsylvania Skill" branded software and game fills onto the cabinet, turning the cabinet into an Illegal Slot Machine.

25.     Each Illegal Slot Machine is operated through the insertion of coins or cash and each entices the user with the possibility of a cash payout.

26.     According to one website used to sell Defendants' Illegal Slot Machines, found at www.PennsylvaniaSkills.com, Defendants' products "deliver gaming experiences." That same website states about the machines that Defendants make and sell: "They function very much like a typical slot machine in terms of a Pennsylvania skill game. For instance, to start playing these games, you would insert cash into the terminal and then spin the reels in the hopes of landing on some paylines with matching symbols. If you succeed once, you will very likely keep playing again and again."

[INTENTIONALLY LEFT BLANK]

27.     The Illegal Slot Machines look like what they are: slot machines. This is an image of one of the machines:



28.     Each Illegal Slot Machine offers several titles such as Amigos Locos, Lucky Liberty, Pirates, Bombs and Bombshells, and Wild Beasts. However, on information and belief, the games, the rules, and the payouts are substantially the same.

29.     Each Illegal Slot Machine utilizes random number generators, digital reels, and video displays, upon information and belief.

30.     Each Illegal Slot Machine offers free games and cash payouts.

31.     While Defendants and the criminal enterprise  mislead the public by suggesting that the products depend upon skill rather than luck to win prizes, that is irrelevant under the Crimes

Code and Gaming Act. The Crimes Code at Section 5513(a) makes it a crime in Pennsylvania to make, assemble, set up, maintain, sell, lease or offer for sale any unregulated slot machine or device whose purpose is gambling. That is a purpose of Defendants' machines, as stated on the website cited above touting the "gaming experience" consumers have when they put their money in the machines and hope for a payout greater than what they spent to play.

32.     Pace-O-Matic, POM, and Miele deceptively market the Illegal Slot Machines as "legal" and as "skill games" when they are not legal and the outcomes are not predominantly determined by skill.

### 2. Pace-O-Matic, POM and Miele Oversee and Manage an Association-in-Fact for the Manufacture, Marketing, Distribution and Use of Illegal Slot Machines

33.     Pace-O-Matic, POM and Miele have constructed an association-in-fact of themselves and others for the purpose of building, marketing, distributing and using Illegal Slot Machines. Each participant in this highly structured enterprise has a specific role to play.

34.     The Defendants' individual roles in the manufacture of the Illegal Slot Machines is described above.

35.     After the Illegal Slot Machines are built, Miele sells the machines to operators who enter into Operator Agreements with POM and Miele. The signatories to these contracts are known as the "Operators." The gaming software is licensed to Miele from Pace-O-Matic and then sublicensed by Miele to the Operators.

36.     Simultaneous with the sale of the Illegal Slot Machines, POM licenses the "Pennsylvania Skill" trademarks and trade name to the Operators. The Operator Agreements allow POM and Miele to maintain control over and to manage the Operators.

37.     After the Operators purchase the Illegal Slot Machines from Miele, subject to oversight by the Defendants, the Operators then place them in clubs and businesses, including bars,

restaurants, convenience stores and gas stations (the "Location Businesses") throughout Pennsylvania.

38.     At the Location Businesses, the Illegal Slot Machines are used by patrons to gamble.

39.     Pace-O-Matic and Miele have control over the relationship between the Operators and the Location Businesses. Though the Operators enter into an Approved Location Agreement with the Location Businesses, POM and Miele require that they be named explicitly as third-party beneficiaries to the Approved Location Agreements.

40.     POM and Miele approve all Location Businesses before the Illegal Slot Machines are placed.

41.     POM and Miele have the authority to limit the number of Illegal Slot Machines that can be placed at any Location Business.

42.     All advertising and promotion of the Illegal Slot Machines performed by the Operators or the Location Businesses must be approved by POM.

43.     The Operators are obligated to participate in promotional events as directed by Miele.

44.     The Operators are obliged to provide training to Location Businesses on the operation of the Illegal Slot Machines.

45.     The Operators also purchase fills for the Illegal Slot Machines that have been placed at Location Businesses. When a batch of games have all been played, Pace-O-Matic and POM supply the Operator a new batch (or fills) for loading on the slot machine.

46.     The Operator is also responsible for maintaining, servicing and cleaning the Illegal Slot Machines placed at any Location Business.

47.     The Operators are prohibited from engaging in any activity relating to any other equipment that is deemed to be equipment that is competitive to the Illegal Slot Machines.

48.     POM is also obligated to defend the Operators and Location Businesses in any legal or administrative challenge to the legality of the Illegal Slot Machines.

49.     In these ways, Defendants Pace-O-Matic, POM and Miele act as the "crime boss," retaining and exercising control and management authority over the entire criminal enterprise, including over each of the Operators and Location Businesses.

### 3.  Pace-O-Matic, POM and Miele, along with the Operators and Business Locations, Reap the Financial Rewards of Operating the Illegal Gambling Devices

50.     Like other racketeers, Defendants share in the proceeds of the enterprise's criminal conduct. Thus, once the Illegal Slot Machines are placed in Location Businesses, and patrons at the Location Businesses gamble, the Operator collects the revenue from the Location Businesses at least every two weeks. 40% of the collected revenue is paid to the Location Business and the remaining 60% of revenues are kicked back to the Operator and POM.

51.     On information and belief, POM delivers a share of the revenues kicked back by the Location Businesses to Pace-O-Matic.

52.     Miele's Amusements division operates the Illegal Slot Machines  and thus collects a portion of the revenue as an Operator.

53.     This entire process of designing, manufacturing, distributing, promoting and profiting from the Illegal Slot Machines in Pennsylvania is referred to herein as the "Illegal Slots Scheme."

54.     None of Pace-O-Matic, POM or Miele are licensed to sell or distribute slot machines for use in Pennsylvania.

55.     On information and belief, none of the Operators or Location Businesses are licensed under the Gaming Act, 4 Pa.C.S. § 1101 *et seq*., as amended.

56.     As unlicensed and unregulated slot machines, the  Illegal Slot Machines operate outside the regulatory framework and tax scheme implemented for regulated and legal slot machines.

57.     The Illegal Slot Machines have generated millions or even hundreds of millions of dollars of revenue annually for years – without payment of slot machine taxes under the Gaming Act.

## B.   THE ILLEGAL SLOT MACHINES ARE ILLEGAL GAMBLING DEVICES

58.     To be very clear, Illegal Slot Machines are illegal gambling devices.

59.     Section 5513(a) of the Pennsylvania Crimes Code makes it illegal to intentionally or knowingly make, assemble, set up, maintain, sell, lend or lease "any … slot machine or any device to be used for gambling purposes" except as permitted under the Gaming Act, the State Lottery Law, Bingo Law, or the Local Option Small Games of Chance Act.  18 Pa. C.S. § 5513(a) and (e.1).

