**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GREENWOOD GAMING & ENTERTAINMENT, INC., | : <br> :   No. 2:22-cv-4434-MMB <br> : |
|     *Plaintiff,* | : <br> : |
| v. | : <br> : |
| POM OF PENNSYLVANIA, LLC, <br> PACE-O-MATIC, INC., and <br> MIELE MANUFACTURING, INC., | : <br> : <br> : <br> : |
|     *Defendants.* | : |

## POM OF PENNSYLVANIA, LLC AND PACE-O-MATIC, INC.'S REPLY BRIEF IN FURTHER SUPPORT OF MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

Plaintiff Greenwood Gaming & Entertainment, Inc., d/b/a Parx Casino (hereafter, "Parx") has filed its Combined Response in Opposition to Defendants' Motions to Dismiss Amended Complaint (the "Response") (Docket No. 22), which asserts multiple arguments in support of its dubious claim that the business of lawful skill-game designers and sellers, like Defendants Pace-O-Matic, Inc. ("Pace-O-Matic") and POM of Pennsylvania, Inc. (collectively, "the POM Defendants"), is somehow tortious. The Response is Parx's latest salvo in its campaign to end the legitimate skill game industry in Pennsylvania so that it can increase the hundreds of millions of dollars it already earns from Pennsylvanians.[1] As addressed in detail

---

[1] Parx asserts in its Response that "As Defendants concede, for purposes of this motion, it is undisputed the machines at issue are 'slot machines'." *See* Response at 4 and 6-7. That statement is not true. In POM of Pennsylvania, LLC and Pace-O-Matic, Inc.'s Brief in Support of Motion to Dismiss Plaintiff's Amended Complaint ("POM's Brief") (Docket No. 18-1), the POM Defendants expressly denied that their skill games are slot machines but stated because of the procedural posture of the case they would sometimes refer to them as such in their Brief. *See*

below, Parx's arguments in the Response cannot save its flawed claims. The Court should dismiss each of the counts in Parx's Amended Complaint for failure to state a claim.

As a final preliminary note, regardless of the outcome of the Motion, the Court should admonish Parx that enough is enough with its *The Godfather*-inspired spurious allegations. These include the outrageous allegation that the POM Defendants are some kind of "crime boss" overseeing a vast criminal enterprise. *See* Response at 5; Amd. Compl. at ¶ 49. While this dramatic commentary may be cathartic to Parx, it is contrary to Pennsylvania law. Indeed, in addition to the Commonwealth Court already holding POM's games **are not** subject to the Gaming Act—something Parx neglected to mention in the Amended Complaint—two different Courts of Common Pleas, after full hearings, have held the POM games **do not** violate the Crimes Code. *See In re: Four Pennsylvania Skill Amusement Devices and One Ticket Redemption Terminal Containing $18,962.00 in U.S. Currency*, No. 6673 Civil 2021, order at ¶ 2 (C.P. Monroe Feb. 8, 2023) (Exhibit A); *In re: Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613*, No. M.D. 965-2013, slip op. at 11-12 (C.P. Beaver Dec. 23, 2014) (Exhibit B). Hence, the POM Defendants are no more like Vito Corleone than is Parx. Thus, Parx's scandalous and fanciful hyperbole to the contrary needs to end.

_____

POM's Brief at 4. Whether a device is a "slot machine" under Pennsylvania law is a conclusion of law, which depends on the factual qualities of the device. *See POM of Pennsylvania, LLC v. Com. of Pa., Dept. of Revenue*, 221 A.3d 717, 737 n.19 (Pa. Cmwlth. 2019). Far from conceding this *legal* conclusion, the POM Defendants simply pointed out they were using nomenclature from the Amended Complaint.

I.    **The Court should dismiss Parx's Amended Complaint because it is an improper attempt to privately enforce laws regulating gambling.**

In response to the POM Defendants' argument that Parx's claims fail because Parx is improperly attempting to enforce laws regulating gambling (*see* POM's Brief at 7-10), Parx responds with two basic arguments: (i) the claims are not about the POM Defendants' alleged failure to comply with state gambling regulations; and (ii) RICO and the Lanham Act create private causes of action and the state law claims are private causes of action. *See* Response at 11-16. Each argument fails.