60.     Because Section 5513(a) of the Crimes Code and the Gaming Act each relate to the same things or to the same class of things, *i.e.*, slot machines or any devices to be used for gambling purposes, the Pennsylvania Rules of Construction require that they "shall be construed together, if possible, as one statute." 1 Pa.C.S. §1932; *see also* 1 Pa.C.S. §1921(c)(5); *PHD v. RRD*, 56 A.3d 702, 706 (Pa.Super. 2012); *PPL Holtwood, LLC v. Pike County Board of Assessment & Revision of Taxes*, 846 A.2d 201, 207 (Pa.Cmwlth. 2004).

61.    Section 1103 of the Gaming Act as amended defines "slot machines," "skill slot machines," and "hybrid slot machines," regardless of the extent to which skill or chance determines the outcome.

62.    Section 1103 of the Gaming Act provides that the term **"Slot Machine"** includes:

> (i) Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, including the use of any electronic payment system except a credit card or debit card, is available to play or operate, the play or operation of which, <u>whether by reason of skill or application of the element of chance or both</u>:
>> (A)    May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, whether the payoff is made automatically from the machine or manually.
>> (B)    May utilize spinning reels or video displays or both.
>> (C)    May or may not dispense coins, tickets or tokens to winning patrons.
>> (D)    May use an electronic credit system for receiving wagers and making payouts.
>
> (ii) Associated equipment necessary to conduct the operation of the contrivance, terminal, machine or other device.  4 Pa.C.S. §1103.  (Emphasis supplied.)

63.    In 2017, the Commonwealth enlarged the definition of "slot machine" to include "skill slot machine" and "hybrid slot machine."  4 Pa.C.S. §1103, "Slot Machine," (1)(a)(iii), as enacted by 2017, October 30, P.L. 419, No. 42, §3, effective immediately.  In a skill slot machine, the outcomes are predominantly affected by skill.  In a hybrid slot machine, the outcomes are affected by a combination of skill and chance.

64.    As far as slot machines are concerned, the Gaming Act abolished any distinction between games of skill and games of chance.

65.    The Gaming Act repealed Section 5513 of the Crimes Code but only in so far as it is inconsistent with the Gaming Act.  4 Pa.C.S. §1903(a)(2), as enacted by 2004, July 5, P.L. 572, No. 71, §1, effective immediately. Thus, all slot machines – whether purely games of chance,

games of skill or some hybrid – remain illegal in Pennsylvania except as specifically allowed and regulated by the Gaming Act.

66.     The Illegal Slot Machines at issue here, which are not licensed under the Gaming Act, are thus illegal under the Crimes Code. 18 Pa.C.S. §5513(a)(1) and §5513(e.1)(4).

67.     In addition, the Illegal Slot Machines are illegal gambling devices under 18 Pa.C.S. § 5513, because consideration is required to play, there is a reward for successful play, and the results of play are not predominantly determined by skill.  On information and belief, the machines employ random number generators, the outcomes are not predominantly determined by skill, and the gaming experience offered by the Illegal Slot Machines is essentially the same as the gaming experience offered by licensed slot machines.

68.     Because the Illegal Slot Machines are illegal gambling devices under 18 Pa.C.S. § 5513, anyone who "makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift" any such machine commits in each instances a crime punishable by up to five years in prison. Yet Defendants have established, maintain and control a criminal enterprise whose purpose, intent and effect is to break this and other criminal statutes, repeatedly and on an ongoing basis, in order to enrich themselves, deprive the Commonwealth and local jurisdictions of revenue, and undermine the lawful, regulated conduct of gaming in Pennsylvania.

C.     **UNLIKE DEFENDANTS, PARX CASINO PARTICIPATES IN LEGAL, REGULATED GAMING IN PENNSYLVANIA**

69.     As previously noted, in 2004, the General Assembly authorized the conduct of slot machine gaming in Pennsylvania, by enacting the original Gaming Act, 4 Pa.C.S. §§ 1101-1904.

70.     Parx Casino is a licensee under the Gaming Act and is among the Pennsylvania licensed casinos that have expended hundreds of millions of dollars to conduct lawful slot operations in the Commonwealth since that time.

13

71.     Those operations have generated billions of dollars for the Commonwealth of Pennsylvania and its citizens, in the form of licensing fees, tax revenue, local share funding and fees, and other financial benefits.

72.     By complying with the law, Parx Casino and Pennsylvania's other licensed casinos have been of great financial benefit to the Commonwealth and its citizens.

73.     Pennsylvania receives more tax revenue from gaming than any other jurisdiction in the United States, taking approximately 54 cents of every dollar wagered in the slot machines of each licensed casino.

74.     In Fiscal Years 2015-2021, Pennsylvania's licensed casinos, including Parx Casino, generated slot machine tax revenue for the Commonwealth in approximately the following amounts:

> 2015-2016, $1.180 billion
>
> 2016-2017, $1.151 billion
>
> 2017-2018, $1.169 billion
>
> 2018-2019, $1.190 billion
>
> 2019-2020, $841 million
>
> 2020-2021, $931 million
>
> 2021-2022, $1.153 billion

75.     In Fiscal Years 2015-2021, slot operations by Pennsylvania's licensed casinos, including Parx Casino, contributed approximately the following amounts in local share funding and fees that were distributed to host counties and municipalities:

> 2015-2016, $95.5 million
>
> 2016-2017, $85.2 million

2017-2018, $23.3 million

2018-2019, $46.4 million

2019-2020, $33.5 million

2020-2021, $37.3 million

2021-2022, $67.2 million

76.    Pennsylvania's licensed casinos, including Parx Casino, spend approximately $230 million annually with local business entities in their host and contiguous counties.

77.    Pennsylvania's licensed casinos, including Parx Casino, employ more than 14,000 employees, the vast majority of whom reside in Pennsylvania.

78.    The success of Pennsylvania's licensed casinos in slot machine gaming was achieved while operating under a highly regulated environment, ensuring the highest integrity in gaming operations, while simultaneously promoting responsible gaming.

**D.    PARX CASINO'S INVESTMENT IN LEGAL GAMING**

79.    The Gaming Act originally established three categories of slot machine licensees — Category 1, 2 and 3 licensees — which have the exclusive right to place and operate licensed slot machines in the Commonwealth.  4 Pa.C.S. § 1301.

80.    The Gaming Act expressly limits the placement and operation of slot machines only to licensed facilities.  *See, e.g*., 4 Pa.C.S. § 1302.

81.    After completing the extensive and costly application process, Parx Casino was awarded a Category 1 slot machine license by the Pennsylvania Gaming Control Board ("PGCB").