Parx's first argument ignores the allegations in its own Amended Complaint. Parx's four claims are entirely based on the POM Defendants' alleged violation of laws that regulate gambling through their skill game business.[2] Indeed, if the POM Defendants' skill games do not constitute illegal gambling as Parx claims, then the four counts in the Amended Complaint evaporate into thin air.[3]

Parx's second argument mischaracterizes the POM Defendants' position. Indeed, Parx simply is creating a straw man that it can then knock down. The POM Defendants recognize that both RICO and the Lanham Act expressly create private rights of action (and that private causes of action exist for Parx's state law tort

---

[2] *See, e.g.,* Amd. Compl. at ¶¶ 1-3, 58-68, 114-127, 135-159, 163-171, 182-193 and 203-206.

[3] Parx argues that the POM Defendants' alleged failure to comply with state gambling regulations "is not what this case is about" because "the Amended Complaint alleges a pattern of criminal conduct by the Illegal Slots Enterprise (giving rise to a civil RICO claim), false and misleading advertising (giving rise to a Lanham Act claim) and tortious conduct pursuant to Pennsylvania common law." *See* Response at 11. But the "pattern of criminal conduct," the "false and misleading advertising" and the "tortious conduct" are all based on the alleged violation of state gaming laws. If those state gaming laws have not been violated, Parx has no claim.

claims). The POM Defendants are not arguing, as Parx contends, "that no RICO claim lies unless private causes of action were further established in the underlying criminal statutes." *See* Response at 13. Rather, the POM Defendants are arguing that under circumstances similar to those present in this case, courts in this district have found that RICO, the Lanham Act, and state law tort claims cannot be used to enforce certain state laws or regulations that do not otherwise provide for private causes of action. *See* POM's Brief at 7-9.

Parx attempts to distinguish the holding in *Checker Cab Philadelphia, Inc. v. Uber Technologies, Inc.*, 2016 WL 950934 (E.D. Pa. March 7, 2016), by contending that the state and local laws and regulations at issue there "were not included in the definition of racketeering activity in 18 U.S.C. § 1961(1)," while the laws at issue here fit within RICO's definition of racketeering activity. *See* Response at 13-14. But the fact that state taxi laws and regulations were not specifically included in the definition of racketeering activity did not factor at all into the court's decision in *Checker Cab Philadelphia*. Rather, the court simply barred the claims because they were based on violations of state and local laws and regulations. *See Checker Cab Philadelphia*, 2016 WL 950934, at *5-6 and 9.[4]

Parx also attempts to distinguish cases barring Lanham Act claims relied on by the court in *Checker Cab Philadelphia—Sandoz Pharmaceuticals Corp. v.*

---

[4] Parx also points out that the *Checker Cab Philadelphia* court did not dismiss certain of the plaintiff's RICO claims that were based on wire fraud. *See* Response at 14. This point is irrelevant, however, because the wire fraud claims that the court did not dismiss in *Checker Cab Philadelphia* were completely unrelated to the violation of state and local laws and regulations.

*Richardson-Vicks, Inc.*, 902 F.2d 222 (3d Cir. 1990), and *Dial A Car, Inc. v. Transportation, Inc.*, 82 F.3d 484 (D.C. Cir. 1996)—by arguing that these cases somehow are different because they involved interpretation of FDA regulations (*Sandoz*) and a local taxi regulation (*Dial A Car*). *See* Response at 15. Parx's attempt fails, however, as the instant case is similar to those cases because it involves the interpretation of a unique question of state law—whether the POM Defendants' skill games are legal games of skill or illegal games of chance under Pennsylvania law—that is currently before the Pennsylvania Commonwealth Court and has been since 2018. Thus, these cases apply equally here.[5]

## II.   The Court should dismiss Parx's Amended Complaint to the extent that it is based on the Gaming Act.

Parx's Response fails to fully address the POM Defendants' argument that the POM Defendants' skill games are not subject to the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. § 1101, *et seq.*, as amended (the "Gaming Act"). *See* POM's Brief at 11-13. Parx's Response attempts to briefly address this argument in a footnote, claiming that it is a "red herring" because "[t]his case is not about the Gaming Act." *See* Response at 11-12, n.2. It is difficult to understand how Parx can claim that "[t]his case is not about the Gaming Act" when its Amended Complaint mentions the Gaming Act no fewer than 28 times. Nevertheless, as found by the Commonwealth Court, the Gaming Act simply does not apply to the POM

---

[5] Parx also argues the relevant question regarding its state law claims for unfair competition and tortious interference is whether it has pleaded the elements of these claims. *See* Response at 15-16. Parx simply ignores the cases cited by the POM Defendants finding these claims also are barred. *See* POM's Brief at 7-9.