82.    Parx Casino paid a $50 million license fee for its Category 1 slot machine license.

83.     In return, Parx Casino was assured that the number of establishments where slot machines could be offered legally would be limited and their locations would be geographically dispersed throughout the Commonwealth.

84.     In 2017, the General Assembly passed Act 42 of 2017.  Act of Oct. 30, 2017, P.L. 419, No. 42 ("Act 42"), 4 Pa.C.S. § 1305.1.

85.     As part of Act 42, the Commonwealth authorized interactive gaming in Pennsylvania, with slot machine licensees having the exclusive right, in the first instance, to offer interactive games. Act 42 also authorized the issuance of Category 4 licenses.

86.     Pursuant to Act 42, slot machine licensees are entitled to apply for an interactive gaming certificate that will enable them to conduct gaming over the Internet, including offering online slot machines, table games and poker. 4 Pa. C.S. §§ 13B11, 13B12.

87.     On August 15, 2018, Parx Casino was awarded an interactive gaming certificate.

88.     Parx Casino paid a $10 million fee for its interactive gaming certificate.

89.     Parx Casino began offering interactive gaming on July 15, 2019 and currently accepts wagers from eligible persons anywhere within the Commonwealth of Pennsylvania.

90.     Parx Casino also secured the right to apply for a Category 4 license at a cost of approximately $8.1 million. A Category 4 license allows the holder to offer slot machines at approved facilities outside its primary location.  As with Category 1 licenses, Category 4 licenses are limited and their locations are geographically dispersed throughout the Commonwealth.

91.     In addition to paying license fees, Parx Casino has invested approximately $500 million in the development and expansion of its casino, including additions to offer dining options, a poker room, and a live entertainment venue.

92.     Legal gaming in Pennsylvania is among the most highly regulated industries in the Commonwealth. Licensed slot machines are overseen by the Pennsylvania Gaming Control Board and are subject to regulations that protect consumers. Among these are regulations that  (1) subject slot machines to rigorous testing through software laboratories at the Board and elsewhere to ensure that they are fair to players; (2)  make certain that a required percentage of wagers is paid to players so that players know that the games are fair as well as the basic cost of playing; (3) impose various complex internal controls and regulatory requirements to ensure proper financial reporting to protect against money laundering; (4) require that the involved entities and their owners and management personnel, as well as manufacturers and suppliers of slot machines, be licensed after thorough investigations, and that all casino employees be licensed; and (5) provide for the collection and resolution of consumer complaints about unfair games.   In addition, the regulations limit gaming to persons over the age of 21 and provide programs for self-exclusion from gaming. All licensees are subject to extensive fines for violations of the regulations.

93.     All of these regulations for licensed slot machines do not protect consumers who play on unlicensed, illegal slot machines, including the Illegal Slot Machines  at issue in this case.

**E.      DEVELOPMENT OF UNLICENSED, UNREGULATED, AND UNTAXED AND ILLEGAL SLOT MACHINES ACROSS THE COMMONWEALTH**

94.     Since 2017, the number of illegal slot machines in bars, restaurants, convenience stores, gas stations, and other unlicensed establishments in Pennsylvania has grown tremendously. This is a direct consequence of the criminal enterprise and Illegal Slot Scheme of the Defendants in this case.

95.     These unlicensed and unregulated illegal slot machines are operating outside of the comprehensive regulatory framework and tax scheme implemented by the Gaming Act as amended.

96.     In October 2019, Major Scott T. Miller, Director of the Pennsylvania State Police Bureau of Liquor Control Enforcement, testified that one manufacturer had placed approximately 10,000 unlicensed slot machines in Pennsylvania and that five manufacturers have marketed unlicensed slot machines in Pennsylvania. (Testimony of Major Miller before the House Gaming Oversight Committee, October 30, 2019.)

97.     Major Scott testified that the annual revenue from 10,000 slot machines would be approximately $260 million.

98.     In earlier testimony, Major Miller identified various problems associated with illegal unlicensed, skill-based slot machines, including:

    a.      The lack of controls to prevent minors from gambling, as contrasted with licensed gaming, which is "strictly controlled and limited to individuals over 21 years of age";

    b.      The proceeds from unlicensed slot machines are typically paid in cash to the owners of the facilities where the machines are located, such that proceeds are not reported to taxing authorities;

    c.      "Skill-based" games are unregulated and, thus, do not have set payout requirements like licensed slot machines; and

    d.      The technology and software for "skill-based" games are constantly changing, making prosecution more difficult.

(Testimony of Major Scott T. Miller before House Gaming Oversight Committee, June 10, 2019.)

99.     To the above-listed problems may be added the lack of background checks on the owners of the establishments where the unlicensed machines are placed and the lack of responsible gaming policies to prevent compulsive and problem gambling.

100.    The Pennsylvania Lottery has complained about competition from unlicensed, skill-based slot machines.

101.    In June 2019, Drew Svitko, the Executive Director of the Pennsylvania Lottery, testified that the Lottery was losing $138 million every year to unlicensed, skill-based slot machines.  (Testimony of Drew Svitko before the House Gaming Oversight Committee, June 10, 2019.)

102.    In 2021, Mr. Svitko testified that the Lottery was losing $145 million annually to unlicensed, skill-based slot machines counting only reduced scratch-off ticket sales.

103.    The Pennsylvania Lottery has reportedly claimed a loss of $500 million in lottery sales between October 2017 and July 2021 due to competition from skill slot machines. Pennsylvania Bar News, Vol. 32, No. 13, July 11, 2022 at p. 8.

104.    Manufacturers and distributors of these illegal unlicensed slot machines, including the participants in the enterprise in this case, have misleadingly branded them as legal "games of skill" or "skill games."


F.      **ECONOMIC IMPACT OF UNLICENSED SLOT MACHINES ON THE LICENSED GAMING MARKET**

105.    Both the number of licensed casinos and the number of licensed slot machines are limited in Pennsylvania.

106.     By contrast, the number of illegal unlicensed slot machines and locations is not subject to any limit.

107.     On information and belief, Pace-O-Matic and POM and other skill slot manufacturers and distributors have placed as many as 80,000 skill slot machines throughout Pennsylvania to date.  Pennsylvania Bar News, Vol. 32, No. 13, July 11, 2022 at p. 3. This is the equivalent of more than three times the number of legal slot machines currently in use at casinos in Pennsylvania.

108.     Unlicensed illegal slot machines compete with licensed casinos (as well as their internet-based games) and inevitably divert business from licensed casinos and interfere with the growth of licensed gaming in Pennsylvania.