Defendants' skill games. Thus, the Gaming Act is not even relevant as an "interpretative aid for Section 5513" as Parx claims. *Id.* Consequently, this Court should dismiss Parx's claims to the extent they are premised on the Gaming Act.

## III.    The Court should dismiss Parx's RICO claim.

Parx's Response devotes much attention to discussing the elements of a RICO claim that the POM Defendants have not challenged in their Motion to Dismiss. *See* Response at 2, 5-9 and 18-19. The purpose of this discussion is apparent: It is intended to distract the Court's attention from the critical issue the POM Defendants have raised with respect to Parx's RICO claim—the absence of proximate cause. *See* POM's Brief at 13-26. Careful review of this issue demonstrates that, like the plaintiffs in *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010) and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006), Parx has failed to plead the proximate cause required to state a RICO claim.

Parx contends that *Hemi* and *Anza* are distinguishable from this case because they "involved attenuated and indirect theories of causation" while Parx's theory of liability allegedly is direct and supported by the United States Supreme Court's decision in *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008). *See* Response at 19-20, 23-24 and 27-28. Parx could not be more wrong. Its theory of liability is "attenuated and indirect," just like the plaintiffs' theories in *Hemi* and *Anza*, and *Bridge* is easily distinguishable from this case. Parx's arguments in its Response on the proximate cause issue fail for two reasons.

*First*, Parx is wrong as a factual matter when it contends its harm described

6

in the Amended Complaint is direct. *See* Response at 20-21. Parx essentially bases this contention on its allegations in the Amended Complaint that: (i) there are as many as 80,000 purported "Illegal Slot Machines" in Pennsylvania (but it does not allege how many of these are the POM Defendants' skill games as opposed to machines produced by other companies); and, (ii) these "Illegal Slot Machines" are at locations surrounding Parx's casino (but it does not identify where). *Id.* Parx also cites the allegations in its Amended Complaint reciting the speculative testimony of alleged experts. *Id.* at 21. Based on these allegations, Parx offers a conclusion that is pure conjecture: "A foreseeable and natural consequence of these Illegal Slot Machines is reduced market share and profits for Parx Casino." *Id.*

Absent from the Amended Complaint are any factual allegations that would support the claim that even a single person played one of the POM Defendants' skill games at a bar, restaurant, club, gas station or convenience store instead of visiting Parx's casino and playing a slot machine. Or that any person would have visited Parx's casino if they had not been able to play a skill game at one of these local establishments. In short, there is nothing "foreseeable and natural" about Parx's alleged harm.[6] Parx's Amended Complaint simply contains no factual allegations that support its customer diversion theory, *i.e.*, that it actually lost customers and

---

[6] Parx's alleged damages are not direct. In fact, they are entirely contingent on the subjective and unknown actions of third party customers, who could have played a skill game for any number of reasons that have nothing to do with playing it as an alternative to a Parx slot machine. Likewise, Parx's alleged loss of customers and market share could have been caused by any number of independent factors unrelated to the POM Defendants' skill games, such as general economic conditions, the pandemic, or customers choosing to play at another casino.

market share because of the POM Defendants' skill games.

*Second*, Parx is wrong as a legal matter when it claims that this case is more like *Bridge* and other cases that have found proximate cause existed to support a RICO claim. *See* Response at 23-25. The Supreme Court's decision in *Bridge* is readily distinguishable from this case. In *Bridge*, plaintiff was one of a finite group of bidders for tax liens who claimed that it had been deprived of its share of liens because other bidders in the group engaged in fraud. *See Bridge*, 553 U.S. at 643-44. The Court found that plaintiff's alleged injury, the loss of valuable tax liens, was the direct result of defendants' fraud because there was no question that if defendants obtained more liens through fraud, less liens would go to other bidders in the finite group. *Id.* at 658. The Court also noted that "here, unlike in *Holmes* and *Anza*, there are no independent factors that account for respondents' injury." *Id.*

This case could not be more different from *Bridge*. While in *Bridge* it was a certainty that plaintiff would have lost liens because of defendants' fraud, here there is no similar certainty that Parx lost customers to the POM Defendants' skill games. In addition, while in *Bridge* there were no contingencies or independent factors in connection with plaintiff's alleged injury, here there are, including: (i) the alleged loss of customers is contingent on the subjective decision of a customer to play a skill game for any number of reasons, many of which may not even involve a choice to play it instead of a slot machine at Parx; and (ii) independent factors like general economic conditions, the pandemic, and customers going to other casinos that could account for Parx's claimed loss. In short, Parx's effort to fit this case

within the Court's reasoning in *Bridge* misses the mark.