109.     At a public meeting on September 15, 2021 before the Gaming Control Board, the Chief Operating Officer of Mount Airy #1 casino testified that physical casinos have experienced a reduction in slot machine revenue in six out of the last eight years.  *Tr. Pa. Gaming Control Bd. Pub. Mtg. of Sept. 15, 2021,* p. 24, lines 9-12.  He testified "there's no question in my mind that [the proliferation of unregulated skill slot machines] has had a material impact on land-based casino revenue [and] slot revenue throughout the Commonwealth over the past several years."  *Tr. Pa. Gaming Control Bd. Pub. Mtg. of Sept. 15, 2021,* p. 24, lines 16-19.  He further testified that the proliferation of unregulated skill slot machines "certainly contributed" to Mount Airy's request to remove 130, or 7.15%, of its slot machines from the gaming floor.  *Tr. Pa. Gaming Control Bd. Pub. Mtg. of Sept. 15, 2021,* p., 25, lines 3-6; *Petition of Mount Airy #1 LLC to Reduce the Number of Slot Machines and Gaming Floor* (Docket No. 9911-2021).

110.     At the Gaming Control Board's November 10, 2021 public meeting, the General Manager of Hollywood Meadows Casino testified that "I think we've seen that the proliferation of

[unregulated skill slot machine] gaming and the additional devices out there certainly are cannibalizing the market." *Tr. Pa. Gaming Control Bd. Pub. Mtg. of Nov. 10, 2021, OHA 10002-2021,* p., 12, line 18 to p. 13, line 2.

111.    Later during the same November 10, 2021 Public Meeting, counsel for Hollywood Penn National casino agreed that the proliferation of unregulated skill machines was impacting Hollywood's slot business: "[L]ogically, it should come as no surprise, if slot machine patrons can play at the local bar, tavern or convenience store and avoid a trip to the casino, they will." *Tr. Pa. Gaming Control Bd. Pub. Mtg. of Nov. 10, 2021, OHA 10003-2021,* p. 14, lines 23-25 and p. 17, lines 6-9.

112.    The number of licensed slot machines at Category 1 and 2 casinos has reportedly been reduced by approximately 24% from the maximum that once was offered.  Pennsylvania Bar News, Vol. 32, No. 13, July 11, 2022 at p. 8.

113.    On information and belief, if unlicensed illegal slot machine operations were halted in Pennsylvania, the revenue currently generated from unlicensed machines would be in whole or part realized by licensed, tax-paying slot machine operators, including Parx Casino. Moreover, these operations would be subject to lawful oversight and taxed for the benefit of the Commonwealth and host counties and municipalities, as the General Assembly intended.

G.    **DEFENDANTS' UNLAWFUL CONDUCT**

114.    Pace-O-Matic, POM, and Miele, themselves and through their criminal enterprise, have repeatedly violated Section 5513 of the Crimes Code, and they continue to do so, by intentionally and knowingly making, assembling, setting up, selling, leasing and promoting the Illegal Slot Machines to Operators and contracting with Operators to place these slot machines at unlicensed locations. These violations have occurred tens of thousands of times, occurring with

each Illegal Slot Machine that they assemble, distribute, sell and operate – conduct that is continuing and expanding every day.

115.    Likewise, the Operators whom Defendants oversee and manage through the criminal enterprise have and do further violate Section 5513 of the Crimes Code by intentionally and knowingly selling, leasing or loaning, maintaining and promoting Illegal Slot Machines that are placed at unlicensed locations. These violations have occurred tens of thousands of time as well, with each Illegal Slot Machine.

116.    Over the course of several years and including at present, multiple locations within a short distance of Parx Casino are Location Businesses offering  Illegal Slot Machines in direct competition to legal slot machines at Parx Casino.

117.    Additionally, the Location Businesses, through the criminal enterprise Defendants manage and control, continually violate Section 5513 of the Crimes Code by promoting the Illegal Slot Machines, allowing people to collect and assemble for the purpose of unlawful gambling, soliciting or inviting people to visit any unlawful gambling place for the purpose of gambling, and/or being the owner, tenant, lessee or occupant of any premises to be used for the purpose of unlawful gambling.

118.    The violations of Section 5513 of the Crimes Code by Defendants and the criminal enterprise have been occurring for more than five years and are continuing today.

119.    At the same time, Defendants and the criminal enterprise have been committing thousands of violations of Title 18, United States Code, Section 1955, which prohibits gambling offenses.

120.    Pace-O-Matic, POM, Miele and the participants of the criminal enterprise further engage in a scheme to defraud the Commonwealth and consumers by fraudulently misrepresenting

22

the nature of their Illegal Slot Machines, falsely branding them as lawful games of skill or "skill games," including on their websites and in their promotional materials.

121.    For example, Pace-O-Matic, POM, and Miele falsely represent that their Illegal Slot Machines are legal.  On their website, Pace-O-Matic and POM state, "We lead the industry with compliant, dominant skill-based games that are exciting to play." The website further states:

> POM develops the best earning games that are both legal and defendable.  We're committed to building up the communities where we do business.  Our games create a unique opportunity to boost business and draw in loyal customers.

> Pace-O-Matic develops, produces and licenses legally compliant games in every state where we operate.

www.paceomatic.com (visited on November 15, 2021).

122.    On its website, Miele states: "Pennsylvania Skill Games are 100% legal."  The website further states, "Legal games of skill, such as Pennsylvania Skill, and gambling are not the same."  www.mielemfg.com/pages/faq (visited on September 21, 2022).

123.    However, the Illegal Slot Machines at issue and referred to by Pace-O-Matic, POM and Miele in these published statements  are not "legal." Neither are the Illegal Slot Machines "skill games" because the outcomes are not predominantly determined by skill, but rather by chance.

124.    By publishing these false statements to the public and to the Commonwealth through the internet, Pace-O-Matic, POM and Miele, advance the fraud scheme they established the criminal enterprise to commit by use of the wires, in violation of 18 U.S.C. § 1343.

125.    Additionally, Pace-O-Matic, POM and Miele further engage in money laundering funds by entering into numerous financial transactions in an amount greater than $10,000 using criminally derived funds, *i.e.*, monies derived from the manufacture, assembly, distribution, sale, set up, maintenance and operation of Illegal Slot Machines, all in violation of 18 U.S.C. § 1957.

126.    Pace-O-Matic, POM and Miele also engage in money laundering by using the funds gained from illegal gambling activity to continue those illegal activities and knowing that the Illegal Slot Scheme was designed to avoid Pennsylvania reporting requirements and paying required taxes, including those established in 4 Pa. C.S. § 1403, in violation of 18 U.S.C. § 1956(a).

127.    Pace-O-Matic, POM and Miele also falsely represent the nature of their income, including by failing to remit taxes required by 4 Pa. C.S. § 1403, and use the U.S. mails to file those false tax returns, further advancing the fraud scheme they established the criminal enterprise to commit, in violation of 18 U.S.C. § 1341.