Parx also cites to two other Third Circuit decisions—*St. Luke's Health Network, Inc. v. Lancaster Gen. Hosp.*, 967 F.3d 295 (3d Cir. 2020) and *In re Avandia Marketing, Sales Practices and Prod. Liability Litig.*, 804 F.3d 633 (3d Cir. 2015)—to support it has pleaded proximate cause. *See* Response at 23-24. Both decisions are distinguishable and actually support the POM Defendants' argument.

In *St. Luke's*, plaintiff hospitals brought a RICO claim against other hospitals alleging that defendants submitted fraudulent claims for reimbursement to the state Extraordinary Expense Program ("EE Program"), which reimbursed hospitals for health care costs related to treating indigent patients. *See* 967 F.3d at 297-98. The EE Program lacked sufficient funds to cover all claims submitted during the relevant years, so eligible hospitals were reimbursed proportionally based on each hospital's share of the total reported claims. *Id.* Not surprisingly, the Third Circuit found that plaintiffs pleaded a direct injury that satisfied RICO's proximate cause requirement because the EE Program had a fixed pool of assets and there was no question that defendants' alleged fraud would have resulted in plaintiffs receiving a smaller proportion of the fixed amount of funding. *Id.* at 302. In addition, in contrast to the damages asserted by Parx in this case, the Third Circuit noted that "Plaintiffs' purported damages are tangible and concrete, as opposed to the uncertain and ill-defined market-based injuries courts have typically rejected as supporting a direct relationship to the RICO violation." *Id.* at 302-03.

In *Avandia*, plaintiffs brought a RICO claim against a drug manufacturer

alleging that they overpaid for the drug Avandia manufactured by defendant because of defendant's false and deceptive marketing practices. *See Avandia*, 804 F.3d at 634-36. The Third Circuit found that plaintiffs pleaded proximate cause because their case was more akin to *Bridge* than *Anza* or *Hemi*. *Id.* at 643. In reaching this conclusion, the Third Circuit noted that in *Anza* and *Hemi*, the Court "was concerned that the conduct causing plaintiffs' injuries was different than the conduct allegedly constituting a RICO violation," but in the case before it, plaintiffs alleged that the cause of their injuries (defendant's misrepresentations concerning the risks of Avandia) was the same conduct that formed the basis of the alleged RICO violation. *Id.* at 644. Unlike in *Avandia*, the conduct that allegedly caused Parx's injuries (third-party customers playing the skill game) is not the same conduct that serves as the basis for the RICO violation (manufacturing, selling and distributing alleged illegal slot machines). Consequently, *Avandia* is inapposite.

Moreover, *Avandia* does not "put to rest [the] argument that allegations of lost profits or market share cannot support proximate cause in the RICO context" as Parx mistakenly claims. *See* Response at 24. Plaintiffs in *Avandia* did not allege a damages theory based on loss of market share and attendant lost profits like Parx does here. To the contrary, plaintiffs in *Avandia* sought damages for the harm they suffered by including Avandia in their formularies and covering it at rates that were greater than Avandia actually was worth. *See Avandia*, 804 F.3d at 636. This Court should reject Parx's mischaracterization of *Avandia* as a case that defies the well-established guidance from the Supreme Court and the Third Circuit that RICO

proximate cause typically will not be found where a plaintiff—like Parx here—alleges as harm loss of market share. *See Anza*, 547 U.S. at 460; *St. Luke's*, 967 F.3d at 302-03; *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 261 (3d Cir. 1999).[7]

## IV.    The Court should dismiss Parx's Lanham Act claim.[8]

If Parx is claiming it did not need to plead proximate causation in the Amended Complaint to survive the pending Motion, that position is incorrect. *See* Response at 42. The Supreme Court has stated that if a plaintiff's allegations "are insufficient to establish proximate causation, then the complaint must be dismissed[.]" *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 135 n.6 (2014). The Court further stated proximate cause is "an element of the cause of action" under the Lanham Act, which is why it needs to be adequately