## H.    DEFENDANTS AND PARTICIPANTS IN THE CRIMINAL ENTERPRISE ENGAGE IN OTHER, LAWFUL CONDUCT

128.    Pace-O-Matic, POM and Miele coordinated the commission of the predicate offenses alleged herein. Moreover, each of Pace-O-Matic, POM and Miele, as well as other participants in the criminal enterprise, provided legitimate services in addition to the unlawful conduct alleged above.

129.    Pace-O-Matic develops software for other games that are placed into states other than Pennsylvania and that do not, accordingly, constitute violations of the Gaming Act or the Crimes Code. Pace-O-Matic also develops and licenses software that is used by customers to manage the financial aspects of their business. Specifically, Pace-O-Matic licenses software to operators to manage and track the gaming machines they have placed along with accounting, serving, collection, fill and repair information. Pace-O-Matic also develops different software that is used by Business Locations to manage their ATM machines.

130.    Miele advertises the other Pace-O-Matic software on its own website, and manufactures other electronic goods like jukeboxes and ATM machines.

131.     On information and belief, the Operators assist Pace-O-Matic and Miele with these other services that are used by Location Businesses.

132.     Thus, the activities of the Defendants and the other participants is not limited to the criminal conduct that is the subject of this complaint, though the criminal enterprise was designed and is implemented to do so.

### COUNT I – RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO"), 18 U.S.C. § 1962(c) (Against Pace-O-Matic, POM and Miele)

133.     Parx Casino incorporates by reference the paragraphs above as if set forth fully herein.

### Defendants are RICO Persons Whose Misconduct Supports RICO Liability

134.     Defendants Pace-O-Matic, POM and Miele are each capable of holding a legal or beneficial interest in property, and therefore each is a person within the meaning of 18 U.S.C. § 1961(3).

135.     As further alleged above, the Defendants have created, manage and control the Illegal Slots Enterprise, as defined and described further below. This includes:

a.     Pace-O-Matic's design and licensing of software for the Illegal Slot Machines;

b.     POM's licensure of the software, game fills and trademarks for the Illegal Slot Machines, including to Miele and the Operators, and POM approval of all locations, the numbers of Illegal Slot Machines placed and all advertising and promotion of the Illegal Slot Machines;

c.     Miele's manufacture of the Illegal Slot Machines, including building the cabinets, loading the software and creating the physical machine. Miele further participates with POM in the approval of locations, the number of Illegal Slot Machines placed and all advertising

and promotion of the Illegal Slot Machines. Miele also sells the Illegal Slot Machines to Operators, who bind themselves to the management and control of POM.

136. In addition, Defendants each participate in the creation and maintenance of websites that falsely advertise the Illegal Slot Machines as lawful games of skill, as specified above.

137. Furthermore, each of the Defendants engage in financial transactions with the proceeds from the Illegal Slot Machines.

138. Each of the Defendants further uses the U.S. Mail or wires to transmit false and fraudulent tax returns that fail to pay gaming taxes that they each, and collectively, have sought to and do evade through the Illegal Slots Scheme.

139. These actions are the basis for RICO liability against each of the Defendants.

### The Illegal Slots Enterprise's Predicate Acts of Racketeering Activity

140. A RICO predicate act occurs every time a subject Illegal Slot Machine is made, assembled, sold, leased, maintained, promoted or placed by an Operator at a Location Business. Likewise, a predicate act occurs each time any Illegal Slots Enterprise participant files a tax return that disguises the source of its revenue in order to evade slot machine taxes, fraudulently holds the machines out as lawful games of skill, or transacts business using any proceeds derived from any Illegal Slot Machine. The Illegal Slots Enterprise has placed tens of thousands of these illegal machines in the Commonwealth and continues to promote and sell them on an ongoing basis. The Illegal Slots Enterprise is thus a paradigm of a criminal enterprise whose alleged conduct is based upon a pattern of interrelated predicate crimes.

141. Specifically, through the Illegal Slots Enterprise, and over a period of time in excess of five years, Pace-O-Matic, POM, Miele and the other participants in the Illegal Slots Enterprise

conducted, engaged in, and participated in a pattern of racketeering activity, consisting, at a minimum, of the following predicate acts:

a.      Defendants and the Illegal Slots Enterprise have manufactured, sold, distributed and maintained and operated tens of thousands of Illegal Slot Machines throughout the Commonwealth and continue to do so every day. In doing so, with every illegal machine, the Defendants and the Illegal Slots Enterprise commit acts in violation of Section 5513 of the Pennsylvania Crimes Code, which makes it illegal to (1) intentionally or knowingly make, assemble, set up, maintain, sell, lend or lease "any … slot machine" except as otherwise permitted; (2) allow persons to collect and assemble for the purpose of unlawful gambling at any place under his control; (3) solicit or invite any person to visit any unlawful gambling place for the purpose of gambling at any place under his control; and (4) being the owner, tenant, lessee or occupant of any premises, knowingly used for the purpose of unlawful gambling;

b.      By their manufacture, sale, distribution, and operation of each of tens of thousands of Illegal Slot Machines in the Commonwealth, the Defendants and the Illegal Slots Enterprise have further committed thousands of violations of Title 18, United States Code, Section 1955 (prohibition of illegal gambling business) which makes any gambling offense under state law a federal offense so long as the business involves at least five persons and it has been in continuous operation for more than 30 days or has a daily gross revenue of $2,000;

c.      By their publication of false and fraudulent statements about the Illegal Slot Machines, including falsely stating on the internet by use of interstate wires that the Illegal Slot Machines are lawful, the Defendants have committed multiple violations of Title 18, United States Code, Section 1343. This includes on the specified websites above on November 15, 2021, and September 21, 2022;

d.      By their receipt and transfer of proceeds from the sale and use of tens of thousands of Illegal Slot Machines, Defendants and the Illegal Slots Enterprise have engaged in tens of thousands of financial transactions in criminally derived funds, *i.e.*, moneys derived from the manufacture, assembly, distribution, sale, set up, maintenance and operation of Illegal Slot Machines with the intent to promote the continuation of the illegal gambling activity and knowing that the transactions were designed to avoid reporting and paying required taxes all in violation of Title 18, United States Code, Section 1956(a) (relating to the laundering of monetary instruments);

e.      By their transfers and expenditure of proceeds from the sale and use of tens of thousands of Illegal Slot Machines, Defendants and the Illegal Slots Enterprise have engaged in tens of thousands of financial transactions in criminally derived funds, *i.e.*, monies derived from the manufacture, assembly, distribution, sale, set up, maintenance and operation of Illegal Slot Machines all in violation of Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity);

f.      Defendants and the members of the Illegal Slots Enterprise have further annually for at least the past five years violated Title 18, United States Code, Sections 1341 or 1343 by the filing of false tax returns through the U.S. mail or wires, which returns unlawfully disguised and concealed the proceeds of the Illegal Slot Scheme as proceeds that were not subject to additional taxation; and

g.      By their use of the telephones between their offices in Georgia and Pennsylvania, as well as by calls to Operators and Location Businesses, by electronic transfers of funds between Georgia and Pennsylvania, and through the mailing of checks, Defendants have violated Title 18, United States Code, Section 1341 and 1343 on numerous occasions throughout

the past five years and more, using the interstate mails and wire communications to run the Illegal Slots Enterprise.