---

[7] Parx cites three other cases for the proposition that lost profits or market share are the foreseeable consequences of predicate crimes and can support a RICO claim—*Expotech Engineering, Inc. v. Cardone Indus.*, 2020 WL 4504441 (E.D. Pa. Aug. 5, 2020), *In re Actiq Sales and Marketing Practices Litigation*, 2009 WL 1444443 (E.D. Pa. May 22, 2009), and *AAMCO Transmissions, Inc. v. Marino*, 1992 WL 38120 (E.D. Pa. Feb. 20, 1992). *See* Response at 25-26. None supports Parx's position that it has pleaded proximate cause under RICO for its highly speculative alleged loss of market share and unknown and unidentified customers. *Expotech* did not involve claims of lost market share. Rather, the court simply found counterclaim plaintiff's alleged loss of money and clients from counterclaim defendant allegedly not performing the contract at issue was direct, foreseeable and "quantifiable to costs incurred and clients actually—not hypothetically—lost." *See Expotech*, 2020 WL 4504441 at *1 and *4. *Actiq* also did not involve claims of lost market share or lost profits—it involved claims by insurers to recover excessive prescription payments for an unlawfully marketed drug—and predated *Hemi. See Actiq*, 2009 WL 1444443 at *1. Similarly, *AAMCO* did not involve claims of lost market share, the court did not discuss the issue of RICO proximate cause and this decision predated both *Anza* and *Hemi. See AAMCO*, 1992 WL 38120 at *1 and *5.

[8] The POM Defendants and Parx are in agreement that if Parx's Lanham Act claim fails, so too does its state-law unfair competition claim. *See* Response at 44-45; POM's Brief at 36-37. Consequently, for the reasons set forth immediately below and in POM's Brief, the Court also should dismiss the unfair competition claim.

pleaded. *See id.* Thus, Parx's causation theory is appropriately addressed now.

Next, the Response fails to further illuminate why the Amended Complaint sufficiently states a Lanham Act claim. To begin, Parx now concedes it is not an "indirect" competitor, so none of the theories supporting indirect competitor liability in *Lexmark* aid Parx in defeating the Motion. *See* Response at 36-39. Instead, Parx goes all in on its theory that it is a "direct" competitor of the POM Defendants. *Id.* at 39. But neither the Amended Complaint nor the Response supports this position.

Indeed, Parx reminds the Court that Parx is in the business of operating a physical casino in Pennsylvania. *Id.* at 20, 38. The POM Defendants do not have a physical place of business in Pennsylvania, let alone a physical casino. *See* Amd. Compl. at ¶¶ 6-13. Parx places games, made by others, in its physical location. *See* Response at 21, 38. The POM Defendants, lacking a physical location, do not place games in their building. *See* Amd. Compl. at ¶¶ 20-21. Parx does not create or sell games. *See* Response at 38-39. The POM Defendants do. *See* Amd. Compl. at ¶¶ 20-21. Lastly, Parx does not enter into licensing agreements with Operators or Locations for use of Parx's software, trademarks, games, or devices. *See* Response at 38. The POM Defendants enter into such agreements. *See* Amd. Compl. at ¶ 21. In other words, Parx has pleaded and described a completely different trade in which it engages, which trade is not in direct competition for the same business or customers at all.[9] In fact, as the POM Defendants already explained, their

---

[9] The lack of direct competition makes inapposite the cases upon which Parx relies to support its proximate cause allegations, *see* Response at 41, 43, since in each the court expressly noted the parties *were* direct competitors. *See Steer Mach.*

customers—as alleged by *Parx itself* in the Amended Complaint—are the Operators and/or the Locations. *See* POM's Brief at 32. *They* are the ones who buy the fills and/or the games and devices from the POM Defendants, which is the business *Parx* claims the POM Defendants engage in. Thus, there is no direct competition and, in turn, no Lanham Act claim.