### **The Predicate Acts Relate as Part of a Pattern of Racketeering Activity**

142.    Pace-O-Matic, POM and Miele, in fact each acted, individually and in association with others, knowingly and repeatedly, to commit the above criminal predicate acts in furtherance of and for the purpose of enriching themselves and to otherwise further the ends of the Illegal Slots Enterprise.

143.    The predicate acts described above were related to one another and were conducted to establish and continue the common plan to operate gambling devices illegally, allowing Pace-O-Matic, POM and Miele to reap financial benefits. The purpose of that plan is to make and sell Illegal Slot Machines, place and operate those machines at Location Businesses, and defraud the people of the Commonwealth into illegal gambling activities while evading payment of taxes and undermining the lawful, regulated gaming industry.

144.    The predicate acts described above were not isolated events. Thousands of such predicate acts occurred in the past ten years. Indeed, thousands of these acts are committed every day.The above-alleged predicate acts were carried out repeatedly and continuously from at least the year 2017. These acts are ongoing.

145.    The Illegal Slots Enterprise poses a threat of continuing racketeering activity, in that the crimes described herein are the regular way of doing business of the enterprise and have extended already for years, injuring many victims, including Parx Casino and other regulated and licensed slot machine operators, as well as the Commonwealth of Pennsylvania, host counties and municipalities, and individual consumers who have been misled to believe they are paying their

hard-earned money into a legal skill game and not, as is the case, into an Illegal Slot Machine. Absent intervention by the Court in this case, the Illegal Slots Enterprise will continue indefinitely.

## **The Illegal Slots Enterprise**

146.    At all relevant times, Pace-O-Matic, POM, Miele, the Operators and the Location Businesses were associated in fact, and constituted an "enterprise" as that term is defined in Title 18, United States Code, Section 1961(4), which enterprise was engaged in, and the activities of which affected, interstate commerce.

147.    The Illegal Slots Enterprise is an ongoing organization, including as established by agreements between Pace-O-Matic, POM and Miele with the Operators and then the Operators with the Location Businesses.

148.    The Illegal Slots Enterprise has a structure and each of the participants have specified roles in it. As further alleged above:

a.    Pace-O-Matic designs and sells software for the Illegal Slot Machines;

b.    POM licenses the software, game fills and trademarks for the Illegal Slot Machines, including to Miele and the Operators, and POM approves all locations, the numbers of Illegal Slot Machines placed and all advertising and promotion of the Illegal Slot Machines;

c.    Miele manufactures the Illegal Slot Machines; participates with POM in the approval of locations, the number of Illegal Slot Machines placed and all advertising and promotion of the Illegal Slot Machines; and sells the Illegal Slot Machines to Operators, who bind themselves to the management and control of POM;

d.    The Operators buy the Illegal Slot Machines from Miele and then agree with Location Businesses throughout Pennsylvania to place the machines for use by the public to gamble, subject to the oversight and control of POM and Miele through Approved Location

Agreements to which POM and Miele are named as beneficiaries; the Operators further set up and maintain the Illegal Slot Machines;

        f.      The Location Businesses further maintain the Illegal Slot Machines, promoting them and making them available for the public to use for gambling purposes and share in the illegal revenues earned by the Illegal Slot Machines.

        g.      Pace-O-Matic, POM, Miele, the Operators and the Location Businesses all share in the profits made by the Illegal Slot Machines.

149.    In this way, the members of the Illegal Slots Enterprise function as a continuing unit for the purpose of manufacturing, distributing, selling and offering to the public Illegal Slot Machines to enrich themselves, evade taxes and regulations, while undermining the lawful and regulated gaming industry in Pennsylvania. In the process, they defraud the machine-using public by fraudulently promoting the illegal machines as games of skill rather than chance and with claims that their activity is "legal."

**<u>The Illegal Slots Enterprise is Distinct from Its Members</u>**

150.    The Illegal Slots Enterprise is separate and distinct from Pace-O-Matic, POM and Miele and from each of the individual members of the Illegal Slots Enterprise.

151.    The members of the Illegal Slots Enterprise each act as part of and to further the enterprise outside the normal scope of their business, which businesses also involve legal purposes, including: designing and selling licensing software for other games of skill and other software related to gaming, manufacturing other electronic goods and operating clubs and other businesses including bars, restaurants, gas stations and convenience stores.

152.    Pace-O-Matic, POM and Miele coordinated the commission of the predicate offenses alleged herein by directing, overseeing and managing the conduct of the Operators and

Location Businesses with regard to the Illegal Slots Scheme. This is in addition to the legitimate business activities of each of Pace-O-Matic, POM and Miele, which legitimate business activities are fostered but which are separate and distinct from the crimes committed by the Illegal Slots Enterprise, as alleged herein.

153.    Through Pace-O-Matic, POM and Miele, the Illegal Slots Enterprise provides a coordination function above and beyond that necessary to carry out any single one of the racketeering activities alleged to have been conducted by any of the Defendants or the other members of the enterprise.

### The Illegal Slots Enterprise Impacts Interstate Commerce

154.    The Illegal Slots Enterprise conducts itself and engages in racketeering activity, in part, using the interstate mails and wire communications, including by use of the telephones, by electronic transfers of funds, and through the mailing of checks. Moreover, while the criminal enterprise's activity that is the subject of this lawsuit occurred in Pennsylvania, the game designs and operating software are sourced from and licensed by Pace-O-Matic in Georgia. The trademarks are licensed from Pace-O-Matic in Georgia. Furthermore, on information and belief, various components of the slot machines, including electronics, are sourced from outside Pennsylvania.

155.    The Illegal Slots Enterprise further is intended to and does directly impact the casino industry along with bars, restaurants, and convenience stores all of which engage in interstate commerce.

156.    The Illegal Slots Enterprise directly competes with the casino industry in Pennsylvania, including Parx Casino, which offers legal slot machines, by offering the public alternative locations throughout the Commonwealth to engage in gaming, albeit on Illegal Slot Machines.