Further, Parx has failed to adequately explain how Players are deceived by the POM Defendants into playing a POM game instead of a Parx-hosted game. *See* Response at 39-44. Above all else, Parx is asserting a false advertising claim. *See* Amd. Compl., Count II. To do so, it must show a deceptive advertisement that "causes [customers] to withhold trade from the plaintiff." *See Lexmark*, 572 U.S. at 133. The Response lays bare how inadequately pleaded the Amended Complaint is on this point: for the first time, Parx claims online promotional ads by the POM Defendants *directed at* the Operators and/or Locations, *see* Amd. Compl. at ¶ 121, *might be* read by Players because they "own[] a phone or computer" and so the Court can just infer they were influenced to withhold trade from Parx. *See* Response at 44-45. This inference is implausible. It is made so by Parx's repeated failures— both in the Amended Complaint and also in the Response—to identify *someone*, *anyone*, *anywhere* who spent even a single dollar in a POM game that they would have otherwise spent at Parx's casino. Thus, there is no one from whom this "inference" of deception could be explored.

---

*Tool & Die Corp. v. SS Niles Bottle Stoppers, LLC*, 331 F. Supp. 3d 429, 434 (M.D. Pa. 2018); *Key Recycling, LLC v. Appliance and Recycling Centers of Am.*, No. 18-cv-1656, 2018 WL 4615856, at *3 (E.D. Pa. Sept. 25, 2018).

Finally, Parx has failed to explain away its inability to plead any non-speculative damages. *See* Response at 40-44. Parx's theory in the Response is that there is a "finite" pool of available dollars in Pennsylvania, such that recreational expenditures in Pennsylvania are a zero-sum game (*i.e.*, a dollar spent in a POM device means that Parx per se loses that same dollar, never to be recovered). *See* Response at 20, 21, 23, 28, 40. This theory is unsupported by the Amended Complaint: not one customer, study, expert, or otherwise is cited in the pleading to support the speculative claim that only a finite pool of recreational dollars exists. This failure is unsurprising since the claim is implausible on the face of the Amended Complaint. To illuminate, Parx alleges that every 10,000 "illegal" skill games generate $260 million in revenue. *See* Amd. Compl. at ¶ 97. It then avers the POM Defendants (and other unnamed parties) have approximately 80,000 such devices in Pennsylvania today, but in October 2019, only 10,000 such devices existed. *Id.* at ¶¶ 96, 107. Thus, Parx is alleging some $2 billion in revenue is generated by skill devices today, which under Parx's theory is directly $2 billion that does not go to casinos. But the Amended Complaint shows that from the 2019-2020 fiscal year (when only 10,000 such devices existed) to 2021-2022 fiscal year (when 80,000 such devices existed) the amount of revenue generated by casinos, which should have gone down by over a billion dollars, ***went up by approximately $300 million***. *Id.* at ¶ 74 ($841 million up to $1.153 billion). In other words, not only does the Amended Complaint not support Parx's zero-sum theory of damages,

it also directly undercuts it.[10] This is fatal to its implausible theory of liability.

## V.   The Court should dismiss Parx's tortious interference with business relations claim.

The speculative nature of the causation and damages theories described above equally infect Parx's tortious interference claim. Parx's rejoinder is to rehash its unsupported, and implausible, position that some unidentified Players are giving money to the POM Defendants, which is part of the purported zero-sum "loss" theory, debunked above. *See* Response at 47. Also, Parx attempts to enhance the tortious interference claim by focusing on purported "repeat" customers. *Id.* at 47. But Parx, once again, simply offers unadorned, rank guesses (1) that these "repeat" Players relied on anything the POM Defendants said, and (2) that they gave any money to the POM Defendants they would have otherwise given to Parx.[11] Again, Parx is grossly speculating that maybe someone, somewhere, at some time played a POM game and not a Parx-hosted game: this is a model of implausibility.

Therefore, the Court should dismiss the tortious interference claim along with the other claims in the Amended Complaint.

---

[10] That Parx pleads its "losses" based on speculative theories, *see* Amd. Compl. at ¶ 172—and not *actual* sums lost—is unsurprising, since in fiscal year 2021-2022 Parx saw its slot revenue rise to a spectacular $407,912,090, **an increase of over $25 million** from fiscal year 2020-2021, where it generated an equally spectacular $373,416,393. *Compare* Pennsylvania Gaming Control Board, *Annual Report 2021-2022*, at 32 (Oct. 1, 2022), *with* Pennsylvania Gaming Control Board, *Annual Report 2020-2021*, at 30 (Oct. 1, 2021). Both reports are available at the Gaming Control Board's website: https://gamingcontrolboard.pa.gov/?p=51.