**The Illegal Slots Enterprise has Proximately Caused Injury to Parx Casino**

157.    As a direct and proximate cause of the above-described racketeering activities and violations of 18 U.S.C. § 1962(c), the Plaintiff has been injured in their business and property as Parx Casino has lost profits, lost market share and lost customers. This loss is shown by the fact that Parx Casino's licensed slot machine business has stagnated relative to other states, relative to industry forecasts, and relative to Parx Casino's internal forecasts. The loss of market share and customers Parx Casino has suffered and will continue to suffer is permanent irreparable harm. The risk and harm to Parx Casino is ongoing and cannot be remedied by monetary damages alone.

158.    By unlawfully competing with Parx Casino through Illegal Slot Machines, the Illegal Slots Enterprise diverts millions of dollars every year from Parx Casino. For context, as alleged above, 10,000 Illegal Slot Machines can generate as much as $260 million every year. The Illegal Slots Enterprise has manufactured, distributed, sold and operates multiple tens of thousands of these machines and has done so for at least the past five years. This conduct has proximately caused Parx Casino losses far in excess of $150,000.

159.    These injuries were a foreseeable consequence of Pace-O-Matic, POM, and Miele's racketeering activities and violations of 18 U.S.C. § 1962(c).

WHEREFORE, Parx Casino respectfully requests that this Court enjoin the Defendants from Pace-O-Matic and Miele from making, selling, leasing, and promoting the Illegal Slot Machines and award all damages to Parx Casino proven pursuant to RICO, trebled as permitted by law, including punitive damages, attorney fees and costs as permitted by law, and order such other relief as the Court may deem appropriate.

**COUNT II – FEDERAL FALSE ADVERTISING (Lanham Act)**

160.    Parx Casino incorporates by reference the paragraphs above as if set forth fully

herein.

161.    The false advertising provisions of the Lanham Act provide a private right of action.

Section 1125(a)(1) of Title 15 of the United States Code states in pertinent part:

> **(a) Civil action**
> **(1)** Any person who, on or in connection with any goods or services, or any
> container for goods, uses in commerce any word, term, name, symbol, or device,
> or any combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which—
>> **(A)** is likely to cause confusion, or to cause mistake, or to deceive as to the
>> affiliation, connection, or association of such person with another person,
>> or as to the origin, sponsorship, or approval of his or her goods, services, or
>> commercial activities by another person, or
>> **(B)** in commercial advertising or promotion, misrepresents the nature,
>> characteristics, qualities, or geographic origin of his or her or
>> another person's goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.
>
> (Emphasis supplied.)

162.    As explained in *National Artists Management Co., Inc. v. Weaving*, 769 F. Supp.

1224, 1230 (SDNY 1991):

> To establish an unfair competition claim under Section 43(a)(2), plaintiffs in this
> action must demonstrate the following: (1) that defendants made false or misleading
> factual representations of the nature, characteristics, or qualities of plaintiffs'
> services; (2) that defendants used the false or misleading representations "in
> commerce", on or in connection with any services; (3) that defendants made the
> false or misleading representations in the context of commercial advertising or
> commercial promotion; and (4) that defendants' actions made plaintiffs believe that
> they were likely to be damaged by such false or misleading factual representations.

163.    On their website, Pace-O-Matic and POM state "We lead the industry with

compliant, dominant skill-based games that are exciting to play."  The website further states:

> POM develops the best earning games that are both legal and defendable.  We're committed to building up the communities where we do business.  Our games create a unique opportunity to boost business and draw in loyal customers.
> Pace-O-Matic develops, produces and licenses legally compliant games in every state where we operate.

From the website at www.paceomatic.com (visited on November 15, 2021).

164.    According to its website, Miele operates skill games in Pennsylvania, Virginia, and Kentucky.  Miele's website contains the following statements: "Pennsylvania Skill Games are 100% legal;" and "Legal games of skill, such as Pennsylvania Skill, and gambling are not the same."  From the website at www.mielemfg.com/pages/faq (visited on September 21, 2022).

165.    The foregoing statements of Pace-O-Matic, POM, and Miele constitute commercial advertising or promotion "in commerce."

166.    The foregoing statements misrepresent the nature, characteristics and qualities of the Illegal Slot Machines.

167.    The Illegal Slot Machines are not legally compliant because they are not licensed under the Gaming Act and constitute illegal gambling devices pursuant to Section 5513 of the Crimes Code, as further alleged above.

168.    Furthermore, the Illegal Slot Machines are not properly described as games of skill because (a) the machines employ random number generators; (b) the outcomes of the games are not predominantly determined by skill; and (c) the gaming experience offered by the Illegal Slot Machines is essentially the same as the gaming experience offered by licensed slot machines.

169.    Pace-O-Matic, POM and Miele directly compete with Parx Casino and other casinos in Pennsylvania through the Illegal Slots Scheme by placing Illegal Slot Machines in Business Locations throughout the Commonwealth, including nearby Parx Casino.  POM collects a kick back of money played in every  Illegal Slot Machine, which on information and belief is shared with Pace-O-Matic. Miele acts as an Operator of the Illegal Slot Machines and so profits

directly from the use of the Illegal Slot Machines by customers who would otherwise go to a licensed casino, like Parx Casino, for the same slot machine experience.

170.    Pace-O-Matic, POM and Miele's misrepresentations and promotion and placement of Illegal Slots Machines injure Parx Casino's legal slot machine business by taking market share and customers away from the legal and licensed slot machines offered by Parx Casino.

171.    Because unregulated slot machines are illegal in Pennsylvania, players and Location Businesses rely on the representations of Pace-O-Matic, POM and Miele in determining that playing the Illegal Slot Machines in unregulated retail locations is legal and safe when that is not the case.

172.    As a direct and proximate result of Pace-O-Matic, POM and Miele's activities, the growth of Parx Casino's licensed slot machine business has stagnated relative to other states, relative to industry forecasts, and relative to Parx Casino's internal forecasts

173.    Pace-O-Matic, POM and Miele deprive Parx Casino of profits and cause it pecuniary harm in excess of  the mandatory arbitration limits.

174.    As a direct and proximate result of Pace-O-Matic, POM and Miele's wrongful conduct, Parx Casino has suffered and will continue to suffer a great risk of incalculable financial losses, permanent irreparable harm, and other continuing harm.

175.    The risk and harm to Parx Casino is ongoing and cannot be remedied by monetary damages alone.

176.    A remedy at law is insufficient to fully compensate Parx Casino and to protect it from further risk of loss and harm due to Pace-O-Matic, POM and Miele's ongoing wrongful conduct.

177.    Pace-O-Matic, POM and Miele's wrongful conduct has caused, and continues to cause, harm to Parx Casino that is different in kind and magnitude from the harm caused to the general public.

178.    Parx Casino is one of a limited number of Category 1 and Category 4 licensees, who pay heavily for the privilege of licensed gaming and are protected by statute from unlicensed and unregulated slot machine operators.