[11] Parx's reliance on *Peerless Heater Co. v. Mestek, Inc.*, No. 98-CV-6532, 2000 WL 637082 (E.D. Pa. May 11, 2000), does not assist its tortious interference claim. At most, *Peerless* shows a plaintiff must develop *some* plausible allegation (and later evidence) that its injury was at least arguably caused by the defendant. *See id.* at *4. Here, no such plausible allegation exists.

Respectfully submitted,

Dated: February 17, 2023

*/s/ Matthew H. Haverstick*
Matthew H. Haverstick (No. 85072)
Edward T. Butkovitz (No. 309565)
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Ph: (215) 568-2000
Eml: mhaverstick@kleinbard.com
ebutkovitz@kleinbard.com
jvoss@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Attorneys for the POM Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the POM Defendants'

Reply Brief in Further Support of Motion to Dismiss to be served via the Court's

CM/ECF system on the following:

Gary Samms, Esq.
Richard Limburg, Esq.
OBERMAYER REBMANN MAXWELL & HIPPEL LLP
Centre Square West
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Gary.Samms@obermayer.com
Richard.Limburg@obermayer.com

*Attorneys for Plaintiff Greenwood Gaming & Entertainment, Inc.*

Marc F. Lovecchio, Esq.
McCORMICK LAW FIRM
835 West Fourth Street
Williamsport, PA 17701
mlovecchio@mcclaw.com

*Attorney for Defendant Miele Manufacturing, Inc.*

Dated: February 17, 2023            */s/ Matthew H. Haverstick*
                                    Matthew H. Haverstick (No. 85072)
                                    KLEINBARD LLC
                                    Three Logan Square, 5th Floor
                                    1717 Arch Street
                                    Philadelphia, PA 19103
                                    Ph: (215) 568-2000
                                    Eml: mhaverstick@kleinbard.com

                                    *Attorneys for the POM Defendants*

# Exhibit A

Monroe County Prothonotary Filed February 08, 2023 1:23 PM

**IN THE COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: FOUR PENNSYLVANIA SKILL | : | No. 6673 Civil 2021 |
| AMUSEMENT DEVICES AND ONE | : | |
| TICKET REDEMPTION TERMINAL | : | |
| CONTAINING $18,692.00 IN U.S. | : | |
| CURRENCY | : | |

## ORDER

**AND NOW**, this 8th day of February, 2023, after hearing on L&M Music

Company, Inc. and Smokin' Joe's Tobacco Shop, Inc.'s (Petitioners) Joint Omnibus

Petition to Return Seized Property and to Suppress Evidence, it is **ORDERED** as follows:

　　　　1.　　　Petitioners' Petition to Suppress Evidence is **GRANTED**.  The court

finds that the Commonwealth improperly withheld and misrepresented material evidence

relative to the issuance of the search warrant in this matter, and that such conduct

warrants the suppression of the seized property.

　　　　2.　　　Petitioners' Petition to Return Seized Property is **GRANTED**.  The

court finds that the devices at issue are legal games of skill, and that the Commonwealth

has failed to establish that the devices, as designed, are games of chance.

1

3.     The Commonwealth shall, within 48 hours of the issuance of this Order, **RETURN** the seized Skill Games and TRT to Petitioners.  Petitioners shall retain the monies previously returned to them pursuant to prior order of court.

BY THE COURT:

**JENNIFER HARLACHER SIBUM, J.**

cc:   District Attorney
        George Westervelt, Esq.
        Matthew Haverstick, Esq.
        Edward Butkovitz, Esq.
        Marc Lovecchio, Esq.
        James Gorman, III, Esq.
        Court Administration

2

# Exhibit B

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| PACE-O-MATIC, INC. EQUIPMENT | : | M.D. 965-2013 |
| | : | |
| TERMINAL I.D. NO. 142613 | : | |

**MEMORANDUM OPINION AND ORDER**

H. KNAFELC, J.                                    December 23rd, 2014

### I.   PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control

Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club

located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for

Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of

Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The

sole purpose of that hearing was to gather evidence as to whether the confiscated property

constituted a gambling device per se. The evidence fails to demonstrate that the machine is a

gambling device per se, and Petitioner's motion for its return is GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device.