179.    The general public has not suffered the type of harm suffered by Parx Casino.

WHEREFORE, Parx Casino respectfully requests that this Court enjoin Pace-O-Matic, POM and Miele from advertising that the Illegal Slot Machines are games of skill and are legal and compliant with Pennsylvania law, award damages to Parx Casino for false advertising, and order such other relief as the Court may deem appropriate.

## COUNT III -- COMMON LAW UNFAIR COMPETITION

180.    Parx Casino incorporates by reference all of the paragraphs above as if set forth fully herein.

181.    Pace-O-Matic, POM and Miele's business competes directly with the licensed gaming offered by Parx Casino, which paid hundreds of millions of dollars for the right to lawfully offer slot machines, skill slot machines and hybrid slot machines.

182.    Pace-O-Matic, POM and Miele directly compete with Parx Casino and other casinos in Pennsylvania through the Illegal Slots Enterprise by placing Illegal Slot Machines in and around Parx Casino and throughout the Commonwealth, thereby providing an illegal alternative to the lawful slot machine experience offered by Parx Casino.  POM takes a kick back of money paid by consumers to use the Illegal Slot Machines, which on information and belief it shares with Pace-O-Matic. Miele's amusement division directly operates and earns money from customers using Illegal Slot Machines.

183.    Pace-O-Matic, POM and Miele's false representations that the Illegal Slot Machines are "legally compliant" are likely to and do deceive and mislead prospective purchasers and players concerning the approval of its games for use in Pennsylvania as well as the nature, characteristics, and qualities of its games, to the commercial detriment of Parx Casino.

184.    Because unegulated slot machines are illegal in Pennsylvania, players and Location Businesses rely on the representations of Pace-O-Matic, POM and Miele in determining that playing  the Illegal Slot Machines in unregulated retail locations is legal and safe.

185.    Defendants' false claims of legality influence Location Businesses to offer and players to spend money on the Illegal Slots Machines.

186.    A portion of the money players spend on the Defendants' Illegal Slot Machines would be played on legal slot machines at Parx Casino or on Parx Casino's legal on-line digital slot machines if Defendants did not make the Illegal Slot Machines available and promote them as legal.

187.    Pace-O-Matic, POM and Miele do not comply with Pennsylvania laws concerning slot machines.

188.    Pace-O-Matic, POM and Miele's Illegal Slot Machines are unfair to the Pennsylvania gaming licensees who are properly licensed and regulated.

189.    Pace-O-Matic, POM and Miele's advertising of Illegal Slot Machines as legal in Pennsylvania, without being subject to the same regulations as licensees, violates Pennsylvania's public policy.

190.    Unlicensed, unregulated slot machines put the public at risk of dishonest gaming and defeat the intent of the Gaming Act.

191.    Pace-O-Matic, POM and Miele's false representations that the Illegal Slot Machines are "legally compliant" games of skill, and their making thousands of Illegal Slots

Machines easily accessible in unregulated retail locations across the Commonwealth, have diverted and are likely to continue to divert players from Parx Casino.

192.    Parx Casino has been and is likely to continue to be harmed by Pace-O-Matic, POM, and Miele's conduct.

193.    Pace-O-Matic, POM and Miele's operations in violation 18 Pa.C.S. §5513 amount to unfair competition.

194.    Pace-O-Matic, POM and Miele's business takes market share and customers away from the slot machines offered by Parx Casino.

195.    Pace-O-Matic, POM, and Miele deprive Parx Casino of profits and cause it pecuniary harm in excess of mandatory arbitration limits.

196.    As a direct and proximate result of Pace-O-Matic, POM and Miele's activities, the growth of Parx Casino's business has stagnated relative to other states, relative to industry forecasts, and relative to Parx Casino's internal forecasts.

197.    As a direct and proximate result of Pace-O-Matic, POM and Miele's wrongful conduct, Parx Casino has suffered and will continue to suffer a great risk of incalculable financial losses, permanent irreparable harm, and other continuing harm.

198.    The risk and harm to Parx Casino is ongoing and cannot be remedied by damages alone.

WHEREFORE, Parx Casino respectfully requests that this Court enjoin Pace-O-Matic, POM and Miele from advertising that the Illegal Slot Machines are games of skill and are legal and compliant with Pennsylvania law, award damages to Parx Casino for unfair competition, and order such other relief as the Court may deem appropriate.

## COUNT IV – TORTIOUS INTERFERENCE WITH
## BUSINESS RELATIONS

199.     Parx Casino incorporates by reference the paragraphs above as if set forth fully herein.

200.     A substantial amount of Parx Casino's revenue from slot machines and online slot machines is repeat business.

201.     Parx Casino invests substantially in cultivating repeat business and encouraging customers to return.

202.     Pace-O-Matic, POM and Miele are well aware of Parx Casino's efforts to cultivate long-term relationships with customers.

203.     Pace-O-Matic, POM and Miele have saturated bars, restaurants, convenience stores, gas stations, and other unlicensed establishments in Pennsylvania with Illegal Slot Machines resembling legal casino slot machines.

204.     Pace-O-Matic, POM and Miele know or should know that the Illegal Slot Machines attract repeat and potential repeat customers of Parx Casino.

205.     Pace-O-Matic, POM and Miele intentionally misrepresent the nature of the Illegal Slot Machines to attract repeat and potential repeat customers of Parx Casino and other licensed gaming operations to play their Illegal Slot Machines.

206.     Pace-O-Matic, POM and Miele's business takes repeat and potential repeat customers away from the lawful, regulated slot machines offered by Parx Casino.

207.     Pace-O-Matic, POM and Miele deprive Parx Casino of profits and cause it pecuniary harm in excess of mandatory arbitration limits.

208.     As a direct and proximate result of Pace-O-Matic, POM and Miele's activities, the growth of Parx Casino's slot business has stagnated relative to other states, relative to industry forecasts, and relative to POM's internal forecasts.

209.    As a direct and proximate result of Pace-O-Matic, POM and Miele's wrongful conduct, Parx Casino has suffered and will continue to suffer a great risk of incalculable financial losses, permanent irreparable harm, and other continuing harm.

WHEREFORE, Parx Casino respectfully requests that the Court award damages against Pace-O-Matic, POM and Miele for tortious interference with business relations.


**OBERMAYER REBMANN**
**MAXWELL & HIPPEL LLP**

By:    _/s/ Gary Samms_
         Gary Samms, Esquire (Attorney I.D. 58096)
         Richard Limburg, Esquire  (Attorney I.D. 39598)
         Attorneys for Plaintiff Parx Casino
         Centre Square West
         1500 Market Street, Suite 3400
         Philadelphia, Pennsylvania 19102
         (215) 665-3000


Dated:  November 21, 2022