The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful

possession of the res; and second, whether the games installed on the device were games of

DEC-24-2014 WED 12:23 PM EddyDeLucaGravinaTownsen     FAX NO. 412 281 3537          P. 03

chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-O-Matic, Inc.

## II.     STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshells," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than another depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely unwinnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

If, during the Tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If a player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

## III.   LEGAL BACKGROUND AND ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 588; *Com. v. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)   A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)   The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

petitioner must prove that he is entitled to possession by a preponderance of the evidence.

*Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. Ct. 2009). A preponderance of evidence

standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from*

*Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful

possession, unless there is countervailing evidence to defeat the claim, the moving party is

entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se

nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v.*

*Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2)

result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the

Commonwealth have stipulated that the machine meets the consideration and reward elements,

only the second element—whether the result is determined predominantly by chance or skill—

will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a

finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game*

*Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts

of skill and chance present in the play of each machine and the extent to which skill or chance

determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game

where chance predominates rather than skill. *Ibid.* A showing of a large element of chance,

without more, is not sufficient, and the outcome need not be wholly determined by skill in order

for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

DEC-24-2014 WED 12:24 PM EddyDeLucaGravinaTownsen    FAX NO. 412 281 3537              P. 07

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* at 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chances of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which one can draw); *compare Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue*, 807 N.W.2d 492 (Neb. 2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A.    Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by a preponderance of the evidence standard. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

DEC-24-2014 WED 12:25 PM EddyDeLucaGravinaTownsen   FAX NO. 412 281 3537   P. 08

### B.   Gambling Device Per Se

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove

by a preponderance of the evidence that the video game machine seized is contraband. *Com. v.*

*Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video

game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the

machine must be so intrinsically connected with gambling as to constitute a gambling device per

se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result

determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have

stipulated that, because a player must insert money to begin play and is enticed to play by the

promise of a payout, the first element, consideration, and the third element, reward, are met. The

only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the games at issue contain elements of skill and chance. It is

therefore the task of this Court to determine, on balance, whether skill or chance is the dominant

factor in successful play. The operation of the machine and the way a player interacts with the

machine must be evaluated. As noted, the machine contains the following features: (1) a Tic-

Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The

extent to which chance and skill decide the outcome of each game must be evaluated.

### 1.   Tic-Tac-Toe Puzzle

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-

Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot

is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees

with the Commonwealth's position. Although there often is, as the Commonwealth points out, an

"obvious" position where placement of the wild would generate a nonzero score, several puzzles

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983).

Even more essential to the analysis than how the game is constructed and presented is the

gameplay itself. During the course of play, the element of skill predominates and determines the

outcome to a much higher degree than chance. It is up to the player to choose which spot to place

the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent*

is instructive. There, the Court held that Texas Hold 'Em is predominantly a game of chance.

*Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that

while skill can determine the outcome in a Texas Hold 'Em poker game, "players are still subject

to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players

are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic

victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania

Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some

have higher wins depending on whether the player has the skill to recognize the most

advantageous spot to place the wild. In this game, the player's choices are the "instrumentality

for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a

traditional game of Texas Hold 'Em. *See ibid; see also Am. Amusements Co. v. Neb. Dep't of*

*Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by

the player than not, it is predominantly a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic*

*Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video

game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is

"shuffled" by a random number generator, and the player is awarded points for various

combinations of cards, ranging from one point for a pair of aces to fifty points for a straight

flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines*, whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominantly by skill rather than chance.

### 2.    Bonus Game

This shooting-style game is predominantly a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3.    "Follow-Me" Mini-Game

Successful play of the Follow-Me feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me feature successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.    CONCLUSION

Each of the three games installed on the confiscated machine is predominantly a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

Page 11 of 13

the three games are games of chance, the Commonwealth has failed to prove that the property

seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's

motion for return of property is granted.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                          :
                                                :
                                                :
PACE-O-MATIC, INC. EQUIPMENT                     :        M.D. 965-2013
                                                :
                                                :
    TERMINAL I.D. NO. 142613                    :

**ORDER**

AND NOW, this __23ʳᵈ__ of __December__ , 20 _14_, it is hereby

ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to

Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED

to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

BY THE COURT

_____ J.

BY THE COURT

2014 DEC 23 A 9: 58

HARRY E. KNAFELC

Page 13 of 13