JOSHUA J. VOSS
JVOSS@KLEINBARD.COM
*Direct Dial  267.443.4114*



**KLEINBARD** LLC

June 8, 2023

**VIA CM/ECF**

Hon. Michael M. Baylson
Eastern District of Pennsylvania

**RE:    *Greenwood Gaming & Entertainment, Inc. v. POM of Pennsylvania, LLC, et al.,* No. 2:22-cv-4434-MMB**

Dear Judge Baylson:

On behalf of Defendants POM of Pennsylvania, Inc. and Pace-O-Matic, Inc., and in follow up to Your Honor's request during the hearing in the above matter on April 12, 2023, I write to bring the Court's attention to new state-law authority relevant to this dispute. On June 5, 2023, the Court of Common Pleas of Luzerne County entered an Order, attached as Exhibit A, regarding the POM Skill Games. The Order granted a motion for return of property, attached as Exhibit B, which explained the POM Skill Games were lawful games of skill, and not illegal gambling devices under Section 5513 of the Crimes Code, 18 Pa.C.S. § 5513.

Separately, the Court of Common Pleas of Monroe County has now entered an Opinion in support of the Order cited in the POM Defendants' reply brief (doc. 25 at 2). That Opinion is attached as Exhibit C. In a related vein, on June 1, 2023, the Monroe County Court also dismissed pending criminal charges related to the POM Skill Games in three separate Orders. Among other things, the Court stated: "the Commonwealth cannot establish a *prima facie* case of the crimes charged since this Court has specifically found that the devices on which the charges are based are legal games of skill and not games of chance." The three Orders are attached as Exhibit D.

Against the above, the POM Skill Games have been found to be lawful by Pennsylvania trial courts in (1) Beaver County, (2) Dauphin County, (3) Luzerne County, (4) Monroe County, and (5) York County.

Respectfully submitted,

Joshua J. Voss

cc:    All parties (via CM/ECF)

# Exhibit A

IN THE COURT OF COMMON PLEAS
LUZERNE COUNTY, PENNSYLVANIA

IN RE:  FOUR PENNSYLVANIA SKILL   :   No. 2022-08552
AMUSEMENT DEVICES                 :
                                  :
                                  :
                                  :
                                  :

AND NOW, this 5ᵗʰ day of JUNE, 2023, upon consideration of Movants

Mack Novelty, Inc. and Claire's Bar, LLC's Motion for Return of Property, and any response

thereto, it is hereby **ORDERED** and **DECREED** that said Motion is **GRANTED**.  It is further

**ORDERED** that, within five (5) days of this Order, the Pennsylvania State Police, Bureau of

Liquor Control Enforcement, shall return to Claire's Bar, LLC, the four Pennsylvania Skill

Amusement Devices and the contents thereof in the same condition in which they were seized.

THE OFFICES OF JUDICIAL RECORDS
& SERVICES OF LUZERNE COUNTY,
PENNSYLVANIA SHALL GIVE NOTICE
OF THIS ORDER TO ALL PARTIES
PURSUANT TO PA  R.C.P 236.

BY THE COURT:

_____, J.

**Distribution:**

Christopher D. Carusone, Esquire ccarusone@cohenseglias.com
Cohen Seglias Pallas Greenhall & Furman, P.C.
525 William Penn Place, Suite 3005
Pittsburgh, PA 15217
Telephone: 412.227.5951

Matthew H. Haverstick, Esquire mhaverstick@kleinbard.com
Edward T. Butkovitz, Esquire ebutkovitz@kleinbard.com
Three Logan Square, 5ᵗʰ Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: 215.568.2000

Joseph May, Esquire
417 Lackawanna Avenue
Scranton, PA 18503


Marc F. Lovecchio, Esquire
835 West Fourth Street
Williamsport, PA 17701

# Exhibit B

IN THE COURT OF COMMON PLEAS
LUZERNE COUNTY, PENNSYLVANIA

| | |
|---|---|
| IN RE: FOUR PENNSYLVANIA SKILL AMUSEMENT DEVICES | : No. 2022-08552<br>:<br>:<br>:<br>: |

## MOTION FOR RETURN OF PROPERTY

Movants Mack Novelty, Inc. and Claire's Bar, LLC, by and through their undersigned counsel, respectfully submit this motion for return of property pursuant to 42 Pa.C.S. § 5806 and Pa.R.Crim.P. 588, and in support thereof, aver as follows:[1]

### Background

1. Movant Mack Novelty, Inc. ("Mack Novelty"), located at 525 S Main St, Wilkes-Barre, Pennsylvania, is a third-generation, family-owned and operated amusement vending company that provides music, digital jukeboxes, bar top games, pool tables, ATMs, and video game systems to Wyoming Valley and Scranton area bars, taverns, and restaurants. Mack Novelty is co-owned and operated by James Mack.

2. Movant Claire's Bar, LLC ("Claire's Bar") is a restaurant/bar located at 752 Hazle Street, Ashley, Luzerne County, Pennsylvania. Claire's Bar is the holder of a restaurant liquor license issued by the Liquor Control Board (License No. R-5380). It is owned by the Estate of Claire Jones, Danielle Day, and Laurie Dimirco, Executrices, and managed by Laurie Dimirco.

---

[1] Movants note that the Honorable Fred A. Pierantoni, III recently adjudicated a motion for return of property involving machines similar to those at issue here. *Pinnacle Amusement, LLC v. Bureau of Liquor Control Enforcement*, Nos. 2020-05529, 2020-05210, 2021-03722, 2021-10019 (Luzerne C.C.P. May 18, 2022) (Opinion).

1

3.  On September 30, 2020, at approximately 12:30 p.m., agents from the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), seized four Pennsylvania Skill Amusement Devices ("Pennsylvania Skill Games") from Claire's Bar. See Exhibit A.

4.  BLCE seized this property pursuant to 42 Pa.C.S. Ch. 58 based upon its belief that the machines were gambling devices. 18 Pa.C.S. § 5513; 42 Pa.C.S. § 5803(a)(7).

5.  BLCE seized the property without a warrant.

6.  The Commonwealth has not filed a forfeiture petition.

7.  No criminal charges were filed as a result of the seizure.

8.  The location of the seized property is believed to be in Luzerne County.

9.  Mack Novelty is the lawful owner of the seized property.

10.  Claire's Bar has a possessory interest in the seized property through its business arrangement with Mack Novelty.

11.  Both Mack Novelty and Claire's Bar have been aggrieved by the seizure of the property and seek its return.

12.  As explained below, movants seek return of the seized property on the grounds that the seizure did not satisfy the requirements of Pennsylvania law, and that the machines are games of skill (not gambling devices) and therefore the seized property is not contraband.

## Legal Standard

13.  The Pennsylvania Skill Games, U.S. currency, and receipts should be returned pursuant to Pennsylvania Rule of Criminal Procedure 588. Rule 588 provides, in relevant part:

> (A)  A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

2

(B)  The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

Pa.R.Crim.P. 588; *see also* 42 Pa.C.S. § 5806.

14.    Rule 588 establishes a burden-shifting model. Initially, the movant must establish that it is "entitled to lawful possession of the property at issue," which is accomplished by showing ownership of the property or a right to possess the property. *See Com. v. Morelli*, 55 A.3d 177, 180 (Pa. Cmwlth. 2012); *see also Com. v. Younge*, 667 A.2d 739, 746 (Pa. Super. 1995).

15.    This burden may be satisfied by the movant alleging under oath that it is entitled to lawful possession of the property. *See Com. v. Howard*, 931 A.2d 129, 131-32 (Pa. Cmwlth. 2007).

16.    Once lawful possession is established, the Commonwealth bears the burden to prove the property is contraband. Absent a judicial determination that the property seized is contraband, it must be returned to the lawful owners. *See Younge*, 667 A.2d at 747-48.  If the Commonwealth fails to meet this burden, the property must be returned to the movant. *See id.*

17.    The Skill Games in the possession of the Commonwealth are legal games of skill, not illegal gambling devices.  Consequently, they are not contraband and must be returned.

18.    Mack Novelty is lawfully entitled to the return of the seized property because it has an ownership interest. *See In re Firearms, Eleven*, 922 A.2d 906, 912 (Pa.Super. 2007).

19.    Claire's Bar is lawfully entitled to the return of the seized property because it has a possessory interest pursuant to its agreement with Mack Novelty and lawfully possessed the property at the time it was seized. *See Commonwealth v. Personal Property of Abendroth*, 929 A.2d 690, 694 (Pa.Super. 2007) (holding "lawful possession" element may be satisfied by evidence of "some possessory interest recognized by law.").

3

20. Since the seized property is not contraband, the Commonwealth cannot meet its burden and the Pennsylvania Skill Games must be returned in the condition they were seized.

### Pennsylvania Skill Games

21. Pennsylvania Skill Games are programmed using software that is licensed and distributed by POM of Pennsylvania, LLC ("POM").

22. Pennsylvania Skill Games offer the skillful player the ability to win, on every play, at least 105% of the player's consideration.

23. Pennsylvania Skill Games have a preview feature, which allows the player (before committing any funds/points for game play) to see the upcoming tic-tac-toe puzzle and decide whether to commit any funds/points to play.

24. Game play on the Pennsylvania Skill Games commences after the player has inserted cash into the machine—which are then converted into points—and the resulting points have been committed to play a puzzle game resembling a tic-tac-toe board.

25. One of three things can happen once the player is presented with the tic-tac-toe style puzzle: a) the puzzle can be correctly solved, resulting in an award equal to at least 105% of the points that were committed to play; b) the puzzle can be correctly solved, resulting in an award equal to less than 105% of the points that were committed to play; or c) the puzzle is incapable of being solved.

26. In the latter two scenarios, the player is always offered the opportunity to continue game play through the "Follow Me" stage of the game, which requires no additional points from the player. This stage requires the player to repeat a pattern of multiple, multi-colored circles in the same order in which the circles are displayed.

4

27.  If the player successfully completes the pattern, the player is awarded 105% of the points committed to play.

28.  Therefore, on every play of the Pennsylvania Skill Game, the skillful player can win more points than were committed to play.

### Improper Seizure

29.  Property subject to forfeiture may be seized by law enforcement pursuant to Section 5803(b) under six specific circumstances:

> (1) The seizure is incident to an arrest or a search under a search warrant or inspection under an administrative inspection warrant and there is reason to believe the property is subject to forfeiture.
> (2) The property subject to seizure has been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter.
> (3) There is probable cause to believe that the property is dangerous to health and safety and exigencies are likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture.
> (4) There is probable cause to believe that the property has been used or is intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction.
> (5) There is a warrant issued by a court of common pleas with appropriate jurisdiction.
> (6) There is probable cause to believe that the property is subject to forfeiture and exigencies are likely to result in the destruction or removal of the property.

42 Pa.C.S. § 5803(b).[2]

30.  The seizure of movants' property was not justified under subsection (a)(1). The seizure was not incident to an arrest because no one has been arrested. Moreover, the seizure was not pursuant to a "search under a search warrant or inspection under an administrative inspection

---

[2] 42 Pa.C.S. Ch. 58 was enacted by Act 13 of 2017 and became effective on July 1, 2017. This Act was intended to reform asset forfeitures in light of reported abuses by law enforcement agencies, and abrogates prior common law. See https://www.governor.pa.gov/newsroom/governor-wolf-signs-civil-asset-forfeiture-reform-bill-into-law/.

warrant." Finally, there is no reason to believe that the property seized is subject to forfeiture, because courts of coordinate jurisdiction have held such machines to be lawful. See *infra*.

31.    The seizure of movants' property was not justified under subsection (a)(2). The property seized has not been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter. To the contrary. See *infra*.

32.    The seizure of movants' property was not justified under subsection (a)(3). There was no probable cause to believe that the property is "dangerous to health and safety" or that exigencies existed at the time of the seizure that made it "likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture."

33.    The seizure of movants' property was not justified under subsection (a)(4). There was no probable cause to believe that the property seized from movants was being "used or [was] intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64), known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction."

34.    The seizure of movants' property was not justified under subsection (a)(5) because no warrant has ever been issued by a court of common pleas with appropriate jurisdiction.

35.    The seizure of movants' property was not justified under subsection (a)(6). There was no probable cause to believe that the property was subject to forfeiture because courts of coordinate jurisdiction have held such machines to be lawful. See *infra*. Moreover, no exigencies existed that were "likely to result in the destruction or removal of the property."

36.    Therefore, the motion for return of property should be granted because BLCE's seizure of the machines in question was unlawful under 42 Pa.C.S. § 5803.

**The Seized Pennsylvania Skill Game Machines Are Not Contraband**

37.    "The proper inquiry is whether the machine is so intrinsically connected with gambling as to constitute a gambling device *per se*." *Commonwealth v. Irwin*, 636 A.2d 1106, 1107 (Pa.Super. 1993) (internal citation omitted). See also 18 Pa.C.S. § 5513.

38.    "A machine is a gambling device *per se* if it can be used for no purpose other than gambling." *Id.* at 1107.

39.    A determination of whether a machine is a gambling device *per se* is made by comparing the characteristics of the machine against the elements necessary to gambling, namely: (a) consideration; (b) result determined by chance rather than skill; and (c) reward. *Commonwealth v. Wintel, Inc.*, 829 A.2d 753, 757-758 (Pa.Super. 2003) (citing *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973, 977 (Pa. 1983)).

40.    In determining whether a game is one of chance or skill, a court must evaluate the relative amounts of skill and chance present in the play of the machine and the extent to which skill or chance determines the outcome. *Two Electronic Poker Game Machines*, 465 A.2d at 977-978. In order for a game to constitute gambling, it must a game where chance predominates rather than skill. *Id.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Id.* The mere fact that a machine involves a substantial element of chance is insufficient to find that a machine is a gambling device. *Id.*

41.    The Pennsylvania Skill Game machines seized by BLCE are games of skill. As explained above, on every play of the Pennsylvania Skill Game, the skillful player can win more points than were committed to play. There is nothing the Pennsylvania Skill Game can do (or does) to prevent a skillful player from winning.

7

42.    **This Court** has determined that machines similar to the Pennsylvania Skill Games were not gambling devices and must be returned. See Exhibit B (Pinnacle Amusement, LLC v. Bureau of Liquor Control Enforcement, Nos. 2020-05529, 2020-05210, 2021-03722, 2021-10019 (Luzerne C.C.P. May 18, 2022) (Opinion) (Pierantoni, J.).

43.    Pennsylvania Skill Games have been determined by the Beaver County Court of Common Pleas to be games of skill. See Exhibit C (*In re: Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613*, No. M.D. 965-2013 (Beaver County C.C.P. December 23, 2014).

44.    The Clearfield County Court of Common Pleas issued Stipulated Orders – agreed to by the Pennsylvania Office of Attorney General – permitting the return of Pennsylvania Skill Games to the establishment from which they were seized. See Exhibit D.

45.    The district attorneys of Centre and Lawrence counties have also concluded that Pennsylvania Skill Games are games of skill, not games of chance. See Exhibit E.

46.    Moreover, the Commonwealth Court of Pennsylvania has ruled that Pennsylvania Skill Games are not "slot machines" under the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. § 1103. See Exhibit F.

47.    No court in Pennsylvania has ever held that Pennsylvania Skill Games are games of chance.

48.    Accordingly, movants are entitled to possession of the Pennsylvania Skill Games.

8

WHEREFORE, movants respectfully request that this Court grant their motion for return of property and issue an Order requiring the Commonwealth to return the four Pennsylvania Skill Amusement Devices and the contents therein in the condition in which they were seized along with any other relief the court deems appropriate and just.

**Respectfully Submitted:**

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

*Christopher Carusone*

Christopher D. Carusone (I.D. No. 71160)
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219
(412) 434-5530
ccarusone@cohenseglias.com
*Counsel for Movant Claire's Bar, LLC*

**KLEINBARD LLC**

Matthew H. Haverstick, Esq. (I.D. No. 85072)
Edward T. Butkovitz, Esq. (I.D. No. 309565)
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
Telephone: (215) 568-2000
mhaverstick@kleinbard.com
ebutkovitz@kleinbrad.com
*Counsel for Movant Mack Novelty, Inc.*

**Date:   September 16, 2022**

9

## <u>VERIFICATION</u>

I, Laurie Dimirco, Manager of Clair's Bar, LLC, verify that the statements contained in this motion are true and correct to the best of my knowledge, information, or belief. I understand that false statements are subject to the penalties set forth in 18 Pa.C.S. § 4902 (relating to perjury) and/or 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

Laurie Dimirco

Date: 9/8/22

## VERIFICATION

I, James Mack, co-owner of Mack Novelty, Inc., verify that the statements contained in this motion are true and correct to the best of my knowledge, information, or belief. I understand that false statements are subject to the penalties set forth in 18 Pa.C.S. § 4902 (relating to perjury) and/or 18 Pa.C.S. § 4904 (relating to unsworn falsification to authorities).

_____
James Mack

Date:  September 15, 2022
       _____

## CERTIFICATION OF NON-CONCURRENCE

I, Christopher Carusone, Esquire, pursuant to Luz. Co. R.C.P. No. 208.2(d), hereby certify that I provided a copy of the foregoing motion to counsel for the Commonwealth, Deputy Attorney General Andrew J. Jarbola, IV, and he does not concur in the motion.

**Respectfully Submitted:**

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**

*Christopher Carusone*

_____
**Christopher D. Carusone, Esquire**
ccarusone@cohenseglias.com

**COHEN SEGLIAS PALLAS GREENHALL & FURMAN, P.C.**
**525 William Penn Place, Suite 3005**
**Pittsburgh, PA 15219**

**Date:   September 16, 2022**

7942123.1 56291-0001

## CERTIFICATE OF SERVICE

I, Christopher Carusone, Esquire, hereby certify that a copy of the foregoing motion for return of property was served on September 16, 2022, via first class and/or electronic mail upon the following officers of the Commonwealth of Pennsylvania:

Luzerne County District Attorney's Office
200 N. River Street
Wilkes Barre, PA 18711

Andrew J. Jarbola, IV
ajarbola@attorneygeneral.gov
Deputy Attorney General
Office of Attorney General
6400 Flank Drive, Suite 1300
Harrisburg, PA 17112

**Respectfully Submitted:**

**COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.**

*Christopher Carusone*

**Christopher D. Carusone, Esquire**
**ccarusone@cohenseglias.com**

**COHEN SEGLIAS PALLAS
GREENHALL & FURMAN, P.C.
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219**

**Date:  September 16, 2022**

Y GROSS   AINTAINED  ☐ YES   REMARKS

SP 3-444 (7-2017)

PENNSYLVANIA STATE POLICE
**RECEIPT FOR PROPERTY SEIZED**
**PURSUANT TO § 5803 42 PA.C.S.A.**

The following property was taken/seized by Pennsylvania State Police pursuant to
Forfeiture of Assets Act, 42 Pa.C.S.A § 5803. You are hereby notified that you ha
right to seek the return of the seized property under 42 Pa.C.S.A. § 5806.

CAD/Case No.: 19-1678371          Property Inventory No.:

Investigating Member Name/Badge No.: LFO G Gigliotti

Member who Seized Property Name/Badge No.: LFO D. Wentsler

Date/Time Seized: 9-30-20      1730

Property Taken/Seized From:   Print Name: Laurie Dimirco

Signature: Laurie Dimirco

The following items have been seized:

1. Pennsylvania SKill VGD
2. Pennsylvania SKill VGD
3. Pennsylvania SKill VGD
4. Pennsylvania SKill VGD
5.
6.
7.
8.
9.
10.


EXHIBIT A

PROTHONOTARY LUZERNE COUN
FILED MAY 18 '22 AM11:

| | | |
|---|---|---|
| PINNACLE AMUSEMENT, LLC, | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| Plaintiff/Petitioner, | : | CIVIL DIVISION |
| | : | |
| v. | : | NOs.: 2020-05529 |
| | : | 2020-05210 |
| BUREAU OF LIQUOR CONTROL | : | 2021-03722 |
| ENFORCEMENT, | : | 2021-10019 |
| | : | |
| Defendant/Respondent. | : | |

## OPINION

Before the trial court for adjudication in the above-consolidated matters are the motions for return of seized property filed by Pinnacle Amusement, LLC (hereinafter referred to as "Pinnacle") and related petitions for forfeiture filed by the Pennsylvania State Police – Bureau of Liquor Control Enforcement (BLCE). The trial court now issues the instant opinion setting forth the reasons for the order adjudicating these pending requests for relief.

## I.    SUMMARY OF PERTINENT FACTUAL HISTORY

On each of December 17, 2019, December 19, 2019, January 14, 2020, and January 24, 2020, undercover investigators from the BLCE entered a liquor-licensed establishment, known as D & M Shumbris, Inc., t/a The Swizzle Stick (hereinafter referred to as "Swizzle Stick"), and located in the Borough of Edwardsville, Luzerne County, Pennsylvania. On each such occasion, one or more investigators played one or more electronic video entertainment machines present within Swizzle Stick and owned by Pinnacle. The entertainment software housed within these

EXHIBIT B

standalone terminals, each developed by a company called Banilla Games, Inc. (hereinafter referred to as "Banilla"), included one model 'Keystone Ultra' (hereinafter referred to as "Ultra") and one model 'Keystone Ultramax' (hereinafter referred to as "Ultramax"). Investigators provided consideration for playing games on the machines, which then dispensed vouchers redeemable by the investigators for United States currency. On January 27, 2020, during the course of a 'routine inspection,' the BLCE seized one (1) Ultra and two (2) Ultramax machines from Swizzle Stick.

On each of December 17, 2019, December 18, 2019, January 5, 2020, and January 24, 2020, agents of BLCE similarly played one or more of either an Ultra or Ultramax machine located at a liquor-licensed establishment known as Park Market Six Packs To Go, LLC (hereinafter referred to as "Park Market"), located in the City of Nanticoke, Luzerne County. On January 27, 2020, during the course of a 'routine inspection,' BLCE seized from Park Market one (1) Ultra and one (1) Ultramax machine, each also owned by Pinnacle.

On each of July 29, 2020, August 11, 2020, and September 15, 2020, agents of BLCE similarly played one or more of an Ultra, Ultramax, 'Keystone Ultramax Dual' (hereinafter referred to as "Dual"), or 'Keystone Gold I' (hereinafter referred to as "Gold") machines located at a liquor-licensed establishment trading as the Anthracite News Stand (hereinafter referred to as "Anthracite"), located in the City of Wilkes-Barre, Luzerne County. Like the Ultra and Ultramax, the Dual machine game software was provided by Banilla. The Gold game software was provided by another company called 'Trestle Corporation' (hereinafter referred to as "Trestle"). On September 30, 2020, BLCE seized from Anthracite one (1) Ultra, one (1) Ultramax, one (1) Dual, and one (1) Gold machine belonging to Pinnacle.

On each of January 24, 2021, March 24, 2021, May 17, 2021, and June 29, 2021, agents of BLCE similarly played one or more of either an Ultra or Dual machine located at a liquor-licensed establishment known as the BW Saloon, inside the Quality Inn and Suites (hereinafter referred to as "BW Saloon"), located in the Township of McKean, Erie County, Pennsylvania. On July 20, 2021, BLCE seized from BW Saloon one (1) Ultra and one (1) Dual machine belonging to Pinnacle.

Instantly, therefore, BLCE has seized a total of eleven (11) machines belonging to Pinnacle, including three (3) Ultra, five (5) Ultramax, two (2) Dual, and one (1) Gold machine.

## II.    **SUMMARY OF PERTINENT PROCEDURAL HISTORY**

On June 3, 2020, Pinnacle filed to Luzerne County civil docket number 2020-05210 a motion pursuant to 42 Pa.C.S. § 5806(a)(1) and Pa.R.Crim.P. 588 for the return of the machines seized by BLCE from Swizzle Stick. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On September 18, 2020, BLCE, by and through the Commonwealth Office of Attorney General, filed an answer to the motion denying the return motion and raised by way of new matter a request pursuant to 42 Pa.C.S. § 5803 for forfeiture of the Swizzle Stick machines and one thousand five hundred twenty-six dollars ($1,526.00) in United States currency.[1] On October 1, 2020, the matter was assigned to the undersigned. On October 6, 2020, Pinnacle filed a reply to BLCE's new matter which contested BLCE's forfeiture petition. On November 6, 2020, pursuant to order issued October 1, 2020, a status conference was held after

---

[1] Our appellate courts have recognized under former Rule of Criminal Procedure 324—subsequently re-numbered and re-enacted in substance at Rule of Criminal Procedure 588—that a request for forfeiture may be set forth as new matter in response to a motion for return of property. *See Commonwealth v. Mosley*, 549 Pa. 627, 632, 702 A.2d 857, 859 (1997). *See also Matter of Kulbitsky*, 112 Pa.Cmwlth. 477, 536 A.2d 458, 459-60 (1988), appeal denied, 520 Pa. 609, 553 A.2d 971 (1988).

which the trial court issued an order scheduling a hearing on the return motion and forfeiture petition for February 2, 2021. The determinative hearing ultimately was continued by the parties on numerous occasions as the instant consolidated matters developed and respectively were subsumed; the procedural trajectory of each matter consolidated herewith is summarized herein.

On June 16, 2020, Pinnacle filed to Luzerne County civil docket number 2020-05529 a motion for the return of the machines seized by BLCE from Park Market. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On September 18, 2020, BLCE filed an answer denying the return motion and filed new matter requesting forfeiture of the Park Market machines and two hundred fifty-six dollars ($256.00) in United States currency. On October 6, 2020, Pinnacle filed a reply to BLCE's new matter which contested BLCE's forfeiture petition.

On April 9, 2021, Pinnacle filed to Luzerne County civil docket number 2021-03722 a motion for the return of the machines seized by BLCE from Anthracite. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On June 21, 2021, BLCE filed an answer thereto, but did not initiate a responsive request for forfeiture.

On August 2, 2021, Pinnacle similarly filed to Erie County civil docket number 2021-11674 a motion for the return of the machines seized by BLCE from BW Saloon, to which BLCE did not respond. Pinnacle contests the seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On August 11, 2021, Pinnacle filed to each of the preceding Luzerne County dockets an Unopposed Petition to Transfer and Consolidate, requesting the Erie County matter be transferred to Luzerne County and consolidated for adjudication herein. On August 23, 2021, the

trial court issued an order scheduling a hearing on the transfer petition; said hearing was held as scheduled on September 16, 2021. On September 17, 2021, the trial court issued an order granting the transfer petition and directing that the Erie County case be transferred to Luzerne County for consolidated adjudication. On October 4, 2021, the trial court's order of September 17, 2021, was filed to the Erie County docket and the Erie County Prothonotary notated therein a transfer to Luzerne County. On October 7, 2021, the record of the Erie County matter was received by the Luzerne County Prothonotary and filed to Luzerne County civil docket number 2021-10019.

On November 2, 2021, after conferencing with the parties and having been assigned all of the instant matters for adjudication, the trial court issued an order scheduling an agreed-upon date of February 18, 2022, for consolidated resolution of all pending requests for relief.

On February 18, 2022, a dispositive hearing was held, at the conclusion of which the parties requested the trial court issue a briefing schedule dependent upon the date of filing of the transcript of said hearing. On March 15, 2022, the transcript was filed to the docket and the trial court issued an order establishing a briefing schedule. The briefing schedule was extended by agreement of the parties with final responsive briefs ordered to be filed by May 2, 2022. The parties timely filed affirmative and responsive post-hearing briefs, respectively.

The requests for relief consolidated herein now are ripe for adjudication and the trial court accordingly issues the instant opinion in support of the order hereto contemporaneously issued.

III.    **SUMMARY OF TESTIMONY AND OTHER RECORD EVIDENCE**

The trial court heard testimony and received evidence at the hearing. The trial court observed the witnesses testify and—having considered their general bearing, conduct on the

stand, demeanor, and candor—finds the testimony summarized herein credible and determinative of the facts instantly in issue. *See In re Funds in Possession of Conemaugh Tp. Sup'rs.*, 562 Pa. 85, 89, 753 A.2d 788, 790 (2000) ("The finder of fact is sole judge of credibility and is free to believe all, part, or none of the evidence. This is true of a judge in a bench trial, as well as a jury.") *and In re Gaston's Estate*, 361 Pa. 105, 112, 62 A.2d 904, 908 (1949) ("In determining the weight to be attached to the testimony of a witness it is proper to consider his appearance, general bearing, conduct on the stand, demeanor, manner of testifying, such as candor or frankness, or the clearness of his statements, and even the intonation of his voice.").

## A.    PINNACLE'S CASE

At the hearing, Pinnacle presented testimony from three (3) witnesses and submitted six (6) exhibits, all of which were admitted to the record.[2] The exhibits included the *curricula vitae* of two expert witnesses and reports issued thereby.

### Susan Hensel, Esq.

Susan Hensel, Esq. (hereinafter "Hensel"), co-founder and partner in a gaming law advisory firm called Hensel Grad, P.C.,[3] was recognized as an expert in the field of 'gaming regulations'[4] and provided testimony in such capacity which herein is summarized.[5] Hensel provided a general description of the Banilla machines and the game software housed therein. She played Banilla models and games identical to those that had been seized by BLCE, but prior to the hearing had not interacted with the exact physical devices seized.

Hensel testified that the Banilla software on each machine include two slot machine-style, reel-based game types, referred to as either 'nudge' or 'hot swap' games, with varying

---

[2] The exhibits admitted to the record at the hearing are hereinafter referred to with the identifier "Hrg. Ex. [#]."
[3] Hrg. Ex. 1. Notes of Testimony, February 18, 2022, p. 12, ll. 3-4.
[4] Hrg. Ex. 1. *N.T.*, p. 14, ll. 7-8 and p. 19, ll. 7-10.
[5] *See N.T.*, pp. 11-48.

thematic presentations available for selection by the player. To play these machines, a player inserts cash and in exchange is provided digital credits on the machine. The examination of Hensel included her in-court demonstration of play on the Ultramax seized from Swizzle Stick. Upon receiving their digital credits, a player selects a game theme to play. Regardless of theme, the player then selects a wager amount and spins the reels. When the reels stop, the player in a nudge game has the option to rotate or 'nudge' one of the reels in an effort to align the reels into a winning pattern, and in a 'hot swap' game has the option to substitute or swap one of the reel symbols with a symbol held in a pool outside the reels to do the same. Regardless of theme and game type, where a player can create a winning pattern, the machine will not allow a player to play through to the next spin of the reels, and instead forces the player to attempt a nudge or swap. If a player successfully creates a winning pattern through nudging or swapping, the player is rewarded with credits based on their wager and only then is able to again spin the reels.

Where the player is unsuccessful in creating a winning pattern by either nudging or swapping, the player is then presented on-screen with the option to engage in a secondary round of play in a game referred to as "Follow the Banana." The on-screen option appears after a few seconds in the form of an opt-in banner displayed at the bottom of the screen. In this second and optional round of gameplay, a grid is displayed and the player is presented with a series of sequential patterns, increasing incrementally in size, to replicate on the touchscreen grid. If the player can successfully replicate the series of patterns displayed, the player is awarded credits equivalent to one hundred and four percent (104%) of their wager. If the player is unsuccessful in replicating the series of patterns, the player is returned to the staging screen for the reel game and then is able to again spin the reels. This round-based gameplay can continue until the player has depleted their credit pool or opted instead to 'cash out' by directing the machine to print a

voucher which is then redeemable by the player with the establishment at which the machine is located for the cash equivalent of the balance of credits cashed out.

Hensel testified that various player skills are contemplated in both the reel and pattern rounds of the game, including "pattern recognition, understanding and knowledge of rules of the game, dexterity, clearly memory to follow the banana, cognitive capabilities, and memory."[6] Hensel testified that these skill factors can determine the outcome of the game and opined that the Banilla games are, therefore, "skill games."[7]

Nick Farley

Nick Farley (hereinafter "Farley"), president of Nick Farley & Associates, Inc. d/b/a Eclipse Compliance Testing (NFA),[8] was recognized as an expert in the field of 'game classification, mechanics, and analysis'[9] and in such capacity provided testimony which—along with the findings contained in his expert reports related to the Ultra, Ultramax, and Dual Banilla machines—is summarized herein.[10] NFA analyzed "representative examples"[11] of the Banilla machines from the player perspective—*i.e.*, engaged in the play of each game theme on each type of model seized—and from the operator perspective—*i.e.*, accessed the administrative functions of the software on the game machine housed within the terminal.

Farley testified that, regardless of theme and gameplay aside, an element of chance does dictate the prizes available to a player in the reel round of gameplay in that the prize selected by a machine for a given round of reel play is selected from a "finite pool" of prize determination outcomes.[12] This means that the game software has a predetermined, finite pool of prize

---

[6] *Id.* at p. 27, ll. 12-17.
[7] *Id.* at p. 27, ll. 20-24.
[8] Hrg. Ex. 3.
[9] *N.T.*, p. 53, l. 14—p. 54, l. 1.
[10] *See id.* at pp. 49-76 and Hrg. Exs. 3-5.
[11] *N.T.*, p. 51, ll. 7-17.
[12] *Id.* at p. 52, ll. 19-24.

outcomes and when gameplay is engaged, a random starting point in this prize pool is selected. Upon a player's successful nudge or swap in the reel round of gameplay, the game awards the prize which had been determined at the beginning of gameplay to be the starting point within the pool. The prize amount for each successive successful round of reel play is, in turn, equivalent to the successive prize in the pool's sequence.

Farley testified that the reel round of gameplay contemplates a player's exercise of various skills:

> There's many different skills that a player has to use. There is memory, cognitive things, they'll have to read the rules, become familiar with the pay schedule to identify what symbols can award what prizes. They will have to use symbol recognition when patterns come up to determine whether a potential win is there; and if so, which task to perform, whether it's a nudge up, nudge down, which reel, which symbol to choose in a hot swap. They would have to use hand-eye coordination, dexterity to touch the screen in the appropriate location to engage in the activity.[13]

Farley testified that the Banilla games are winnable by a player "every time" and that a player "can get better at it with practice."[14] Farley opined that, as a result, that "[s]kill definitely determines the outcome on all three of those models."[15]

Follow the Banana gameplay is available on every model and in every game theme tested on the Banilla machines. Follow the Banana is always available to the player on the Ultra. This feature comes from the factory as enabled on the Ultramax and Dual machines, but with administrative access privileges, however, the Ultramax and Dual machines allow Follow the Banana to be disabled. In order to access the administrative functions of the machine and disable the Follow the Banana gameplay on an Ultramax or Dual, one would require a key to access the physical cabinet of the terminal housing the game machine, toggle a switch, input a PIN code,

---

[13] *Id.* at p. 56, ll. 13-24.
[14] *Id.* at p. 58, ll. 6-12.
[15] *Id.* at ll. 13-17.

locate the appropriate game configuration page of the menu screen, and disable the feature. Farley's testimony indicated that he had been "informed that the Follow the Banana feature has been enabled in each of" the seized Banilla games.[16]

Farley testified that a person can intentionally fail at the nudge or swap reel game task and can intentionally fail at the Follow the Banana game.[17]

Albert Ceccoli

Albert Ceccoli (hereinafter "Ceccoli") is an employee of Pennsylvania Coin, a company in the vending business, and in such capacity provided testimony which is summarized herein.[18]

Pennsylvania Coin owns and operates vending and amusement equipment throughout Pennsylvania and New York, and has obtained from Pinnacle machines manufactured by Banilla, including the Ultra, Ultramax, and Dual, and by Trestle, including the Gold. Pennsylvania Coin markets the 'Keystone' machines only in Pennsylvania. Generally, when Pennsylvania Coin brings a gaming machine to an establishment, its employees set it up, test the functionality, clear the bookkeeping, and advise the establishment owner on the operation of the machine. This administrative configuration is accomplished by means described earlier in Farley's testimony. Pennsylvania Coin employees have the PIN code for administrative access to its machines but do not provide the PIN to the establishments where the machines are placed in commerce. Pennsylvania Coin set up the Banilla and Trestle machines at Swizzle Stick, Park Market, and Anthracite, and the machines at BW Saloon were set up by an affiliated amusement operator. Pennsylvania Coin employees, upon delivery and configuration of gaming machines, do not turn off the Follow the Banana feature and are instructed to ensure that the feature is enabled. Ceccoli

---

[16] *Id.* at p. 65, ll. 1-5.
[17] *Id.* at p. 74, ll. 7-11.
[18] *See id.* at pp. 76-80.

testified that this Pennsylvania Coin policy is aimed at curtailing the potential for criminal prosecution for distribution of gambling devices. Ceccoli acknowledged that Pennsylvania Coin is aware that ensuring the Follow the Banana feature is enabled on the machines it distributes also ensures that a player has the potential to "beat" Pennsylvania Coin, monetarily, through winning the game in every single round of play carried out on a given machine.[19]

## B.    BLCE'S CASE

At the hearing, BLCE presented testimony from two (2) witnesses.

### Trooper Gabriel Gigliotti

Gabriel Gigliotti (hereinafter "Trooper Gigliotti") is a Pennsylvania State Police Trooper and previously served as an officer of BLCE, and in his capacity as a former BLCE officer provided testimony which is summarized herein.[20]

Trooper Gigliotti was involved as an undercover investigator in the investigations conducted by BLCE at Swizzle Stick, Park Market, and Anthracite in Luzerne County, but was not involved in the investigation at BW Saloon in Erie County. Trooper Gigliotti investigated the machines located at the Luzerne County establishments by engaging in their gameplay and redeeming vouchers printed from the machines for cash at the respective establishments. He engaged in both reel gameplay and Follow the Banana gameplay on one or more of the machines at issue. Each of the machines in issue operate on similar principles and have similar gameplay. On those machines, an individual voucher is limited to a maximum redeemable value of five hundred dollars ($500.00), but the machines do not limit the number of vouchers that may be printed where a player possesses in-game credits equivalent to a redeemable value of more than the maximum value of a single voucher—that is to say that were a player to have the equivalent

---

[19] *Id.* at p. 80, ll. 5-17.
[20] *See id.* at pp. 81-97.

of six hundred dollars ($600.00) in in-game credit, the player to redeem all credits available on the machine would have to print a $500.00 voucher and a separate $100.00 voucher. Further, all vouchers are rounded down to the nearest whole dollar. He has played the Follow the Banana feature on one or more of the machines at issue and, in a laboratory setting on a machine including the same feature, has previously successfully completed the Follow the Banana round of gameplay. Trooper Gigliotti's incident report confirmed that he observed the Follow the Banana feature was enabled on the Ultramax seized by BLCE from Swizzle Stick.

Ross Homentosky

Ross Homentosky (hereinafter "Officer Homentosky") is an officer of BLCE, and in that capacity provided testimony which is summarized herein.[21]

Officer Homentosky was involved in the inspection of the machines seized from the Luzerne County establishments, but otherwise did not participate in the field portion of BLCE's Luzerne County investigations and was not involved in the Erie County matter. With respect to the Banilla machines, Homentosky testified that wager amounts available range from twenty-five cents ($0.25) to twenty dollars ($20.00). He also confirmed the maximum amount printable by the machines on a single voucher. Homentosky demonstrated on the Ultramax present in the courtroom the "rapid play" technique he utilized when previously operating in an undercover capacity for BLCE during unrelated investigations, in which he opted not to engage in the Follow the Banana rounds of gameplay after unsuccessful rounds of reel play. In this method of play, Officer Homentosky repeatedly spun the reels until a potential winning nudge or swap opportunity was presented. Further, Officer Homentosky demonstrated the available auto-play feature on the Ultramax in the courtroom, wherein a player can opt to enable the machine to

---

[21] *See id.* at pp. 97-109.

force the reel round of gameplay to move from one spin to the next automatically. With auto-play enabled, the Ultramax can and will continue its automatic spinning of the reels until the reels arrive at a pre-nudge or pre-swap alignment wherein a player's successful nudge or swap can produce a winning combination. In this mode, a player chooses to bypass the Follow the Banana game. He has previously successfully completed the Follow the Banana round of gameplay on similar machines offering the feature. Officer Homentosky testified that each of the machines in issue operate on similar principles and offer similar functionality. At the time he participated in the inspection of the machines seized from Swizzle Stick, Officer Homentosky believed they were in the same condition—that is, with the Follow the Banana feature enabled— as when they were seized.

## IV.   DISCUSSION

### A.   ANALYTICAL FRAMEWORK

BLCE seized the machines at issue pursuant to purported violations of Section 5513 of the Crimes Code, 18 Pa.C.S. §§ 101-9546, which reads, in pertinent part, as follows:

> (a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he:
> (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any … slot machine or any device to be sued for gambling purposes, except playing cards;
> (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
> (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
> (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.
> …
> (b) Confiscation of gambling devices.—Any gambling device possessed or used in violation of the provisions of subsection (a) shall be seized and forfeited to the Commonwealth. The forfeiture shall be conducted in accordance with 42 Pa.C.S. § 5803 (relating to asset forfeiture), 5805 (relating to forfeiture procedure), 5806 (relating to motion for return of property), 5807 (relating to restrictions on use)

5807.1 (relating to prohibition on adoptive seizures) and 5808 (relating to exceptions).

18 Pa.C.S. § 5513.

Having asserted violations of Section 5513 of the Crimes Code, BLCE seized the 11 machines and cash under the authority of Section 5513(b) and Section 5803 of the Judicial Code, 42 Pa.C.S. §§ 101-9913, which states, in pertinent part, as follows:

(a) Applicability.—Notwithstanding any law to the contrary, this section shall apply to forfeitures conducted under the following:

...

(7) 18 Pa.C.S. § 5513 (relating to gambling devices, gambling, etc.).

...

(b) Process and seizure of money and personal property.—Property subject to forfeiture may be seized by a law enforcement authority if any of the following apply:

(1) The seizure is incident to an arrest or a search under a search warrant or inspection under an administrative inspection warrant and there is reason to believe the property is subject to forfeiture.

...[22]

(4) There is probable cause to believe that the property has been used or is intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64),[] known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction.

(5) There is a warrant issued by a court of common pleas with appropriate jurisdiction.

(6) There is probable cause to believe that the property is subject to forfeiture and exigencies are likely to result in the destruction or removal of the property.

42 Pa.C.S. 5803(a)-(b).

Pinnacle's motions for return of property are filed pursuant to 18 Pa.C.S. § 5513(b), set forth above, and 42 Pa.C.S. § 5806 and Pa.R.Crim.P. 588, which provide, respectively and in pertinent part, as follows: "A person aggrieved by a search and seizure may move for the return

---

[22] Subsections (b)(2)-(3) are explicitly inapplicable to the instant matter, but provide as follows:
    (2) The property subject to seizure has been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter.
    (3) There is probable cause to believe that the property is dangerous to health and safety and exigencies are likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture.
42 Pa.C.S. § 5803(b)(2)-(3).

of property seized by filing a motion in the court of common pleas in the judicial district where

the property is located," 42 Pa.C.S. § 5806(a)(1), and:

> (A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
> (B) A judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

Pa.R.Crim.P. 588.

Thus, "Pennsylvania Rule of Criminal Procedure No. 588 requires the moving party to

demonstrate lawful possession of the property. Then the burden shifts to the Commonwealth to

defeat the motion by showing that the property is contraband or derivative contraband." *Com. v.*

*Wintel, Inc.*, 829 A.2d 753, 756 (Pa. Commw. Ct. 2003) (citing *Com. v. Pomerantz*, 393

Pa.Super. 186, 573 A.2d 1149 (1990)). As has been recognized by Pennsylvania jurisprudence,

motions for return of property are often subject to consideration as either responsive to or

precipitous of petitions for forfeiture:

> It is well settled "that a proceeding for return of property under [Rule] 588 is simply a mirror image of a forfeiture action under the [Controlled Substances] Forfeiture Act." ...
> Nonetheless, because these proceedings necessarily entail some criminal conduct, they have been described as "civil in form, but quasi-criminal in nature." ... [O]ur courts have required the Commonwealth to prove its forfeiture case by a preponderance of the evidence, rather than the beyond a reasonable doubt standard applicable in criminal cases. ...

*In Re $300,000 in U.S. Currency*, 259 A.3d 1051, 1059-60 (Pa. Commw. Ct. 2021) (citations

omitted). Thus, both in contesting Pinnacle's return motions and in responsively seeking the

forfeiture of the Swizzle Stick and Park Market personalty, the burden is on BLCE to

demonstrate by a preponderance of the evidence[23] whether the machines are "gambling devices," and thus subject to forfeiture. *See In re: Petition of District Attorney of Wyoming County Seeking Forfeiture of One 1986 Oldsmobile Sedan*, 165 Pa.Cmwlth. 61, 65, 644 A.2d 240, 242 (1994) (citing *Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super. 431, 288 A.2d 919 (1972)).

The term 'gambling devices' is not defined by the legislature and the ambit of the term instead has been left to the courts of this Commonwealth to discern. In its opinion in *Com. v. Irwin*, 535 Pa. 524, 636 A.2d 1106 (1993), the Supreme Court of Pennsylvania reiterated the relevant definitional standard through which the law of this Commonwealth has been expressed:

> A machine is a gambling device *per se* if it can be used for no purpose other than gambling. *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983). The proper inquiry is "whether the machine is so intrinsically connected with gambling as to constitute a gambling device *per se*." *Id*. at 194, 465 A.2d at 977 (quoting *Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super. 431, 433, 288 A.2d 919, 920 (1972)).
> The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward. *Commonwealth v. Twelve Video Poker Machines*, 517 Pa. 363, 366, 537 A.2d 812, 813 (1988). Where these three elements are present, the machine will be "so intrinsically connected with gambling" as to be a gambling device *per se. Two Electronic Poker Game Machines*, 502 Pa. at 194, 465 A.2d at 977. The Commonwealth has the burden of proving the *per se* nature of the machines. *Id*. at 190, 465 A.2d at 975.

*Id.*, 636 A.2d at 1107. The standards established by the jurisprudence of our Commonwealth also make clear that BLCE's entitlement to forfeiture of the cash seized from Swizzle Stick and Park Market is contingent upon BLCE's success in establishing that the machines are 'gambling devices':

> Cash may be forfeited to the Commonwealth as derivative contraband of an illegal gambling operation. ... Cash will be found derivative contraband of an illegal gambling operation where

---

[23] As set forth by the Commonwealth Court of Pennsylvania in its opinion in *Com. v. McJett*, 811 A.2d 104 (Pa. Commw. Ct. 2002), "[p]reponderance of the evidence is tantamount to a 'more likely than not' standard. ... Proof by a preponderance of the evidence is 'often alluded to as a weighing of the evidence and a determination based upon which way the mythical scales are tipped.'" *Id*. at 110 (citations omitted).

> *it is clearly apparent that the money formed an integral part of the illegal gambling*
> operation ... .

*In re: Return of Property Confiscated October 30, 1999 from 411 East Mac Dade Boulevard,*

856 A.2d 238, 246 (Pa. Commw. Ct. 2004) (emphasis in original).[24]

Finally in reviewing the instantly-appropriate analytical framework, the trial court notes

that, to the extent raised in post-hearing briefs by BLCE, BLCE's reliance on the Pennsylvania

Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904 (hereinafter referred to as

the "Gaming Act"), for the proposition that the seized machines are contraband is misplaced and

the instant controversy must be decided under the framework that stems from Section 5513 of

the Crimes Code as previously summarized herein.[25] *See POM of Pennsylvania, LLC v.*

*Department of Revenue*, 221 A.3d 717, 731 (Pa. Commw. Ct. 2019) ("[T]he Gaming Act does

not apply to unlicensed and/or illegal slot machines."); *also id.*, 221 A.3d at 736 ("[S]ection 5513

of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the

preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.").

---

[24] The case of *Return of Property Confiscated October 30, 1999* was adjudicated under a previously-enacted version of 18 Pa.C.S. § 5513. *See* Act of 1996, July 11, (P.L. 552, No. 98, § 3), imd. effective. That version of Section 5513, in subsection (b), did not explicitly incorporate a specific statutory forfeiture procedure, as does the current version by reference to Sections 5803, *et. seq.*, of the Judicial Code, *see* 18 Pa.C.S. § 5513(b). Instead, the then-current version of Section 5513 incorporated by reference "[a]ll provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of intoxicating liquor shall apply to seizures and forfeitures under the provisions of this section." The trial court recognizes that decisions issued by our courts prior to Section 5513(b)'s explicit incorporation of the forfeiture provisions of the Judicial Code were analyzed under, *inter alia*, the framework codified in Section 602 of the Liquor Code, Act of 1951, April 12 (P.L. 90), *as reenacted and amended*, 47 P.S. §§ 1-101—10-1001. *See* 47 P.S. § 6-602(e); *see also, e.g., Return of Property Confiscated October 30, 1999*, 856 A.2d at 246 ("The procedure to be applied in a gambling forfeiture case is set forth in Section 602(e) of the Liquor Code, 47 P.S. § 6-602(e); *Commonwealth v. McDermond*, 127 Pa.Cmwlth. 17, 560 A.2d 901 (1989)."). Nonetheless, the trial court relies upon the principles espoused by our appellate courts in the context of 47 P.S. § 6-602(e) with respect to derivative contraband as remaining viable and sound when applied in the context of the instant analysis under 42 Pa.C.S. § 5803.

[25] Parenthetically, the trial court notes that, at the hearing, BLCE acknowledged the inapplicability of the Gaming Act to the instant controversy. Counsel for BLCE argued against Pinnacle's proffer for recognition of Hensel as an expert witness in the field of 'gaming regulations,' stating: "These machines are not regulated. They're not—they don't fall under Title 4 of the Gaming Board which is Section 5513. It's a different animal altogether." *N.T.* at p. 18, ll. 21-24.

B.    APPLICATION AND ANALYSIS

1.    Propriety of the Seizures

Having considered the facts of record, as summarized above, the trial court first reviews—in light of Pinnacle's assertions that BLCE "improperly seized" Pinnacle's machines[26]—the propriety of the manner in which the seizures at issue occurred. Section 5513 of the Crimes Code mandates that gambling devices used in violation thereof shall be seized and the forfeiture of such devices shall be conducted in accordance with the requirements set forth in the forfeiture provisions of the Judicial Code. *See* 18 Pa.C.S. § 5513(b). Section 5803 of the Judicial Code, in turn, provides, as instantly pertinent, that seizure under those forfeiture provisions may only occur after an arrest or a favorable probable cause determination of varying potential provenance. *See* 42 Pa.C.S. § 5803(b). As Sections 5513 of the Crimes Code and 5803 of the Judicial Code explicitly reference each other in relation to the potential forfeiture of 'gambling devices,' the trial court concludes as a matter of law that they relate to the same subject matter. Accordingly, the trial court reads these statutory provisions *in pari materia* to conclude that the instant seizures, where mandated by 18 Pa.C.S. § 5513(b), must have comported with the procedural prerequisites set forth in 42 Pa.C.S. § 5803(b). *See, e.g., Cozzone ex rel. Cozzone v. W.C.A.B. (Pa Municipal/East Goshen Tp.)*, 621 Pa. 23, 39, 73 A.3d 526, 536 (2013) ("[A]s a fundamental principle, where two parts of a statute relate to the same persons or things, those statutory parts are to be construed and considered concurrently, whenever possible. They are not to be construed as if one part operates to nullify, exclude or cancel the other, unless the statute expressly says so. 'If they can be made to stand together, effect should be given to both as far as possible.'").

---

[26] *See, e.g.*, Motion for Return of Seized Property, 2020-05210, Jun. 3, 2020, ¶ 9.

Page **18** of 27

Here, no testimony, evidence, averment, or argument was made by BLCE that any of the instant seizures were undertaken in relation to an arrest or subsequent to BLCE having been afforded authority in consequence of a favorable probable cause determination. Rather, the only reference in the record to the manner in which any of the instant seizures occurred can be found in the new matter filed by BLCE in response to Pinnacle's return motions with respect to the Swizzle Stick and Park Market machines, wherein BLCE avers that each respective seizure occurred "while troopers conducted a routine inspection."[27] Accordingly, the trial court finds preliminarily that the instant seizures were improper and for that reason, all personalty of Pinnacle—or other persons aggrieved by the improper seizures—which is not contraband must be disgorged from the Commonwealth's possession. To determine however, whether the machines and associated cash are not contraband and, therefore, capable of lawfully being returned, the trial court must adjudge whether the machines are gambling devices *per se* and whether, as a result, the cash seized is derivative contraband.

In the alternative, if the seizures were to be deemed not improper, the trial court must nonetheless reach a conclusion as to the nature of the machines and the associated cash in the context of the return motions and forfeiture requests now being adjudicated. Accordingly, and regardless of whether the seizures offended Pinnacle's procedural protections, the trial court now turns to an analysis of whether the machines are 'gambling devices' *per se*.

2.    Determination of Status as 'Gambling Devices' *per se*

As noted, the threshold inquiry into resolving the heart of the instant controversy is dictated by Pa.R.Civ.P. 588 to be whether Pinnacle has proven by a preponderance of the evidence that it is entitled to lawful possession of the seized machines. To sustain this burden,

---

[27] *See* Commonwealth's Answer to Motion for Return of Seized Property, 2020-05210, Sep. 18, 2020, ¶ 23(b), and Commonwealth's Answer to Motion for Return of Seized Property, 2020-05529, Sep. 18, 2020, ¶ 23(b).

Page **19** of **27**

Pinnacle must have demonstrated that said machines are not gambling devices *per se*; that is to say that they are not intrinsically connected to gambling. *Irwin*, 636 A.2d at 1107. The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward. *Id.* (*citing Twelve Video Poker Machines*, 537 A.2d 812, 813 (1988)). Here, Pinnacle does not contest that the elements of consideration and reward exist. Accordingly, to satisfy the initial burden, Pinnacle must have proven that it is more likely than not that the results of games played on the instant machines are determined by skill rather than chance. *See id.* In adjudicating this precise issue under other factual scenarios previously presented, Pennsylvania's appellate courts have determined that the outcome is to be determined by application of the 'predominate-factor test,' wherein "the court should determine the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game." *Com. v. Dent*, 2010 Pa.Super. 47, ¶ 11, 992 A.2d 190, 193 (2010) (*citing Two Electronic Poker Game Machines*, 465 A.2d at 978). Because in response, in the two cases in which BLCE seeks forfeiture, BLCE's burden is the mirror image of Pinnacle's, *In Re $300,000 in U.S. Currency*, 259 A.3d at 1059-60, and because Pinnacle must sustain this burden in the two cases where BLCE does not seek forfeiture, *Wintel, Inc.*, 829 A.2d at 756, resolution of the predominate-factor test will be determinative of the legality of possession for all 11 of the seized machines.

Here, the evidence bears out that elements of both chance and skill exist in the games housed within Pinnacle's Banilla machines. The testimony and exhibits show that, regardless of a player's skill: (1) what combination of symbols are presented by the reels prior to a nudge or swap attempt; (2) what symbols are available to a player with which to attempt a nudge or a swap; and (3) what prize is available to the player in any given round of reel play are left to

chance. The evidence also shows, however, that after having attempted to perform a nudge or swap—as may be appropriate for a given selected game theme—a player is always able, through the exercise of skill, to obtain a winning result in every round of play on every Banilla game through the successful completion of the Follow the Banana task. Where a player, through the exercise of skill, is able to obtain a successful outcome in every single round played in every single game theme, there is little doubt that skill predominates over chance.

The evidence here shows that a player has the ability to choose how to play these games. A given player may ignore completely the available Follow the Banana function and another player may take up the gauntlet of the pattern replication round of gameplay at every opportunity. In essence, BLCE argues: (1) because a player may choose to disregard their opportunity to skillfully obtain a successful result in each and every round of play; or (2) because the skill of pattern replication may be difficult to obtain or exercise, that chance predominates. Given the zero-sum burden of proof between the parties, this position fails to carry the day.

If anything, the fact that a player has a choice—and the fact that that choice contemplates a player's election to disregard an opportunity to exercise skill—belies the assertion that chance predominates. 'Chance' is defined by the Black's Law Dictionary as "the unforeseen, *uncontrollable*, or unintended consequences of an act." Chance Definition, *Black's Law Dictionary*, (11th ed. 2019), *available at* Westlaw (emphasis added). The machines vest in the player choice and control over the manner in which they choose to utilize their wager and the manner in which, therefore, they try to win—a player chooses whether to engage in reel play only or to engage in the pattern replication task inherent to Follow the Banana. Where choice and control avail the player, without exception, of the opportunity to obtain a successful result through the exercise of skill, chance—as an element of play—is rendered subservient to that

Page **21** of **27**

element of play brought to bear by a player's skill. Whether a player opts to engage in the available post-reel play simply is, therefore, inapposite to the outcome of the predominate-factor test. Likewise, whether a player can or has obtained the necessary proficiency in the exercise of the skill required is similarly inapposite. A player's disregard of choice and degree of skill do not, by themselves, neither obviate the existence of skill nor determine whether the element of skill looms larger than the element of chance in a given round of play.

In its opinion in the very case in which the Supreme Court of Pennsylvania crystalized and set forth the governing 'predominate-factor test,' *Two Electronic Poker Machines, supra,* our high court recognized the validity of a critical and pervasive factual proposition, as set forth by the intermediate appellate court, which is inescapable in an analysis such as that instantly undertaken. There, our high court affirmed the understanding of our courts that the law of Pennsylvania contemplates and accepts the proposition that skill and chance each have a role to play in many of the competitive games to which a person may resort for entertainment:

> A peculiar combination of luck and skill is the *sine qua non* of almost all games common to modern life. It is hard to imagine a competition or a contest which does not depend in part on serendipity. It cannot be disputed that football, baseball and golf require substantial skill, training and finesse, yet the result of each game turns in part upon luck or chance.

*Id.,* 465 A.2d at 977 (*quoting Com. v. One Electro-Sport Draw Poker Machine, Serial No. 258,* 297 Pa.Super. 54, 60, 443 A.2d 295, 298 (1982)). In light of our high court's recognition of the continued validity of the factual principle that elements of chance and skill both almost always have a hand to play in the outcome of a given competitive game, the trial court, of course, recognizes that elements of both skill and chance exist in the play of those machines whose nature the trial court instantly must discern.

Page **22** of **27**

The player of a Banilla gaming machine is presented options with which to attempt to obtain a successful gameplay result in a given round. Upon a spin of the reels, the Banilla software indiscriminately places a player in a pre-determined position within the confines of the finite prize pool; this starting position is left largely to an element of chance. The outcome of any given spin of the reels on these Banilla gaming machines could be said to be predominated by chance, as though elements of skill can be brought to bear, the machine's software governs the available outcomes. An unsuccessful nudge or swap after a spin of the reels, however, does not demarcate the end of a round of gameplay.

Upon a player's entry into the Follow the Banana feature, the player is in complete control of the ultimate outcome of that round of gameplay in which the reels did not provide success. Both whether a player chooses to access the pattern replication feature and how proficient our player may be in carrying that choice through to success are not predominated by chance, but rather by the player and that player's skill alone. A player could elect to merely hope for an opportunity to nudge or swap for a winning combination in the reel round of gameplay by, for example, employing a 'rapid play' technique, and thereby choose to forego all opportunity to meaningfully employ their skill in the pattern replication task. A player may ignore the Follow the Banana game subsequent to every single spin of the reels. In opting, however, to enter the Follow the Banana round of the gameplay, the player instead chooses to foreclose the potential that anything other than their individual skill may predominate in dictating the outcome of that round.

The critical determinative fact is that on every single play throughout the entire duration of the Banilla game—where the reels have not resulted in a successful outcome and a player is in danger of not obtaining a successful result predominately through chance—the player may

Page 23 of 27

always dictate that they be afforded an opportunity to win the round and receive a reward through the exercise of skill. The evidence of record mandates a factual finding of the banana game's perpetual availability. Where the Banilla player may continuously affix the outcome of each distinct reel-and-pattern round of play firmly within their control, BLCE's burden is rendered incapable of satisfaction. On those machines instantly at issue before the trial court, the player's exercise of skill can deliver a successful outcome in each and every play of each and every reel-and-pattern round—without exception.

The player of a Banilla gaming machine at issue—given the appropriate level of skill and through the exercise of choice and control to employ the same—could win every single round of play; and so, skill predominates. The outcome of every round of play on the instant machines is not predominated by chance as it, ultimately, is neither a matter purely of fate nor is it even dictated by the source code of the gaming software encoded within the machines. The outcome of every round of play, instead, is predominated by a player's choice over their election to utilize—and their exercise of—skill, to whatever degree it may have been honed.

Pinnacle, therefore, has met their burden to prove by a preponderance of the evidence that skill predominates over chance in the gameplay on the Ultra, Ultramax, and Dual machines which house the Banilla gaming software. BLCE has failed to meet their burden that chance predominates over skill in the same. Further, with no evidence of record other than the unrefuted assertions that the Trestle machine operates on similar principles and with similar play and functionality to the Banilla games, the trial court concludes that BLCE has similarly failed to meet its burden that chance predominates over skill in the game(s) contained therein and that Pinnacle has, instead, sustained its burden with respect to the Gold machine in which Trestle game software is housed. Accordingly, the 11 machines are not gambling devices *per se* and

therefore are not contraband. As a result, the cash seized by BLCE cannot be found to be derivative contraband.

## V.  <u>CONCLUSION</u>

For the reasons set forth above, the trial court this day enters the order in support of which this opinion has been issued.

BY THE COURT:

_____
HON. FRED A. PIERANTONI, III, J.

[END OF OPINION. ORDER APPENDED AS PAGES 26-27.]

Copies:      Ryann D. Loftus, Esq.
             Danielle Mulcahey, Esq.
             Donald P. Shiffer, III, Esq.
             148 Adams Avenue
             Scranton, PA 18503

             Joseph O. May, Esq.
             Deputy Attorney General
             Pennsylvania Office of Attorney General
             680 Baltimore Drive
             Wilkes-Barre, PA 18702

PROTHONOTARY LUZERNE COUNT
FILED MAY 18 '22 AM 11:

| | | |
|---|---|---|
| PINNACLE AMUSEMENT, LLC, | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| Plaintiff/Petitioner, | : | CIVIL DIVISION |
| | : | |
| v. | : | NOs.: 2020-05210 |
| | : | 2020-05529 |
| BUREAU OF LIQUOR CONTROL | : | 2021-03722 |
| ENFORCEMENT, | : | 2021-10019 |
| | : | |
| Defendant/Respondent. | : | |

## ORDER

AND NOW, this __18th__ day of May, 2022, after consolidated hearing upon the Motion

for Return of Seized Property of Plaintiff, Pinnacle Amusement, LLC, filed to each of the above-

captioned dockets and the requests for forfeiture filed by Defendant, Bureau of Liquor Control

Enforcement, as new matter to dockets 2020-05529 and 2020-05210, after review and

consideration of the pleadings, evidence, and respective briefs of the parties, and for all of the

reasons set forth in the opinion issued in support of the instant order, it is hereby ORDERED,

ADJUDGED, and DECREED as follows:

1.      The motion for return of property filed by Plaintiff, Pinnacle Amusements, LLC,

at each of docket numbers 2020-05210, 2020-05529, 2021-03722, and 2021-10019, is

GRANTED.

2.      The request for forfeiture filed as new matter by Defendant, Bureau of Liquor

Control Enforcement, at each of docket numbers 2020-05210 and 2020-05529, is DENIED.

Page **26** of **27**

3.   The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to Plaintiff, Pinnacle Amusements, LLC:

    a.   three (3) Keystone Ultra-model gaming machines;

    b.   five (5) Keystone Ultramax-model gaming machines;

    c.   two (2) Ultramax Dual-model gaming machines; and

    d.   one (1) Keystone Gold I-model gaming machine.

4.   The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to D & M Shumbris, Inc., t/a The Swizzle Stick: one thousand five hundred twenty-six dollars ($1,526.00) in United States currency.

5.   The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to Park Market Six Packs To Go, LLC: two hundred fifty-six dollars ($256.00) in United States currency.

6.   The Prothonotary shall serve notice of the entry of this Order and the Opinion issued in support hereof pursuant to Pa.R.C.P. 236.

BY THE COURT:

_____
HON. FRED A. PIERANTONI, III, J.

Copies:    Ryann D. Loftus, Esq.
    Danielle Mulcahey, Esq.
    Donald P. Shiffer, III, Esq.
    148 Adams Avenue
    Scranton, PA 18503

    Joseph O. May, Esq.
    Deputy Attorney General
    Pennsylvania Office of Attorney General
    680 Baltimore Drive
    Wilkes-Barre, PA 18702

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| PACE-O-MATIC, INC. EQUIPMENT | : | M.D.965-2013 |
| | : | |
| | : | |
| TERMINAL I.D. NO. 142613 | : | |

## MEMORANDUM OPINION AND ORDER

H.KNAFELC,J.                                                    December 23, 2014

### I.    PROCEDURAL HISTORY

On November 19, 2013, agents of the Pennsylvania Bureau of Liquor Control

Enforcement seized a Pace-O-Matic, Inc. video game device from the American-Italian Club

located in Aliquippa, Beaver County. The manufacturer of the device filed a timely Petition for

Return of Seized Property and requested a post-seizure hearing pursuant to Pennsylvania Rule of

Criminal Procedure 588. This Court held a hearing on the matter on September 26, 2014. The

Sole purpose of that hearing was to gather evidence as to whether the confiscated property

Constituted a gambling device per se. The evidence fails to demonstrate that the machine is a

gambling device per se, and Petitioner's motion for its return GRANTED.

During the hearing, this Court heard testimony on the operation of the confiscated device.

The Court heard testimony on two issues: first, whether Petitioner was entitled to lawful

Possession of the res; and second, whether the games installed on the device were games of



chance or games of skill. Both parties stipulated that the other elements of a gambling device per se, consideration and reward, were satisfied. The device requires a player to put in cash in order to access the games installed on the device. Successful play has the potential to reward a player with more credits than he or she put into the device. Thus, this Court is tasked only with resolving whether the games on the device are games of skill or games of chance. Because of the level of interactivity between the game and the player, as well as the gameplay mechanics, the evidence fails to show that the games included on the device—Tic-Tac-Toe, unlockable bonus game, and the "Follow-Me" mini-game—are anything other than games of skill. The device is therefore not a gambling device per se and shall be returned to Pace-Omatic, Inc.

## II.   STATEMENT OF FACTS

The property seized in this case is a coin-operated table top machine that offers a Tic-Tac-Toe puzzle, an unlockable bonus game, and a "Follow-Me" mini-game. The player uses a touch screen navigate through the system. A player initiates the game by inserting money into the device. A player can place a bet of 40, 80, 120, 160, or 200 "points." One point equals one cent. A player then proceeds to select one of three themes. These are "Bombs and Bombshell," "Pirates Prize," and "Cocktail Cove." While the graphics and some pay amounts differ depending on which theme the player chooses, the gameplay is functionally equivalent among the three themes. The player has access to the same features regardless of which theme he or she chooses, and the themes will thus be treated interchangeably.

The first game that the player interacts with is the Tic-Tac-Toe puzzle. This is the primary game included on the device, and a player cannot access the other features of the game without first playing the Tic-Tac-Toe puzzle. Upon initiating gameplay, the game spins each of the nine reels arranged in a three-by-three grid on the screen. After the reels stop spinning, the

Page 2 of 13

player has ten seconds to select one of the nine cells to change a symbol in that position to a wild symbol. The player is tasked with choosing the most advantageous spot to place the wild. Whether one spot is more advantageous than other depends on the value of the symbols in the row, column, or diagonal that was completed, and whether completion of one row, column, or diagonal completes another. If the player does not make a selection in the allotted time, no wild symbol will be placed on the screen. Because a random number generator excludes an automatic winning game, failure to place the wild will always result in a loss for the player. Each game will have at least one spot where placing the wild will result in a nonzero score, and no game will be completely winnable.

A player has the opportunity to access a bonus game while playing the Tic-Tac-Toe puzzle. Certain symbols in the three-by-three grid have the potential to unlock the bonus game. A player must align three bonus symbols in a row, column, or diagonal on the three-by-three grid. Where the player manages to place a wild in the proper position, the game awards the player with a bonus shooting game. There are slight differences in the bonus games depending on the theme chosen, but the core gameplay mechanics of the three bonus games are virtually identical, and will be treated in the same manner. The bonus games are shooting-style games. Targets appear at random positions across the screen, and the object of the bonus game is to target all of the symbols on the touch screen during the time allotted (30 or 45 seconds, depending on the theme chosen). The speed with which the targets appear on the screen and the fact that they are scattered about the screen provides the game's challenge. The player is rewarded with points depending on how many of the symbols he or she was able to target and touch.

If during the tic-Tac-Toe game, the player wins an amount that is less than 104% of the purchase price to play the game, the player is afforded the option of selecting the "Follow-Me" mini-game. A player who chooses to proceed with the Follow-Me feature is presented with a three-by-three grid of colored dots. Essentially, the Follow-Me feature is a memory game. The dots flash in a random sequence which the player must repeat. Starting with one circle flashing, the player will need to follow the correct sequence for a total of forty rounds of play, with each sequence adding another circle. If the player successfully follows the pattern each time, the player is awarded with 104% of his or her original wager. For example, if the player had wagered 40 credits, successful completion of the Follow-Me mini-game would result in a payout of 42 credits.

### III.    LEGAL BACKGROUND AN ANALYSIS

A motion for return of property pursuant to Rule 588 is intended to return goods to a person aggrieved by a search and seizure based upon the right to lawful possession and the non-contraband status of the goods. Pa. R. Crim. P. 5888; *Com. V. Pomerantz*, 573 A.2d 1149, 1150 (Pa. Super. Ct. 1989). Rule 588 provides, in pertinent part, the following:

**Rule 588. Motion for Return of Property**

(A)    A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B)    The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

A petitioner's motion for return of property must, at a minimum, allege that the petitioner Is entitled to lawful possession of the property at issue. *Pomerantz*, 573 A.2d at 1150. The

petitioner must prove that he is entitled to possession by a preponderance of the evidence. *Beaston v. Ebersole*, 986 A.2d 876, 881 (Pa. Super Ct. 2009). A preponderance of evidence standard is tantamount to a "more likely than not" standard. *Com. v. $6,425.00 Seized from Esquilin*, 880 A.2d 523 (Pa. 2005).

Where a petitioner meets the minimal burden of establishing entitlement to lawful possession, unless there is a countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property. *Ibid.* The Commonwealth must prove the per se nature of machines seized as gambling devices by a preponderance of the evidence. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993).

A machine is a gambling device per se if three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. Because both the Petitioner and the Commonwealth have stipulated that the machine meets the consideration and reward elements, only the second element—whether the result is determined predominantly by chance or skill—will be addressed in depth.

That successful play is determined by chance rather than skill is an element essential to a Finding that a machine is a gambling device per se. *Com. v. Two Elec. Video Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983). Courts must determine in each case the relative amounts of skill and chance present in the play of each machine and the extent to which skill or chance determines the outcome. *Ibid.* In order for a game to constitute gambling, it must be a game where chance predominates rather than skill. *Ibid.* A showing of a large element of chance, without more, is not sufficient, and the outcome need not be wholly determined by skill in order for a machine to fall outside the gambling per se category. *Ibid.* The mere fact that a machine

involves a substantial element of chance is insufficient to find that a machine a gambling device. *Ibid.*

A game decided predominately on the basis of probability rather than any real input of skill from a player will be a game of chance. The level of interactivity and the consequences of a player's choices in playing the game are relevant in determining whether the game is one of chance or skill. *See id.* At 976 (noting that while skill, in the form of knowledge of probabilities, can improve a player's chance of winning a video poker game, chance ultimately determines the outcome because chance determines the card dealt and the cards from which they can draw); *compare Com. v. Dent,* 992 A.2d 190 (Pa. Super. Ct. 2010) (holding that although skill can determine the outcome in a poker game, players are still subject to defeat at the turn of the cards), *with Am. Amusements Co. v. Neb. Dep't of Revenue,* 807 N.W.2d 492 (Neb.2011) (noting that because the gameplay in a tic-tac-toe puzzle was under the control of the player and not the machine, the game was one of skill rather than chance).

### A. Lawful Possession

The initial burden is on the Petitioner, Pace-O-Matic, Inc., to prove that it is entitled to lawful possession of the res at issue by preponderance of the evidence standard. *Beaston v. Ebersole,* 986 A.2d 876, 881 (Pa. Super. 2009). Petitioner has met that burden here. The device at issue is a coin-operated tabletop video game machine manufactured by Pace-O-Matic, Inc. The fact that Petitioner has manufactured, designed, and provided the source code for the machine makes it more likely than not that Petitioner is entitled to lawful possession of the video game machine at issue.

### B.   Gambling Device Per Se

Upon a showing of lawful entitlement, the burden shifts to the Commonwealth to prove by a preponderance of the evidence that the video game machine seized is contraband. *Com. v. Irwin*, 636 A.2d 1106, 1107 (Pa. 1993). Specifically, the government must show that the video game is a "gambling device per se." *Ibid.* In determining whether a machine can be seized, the machine must be so intrinsically connected with gambling as to constitute a gambling device per se. This intrinsic connection is met where three elements are present: (1) consideration, (2) result determined by chance rather than skill, and (3) reward. *Ibid.* The parties in this case have stipulated that, because a player must insert money to begin play and is enticed to play by the promise of a payout, the first element, consideration, and the third element, reward, are met. The only issue remaining is whether successful play is determined predominantly by skill or chance.

There is no doubt that the game at issue contain elements of skill and chance. It is therefore the task of this Court to determine, on balance, whether skill or chance is the dominant factor in successful play. The operation of the machine and the way a player interacts with the machine must be evaluated. A noted, the machine contains the following features: (1) a Tic-Tac-Toe puzzle; (2) an unlockable bonus shooting game; and (3) a "Follow-Me" mini-game. The extent to which chance and skill decide the outcome of each game must be evaluated.

### I.   Tic-Tac-Toe Puzzle

The parties disagree on whether skill or chance dominates the outcome of the Tic-Tac-Toe puzzle. The Commonwealth asserts that the skill required to place the wild symbol in a spot is outweighed by the chance determination of the puzzle itself. This Court respectfully disagrees with the Commonwealth's position. Although there often is, as the Commonwealth points out, an "obvious" position where placement of the wild would generate a nonzero score, several puzzles

have a position where placement of the wild will lead to a more advantageous score. It takes skill for a player to recognize both which symbols are most advantageous to his or her payout and which position will maximize the player's score. A Player who lacks the skill to recognize that the placement of a wild symbol in a particular position will lead to the completion of two or three rows, columns, or diagonals will not achieve as high a score as one who does recognize those patterns. Were the game one predominantly based on chance, one would reasonably expect that a skilled player and an unskilled player would stand to gain roughly the same score. However, a more skilled player is much more likely to achieve a greater score than an unskilled player, which augurs in favor of holding that the game is one of skill, not chance.

The Commonwealth places heavy emphasis on the fact that the device utilizes a random number generator to generate the puzzle itself. However, the fact that a machine utilizes a random generator, without more, is insufficient to push this game into the realm of chance. The function of the random number generator is not to determine whether the player wins or loses, but merely to determine which puzzle within a finite pool of puzzles will be presented to the player. The random number generator simply constructs the field on which the player will be playing. It establishes the constraints in which the player must operate to receive the most points possible. Additionally, the generation of a puzzle is not a purely random event. Each puzzle presented to the player has the possibility of a win, and the player will not be presented with a puzzle that is already solved. Thus, the purpose of the random number generator is only to choose, at random, which of a large—yet finite—pool of puzzles to present to the player. Even if the presentation of the puzzle were a "substantial element of chance," this, without more, is insufficient to a finding that the Tic-Tac-Toe game is a game of chance. *Com. v. Two Elec. Video Poker Game Machs.,* 465 A.2d 973, 977 (Pa. 1983).

Even more essential to the analysis than how the game is constructed and presented is the gameplay itself. During the course of play, the element of skill predominates and determines the outcome to a much higher degree than chance. It is up to the player to choose which spot to place the wild in order to achieve the most advantageous score. Our Superior Court's holding in *Dent* is instructive. There, the Court held that Texas Hold 'Em is predominately a game of chance. *Com. v. Dent*, 992 A.2d 190 (Pa. Super. Ct. 2010). The Court placed great weight on the fact that while skill can determine the outcome in a Texas Hold "Em poker game, "players are still subject to defeat at the turn of the cards." *Id.* at 196. In the Tic-Tac-Toe game at issue here, the players are not subject to victory or defeat at the spin of the reels. The game's code precludes automatic victories and automatic defeats. Unlike a traditional poker game, the players of the Pennsylvania Skill game are not at the mercy of the hand they are dealt. Every puzzle is winnable, and some have higher wins depending on whether the player has the skill to recognize the most advantageous spot to place the wild. In this game, the player's choices are the "instrumentality for victory"—in sharp contrast to the capricious nature of card dealing and shuffling present in a traditional game of Texas Hold Em'. *See Ibid: see also Am. Amusements. Co. V. Neb. Dep't of Revenue*, 807 N.W.2d 492, 504 (Neb. 2011) (holding that where a puzzle is more controlled by the player than not, it is predominately a game of skill).

This Tic-Tac-Toe puzzle is also different from the devices confiscated in *Two Electronic Poker Game Machines*. There, the Pennsylvania Supreme Court dealt with a coin-operated video game that simulated the events of five card draw poker. 465 A.2d 973 (Pa. 1983). The deck is "shuffled" by a random number generator, and the player is awarded points for various combinations of cards, ranging from one point for a pair of aces to fifty points for a straight flush. *Id.* at 976. The Court emphasized that chance was the predominant factor in the outcome

because chance determined the cards dealt and the cards from which one could draw. *Id.* at 978. The "skill" at issue was knowledge of probabilities. *Ibid.* This is different from the Tic-Tac-Toe game in this case for two reasons. First, the random number generator in the machine here does not determine a win or loss; rather, it merely chooses the puzzle that the player is presented with. Second, knowledge of statistics was the skill at issue in *Two Electronic Poker Game Machines,* whereas the skill at issue here is ability to play Tic-Tac-Toe. Knowledge of statistics was a skill wholly independent of the simulated poker game, and was not contemplated by or integral to the gameplay. It was a skill that was based on the nature of the player rather than the nature of the game. Here, skill at Tic-Tac-Toe and pattern recognition is fully integrated into the gameplay, and is demanded of the player for successful play. A player cannot beat the game with mere knowledge of probabilities; the player must choose the most advantageous spot to place the wild in the allotted time. The player exercises control over the game, and is not at the mercy of getting a lucky hand.

On balance, the outcome of the game is determined predominately by skill rather than chance.

### 2. Bonus Game

This shooting-style game is predominately a game of skill. The game requires that the player recognize, target, and touch the symbol within the allotted time frame. This requires hand-eye coordination and dexterity. Chance or luck has very little to do with the outcome of the game. Instead, the outcome is dependent almost wholly on a player's skill. That the bonus game presents itself only if certain conditions are fulfilled is immaterial to determining whether skill or chance dominates in the bonus game. Rather, the availability of the game is simply a

consequence of one possible puzzle that a player may be presented with in the Tic-Tac-Toe game.

### 3. "Follow-Me" Mini-Game

Successful play of the "Follow-Me" feature undoubtedly requires a great deal of skill on the part of the player. The game starts out easy, but becomes progressively more difficult with each recurrence of flashing dots. It is true that the average player cannot be expected to complete the Follow-Me features successfully. After 10 to 15 sequences, most players would be unable to remember the sequence. The feature is immensely difficult and demands a much higher level of cognitive skill than the average player could muster. This immense difficulty does not, as the Commonwealth suggests, transform the game into a game of chance. The only chance involved in the game is the sequence in which the circles flash. The odds against randomly choosing the correct sequence for each of the forty rounds (a total of 820 flashing dots) are astronomical. Skill determines how well a player does.

### IV.    CONCLUSION

Each of the three games installed on the confiscated machine is predominately a game of skill rather than a game of chance. Successful play at the Tic-Tac-Toe game depends mainly on a player's ability to recognize Tic-Tac-Toe patterns to maximize his or her score. The bonus game is essentially a shooting game, requiring a player to target and touch numerous symbols on the screen to achieve a high score. Finally, the Follow-Me mini-game, though immensely difficult for the average player, requires a great deal of cognitive ability for a player to remember the intricate sequence of flashing dots. Because the preponderance of the evidence fails to show that

the three games are games of chance, the Commonwealth has failed to prove that the property seized is a gambling device per se. The machine is therefore not contraband, and Petitioner's motion for return of property is granted.

IN THE COURT OF COMMON PLEAS OF BEAVER COUNTY

PENNSYLVANIA

CRIMINAL DIVISION

In re:                                          :

PACE-O-MATIC, INC. EQUIPMENT      :        M.D. 965-2013

TERMINAL I.D. NO. 142613              :

## ORDER

AND NOW, this 23rd of December, 20 14, it is hereby ORDERED and DECREED that Petitioner's Motion of Return of Property pursuant to Pennsylvania Rule of Criminal Procedure 588 is GRANTED. The Commonwealth is ORDERED to return the Pennsylvania Skill game to Pace-O-Matic, Inc.

· BY THE COURT

_____  J.

BY THE COURT

2014 DEC 23  A 9:58

HARRY E. KNAFELC
JUDGE

Page 13 of 13

I hereby certify this to be a true and attested copy of the original statement filed in this case.

IN RE: EIGHT PENNSYLVANIA SKILL
AMUSEMENT DEVICES, ONE TICKET
REDEMPTION CENTER, ONE
REDEMPTION TICKET

:
:
:
:
:
:
:

COURT OF COMMON PLEAS
CLEARFIELD COUNTY    MAY 27 2022

No. 2022-258-CD   A TRUE COPY
ATTEST: _____
PROTHONOTARY-CLERK

## STIPULATED ORDER

AND NOW, this _____27ᵗʰ_____ day of May, 2022, Motions to Return Property and

Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of

an agreement between the parties,

1. While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return

   all seized property to Petitioner.

2. Said property still in possession of the Commonwealth shall be returned forthwith.

Respectfully submitted,

_____
Andrew J. Jarbola, IV (No. 314659)
Deputy Attorney General
Office of Attorney General
2515 Green Tech Drive
State College, PA 16803
(814) 863-6503
*Counsel for Comm. of Pennsylvania*

_____
Steven P. Trialonas (No. 310159)
The Mazza Law Group, P.C.
2790 West College Avenue
Suite 800
State College, PA 16801
(814) 237-6255
*Counsel for The After Dark Bar*

SO APPROVED AND ORDERED this ____27____ day of ____May____, 2022.

_____
P. J.

EXHIBIT D

I hereby certify this to be a true
and attested copy of the original
statement filed in this case.

IN RE: FIVE PENNSYLVANIA SKILL          :    COURT OF COMMON PLEAS    MAY 27 2022
AMUSEMENT DEVICES, D-LINK ROUTER        :    CLEARFIELD COUNTY
BOX, NETGEAR ROUTER BOX, THIRTY         :                    A TRUE COPY
WEEKLY ACCOUNTING DOCUMENTS,            :                    ATTEST: _____
AND $5,000 IN U.S. CURRENCY             :    No. 2022-259-CD      PROTHONOTARY/CLERK
                                        :

## STIPULATED ORDER

AND NOW, this _____ 27 _____ day of May, 2022, Motions to Return Property and

Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of

an agreement between the parties,

1.  While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return

    all seized property to Petitioner.

2.  Said property, five (5) Pennsylvania Skill Amusement Devices, D-Link router box,

    Netgear router box, and thirty (30) weekly accounting documents, still in possession of

    the Commonwealth shall be returned forthwith.

Respectfully submitted,


_____          _____
Andrew J. Jarbola, IV (No. 314659)        Steven P. Trialonas (No. 310159)
Deputy Attorney General                   The Mazza Law Group, P.C.
Office of Attorney General                2790 West College Avenue
2515 Green Tech Drive                     Suite 800
State College, PA 16803                   State College, PA 16801
(814) 863-6503                            (814) 237-6255
*Counsel for Comm. of Pennsylvania*       *Counsel for The After Dark Bar*


SO APPROVED AND ORDERED this _____ 27 _____ day of _____ May _____, 2022


_____
P. J.

IN RE:  FIVE PENNSYLVANIA SKILL       :    COURT OF COMMON PLEAS
AMUSEMENT DEVICES                      :    CLEARFIELD COUNTY
                                       :
                                       :              MAY 2 7 2022
                                       :
                                       :    No. 2022-260-CD

I hereby certify this to be a true
and attested copy of the original
filed in this case.

A TRUE COPY
ATTEST: _____
PROTHONOTARY-CLERK

## STIPULATED ORDER

AND NOW, this _____27th_____ day of May, 2022, Motions to Return Property and

Suppress Evidence having been filed by Petitioner and scheduled, the Court being informed of

an agreement between the parties,

1.  While it admits no wrongdoing, the Commonwealth of Pennsylvania consents to return

    the Five Pennsylvania Skill Amusement Devices to Petitioner.

2.  Said property shall be returned forthwith.

Respectfully submitted,


_Andrew Jarbola IV_____          _Steven P Trialonas/dks_____
Andrew J. Jarbola, IV (No. 314659)    Steven P. Trialonas (No. 310159)
Deputy Attorney General               The Mazza Law Group, P.C.
Office of Attorney General            2790 West College Avenue
2515 Green Tech Drive                 Suite 800
State College, PA 16803               State College, PA 16801
(814) 863-6503                        (814) 237-6255
*Counsel for Comm. of Pennsylvania*   *Counsel for The After Dark Bar*


SO APPROVED AND ORDERED this _____27th_____ day of ___May___, 2022

                    _____
                    P. J.

RECEIVED OCT 2 9 2021

```
IN RE:  FOUR PENNSYLVANIA SKILL         :    COURT OF COMMON PLEAS
AMUSEMENT DEVICES AND ONE TICKET        :    CLEARFIELD COUNTY
REDEMPTION TERMINAL CONTAINING          :
$31,804.00 IN U.S. CURRENCY             :
                                        :    NO. 2021-1327-CD
                                        :
```

## STIPULATED ORDER

AND NOW, this _____25ᵀᴴ_____ day of October, 2021, it is hereby stipulated and agreed by and between counsel for the parties to this action as follows:

1. The Commonwealth of Pennsylvania, by and through the Office of District Attorney for Clearfield County (the "Commonwealth") shall release the Ticket Redemption Terminal ("TRT"), and the $31,804.00 in U.S. currency contained therein, which were seized at Nittany Oil Company, Inc. ("Nittany Oil") in the condition in which they were seized. Nittany Oil stipulates that following the pendency of the Commonwealth Court actions captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of Revenue, et al.,* 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement,* 503 MD 2018, and in the event of a subsequent holding by this Court that the TRT and currency are derivative contraband and subject to forfeiture, Nittany Oil shall remit $31,804.00 to the Commonwealth.

2. The Commonwealth shall release the TRT seized at Reno Dubois; 13 Brady St., Dubois, PA in the condition in which it was seized.

3. The Commonwealth shall immediately release the TRT seized at Snappy's, 14543 Clearfield-Shawville Highway, Clearfield, PA in the condition in which it was seized.

A TRUE COPY ATTEST:
PROTHONOTARY-CLERK

OCT 2 6 2021

I hereby certify the within and attested copy of the statement filed in this case to be a true and correct copy of the original filed in this case.

{02156298;v1 }                                          1

4. The Commonwealth shall immediately release $5000.00 in U.S. currency seized at the Loyal Order of Moose, Houtzdale Lodge No. 327, 607 Brisbane Street, Houtzdale, PA to the Loyal Order of Moose, Houtzdale Lodge No. 237.

5. The Commonwealth shall immediately release $8330.00 in U.S. currency seized at The After Dark, 309 N. Third St., Clearfield, PA to The After Dark.

6. The releases of property described in paragraphs 1-5 supra shall be accomplished within ten (10) days of the date this Stipulated Order is entered by the Court.

7. During the pendency of the Commonwealth Court actions captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of Revenue, et al.*, 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 503 MD 2018, the Commonwealth shall not move forward with the prosecution of any of the locations listed below regarding the operation of Pennsylvania Skill Amusement Devices:

|  | Search Warrant Docket No. | Location |
|---|---|---|
| a. | CP-17-MD-211-2021 | Snappy's 2807 Beeline Drive DuBois, PA 15801 |
| b. | CP-17-MD-212-2021 | Snappy's 14543 Clearfield Shawville Highway Clearfield, PA 16830 |
| c. | CP-17-MD-213-2021 | Loyal Order of Moose Houtzdale Lodge No. 327 607 Brisbin Street Houtzdale, PA 16651 |
| d. | CP-17-MD-210-2021 | The After Dark 309 N. 3rd Street Clearfield, PA 16830 |
| e. | CP-17-MD-207-2021 | Reno Dubois 1 LLC 9 Brady Street DuBois, PA 15801 |
| f. | CP-17-MD-207-2021 | Reno Dubois 2 LLC |

{02156298;v1 }                                        2

| | | 13 Brady Street |
| | | DuBois, PA 15801 |

8. The Commonwealth shall not seize, cause to be seized, initiate or continue any prosecution, impose any penalties, or otherwise interfere with the use of any Pennsylvania Skill Amusement Devices in Clearfield County during the pendency of the Commonwealth Court actions captioned *POM of Pennsylvania, LLC v. Commonwealth of Pennsylvania Department of Revenue, et al.*, 418 MD 2018 and *POM of Pennsylvania, LLC v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 503 MD 2018, provided a location maintaining a Pennsylvania Skill Amusement Device shall not be subject to seizure and/or penalties regarding that Device so long as it maintains five (5) or less Pennsylvania Skill Amusements Devices.

Respectfully submitted,

Ryan Sayers
Clearfield County District Attorney
230 E Market St.
Clearfield, PA  16833
(814) 765-2641
*Counsel for Commonwealth of Pennsylvania*

Matthew H. Haverstick, Esq. (I.D. No. 85072)
Edward T. Butkovitz, Esq. (I.D. No. 309565)
James G. Gorman III, Esq. (I.D. No. 328376)
KLEINBARD LLC
Three Logan Square, 5th Floor
1717 Arch Street
Philadelphia, PA 19103
(215) 568-2000
mhaverstick@kleinbard.com
ebutkovitz@kleinbrad.com
jgorman@kleinbard.com
*Counsel for L. & M. Music Company, Inc.*

{02156298;v1 }                                3

Steven P. Trialonas, Esq. (No. 310159)
THE MAZZA LAW GROUP, P.C.
2790 West College Avenue
Suite 800
State College, PA 16801
(814) 237-6255
trialonas@mazzalaw.com
*Counsel for Nittany Oil Company, Inc.*

SO APPROVED AND ORDERED this _____ 25 _____ day of _____ October _____, 2021

_____, J.

NO. 2021- 1327 -CD

Civil docket.

{02156298;v1 }                                            4



**County of Centre**

COMMONWEALTH OF PENNSYLVANIA
OFFICE OF THE DISTRICT ATTORNEY

**STACY PARKS MILLER**
District Attorney

**MARK S. SMITH**
First Assistant District Attorney

Courthouse, Room 404
Bellefonte, PA 16823
Telephone (814) 355-6735

Victim/Witness (814) 548-1107
FAX (814) 355-8756
www.centreda.org

December 3, 2015

Richard Campbell, Esquire
Law Offices of Campbell, Miller, Williams, Benson, Etter & Consiglio, Inc.
720 South Atherton Street, Suite 201
State College, PA 16801

Re:    Opinion on Pace-O-Matic Machine

Dear Dick:

We received an inquiry from you regarding the distribution of a video game in Centre County.

Your client, Pace-O-Matic, Inc., would like to place these games in various clubs (most having liquor licenses) and would like to avoid their confiscation as illegal gambling devices.

As you know, the District Attorney of a county can prosecute Gambling charges, but PSP Liquor Control Enforcement (LCE) can administratively seek the suspension or revocation of a liquor license.

Your memorandum included a Common Pleas Court opinion from Beaver County where the court did NOT find that the video games were gambling devices per se.

In the past, we have worked with LCE in the confiscation and forfeiture of video poker machines, which were considered gambling devices per se because they possessed a "knock-down" switch, which allowed for the elimination of accumulated points, prior to pay-off.

EXHIBIT E

The Pace-O-Matic video games are different and more advanced than the old video poker machines.

First Assistant District Attorney Mark Smith contacted LCE in Duncansville and the Compliance, Auditing and Gambling Enforcement (CAGE) Unit that specializes in gambling complaints.

The CAGE Unit was slow to respond, but finally conferred with Attorney Smith so that we could reconcile our position with theirs. The Supervisor in the CAGE Unit was quite familiar with Pace-O-Matic, Inc., as well as the history of the Beaver County court opinion.

The Supervisor explained the video games and how they contain both elements of skill and chance. The question with this machine was whether skill or chance is dominant factors in successful play. They recognized that the Court found the games are predominantly a game of skill.

Therefore, as a result of the Opinion, the CAGE Unit is not confiscating these games. Additionally, if the law changes or another county obtains a different opinion from an appellate court, then their position may change.

In addition, if their position would change, the LCE will give an advanced warning and time for these establishments to remove the games from their premises.

My Office will follow the interpretation of the Beaver County Court's opinion as well as LCE's position on the machines.

I hope this opinion letter satisfies your inquiry. I apologize for the delayed response due to the slow reply of the agency. Please feel free to contact either First Assistant District Attorney Mark Smith or myself with any questions. It is always a pleasure dealing with you!

Warmly,

Stacy Parks Miller, Esquire
Centre County District Attorney

SPM/sy

Centre County District Attorney Pg. 2 of 2

JOSHUA D. LAMANCUSA
DISTRICT ATTORNEY



COUNTY OF LAWRENCE
New Castle, Pennsylvania
www.colawrence.pa.us/DA/Index.htm

Diane M. Shaffer
Luanne Parkonen
William Flannery
Jonathan Miller
Jessica Sullivan
Thomas W. Minett

Lawrence County
Government Center
430 Court Street
New Castle, PA 16101

Phone 724-656-1916
Fax: 724-656-1986

Eddy, DeLuca, Gravina & Townsend
Manor building Penthouse
564 Forbes Avenue
Pittsburgh, PA 15219

12 OCT 16

RE: Pace-O-Matic

Dear Attorney DeLuca,

I am in receipt of your correspondence regarding the lawfulness of placing Pace-O-Matic games of skill in Lawrence County. I have reviewed Judge Knafelc's Memorandum Opinion and Order regarding the Pace-O-Matic machines and I have contacted the Pennsylvania State Police and Pennsylvania Liquor Control Board regarding the possibility of appeal from Judge Knafelc's Order of Court. I have been informed that the Commonwealth will not appeal the decision. Therefore, the Pace-O-Matic machine is not considered a game of chance under Pennsylvania gaming laws and therefore is legal within the Commonwealth. This letter serves to authorize you to place only Pace-O-Matic machines in Lawrence County. Specifically the only machine that is permissible is the machine that was the subject of Judge Knafelc's Order of Court. Variations or modifications of that machine may result in criminal and/or civil sanctions. Lastly, I would strongly recommend that you refrain from serving alcohol at any establishment where you are operating Pace-O-Matic machines as this letter only serves to insulate you from criminal liability but in no way is controlling or persuasive regarding the legality of a liquor license.

Very Respectfully,

Joshua Lamancusa

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

221 A.3d 717
Commonwealth Court of Pennsylvania.

POM OF PENNSYLVANIA, LLC, Petitioner

v.

Commonwealth of Pennsylvania, DEPARTMENT OF
REVENUE, and City of Philadelphia, Respondents

No. 418 M.D. 2018
|
Argued May 8, 2019
|
Decided November 20, 2019

**Synopsis**
**Background:** Arcade game software distributor brought petition for review in the nature of action for declaratory and injunctive relief against Department of Revenue and city after city seized coin-operated arcade machines and funds based on allegation that arcade game was illegal gambling device. Department asserted counterclaim for declaration that distributor violated Pennsylvania Race Horse Development and Gaming Act by manufacturing and distributing slot machines without a license. Department applied for summary relief in the nature of motion for partial judgment on the pleadings with respect to counterclaim.

**[Holding:]** The Commonwealth Court, No. 418 M.D. 2018, Patricia A. McCullough, J., held that Gaming Act did not apply to unlicensed or illegal slot machines located outside licensed facilities.

Motion denied.

Renée Cohn Jubelirer, J., dissented.

P. Kevin Brobson, J., did not participate in this decision.

Anne E. Covey, J., concurred in the result.

**Procedural Posture(s):** Original Jurisdiction; Motion for Partial Judgment on the Pleadings.

West Headnotes (20)

**[1]** Pleading ⬥ Judgment on Pleadings
Pleading ⬥ Admissions by motion in general
A motion for judgment on the pleadings is in the nature of a demurrer; thus, all of the opposing party's allegations are viewed as true and only those facts which have been specifically admitted by him may be considered against him. Pa. R. App. P. 1532(b).

2 Cases that cite this headnote

**[2]** Pleading ⬥ Matters considered
In reviewing a motion for judgment on the pleadings, a court may only consider the pleadings themselves and any documents properly attached thereto.

2 Cases that cite this headnote

**[3]** Pleading ⬥ Judgment on Pleadings
A motion for judgment on the pleadings should only be granted when the pleadings show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

2 Cases that cite this headnote

**[4]** Pleading ⬥ Admissions by motion in general
The party moving for judgment on the pleadings must admit the truth of all the allegations of his adversary and the untruth of any of his own allegations that have been denied by the opposing party.

**[5]** Pleading ⬥ Judgment on Pleadings
Where material issues of fact are in dispute, judgment on the pleadings cannot be entered.

**[6]** Gaming and Lotteries ⬥ Construction and Operation in General


EXHIBIT F

The Pennsylvania Race Horse Development and Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines. 4 Pa. Cons. Stat. Ann. §§ 1102, 1103, 1207, 1301, 1302, 1304, 1305, 1307.

[7]  Gaming and Lotteries ⟱ Gaming commissions and boards

Although the Bureau of Investigations and Enforcement within the Gaming Control Board has the authority to investigate and inspect licensees, permittees, and licensed entities, it does not have the authority to investigate and inspect unlicensed entities. 4 Pa. Cons. Stat. Ann. §§ 1517(a.1)(2)-(3), 1517(a.1)(5), 1518(a)(3), 1518(a)(4).

[8]  Gaming and Lotteries ⟱ Slot and pinball machines

Although the Pennsylvania Race Horse Development and Gaming Act makes it unlawful to place slot machines on the premises of a licensed facility without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an unlicensed location. 4 Pa. Cons. Stat. Ann. §§ 1518(a)(3), 1518(a)(4).

[9]  Statutes ⟱ Statute as a Whole; Relation of Parts to Whole and to One Another

Every statute must be construed, if possible, to give effect to all its provisions.

[10]  Statutes ⟱ Statute as a Whole; Relation of Parts to Whole and to One Another

Statutes ⟱ Giving effect to entire statute and its parts; harmony and superfluousness

When construing a statute, a court must attempt to give meaning to every word in a statute, as it cannot assume that the legislature intended any words to be mere surplusage.

[11]  Statutes ⟱ Context

In construing and giving effect to statutory text, courts should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.

[12]  Gaming and Lotteries ⟱ Slot and pinball machines

Pennsylvania Race Horse Development and Gaming Act did not apply to unlicensed or illegal slot machines located outside licensed facilities, including unlicensed arcade games located in taverns and social clubs; Gaming Act was intended to license large-scale slot machine operations at licensed facilities such as racetracks and hotels, Gaming Act specifically regulated slot machines in licensed facilities, statutory grant of authority to Gaming Control Board over authorization and operation of slot machines was contextually limited to licensed gaming and did not include power to investigate unlicensed entities, legislative history showed slot machine provisions of Gaming Act were primarily intended to apply in horseracing context, and Crimes Code otherwise encompassed illegal gambling. 4 Pa. Cons. Stat. Ann. §§ 1102(8), 1103, 1202(a)(1), 1301, 1302, 1304, 1305, 1517(a.1)(3), 1517(a.1)(5), 1518; 18 Pa. Cons. Stat. Ann. § 5513(a).

1 Cases that cite this headnote

[13]  Statutes ⟱ Debates, speeches, and floor statements

Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. 1 Pa. Cons. Stat. Ann. § 1921(c)(7).

[14]  Statutes ⟱ By Statute Relating to Same Subject

When a statute sets up a general or exclusive system covering the entire subject matter of a

former statute and is intended as a substitute for such former statutes upon the same subject, the former statute is impliedly repealed. 1 Pa. Cons. Stat. Ann. § 1971.

**[15]** Statutes ⟶ Implied Repeal

There is a very strong presumption that a statute does not impliedly repeal another statute. 1 Pa. Cons. Stat. Ann. § 1971.

**[16]** Statutes ⟶ Implied Repeal

The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent. 1 Pa. Cons. Stat. Ann. § 1971.

**[17]** Statutes ⟶ By Statute Relating to Same Subject

Because repeals by implication are not favored, they will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter. 1 Pa. Cons. Stat. Ann. § 1971.

**[18]** Statutes ⟶ Implied Repeal

Since implied repeals are not favored, legislative intent to repeal a statute by enacting another must be clearly shown. 1 Pa. Cons. Stat. Ann. § 1971.

**[19]** Gaming and Lotteries ⟶ Construction and Operation in General

Enactment of Pennsylvania Race Horse Development and Gaming Act did not impliedly repeal entirety of earlier Crimes Code regulation of illegal and unlicensed gambling devices and slot machines; Gaming Act expressly provided that Crimes Code provisions governing gambling devices were only repealed to the extent they were inconsistent with Gaming Act, Gaming Act only regulated licensed slot machines in licensed facilities, and Gaming Act did not purport to set up general or

exclusive system covering entire subject matter of gambling. 1 Pa. Cons. Stat. Ann. § 1971; 4 Pa. Cons. Stat. Ann. § 1903(a)(2); 18 Pa. Cons. Stat. Ann. § 5513(a).

**[20]** Gaming and Lotteries ⟶ Parties

Gaming Control Board was not indispensable party to Department of Revenue's counterclaim against arcade game software distributor arising out of alleged violations of Pennsylvania Race Horse Development and Gaming Act, where arcade machines at issue did not fall within purview of Gaming Act, such that Gaming Control Board had no regulatory authority over distributor. 4 Pa. Cons. Stat. Ann. §§ 1103, 1202(b)(12).

1 Cases that cite this headnote

**\*719 ORIGINAL JURISDICTION**

**Attorneys and Law Firms**

Matthew H. Haverstick, Philadelphia, for Petitioner.

Karen M. Romano, Sr. Deputy Attorney General and Inder Deep Paul, Deputy Attorney General, Harrisburg, for Respondent Department of Revenue.

BEFORE: HONORABLE MARY HANNAH LEAVITT, President Judge, HONORABLE RENÉE COHN JUBELIRER, Judge, HONORABLE ROBERT SIMPSON, Judge [1], HONORABLE PATRICIA A. McCULLOUGH, Judge, HONORABLE ANNE E. COVEY, Judge, HONORABLE MICHAEL H. WOJCIK, Judge, HONORABLE CHRISTINE FIZZANO CANNON, Judge

**Opinion**

OPINION BY JUDGE McCULLOUGH

**\*720** Before this Court is the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to the Department's counterclaim to the petition for review in the nature of a complaint seeking a declaratory judgment and

injunctive relief, filed in this Court's original jurisdiction by POM of Pennsylvania, LLC (POM). For the reasons set forth, we deny the Department's application for summary relief.

## I. Procedural History

On June 8, 2018, POM filed a petition for review in this Court's original jurisdiction seeking a declaratory judgment and injunctive relief, naming as respondents the Department and the City of Philadelphia (City). According to POM's petition for review, POM "distributes software for a skill-based video game machine, called the Pennsylvania Skill[TM] Amusement Device 402.49 PEN" (POM Game) throughout Pennsylvania. (Petition ¶1.) The POM Game is primarily located in taverns, restaurants, and social clubs that serve alcohol under license from the Pennsylvania Liquor Control Board. (Petition ¶12.) The POM Game is a coin-operated video machine that offers several games including a tic-tac-toe style puzzle, a potentially unlockable bonus session, and a "Follow Me[TM] colored dot-matching second phase of game play." (Petition ¶¶13-14.) If a player is ultimately successful playing the POM Game he or she is awarded with a combined total of 105% of the original amount spent to play. (Petition ¶28.) POM asserts that the POM Game is not an illegal gambling device under Pennsylvania criminal law, but rather, that it is a legal game of skill. (Petition ¶29.)

POM avers that from March 2017 until June 2018, the City conducted 11 separate seizures of the POM Game and arrested employees and seized funds at each location. (Petition ¶30.) POM alleges that the City's illegal seizures of the POM Games have interfered with the Department's mission to fairly, efficiently, and accurately administer the tax laws and other revenue programs of the Commonwealth. (Petition ¶36.) POM contends that the POM Game generates revenue for the Commonwealth in various ways. (Petition ¶37.)

POM maintains that the POM Game is not an illegal game of chance under the relevant statute of the Pennsylvania Crimes Code[2] governing illegal gambling devices. (Petition ¶¶38-39.) POM also alleges that in *In re Pace-O-Matic, Inc. Equipment, Terminal I.D. No. 142613* (C.P. Beaver, No. M.D. 965-2013, filed December 23, 2014), the Court of Common Pleas of Beaver County determined that a similar POM game was a game in which skill predominated and, thus, not a gambling device *per se* under Pennsylvania law.[3],[4] (Petition *721 ¶48.) Consequently, POM requests

that this Court enter a declaratory judgment in its favor and (1) declare that the POM Game is a legal device under Pennsylvania law; (2) declare that the City lacks the power and authority to seize or threaten to seize POM Games or initiate administrative or criminal proceedings regarding POM Games; (3) permanently enjoin the City from seizing or threatening to seize POM Games and/or initiating administrative or criminal proceedings regarding POM Games; and (4) grant any other relief deemed appropriate. (Petition ¶67.) POM also requests that we enter a preliminary injunction enjoining the City from (1) seizing or threatening to seize POM Games; (2) initiating administrative or criminal proceedings regarding the POM Game; and (3) arresting or prosecuting persons in connection with operation of the POM Game. *Id.*

The Department filed an answer, new matter, and counterclaim in response to POM's petition for review.[5] In its counterclaim, the Department alleges that the POM Game is considered a slot machine under section 1103 of the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. § 1103. (Counterclaim ¶18.) The Department also avers that the POM Game has not been inspected or certified by the Pennsylvania Gaming Control Board (Gaming Control Board) and that POM has been acting in violation of the Gaming Act.[6] (Counterclaim ¶¶20-21.) The Department also maintains that POM is a manufacturer of slot machines under section 1103 of the Gaming Act, 4 Pa.C.S. § 1103, and that it has violated the Gaming Act by manufacturing slot machines without a manufacturer's license. (Counterclaim ¶¶25-27, 29-30.) Similarly, the Department contends that POM is a supplier of slot machines under the Gaming Act and that POM has violated the Gaming Act by distributing slot machines without a supplier license. (Counterclaim ¶¶37-40, 42.)

The Department seeks a declaration that (1) the Gaming Act regulates the manufacture, possession, and operation of slot machines; (2) the Gaming Act and its regulations prohibit any person from possessing a slot machine unless lawfully manufactured by a licensed manufacturer; (3) the Gaming Act prohibits the possession and operation of any slot machines unless on the premises of a licensed casino facility; (4) the POM Game is an illegal gambling device under the Gaming Act; (5) the POM Game is a slot machine under the Gaming Act and subject to a daily tax of 34% of its revenue; and (6) POM is a *722 manufacturer and/or supplier of slot machines and is required to obtain a license from the Gaming Control Board. (Counterclaim ¶51.) The Department also

requests that POM be ordered to remove its machines from all Pennsylvania establishments and cease further sale and distribution of its machines within Pennsylvania unless and until POM obtains the proper licenses from the Gaming Control Board. (Counterclaim ¶52.) While the Department repeatedly argues that the POM Games are subject to the Gaming Act and the authority of the Gaming Control Board, the Gaming Control Board has not sought to intervene in this matter.

POM filed a reply to the Department's new matter and counterclaim. Thereafter, the Department filed an application for summary relief in the nature of a motion for partial judgment on the pleadings with respect to its counterclaim.

[1]  [2]  [3]  [4]  [5]  The Department raises the following issues in its application for summary relief in the nature of a motion for judgment on the pleadings: [7] (1) The POM Game is a slot machine under the Gaming Act; (2) POM is a manufacturer and/or a supplier of slot machines under the Gaming Act; and (3) POM is acting in violation of the Gaming Act.

## II. The Department's Argument

In support of its application, the Department argues that the Gaming Act sets forth a comprehensive regulatory structure that controls every aspect of gaming in the Commonwealth, including the manufacture, possession, and operation of slot machines. The Department notes that section 1102(1) of the Gaming Act provides that the primary objective of the Gaming Act is to "protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1). [8]  Consequently, the Department asserts that the General Assembly intended for the Gaming Act to regulate **all gaming** in Pennsylvania, including all slot machines, regardless of their location or whether they are "licensed" by the Gaming Control Board. The Department asserts that the Gaming Act regulates both legal and illegal gambling, including POM Games, which it contends constitute illegal gambling devices. It also avers that the General Assembly entrusted the Gaming Control Board with *723 the authority to establish procedures for the inspection and certification of compliance of all slot machines, but that the POM Game has never been inspected or certified.

The Department argues that under the Gaming Act, a slot machine is defined as any mechanical device that is played for consideration and, whether by reason of skill or chance, provides anything of value. The Department argues that because POM admits in its petition for review that the POM Game is a skill-based game, the game is available to play upon payment of money/consideration, and the game provides a reward, POM's game is, by definition, considered a slot machine under the Gaming Act. The Department notes that in 2017 the definition of slot machine was amended to include both games of skill and of chance. Accordingly, it asserts that POM's game of skill fits squarely within the definition of slot machine under the Gaming Act. The Department alleges that POM is violating the Gaming Act because the POM Game is not being regulated and is not subject to monitoring enforcement controls, and that POM's violations have prevented the Commonwealth from protecting the public from unregulated gaming activities, which is the primary intent of the Gaming Act.

The Department also argues that POM is, by definition, a manufacturer and supplier of slot machines under the Gaming Act. Because sections 1317 and 1317.1 of the Gaming Act, 4 Pa.C.S. §§ 1317, 1317.1, [9] require manufacturers and suppliers of slot machines to obtain licenses and POM does not hold the required licenses, the Department maintains that POM is violating the Gaming Act. Because it alleges that there are no facts in dispute relating to its counterclaim, the Department asserts that it is entitled to judgment as a matter of law on its counterclaim.

## III. POM's Argument

In contrast, POM argues that its game is not a regulated gaming device under the Gaming Act because its game is not a regulated "skill slot machine," as defined by the statute, and the amended Gaming Act was never intended to change existing Pennsylvania law regarding what is an illegal gambling device. (POM's Br. at 7.) POM attempts to distinguish "gaming" from "gambling." POM contends that "gaming" occurs in licensed facilities regulated by the Gaming Control Board pursuant to the Gaming Act, whereas the Pennsylvania Crimes Code regulates alleged illegal "gambling" devices. POM also asserts that the 2017 amendments to the Gaming Act did not expand the scope of the Gaming Act, but continued to only regulate gaming in licensed facilities. POM contends that several well-

established principles of statutory construction *724 support its interpretation of the Gaming Act.

POM maintains that the POM Game is entirely outside of the regulatory scheme of the Gaming Act because the Gaming Act only applies to licensed games located in regulated gaming locations, such as casinos and horse racing tracks. Thus, POM argues that the Gaming Act does not regulate the types of places that operate the POM Game, including taverns, bars, restaurants and convenience stores. Moreover, POM alleges that if the POM Game is subject to the Gaming Act and, hence, illegal, so are arcade games located at establishments such as Chuck E. Cheese or Dave & Buster's. In addition, POM maintains that if the Department is correct that the POM Game is subject to the Gaming Act, then the Department has failed to join an indispensable party to the counterclaim, i.e., the Gaming Control Board and, therefore, the counterclaim is jurisdictionally defective.

## IV. Analysis

### A. "Slot Machine," "Manufacturer," and "Supplier" of Slot Machines Under the Gaming Act.

We first address the definitions of "Slot machine," "Manufacturer," and "Supplier" under the Gaming Act to determine whether—if the Gaming Act applies to unlicensed slot machines—the POM Game would be considered a slot machine and POM a manufacturer and/or supplier of slot machines. Thus, at the outset, we are merely deciding whether, based on the factual allegations, the POM Games are slot machines pursuant to the definitions in the Gaming Act. If the POM Games do not fit within the definitions, our analysis ends at this stage because the Gaming Act would not apply to the POM Game under any circumstances. On the other hand, if the POM Game does fit within the slot machine definitions, we will next determine whether the Gaming Act applies to unlicensed slot machines like the POM Game.

The Department argues that, based on POM's factual allegations, POM's activities vis-à-vis its game fit squarely within the definitions of "Slot Machine," "Manufacturer," and "Supplier." If the Department is correct that, based on the factual allegations in the pleadings, POM's activities fit within these definitions, then the question of whether the Gaming Act applies to POM's activities would be a pure question of law.

"Slot machine" is defined under the Gaming Act as follows:

(1) The term includes:

(i) Any mechanical, electrical or computerized contrivance, terminal, machine or other device approved by the Pennsylvania Gaming Control Board which, upon insertion of a coin, bill, ticket, token or similar object therein or upon payment of any consideration whatsoever, ... is available to play or operate, the play or operation of which, whether by reason of skill or application of the element of chance or both:

(A) May deliver or entitle the person or persons playing or operating the contrivance, terminal, machine or other device to receive cash, billets, tickets, tokens or electronic credits to be exchanged for cash or to receive merchandise or anything of value whatsoever, ....

...

(iii) A skill slot machine, hybrid slot machine ....

(iv) A slot machine used in a multistate wide-area progressive slot machine system and devices and associated equipment as defined by the *725 Pennsylvania Gaming Control Board through regulations.

(v) A multi-use computing device which is capable of simulating, either digitally or electronically, a slot machine.

Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103 (emphasis added). Further, a "Skill slot machine" is defined as "[a] slot machine in which the skill of the player, rather than the element of chance is the predominant factor in affecting the outcome of the game," and "Hybrid slot machine" is defined as "[a] slot machine in which a combination of the skill of the player and elements of chance affect the outcome of the game." Id. Therefore, if a player must primarily use skill to affect the game's result, it is considered a "Skill slot machine." If the skill of the player is not the primary factor, but outcome of the game is affected by both skill and chance, it is a "Hybrid slot machine."

In its petition, POM alleges that the POM Game is a coin-operated video machine that provides a reward of up to a combined total of 105% of the original amount spent to play.

(Petition ¶¶13, 28.) POM also states that for the purposes of its petition it does not dispute that its game requires consideration to play and provides a reward. (Petition ¶44.) POM avers that the POM Game is a game of skill because the element of skill predominates over the element of chance. (Petition ¶¶29, 47, 50.)

Section 1103 of the Gaming Act defines "Slot machine" as any mechanical or computerized machine, which upon payment of a coin or any consideration provides something of value. The definition includes what are termed "Skill slot machines," which are defined as slot machines where the skill of the player is the predominant factor in determining the outcome of the game. Because POM alleges that its game requires consideration to play, provides something of value, and is skill-based, if POM's activities are subject to the Gaming Act, then the POM Game fits within the definition of "Slot machine" under the Gaming Act. Similarly, since POM alleges that players of the POM game must use skill, if the Gaming Act applies to unlicensed games then the POM Game would fit within the definition of "Skill slot machine" under the Act.

"Manufacturer" is defined, in pertinent part, under section 1103 of the Gaming Act as, "A person who **manufactures, builds, rebuilds, fabricates, assembles, produces, programs, designs or otherwise makes modifications to any slot machine** .... *Id.* (emphasis added). Under this definition, if the Gaming Act applies to POM's activities, POM is a "Manufacturer" of slot machines because it alleges that it "designs ... the essential components" of the POM Game. (Petition ¶56.)

"Supplier" is defined, in relevant part, as follows: "A person **that sells, leases, offers or otherwise provides, distributes or services any slot machine** ... in this Commonwealth. *Id.* (emphasis added). Likewise, if the Gaming Act were to apply to POM's activities, POM's factual allegations would also establish POM as a "Supplier" of slot machines. For example, POM avers that it "sells the essential components" of the POM Game, that it distributes software for the POM Game (Petition ¶¶1, 56), and admits that it does not hold a manufacturer's license under the Gaming Act (Reply to Counterclaim ¶30). The definition of "Supplier" includes anyone that sells or distributes slot machines. As POM alleges it sells and distributes the POM Game, it would also be considered a supplier of slot machines under the Gaming Act.

Accordingly, there is one dispositive question remaining before us, which is a pure question of law: whether the Gaming *726 Act applies to POM's conduct.[10] As argued by the Department, the Gaming Act sets forth a comprehensive regulatory regime that applies to both legal and illegal gambling, including POM's allegedly illegal game. To answer the question of whether the Gaming Act applies to the POM Game, we must analyze the language of the Gaming Act to determine the overall intent of the General Assembly in enacting the Gaming Act and its amendments.

## B. Whether, As a Matter of Law, the Gaming Act Applies to POM's Activities.

### 1. Gaming Act Statutory Framework.

We now turn to the crux of the matter, *i.e.*, whether the Gaming Act applies to the unlicensed POM Game. In order to answer this question we must first conduct a review of the statutory framework of the Gaming Act.

Section 1102 of the Gaming Act, titled "Legislative intent," provides, in part, as follows:

> The General Assembly recognizes the following public policy purposes and declares that the following objectives of the Commonwealth are to be served by this part:
>
> (1) The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful.
>
> (2) The authorization of limited gaming by the installation and operation of slot machines as authorized in this part is intended to enhance live horse racing, breeding programs, entertainment and employment in this Commonwealth.
>
> ...
>
> (4) The authorization of limited gaming is intended to positively assist the Commonwealth's horse racing industry, support programs intended to foster and promote horse breeding and improve the living and working conditions of personnel who work and reside in and around the stable and backside areas of racetracks.

...

**(8) Strictly monitored and enforced control over all limited gaming authorized by this part shall be provided** through regulation, licensing and appropriate enforcement actions of specified locations, persons, associations, practices, activities, licensees, permittees, registrants and certificate holders.

...

**(12) It is the intent of the General Assembly to authorize the operation and play of slot machines, table games and interactive gaming under a single slot machine license issued to a slot machine licensee when a slot machine licensee has been issued a table game operation certificate and an interactive \*727 gaming certificate under this part.**

4 Pa.C.S. § 1102 (emphasis added). Therefore, based on the language of section 1102, the intent of the Gaming Act is to protect the public from unlawful gaming activity, enhance live horse racing, breeding programs, entertainment and employment, and to regulate licensed slot machines when the licensee has been issued a table game operation certificate and an interactive gaming certificate. The POM Games are not used for any of the noted activities intended to be monitored by the Gaming Board.

Section 1103 of the Gaming Act, the Act's "definitions" provision, defines a "Licensed entity," as "[a]ny slot machine licensee, manufacturer licensee, supplier licensee or other person licensed by the Pennsylvania Gaming Control Board under this part," 4 Pa.C.S. § 1103 (emphasis added). "Licensed facility" is defined, in part, as "[t]he physical land-based location at which a licensed gaming entity is authorized to place and operate slot machines." *Id.* (emphasis added). Section 1103 also provides that a "Licensed gaming entity" or "slot machine licensee" is "[a] person that holds a slot machine license pursuant to this part." *Id.* (emphasis added). Thus far, we see that, a licensed entity is an entity that has obtained a license from the Gaming Control Board, and a licensed facility is a location where a licensed entity has been authorized by the Gaming Control Board to operate slot machines. These definitions, when applied here, stand in stark contrast to POM's status as an unlicensed entity.

[6] A closer look at several of the provisions of the Gaming Act indicates the type of slot machine activities the Act

is intended to regulate. Section 1301 of the Gaming Act provides for three distinct classifications of slot machine licenses. 4 Pa.C.S. § 1301. Section 1302, titled "Category 1 slot machine license," permits licensed slot machines at certain "licensed racetrack facilit[ies]" that have been issued licenses by the State Horse Racing Commission or State Harness Racing Commission to conduct thoroughbred or harness races. 4 Pa.C.S. § 1302 (emphasis added). Section 1304, titled "Category 2 slot machine license," allows applicants, not otherwise available to apply for Category 1 licenses, to "seek[ ] to locate a **licensed facility** in a city of the first class, a city of the second class or a revenue—or tourism —enhanced location." 4 Pa.C.S. § 1304 (emphasis added). [11] A "licensed facility," includes any "area of a licensed racetrack," "board-approved interim facility or temporary facility," "area of a hotel which the [Board] determines is suitable to conduct table games," or "area of a licensed facility where casino simulcasting is conducted, as approved" by the Board. Section 1103 of the Gaming Act, 4 Pa.C.S. § 1103 (emphasis added). Section 1305, titled "Category 3 slot machine license," allows applicants that have not applied for or been approved or issued a Category 1 or 2 license to obtain a Category 3 license for a "licensed facility in a well-established **resort hotel having no fewer than 275 guest rooms** under common ownership and having substantial year-round recreational guest amenities." 4 Pa.C.S. § 1305 \*728 (emphasis added). *Id.* [12], [13] The Gaming Act permits, with certain exceptions, no more than seven Category 1 licensed facilities, five Category 2 licensed facilities, and two Category 3 facilities. Section 1307 of the Gaming Act, 4 Pa.C.S. § 1307. Clearly, the above enumerated sections indicate that the Gaming Act was intended to authorize and regulate large-scale slot machine operations involving hundreds or thousands of slot machines, and there is no suggestion that the Act was ever intended to apply to devices in taverns, and/or social clubs, such as the game in question.

Further, section 1202(a)(1) of the Gaming Act states that the Gaming Control Board "shall have general and sole regulatory authority over the conduct of gaming and related activities as described in this part" and that the Gaming Control Board "shall ensure the integrity of the acquisition and operation of slot machines ... and shall have sole authority over every aspect of the authorization, operation, and play of slot machines." 4 Pa.C.S. § 1202(a)(1). "Conduct of gaming" is defined in the Gaming Act as "[t]he licensed placement, operation and play of slot machines ... under this part, as **authorized and approved by the Pennsylvania Gaming Control Board.**" 4 Pa.C.S. § 1103 (emphasis added). The

Gaming Control Board further has the specific power and duty "[a]t its discretion, to issue, approve, renew, revoke, suspend, condition or deny issuance or renewal of slot machine licenses." Section 1202(b)(12) of the Gaming Act, 4 Pa.C.S. § 1202(b)(12). While these sections state that the Gaming Control Board has general and regulatory authority over slot machines, such authority must be viewed through the lens of the limiting clause stating that the Board has authority over the "conduct of gaming," as described in this part and which is defined as the licensed placement and operation of slot machines as authorized and approved by the Board.

The Gaming Control Board is also given the power to, *inter alia,*

(1) Deny, deny the renewal, revoke, condition or suspend any license, permit, certificate, registration or other authorization provided for in this part ...

...

(3) Prescribe and require periodic financial reporting and internal control requirements for all licensed entities.

...

(9) Establish procedures for the inspection and certification of compliance of each slot machine ... prior to being placed into use by a slot machine licensee....

...

(11) **Require each slot machine license applicant to provide detailed site plans of its proposed licensed facility** which shall be reviewed and approved by the board for the purpose of determining *729 the adequacy of the proposed security and surveillance measures inside and outside the facility....

...

(21.1) Authorize, at its discretion, a slot machine licensee to place slot machines that are used in a multistate wide-area progressive slot machine system, skill slot machines or hybrid slot machines and make them available for play at licensed facilities.

(21.2) Adopt and promulgate regulations to govern the operation and placement of skill slot machines and hybrid slot machines by slot machine licensees at licensed facilities in the same manner as provided in section 13B03 (relating to regulations).

Section 1207 of the Gaming Act, 4 Pa.C.S. § 1207 (emphasis added). As already noted, the license applicants for slot machines under the Gaming Act are those that are operating or intend to operate licensed racetrack facilities, large hotels and resort hotels with casinos and section 1207 further underscores that the Board's authority mainly applies to these licensed slot machines, rather than unlicensed or otherwise illegal devices.

[7]    [8] The Gaming Act also establishes within the Gaming Control Board a "Bureau of Investigations and Enforcement" (Bureau), which is given the power to, *inter alia,* "[i]nvestigate and review all applicants and applications for a license, permit or registration" and "[i]nvestigate licensees, permittees, registrants and other persons regulated by the board for noncriminal violations of this part." Section 1517(a.1)(2)-(3) of the Gaming Act, 4 Pa.C.S. § 1517(a.1)(2)-(3) (emphasis added). The Gaming Act further provides that the Bureau has the power to "[i]nspect and examine licensed entities as provided in subsection (e)." Section 1517(a.1)(5) of the Gaming Act, 4 Pa.C.S. § 1517(a.1)(5) (emphasis added). Section 1518(a)(3), titled "Prohibited acts; penalties," makes it a criminal offense for "any licensed entity... or any other person to permit a slot machine to be operated, transported, repaired or opened on the premises of a licensed facility by a person other than a person licensed or permitted by the [Board] pursuant to this part." 4 Pa.C.S. § 1518(a)(3) (emphasis added).[14]     · Further, section 1518(a)(4) makes it a criminal offense "for any licensed entity or other person to manufacture, supply or place slot machines into play or display slot machines on the premises of a licensed facility without the authority" of the Board. 4 Pa.C.S. § 1518(a)(4) (emphasis added).[15] These provisions demonstrate *730 that although the Bureau has the authority to investigate and inspect licensees, permittees, and licensed entities it does not have the authority to investigate and inspect unlicensed entities. More importantly, however, is the fact that although the Act makes it unlawful to place slot machines on the premises of a licensed facility without the authority of the Gaming Control Board, it does not make it unlawful to place a slot machine in an unlicensed location.

The Department's position is that the above statutory framework authorizes it to regulate both legal and illegal gambling. But POM argues that the Department has no such authority as the Gaming Act only repeals any provisions in the Crimes Code that are inconsistent with it. *See* section 1903(a)

(2) of the Gaming Act, 4 Pa.C.S. § 1903(a)(2) (providing that "[t]he provisions of 18 Pa.C.S. § 5513(a) are repealed insofar as they are inconsistent with this part"). The Crimes Code, under section 5513(a), titled "Gambling devices, gambling, etc.," states that a person is guilty of a first degree misdemeanor if he does any of the following:

> (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;
>
> (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
>
> (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
>
> (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

18 Pa.C.S. § 5513(a). Moreover, the Pennsylvania State Police, Bureau of Liquor Control Enforcement, when investigating whether "there are reasonable grounds to believe liquor, alcohol or malt or brewed beverages are being sold on premises not licensed," has the power to arrest any person in violation of section 5513 of the Crimes Code. Section 211 of the Liquor Code, Act of April 12, 1951, P.L. 90, as amended, 47 P.S. § 2-211. Thus, the Crimes Code defines what constitutes illegal gambling, and the Liquor Code gives the Pennsylvania State Police primary enforcement duties with respect to illegal gambling occurring at premises where unlicensed liquor sales are also taking place.

## 2. Whether the Gaming Act was Intended to Regulate All Unlicensed and/ or Illegal Slot Machines and Other Gambling Devices in the Commonwealth.

In light of the above statutory framework, we are faced with the question of whether the General Assembly intended that the regulation of all illegal slot machines and other gambling devices in the Commonwealth is within the purview of the Gaming Act. In other words, we must decide whether

the General Assembly intended for the Gaming Act to comprehensively regulate all gambling in the Commonwealth and, thus, apply to both legal and illegal gambling.

[9] [10] [11] When interpreting the Gaming Act our paramount objective must be to ascertain and effectuate the intention of the General Assembly. See Section 1921 of the Statutory Construction Act of 1972 (Statutory Construction Act), 1 Pa.C.S. § 1921(a) ("The object of all interpretation *731 and construction of statutes is to ascertain and effectuate the intention of the General Assembly."). Moreover, "[e]very statute must be construed, if possible, to give effect to all its provisions." Id. Thus, when construing a statute, a court "must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage." City of Philadelphia Fire Department v. Workers' Compensation Appeal Board (Sladek), —— Pa. ——, 195 A.3d 197, 207 (2018). Additionally, "[i]n construing and giving effect to the text, 'we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear.' " A.S. v. Pennsylvania State Police, 636 Pa. 403, 143 A.3d 896, 906 (2016) (quoting Roethlein v. Portnoff Law Associates, Ltd., 623 Pa. 1, 81 A.3d 816, 822 (2013)).

[12] For the following reasons, however, we conclude that the Gaming Act does not apply to unlicensed and/or illegal slot machines. First, the Gaming Act does not give the Gaming Control Board the jurisdiction or authority it now claims. As indicated by sections 1301-1302 and 1304-1305 of the Gaming Act, 4 Pa.C.S. §§ 1301-1302, 1304-1305, the Gaming Act was intended to license slot machine operations at racetracks, casinos, hotels, and established resort hotels. Thus, its intent was to provide licenses to large, individual slot machine operations that raise millions of dollars in revenue. The POM Games are not located at any of these types of facilities and there is absolutely no suggestion in these provisions of the Gaming Act, or any other provisions of the Act, that the Gaming Act was intended to apply to the facilities where the POM Games are located, e.g., taverns and social clubs, or that the Gaming Act regulates the placement of slot machines at such facilities.

Moreover, the Gaming Act specifically regulates licensed slot machines in licensed facilities. In particular, section 1103 of the Gaming Act defines slot machines as devices that are approved by the Gaming Control Board. 4 Pa.C.S. § 1103. Section 1103 also defines licensed entities as persons

licensed by the Gaming Control Board under the Gaming Act and gaming facilities as the locations at which licensed gaming entities are authorized to place and operate slot machines. *Id.* The definitional provisions of the Gaming Act clearly demonstrate that the General Assembly intended for the Gaming Act to regulate slot machines that are **licensed and approved by the Gaming Control Board**, not those that are illegal or unlicensed. The Department argues that the POM Games are illegal; however, even if we were to assume *arguendo* they are illegal and thus in violation of the Crimes Code, there is nothing in the Gaming Act to suggest the General Assembly intended for the Gaming Control Board to also have the authority to regulate gambling devices that are unlawful pursuant to the Crimes Code.

Further, while section 1202(a)(1) of the Gaming Act, 4 Pa.C.S. § 1202(a)(1), provides that the Gaming Control Board has sole authority over every aspect of the authorization and operation of slot machines, the preceding clause in that provision states that the Gaming Control Board only has general and sole regulatory authority over the **conduct of gaming**, which is defined in section 1103, as the "licensed placement" and "operation" of slot machines, "**under this part, as authorized and approved by the ... Gaming Control Board**," 4 Pa.C.S. § 1103 (emphasis added). As it is a basic principle of statutory construction that a particular provision controls the general, *see* Section 1933 of the Statutory Construction Act, ▨ 1 Pa.C.S. § 1933, under section 1202 of the Gaming **\*732** Act the Gaming Control Board only has regulatory authority with respect to the **licensed** placement of slot machines as authorized under the Act and, thus, does not have regulatory authority over all slot machines in the Commonwealth.

The legislative intent outlined in the Gaming Act also demonstrates that the General Assembly only intended the Gaming Act to regulate **legal** and **licensed** gaming. Of particular importance, section 1102(8) provides that one of the objectives of the Gaming Act is to **provide strict monitoring "and enforced control over all limited gaming authorized"** by the Gaming Act. 4 Pa.C.S. § 1102(8) (emphasis added). Section 1102(8) does not state that it is the General Assembly's intention to provide strict monitoring and enforced control over all gambling in the Commonwealth, **whether legal or illegal**, but merely that the General Assembly intended to strictly control the limited gaming authorized by the Gaming Act.

The conclusion that the Gaming Act only regulates licensed slot machines is further bolstered by section 1517(a.1)(5) of the Gaming Act, which gives the Bureau the power to inspect and examine "**licensed entities**," 4 Pa.C.S. § 1517(a.1)(5) (emphasis added), and section 1517(a.1)(3), 4 Pa.C.S. § 1517(a.1)(3), which gives the Bureau the authority to investigate **license applicants, licensees, and permittees.** If the General Assembly had intended for the Gaming Act to regulate illegal gambling, in addition to licensed, legal gaming, the General Assembly would likely have given the Bureau the power to inspect, examine, and investigate **unlicensed entities**, such as taverns, bars, restaurants and convenience stores, where the POM Games are present. However, the General Assembly did not do so. Courts cannot assume that an agency has been bestowed additional powers *that are not present in or inferable from statutory language.*

Section 1518 of the Gaming Act also provides strong evidence that the General Assembly did not intend for the Gaming Act to regulate unlicensed/illegal slot machines. Section 1518, 4 Pa.C.S. § 1518, makes it unlawful for any person to permit a slot machine to be opened on the premises of a **licensed facility** unless licensed by the Board, and makes it illegal to manufacture, supply, or place slot machines *into play at a licensed facility without the authority* of the Gaming Control Board. However, neither section 1518 nor any other provision in the Gaming Act makes it unlawful for any person to manufacture, supply, or place slot machines at **unlicensed facilities** or generally unlawful to display or operate slot machines when **not authorized** by the Gaming Control Board. In contrast, section 3501 of the Gaming Act, 4 Pa.C.S. § 3501, makes it unlawful for any person to make available for play video gaming terminals *unless that person is licensed* by the Gaming Control Board, section 3508, 4 Pa.C.S. § 3508, requires a person seeking to manufacture video gaming terminals to apply for a license with the Board, and section 13C71, 4 Pa.C.S. § 13C71, states that sports wagering conducted by an entity that holds a sports wagering certificate does not constitute criminal activity. Accordingly, whereas the provisions of the Gaming Act dealing with video gaming terminals and sports wagering indicate that the General Assembly intended for the Board to have exclusive regulatory authority over such activities, section 1518 indicates the opposite with respect to slot machines.

Moreover, the Gaming Act bestows the Gaming Control Board with the power to, *inter alia*, deny or suspend slot machine licenses; establish procedures and financial reporting

requirements for **slot machine** *733 licensees; and adopt and promulgate regulations to govern the operation and placement of slot machines by slot machine licensees at **licensed facilities.** Section 1207 of the Gaming Act, 4 Pa.C.S. § 1207. There is no indication in section 1207 that the Gaming Control Board was given comprehensive authority over all illegal gambling activities in the Commonwealth, nor can we create such authority. Therefore, even if the POM Games were considered illegal gambling devices, illegal devices have been historically regulated by the Crimes Code and the Gaming Act does not provide any authority for regulating such devices.

Due to the language in the Gaming Act discussing the regulation of licensed slot machines and facilities, we simply cannot glean any intention by the General Assembly for the Gaming Act to regulate all unlicensed and illegal slot machines in the Commonwealth. Moreover, the various references to racetracks, hotels, and casinos in the Gaming Act indicate that it only regulates slot machines at these types of licensed facilities/locations, and not the locations at issue, such as taverns, social clubs, and restaurants. In addition, were we to accept the Department's argument that the Gaming Act applies to unlicensed slot machines, it would render the multiple references in the Gaming Act to **licensed** slot machines, **approved** slot machines, **licensed** entities, and **licensed facilities** mere surplusage, which is not permissible under basic statutory construction principles. *See, e.g., City of Philadelphia Fire Department,* 195 A.3d at 207 (holding that pursuant to section 1921(a) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1921(a), when "construing a statute, the courts must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage"). Accordingly, based on the overall framework and context of the Gaming Act, we hold that it only applies to licensed slot machines in licensed entities/facilities and does not apply to unlicensed and illegal devices.

[13] Our conclusion that the Gaming Act does not apply to the unlicensed POM Game is further bolstered by comments made during the 2004 Senate floor debate for the Gaming Act. [16] During the debate, Senator Vincent Fumo made the following prepared statement:

> [A]t no time has this bill's original purpose changed. This bill was originally introduced to provide for a

manner of regulating the Pennsylvania horseracing industry. This purpose has not changed. The amendment we offered furthers the regulation of the Pennsylvania horseracing industry and funds many of the horse development functions with a direct subsidy from the legalization of gaming operations throughout the Commonwealth. The original purpose has never changed.... [T]his bill embraces only one subject as expressed in its drafting as an amendment to Title 4 of the Pennsylvania Consolidated Statutes, in this case, the subject of amusements or more specifically, Pennsylvania horseracing. *734 A new chapter to Title 4 has been added, entitled, the Pennsylvania Racehorse Development and Gaming Act, of which slot machine operations are the revenue engine through which Pennsylvania may enhance horseracing opportunities. Simply stated, though the media simplification of this issue is slot machines, the public policy purpose that carries throughout every provision of this Act is the development of the horseracing industry.

Legislative Journal—Senate, 188th Sess., July 1, 2004, at 1992. Thus, the legislative history demonstrates that when the Gaming Act was first enacted, its intent was to further regulate the horse racing industry and support the industry by providing it revenue from slot machines. The legislative history does not demonstrate that the General Assembly intended for the Gaming Act to regulate all unlicensed and/or illegal slot machines then existing in the Commonwealth.

Additionally, during the same floor debate, Senator Robert Tomlinson stated that although it would take several years before all of the racetrack facilities were up and running, the projected revenue from those facilities was $2.4 billion to $2.9 billion. *Id.* at 1954. Senator Fumo also explained that the bill would "generate an economic development fund that [would] yield $2 billion in money for projects throughout the State" and that in Philadelphia, alone, it was projected

that as much as $200 million to $300 million would be spent on each slot machine operation. *Id.* at 1990-1991. He noted that under the bill, Pennsylvania would be the first state to charge a $50 million fee for a gambling license. *Id.* at 1991. Senator Fumo also stated that although gambling is a problem, "We already have gambling. We have gambling at the very racetracks we are trying to save. We have gambling with the Pennsylvania Lottery, and if you have not looked in your local bar, go take a look at the illegal machines that are in there." *Id.* Senator Fumo further stated that, "As far as our horsemen are concerned, they do need help." *Id.* Thus, according to the legislative history, the Gaming Act was meant to legalize slot machines at large-scale facilities in order to aid the horse racing industry and there is no indication that the Gaming Act was intended to apply to or regulate illegal machines already existing at bars and taverns.

This conclusion is further corroborated by remarks made during the floor debate for the 2017 amendments to the Gaming Act. Specifically, during the floor debate, the following exchange occurred with Representative Jason Ortitay, the prime sponsor of the 2017 amendments:

> Mr. STURLA: Mr. Speaker, will the prime sponsor of the bill rise for brief interrogation?
>
> The SPEAKER. Representative Ortitay. He will stand for interrogation. He is glad to do so.
>
> Mr. STURLA. Thank you, Mr. Speaker. Mr. Speaker, the *previous speaker said that he believes that the language in this bill will make illegal all games of skill in the State of Pennsylvania that currently exist, all the ones that exist currently at truckstops and convenience stores and social clubs and taverns throughout the State of Pennsylvania.* Would you agree with that assessment?
>
> Mr. ORTITAY. I do not believe so, Mr. Speaker.

Legislative Journal—House, 201st Sess., October 25, 2017, at 1174 (emphasis added).

Therefore, based on both the plain language of the Gaming Act, as well as its legislative history, we conclude that unlicensed slot machines and/or slot machines *735 that are not approved by the Gaming Control Board, such as the POM Game, are not subject to the Gaming Act.[17] Consequently, we hold that even if the POM Game were considered an illegal gambling device, the Gaming Act does not give the Gaming Control Board the power to regulate illegal gambling devices.

### 3. Whether the Gaming Act Supersedes the Crimes Code's Regulation of Unlicensed Gambling Devices.

Our conclusion is enhanced by an analysis of whether the General Assembly intended the Gaming Act to supplant the Crimes Code's regulation of unlicensed slot machines and illegal gambling devices. The Department contends that "[t]he Gaming Act sets forth a comprehensive regulatory structure that controls and provides oversight for every aspect of gaming in the Commonwealth." (Department's Br. at 9.) It argues that the General Assembly intended the Gaming Act to regulate all gaming in the Commonwealth and that, regardless of the Crimes Code, the POM Game is a slot machine pursuant to the Gaming Act. Conversely, POM maintains that there is a strong presumption that a statute does not impliedly repeal another statute and, therefore, that the Gaming Act did not displace section 5513 of the Crimes Code, as it pertains to gambling devices. We agree with POM.

Under section 1971 of the Statutory Construction Act of 1972, when a statute "purports to be a revision of all statutes upon a particular subject, [ ] sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statute," or "purports to establish a uniform and mandatory system covering a class of subjects," the statute will be construed to supply and to repeal any preexisting local or special statutes on the same class of subjects. 1 Pa.C.S. § 1971. However, "in all other cases, a later statute shall not be construed to supply or repeal an earlier statute unless the two statutes are irreconcilable." *Id.*

[14] [15] [16] [17] [18] Thus, "[w]hen a statute sets up a general or exclusive system covering the entire subject matter of a former statute and is intended as a substitute for such former statutes upon the same subject, the former statute is impliedly repealed." *Licensed Beverage Association of Philadelphia v. Board of Education of School District of Philadelphia,* 669 A.2d 447, 450 (Pa. Cmwlth. 1995), *abrogated on different grounds by Buffalo Township v. Jones,* 571 Pa. 637, 813 A.2d 659 (2002). Yet, "there is a very strong presumption that a statute does not impliedly repeal another statute." *Borough of Emmaus v. Pennsylvania Labor Relations Board,* 156 A.3d 384, 398 n.9 (Pa. Cmwlth. 2017);

*see also In re Delinquent Tax Sale*, 83 Pa.Cmwlth. 411, 477 A.2d 603, 605 (1984) (noting that "implied repeals are not favored by the law"); *City of Pittsburgh v. Pennsylvania Public Utility Commission*, 3 Pa.Cmwlth. 546, 284 A.2d 808, 811 (1971) (concluding "there is a presumption against implied repeal"). "The question of whether a statute has been impliedly repealed by a later statute is exclusively a question of legislative intent." *HSP Gaming, L.P. v. City of Philadelphia*, 598 Pa. 118, 954 A.2d 1156, 1175 (2008). Because repeals by implication are not favored, they "will not be implied unless there be an irreconcilable conflict between statutes embracing the same subject matter." *Id.* Moreover, since implied repeals are not favored, "legislative intent *736 to repeal a statute by enacting another must be clearly shown." *Id.*

[19] Here, section 5513(a) of the Crimes Code makes it illegal to "intentionally or knowingly make[ ], assemble[ ], set[ ] up, maintain[ ], sell[ ], lease[ ], give[ ] away, or offer[ ] for sale, loan, lease or gift any ... slot machine or any device to be used for gambling purposes." 18 Pa.C.S. § 5513(a). Further, section 211 of the Liquor Code, 47 P.S. § 2-211, gives the Pennsylvania State Police, Bureau of Liquor Control Enforcement, the power and duty to enforce section 5513 of the Crimes Code in the course of investigating Liquor Code violations. Additionally, section 1903(a)(2) of the Gaming Act, 4 Pa.C.S. § 1903(a)(2), mandates that provisions of section 5513(a) of the Crimes Code are only repealed to the extent they are inconsistent with the Gaming Act.

The Department essentially argues that the Gaming Act establishes a uniform system for all gambling in the Commonwealth, regardless of whether the gambling is legal or illegal. Under this interpretation, the Gaming Act would effectively supersede and displace section 5513(a)'s prohibition of illegal gambling. In effect, illegal gambling would be governed by the Gaming Act instead of the Crimes Code, as has historically occurred. This reading of the Gaming Act would also significantly curtail the Bureau of Liquor Control's enforcement activities with respect to illegal gambling, because many such activities would be entrusted to the Gaming Control Board.

However, there is nothing in the Gaming Act that suggests that it purported to revise all statutes governing illegal gambling, set up a general or exclusive system covering the entire subject matter of gambling, or establish a uniform and mandatory system encompassing all gambling. *See* 1 Pa.C.S. § 1971. The Gaming Act does not demonstrate that the General Assembly intended to repeal section 5513 of the Crimes Code, to the extent it continued to regulate illegal gambling. Given the strong presumption against implied repeals of statutes and the lack of an irreconcilable conflict between the Gaming Act's regulation of licensed slot machines and the Crimes Code's regulation of illegal slot machines, we decline to conclude that the Gaming Act impliedly repealed the Crimes Code's regulation of illegal gambling devices and slot machines. Therefore, pursuant to our rules of statutory construction we hold that section 5513 of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.

## V. Conclusion

[20] Because the plain language of the Gaming Act indicates that the General Assembly did not intend for the Gaming Act to regulate unlicensed slot machines which fall outside the ambit of the licensed facilities clearly delineated by the Gaming Act, and/or supplant the Crimes Code's regulation of the same, we conclude that the POM Game is not subject to the Gaming Act.[18] We therefore deny the Department's *737 application for summary relief in the nature of a motion for a judgment on the pleadings.[19]

Judge Cohn Jubelirer dissents.

Judge Brobson did not participate in this decision.

Judge Covey concurs in the result only.

## *ORDER*

AND NOW, this 20th day of November, 2019, the Commonwealth of Pennsylvania, Department of Revenue's (Department) application for summary relief in the nature of a motion for partial judgment on the pleadings, with respect to the Department's counterclaim, is denied.

POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

**All Citations**

221 A.3d 717

## Footnotes

1    This matter was assigned to this panel before September 1, 2019, when Judge Simpson assumed the status of senior judge.

2    18 Pa.C.S. §§ 101-7707.

3    In *Pace-O-Matic*, agents of the Pennsylvania Bureau of Liquor Control Enforcement seized coin-operated video devices from a social club. *Id.*, slip op. at 1-2. Like the POM Game at issue, the devices contained tic-tac-toe style puzzles that were played for money and offered rewards and dot-matching bonus games. *Id.*, slip op. at 2-4. The court of common pleas concluded that a machine is a gambling device *per se* where three elements are present: (1) consideration; (2) a result determined by chance, instead of skill; and (3) a reward. *Id.*, slip op. at 5. Because the court of common pleas determined that the outcome of both the tic-tac-toe and bonus games was determined predominantly by skill, rather than chance, it held that the Commonwealth failed to prove that the seized devices were gambling devices *per se. Id.*, slip op. at 10-12.

4    Additionally, POM alleges that after the Beaver County decision, the District Attorney for Centre County issued a letter stating that, in light of the decision, her office would not confiscate POM machines. Similarly, POM avers that the District Attorney for Lancaster County issued a letter stating that for the reasons set forth in the Beaver County decision, the POM machine was not considered a game of chance under Pennsylvania gaming laws. (Petition ¶49.)

5    The City also filed a separate answer and new matter in response to POM's petition for review.

6    4 Pa.C.S. §§ 1101-1904.

7    Rule 1532(b) of the Pennsylvania Rules of Appellate Procedure, which is titled "Summary relief," provides that "[a]t any time after the filing of a petition for review in an appellate or original jurisdiction matter the court may on application enter judgment if the right of the applicant thereto is clear." Pa.R.A.P. 1532(b). "A motion for judgment on the pleadings is in the nature of a demurrer"; thus, "all of the opposing party's allegations are viewed as true and only those facts which have been specifically admitted by him may be considered against him." *Trib Total Media, Inc. v. Highlands School District*, 3 A.3d 695, 698 n.2 (Pa. Cmwlth. 2010).

In reviewing a motion for judgment on the pleadings we "may only consider the pleadings themselves and any documents properly attached thereto." *Id.* The motion should only be granted "when the pleadings show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* Further, "the party moving for judgment on the pleadings must admit the truth of all the allegations of his adversary and the untruth of any of his own allegations that have been denied by the opposing party." *Pfister v. City of Philadelphia*, 963 A.2d 593, 597 (Pa. Cmwlth. 2009). Where "material issues of fact are in dispute, judgment on the pleadings cannot be entered." *Id.*

8    Section 1102(1) of the Gaming Act provides, in full, as follows: "The primary objective of this part to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1).

9    Section 1317 of the Gaming Act provides, in relevant part, the following:

> A manufacturer that elects to contract with a supplier under section 1317.1(d.1) (relating to manufacturer licenses) shall ensure that the supplier is appropriately licensed under this section. A person seeking to provide slot machines, table game devices or associated equipment, interactive gaming devices or associated equipment or multi-use computing devices to a slot machine licensee, an interactive gaming certificate holder or an interactive gaming operator within this Commonwealth through a contract with a licensed manufacturer shall apply to the board for the appropriate supplier license.

> 4 Pa.C.S. § 1317. Section 1317.1 of the Gaming Act provides, in pertinent part, as follows: "A person seeking to manufacture slot machines, table game devices and associated equipment or interactive gaming devices and associated equipment for use in this Commonwealth shall apply to the board for a manufacturer license." 4 Pa.C.S. § 1317.1.

10   .POM argues that there are certain material issues of fact that preclude summary relief for the Department. In particular, POM maintains that (1) the Department makes several **policy** arguments that are predicated on unsupported factual assertions and (2) the Gaming Act has historically not been applied to similar circumstances, which necessitates discovery of pertinent formal guidance documents and interpretive rules in the possession of the Department and the Gaming Control Board. However, questions of policy and the potential existence of interpretive guidelines do not present genuine issues of material fact with respect to the fundamental question of whether, given the facts alleged by POM, the Gaming Act should be interpreted to apply to the POM Game.

11   The Gaming Act permits Category 1 and 2 licensees to operate up to **3,000 slot machines** at any one licensed facility and, under certain circumstances, apply to operate an additional **2,000 slot machines** at a licensed facility; such licensees, however, are required to operate and make available to play a minimum of **1,500 slot machines** at a licensed facility. Section 1210 of the Gaming Act, 4 Pa.C.S. § 1210. Successful Category 1 and Category 2 license applicants are required to pay a one-time slot machine license fee in the amount of $50,000,000. Section 1209 of the Gaming Act, 4 Pa.C.S. § 1209.

12   A maximum of **500 slot machines** are permitted at a Category 3 licensed facility, unless the licensee also holds a table game operation certificate, which entitles the licensee to operate up to **600 slot machines**. Section 1305 of the Gaming Act, 4 Pa.C.S. § 1305. Under certain circumstances, Category 3 licensees may obtain approval for an additional 250 slot machines. *Id.* Successful applicants must pay a one-time fee of $5,000,000, and an additional fee of $2,500,000 if additional slot machines are approved. *Id.*

13   In 2017, the General Assembly amended the Gaming Act to permit current slot machine licensees to submit bids for so-called "Category 4 slot machine license[s]." Section 1305.1 of the Act of October 30, 2017, P.L. 419, 4 Pa.C.S. § 1305.1. Only ten of these licenses are permitted and they may not be placed within 25 linear miles of the winning bidder's preexisting licensed facility. *Id.*

14   *Compare* Section 1518(a)(3) of the Gaming Act, 4 Pa.C.S. § 1518(a)(3), *with* section 3501 of the Gaming Act, 4 Pa.C.S. § 3501 (titled "General Prohibition," and providing that "[n]o person may offer or otherwise **make available for play in this Commonwealth** a video gaming terminal **unless the person is licensed** under this part" (emphasis added)), *and* section 13C04 of the Gaming Act, 4 Pa.C.S. § 13C04 (titled "Unauthorized sports wagering," and making it a criminal offense "for any person to operate, conduct, offer or expose sports wagering for play or to accept a bet or wager associated with sports wagering from any person physically

located in this Commonwealth which at the time of play that is not within the scope of a valid sports wagering certificate issued by the [Gaming Control Board] ...."), *and* section 13C71 of the Gaming Act, 4 Pa.C.S. § 13C71 (titled "Criminal activity," and providing that "Sports wagering conducted by a sports wagering certificate holder in accordance with this chapter shall not constitute a criminal activity under 18 Pa.C.S. § 5514 (relating to pool selling and bookmaking).").

15    *Compare* Section 1518(a)(4) of the Gaming Act, 4 Pa.C.S. § 1518(a)(4), *with* section 3508(a) of the Gaming Act, 4 Pa.C.S. § 3508(a) ("A person seeking to manufacture video gaming terminals, redemption terminals and associated equipment for use in this Commonwealth must apply to the [Board] for a manufacturer license.").

16    The Statutory Construction Act specifically authorizes consideration of legislative history when construction of a statute, beyond its plain language, is required. *See* 1 Pa.C.S. § 1921(c)(7). Although lawmakers' statements during debate are generally not dispositive of legislative intent, they may properly be considered as part of the contemporaneous legislative history. *Arneson v. Wolf*, 117 A.3d 374, 384 n.10 (Pa. Cmwlth.), *aff'd*, 633 Pa. 224, 124 A.3d 1225 (2015); *see also Board of Revision of Taxes v. City of Philadelphia*, 607 Pa. 104, 4 A.3d 610, 624 n.10 (2010) (noting that although legislators' statements during floor debate are not dispositive, they can be instructive to our analysis and persuasive evidence of the General Assembly's intent).

17    Of course, we do not answer the separate question of whether the POM Game qualifies as an illegal gambling device under section 5513 of the Crimes Code, which both parties appear to acknowledge presents a question of fact that requires factual discovery to resolve.

18    Because we hold that the Gaming Act is inapplicable to the POM Game, we concomitantly conclude that the Department did not fail to join the Gaming Control Board as an indispensable party to the counterclaim, as argued by POM. "A party is generally regarded to be indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights." *HYK Construction Company, Inc. v. Smithfield Township*, 8 A.3d 1009, 1015 (Pa. Cmwlth. 2010) (internal quotation marks omitted). The relevant analysis of whether a party is indispensable requires consideration of the following factors: (1) whether "absent parties have a right or interest related to the claim"; (2) "[i]f so, what is the nature of that right or interest"; (3) whether that right or interest is "essential to the merits of the issue"; and (4) whether justice can "be afforded without violating the due process rights of absent parties." *Rachel Carson Trails Conservancy, Inc. v. Department of Conservation and Natural Resources*, 201 A.3d 273, 279 (Pa. Cmwlth. 2018). Moreover, regarding cases involving the Commonwealth, "[a] Commonwealth party may be declared an indispensable party when meaningful relief cannot conceivably be afforded without the Commonwealth party's direct involvement in the action." *Id.* at 280.

Here, because the POM Game does not fall under the purview of the Gaming Act, the Gaming Control Board has no regulatory authority regarding the POM Game. Thus, the Gaming Control Board does not have a right or interest related to the counterclaim and meaningful relief can be afforded without its involvement. It is also notable that the Gaming Control Board is aware of this matter, has not sought to intervene, and takes the position that unlicensed "skill games" are not subject to the Gaming Control Board's regulation. *See* Department's Reply Br. at 17; Video, *Pennsylvania House Appropriations Committee Budget Hearing, FY 2019-20*, (February 27, 2019), https://s3.us-east-2.amazonaws.com/pagopvideo/106913203.mp4 (last visited October 15, 2019).

19    *Our denial of the Department's application, however, does not decide the separate question raised in POM's claim, i.e., whether the POM Game is an illegal gambling device under the Crimes Code, which both parties appear to acknowledge requires discovery in order to resolve.*



POM of Pennsylvania, LLC v. Department of Revenue, 221 A.3d 717 (2019)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit C

Monroe County Prothonotary Filed May 19, 2023 8:38 AM

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**FORTY-THIRD JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: FOUR PENNSYLANIA SKILL AMUSEMENT DEVICES AND ONE TICKET REDEMPTION TERMINAL CONTAINING $18,692 IN U.S. CURRENCY | : : : : : : : : : : | No. 6673 CV 2021 |
| | : | **APPEAL** |

### STATEMENT PURSUANT TO Pa.R.A.P. 1925(a)

This matter comes before us on Commonwealth's appeal from our February 8, 2023 order granting L&M Music Company, Inc. and Smokin' Joe's Tobacco Shop, Inc.'s (Petitioners, collectively) Joint Omnibus Petition to Return Seized Property and to Suppress Evidence. For the reasons set forth below, we respectfully request that the Commonwealth's appeal be denied and our February 8, 2023 order affirmed.

### History

This is the second appeal taken in this matter by the Commonwealth to the Pennsylvania Superior Court. On May 16, 2022, the Commonwealth filed a Notice of Appeal from our order filed May 17, 2022 denying the Commonwealth's Motion for Recusal. On July 11, 2022, we filed our Statement Pursuant to Pa.R.A.P. 1925(a) (First 1925(a) Statement) with respect to the Commonwealth's appeal. In our First 1925(a) Statement, we thoroughly recited the factual and procedural history of this case from its inception until May 16, 2022. We incorporate that history and will not reiterate it here.

1

Accordingly, we will begin with a review of the facts and procedural history relevant to the Commonwealth's current appeal that have transpired from May 16, 2022 to present.

On May 16, 2022, we proceeded to hearing on Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence.  At the conclusion of the hearing, the Commonwealth requested 30 days to file a memorandum in support of its position.  We gave the parties 21 days to file briefs. To date, the Commonwealth has not filed a brief in support of its position.  Instead, the Commonwealth filed an application to stay the trial court proceedings in this Court while it litigated its appeal from our denial of its motion for recusal.  The Superior Court stayed the matter before this court on May 20, 2022.

On January 24, 2023, the Superior Court, at docket number 1218 EDA 2022, quashed the Commonwealth's appeal.  In its opinion, the Superior Court stated that "[a]s a preliminary matter, we must address whether we have jurisdiction to consider this interlocutory appeal." *In re Four Pennsylvania Skill Amusement Devices & One Ticket Redemption Terminal Containing $18,692 in U.S. Currency*, 1218 EDA 2022, 2023 WL 371788, at *7 (Pa. Super. Ct. Jan. 24, 2023), *reargument denied* (Apr. 5, 2023).  Further, the Superior Court reasoned,

> [i]n this case, the Commonwealth is seeking to recuse the trial judge from considering whether to return the four gambling devices. If the trial judge orders that the devices be returned, double jeopardy principles would not be implicated and that decision could be appealed, including the trial judge's denial of the recusal motion.
> Accordingly, the appeal from the denial of the recusal motion is from an interlocutory order and is quashed.

*Id*. at 9.

2

On February 7, 2023, the Commonwealth filed an Application for Reargument with the Superior Court. On April 5, 2023, the Superior Court denied the Commonwealth's request. In the interim, on February 8, 2023, we issued an order granting the Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence. In our February 8th order, we wrote:

> 1. Petitioners' Petition to Suppress Evidence is **GRANTED**. The court finds that the Commonwealth improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.
>
> 2. Petitioners' Petition to Return Seized Property is **GRANTED**. The court finds that the devices at issue are legal games of skill, and that the Commonwealth has failed to establish that the devices, as designed, are games of chance.
>
> 3. The Commonwealth shall, within 48 hours of the issuance of this Order, **RETURN** the seized Skill Games and TRT to Petitioners. Petitioners shall retain the monies previously returned to them pursuant to prior order of court.

The next day, the Commonwealth filed a Motion to Strike our February 8th order on jurisdictional grounds. On February 13, 2023, Petitioners filed an answer to the Commonwealth's Motion to Strike.

We held a hearing on the Commonwealth's motion on February 17, 2023. At the conclusion of the hearing, we issued an order and denied the Commonwealth's Motion to Strike. In our order, we found "consistent with the Superior Court's decision entered in this matter on January 24, 2023 and Pa.R.A.P. 1701(b)(6), that we have jurisdiction to issue our February 8, 2023 final order in this matter." We further found "that Pa.R.A.P. 2572 is not dispositive of jurisdiction with respect to a quashed, interlocutory appeal."

3

On March 7, 2023, the Commonwealth filed a Notice of Appeal from our February 8th order.[1] On March 17, 2023, we directed the Commonwealth to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) within twenty-one days.  The Commonwealth complied with our order by filing its concise statement on April 12, 2023 raising the following two alleged errors:

1.  The Court made an error of law and abused its discretion in entering an order on February 8, 2023 returning property and suppressing evidence in a matter in which it has no jurisdiction, due to a pending appeal, and when the record had not been returned by the Superior Court, contrary to established case law, and the Pennsylvania Rules of Appellate Procedure.

2.  Assuming, *arguendo*, that the Court had jurisdiction, which is not conceded, the Court made an error of law and abused its discretion in issuing its Order of February 8, 2023, returning property and suppressing evidence, without explaining its reasoning, by issuing an opinion, or a statement of findings of fact and conclusions of law, which is contrary to established case law and the Pennsylvania Rules of Criminal Procedure.[2] [3]

For the reasons that follow, we find no merit to the Commonwealth's claims.  We will address each of the Commonwealth's claims in turn.

---

[1] At this time, the Commonwealth has yet to return the property to Petitioners. On February 17, 2023, Petitioners filed a Motion to Hold The Monroe County District Attorney in Contempt of this Court's Order of February 8, 2023. On February 24, 2023, we issued a Rule Returnable for Answer and Hearing upon Assistant District Attorney Andrew Throckmorton to show cause why the Petition or Motion should not be granted, and he should not be held in indirect contempt of court for failure to comply with our February 8, 2023 Order directing the return of the seized devices to Petitioners. A contempt hearing is scheduled for July 2, 2023.

[2] The Commonwealth has NOT alleged any substantive error of law and thus has waived any possible issue on those grounds. Pa.R.A.P. 1925(b)(4)(vii), *Com. v. Hill*, 609 Pa. 410, 427, 16 A.3d 484, 494 (2011) *citing Com. v. Lord*, 553 Pa. 415, 719 A.2d 306, 309 (1998).

[3] Petitioners filed a Motion to Vacate Automatic Supersedeas on April 27, 2023.  We scheduled hearing on the motion for May 19, 2023.  In the interim, the Commonwealth filed a Petition for Allowance of Appeal to the Pennsylvania Supreme Court from the Superior Court's quashing of its appeal concerning its recusal motion.  The Petition is still pending before the Supreme Court.

4

**Discussion**

**Jurisdiction**

In its first statement of error, the Commonwealth contends that we lacked jurisdiction to enter our February 8, 2023 final order directing the Commonwealth to return the seized devices to Petitioners.  We do not agree.

In its January 24, 2023 decision, the Superior Court explicitly stated, "[a]s a preliminary matter, we must address whether we have jurisdiction to consider this interlocutory appeal." *In re Four Pennsylvania Skill Amusement Devices & One Ticket Redemption Terminal Containing $18,692 in U.S. Currency*, 1218 EDA 2022, 2023 WL 371788, at \*7 (Pa. Super. Ct. Jan. 24, 2023), *reargument denied* (Apr. 5, 2023). The Superior Court concluded that "the appeal from the denial of the recusal motion is from an interlocutory order" and quashed the Commonwealth's appeal. *Id.* at 9.  Finding that it lacked jurisdiction, there was nothing to relinquish to this court.

Even if the Commonwealth's interlocutory appeal had not been quashed, the appeal would not prevent the entry of our February 8th final order.  Pa.R.A.P. 1701(b)(6) states in relevant part:

> (b)    Authority of a trial court or other government unit after appeal.—
> After an appeal is taken or review of a quasijudicial order is sought, the trial court or other government unit may:
>
>     \*      \*      \*      \*      \*      \*
>
> (6)    Proceed further in any matter in which a non-appealable interlocutory order has been entered, notwithstanding the filing of a notice of appeal or a petition for review of the order.

Pa.R.A.P. 1701(b)(6) specifically authorizes the trial court to proceed in matters where an appeal is pending.  Furthermore, both the Pennsylvania Superior Court and Pennsylvania Commonwealth Court have consistently held that under Pa.R.A.P. 1701(b)(6), a trial court does not lose jurisdiction to proceed in a matter, despite the filing of an appeal from an interlocutory order. (*See Melani v. Nw. Eng'g, Inc.*, 2006 PA Super 281, 909 A.2d 404 (Pa. Super. Ct. 2006), PA.Super.2006) (Appeal from trial court's order and opinion, making findings on exact location of right-of-way and ordering that landowner who brought the action to quiet title pay legal costs, was an appeal from an interlocutory order and, thus, did not divest the trial court of jurisdiction to rule on landowner's post-trial motion; record showed that no judgment was ever entered in the case.); (*See also E.O.J., Inc. v. Tax Claim Bureau of Schuylkill Cnty.*, 721 A.2d 79 (Pa.Cmwlth. 1998), Cmwlth.1998) (Trial court had authority to adjudicate plaintiff's petition for relief from judgment of *non pros*, notwithstanding plaintiff's filing of notice of appeal in the case, since plaintiff's notice of appeal was an appeal from a nonappealable interlocutory order); (*Com. v. Tourscher*, 453 Pa.Super. 1, 682 A.2d 1275 (1996)) (Fact that defendant's appeal from order denying his petition to dismiss for double jeopardy was pending in Superior Court at start of trial did not preclude trial court from exercising jurisdiction to commence trial on criminal charges, where Superior Court subsequently quashed appeal as interlocutory); and (*Com. v. Cameron*, 445 Pa.Super. 165, 664 A.2d 1364 (1995)) (Trial court was not precluded from proceeding with trial pending appeal of ruling on defendant's motion to suppress and Commonwealth's motion to quash).  Accordingly, we had jurisdiction to enter our February 8th order, and did not commit error in doing so.

6

Despite the clear language of Pa.R.A.P. 1701(b)(6) and the clear holdings of the appellate case law interpreting Pa.R.A.P. 1701(b)(6), the Commonwealth contends that we lacked jurisdiction to issue our February 8th order because the Superior Court had not "relinquished jurisdiction" and had not "remanded" the matter back to us.  The Commonwealth cites Pa.R.A.P. 2572 in support of its position.  Pa.R.A.P. 2572 states, in relevant part:

> (a) General rule. Except as provided in paragraphs (b) or (c), the record shall be   remanded after the entry of the judgment or other final order of the appellate court possessed of the record.
> (b) Effect of pending post-decision applications on remand. Remand is stayed until disposition of: (1) an application for reargument; (2) any other application affecting the order; or (3) a petition for allowance of appeal from the order. The court possessed of the record shall remand 30 days after either the entry of a  final order or the disposition of all post-decision applications, whichever is later.
> \*       \*       \*       \*       \*       \*       \*       \*       \*
> (e) Docket entry of remand. The prothonotary of the appellate court shall note on the docket the date on which the record is remanded and give written notice to all parties of the date of remand.

Pa.R.A.P. 2572(a), (b) and (e).

We find Pa.R.A.P. 2572 inapplicable to this case.  By its own language, Pa.R.A.P. 2572 pertains only to the record and when it is to be remanded after the entry of a judgment or other final order of the appellate court possessed of the record.  It does not pertain to or address a trial court's ability to proceed in matters in which an appeal has been filed from a non-appealable interlocutory order.  Nor does it pertain to matters which the Superior Court quashes for lack of jurisdiction.  If we were to follow the Commonwealth's reading of Pa.R.A.P. 2572, Pa.R.A.P. 1701(b), which specifically governs when a trial court may proceed further in any matter in which a non-appealable

7

interlocutory order has been entered, would be moot.  For these reasons, we find no merit to the Commonwealth's argument and ask to be affirmed.

**Failure to issue Opinion**

In its second statement of alleged error, the Commonwealth contends that, even if we did have jurisdiction to enter our order, we erred by failing to issue an opinion or findings of fact and conclusions of law.  We find that this issue is both waived and meritless.

"Issues not raised in the trial court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a).  It is well settled that issues not raised before the trial court cannot be raised for the first time on appeal or in a Pa.R.A.P. 1925(b) Concise Statement of Claims Raised on Appeal. *Orange Stones Co. v. City of Reading, Zoning Hearing Bd.*, 32 A.3d 287, 291 (Pa.Cmwlth. 2011) *citing Irwin Union Nat. Bank & Tr. Co. v. Famous*, 2010 PA Super 145, 4 A.3d 1099 (Pa. Super. Ct. 2010).

We issued our February 8, 2023 order granting Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence and directing the Commonwealth to return the seized devices to Petitioners within 48 hours.  The Commonwealth filed a Motion to Strike our February 8th order.  In its motion, the Commonwealth does not cite any legal authority but contends that we erred in entering our order because we did not have jurisdiction.  On February 14, 2023, we issued an order scheduling hearing on the Commonwealth's Motion to Strike for February 17, 2023 at 10: 30 am and directing the Commonwealth to cite to specific authority in support of its motion.  The Commonwealth filed its revised motion on February 17, 2023

8

at 10:49 am, claiming only that we lacked jurisdiction to enter our February 8th order, and citing to Pa.R.A.P. 2572 in support. At the hearing on February 17th, the sole argument made by the Commonwealth in support of its motion was that we lacked jurisdiction under Pa.R.A.P. 2572 to issue our February 8th order. At no time prior to the filing of its 1925(b) Statement has the Commonwealth ever raised the issue of an opinion, finding of facts, or conclusions of law. The issue is waived.

Although the issue is waived and we need not address its merits, even on the merits, the Commonwealth's argument fails. To begin, the Commonwealth cites none and we know of no law that requires us to issue an opinion, findings of fact, or conclusions of law in order to enter an order for return of property. *See* Pa.R.Crim.P. 588.

Regarding suppression of evidence, Pa.R.Crim.P. 581(I) states:

> (I)     At the conclusion of the hearing, the judge shall enter
> on the record a statement of findings of fact and
> conclusions of law as to whether the evidence was
> obtained in violation of the defendant's rights, or in
> violation of these rules or any statute, and shall make
> an order granting or denying the relief sought.

Pa.R.Crim.P. 581(I). However, the Superior Court has found that when a trial judge provides adequate subsequent explanation for their ruling in their Pa.R.A.P. 1925(a) opinion as to not impeded their appellate review, remand is not necessary. *Commonwealth v. Cabbagestalk*, 1230 WDA 2017, 2018 WL 4496627, at *2 (Pa. Super. Ct. Sept. 20, 2018) *citing Com. v. Millner*, 585 Pa. 237, 888 A.2d 680, 688–89 (2005) (explaining the purpose of the Rule and "recogniz[ing] that, unfortunately, it is not uncommon for suppression judges to fail to comply with this directive[,]" but declining to

9

remand for compliance with Pa.R.Crim.P. 581(I) where review was not hampered, and for judicial economy).

Our February 8, 2023 order states that;

1.  Petitioners' Petition to Suppress Evidence is **GRANTED**. The court finds that the Commonwealth improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property.

2.  Petitioners' Petition to Return Seized Property is **GRANTED**. The court finds that the devices at issue are legal games of skill, and that the Commonwealth has failed to establish that the devices, as designed, are games of chance.

3.  The Commonwealth shall, within 48 hours of the issuance of this Order, **RETURN** the seized Skill Games and TRT to Petitioners. Petitioners shall retain the monies previously returned to them pursuant to prior order of court.

See February 8, 2023 Order. We believe our February 8th order satisfies the mandates of Pa.R.Crim.P. 581(I). To the extent it does not, we provide the following:

L & M Music Company, Inc. is lawfully incorporated and authorized to conduct business within the Commonwealth of Pennsylvania. Smokin' Joe's Tobacco Shop, Inc. is a lawful entity authorized to conduct business within the Commonwealth of Pennsylvania. On October 28, 2021, the Commonwealth of Pennsylvania, acting through the Monroe County District Attorney's Office, executed a search warrant and seized property belonging to Petitioners. Specifically, the Commonwealth conducted a search and seized video Pennsylvania skill amusement devices and one ticket redemption terminal (devices, collectively). L & M is the lawful owner of the devices,

10

and Smokin' Joe's has a lawful possessory interest in the devices through a business arrangement with L & M.  The devices were seized from Smokin' Joe's premises located at 15 N. 3rd St., Stroudsburg, PA 18360. The TRT contained $18,692 in US currency.

On November 24, 2021, Petitioners filed their Joint Omnibus Petition to Return Seized Property, to Suppress Evidence, and to Unseal Search Warrant.[4]  In their filing, Petitioners seek the return of the devices pursuant to Pa.R.Crim.P. 588 because 1) L & M is the owner of the devices and Smokin' Joe's has a possessory interest in the devices at the time they were seized; and 2) the devices are not contraband. Petitioners contend that the devices are not gambling devices as that term is defined in Pennsylvania law. Petitioners also seek suppression of the seized devices pursuant to Pa.R.Crim.P. 581. Petitioners contend the devices should be suppressed because they were unlawfully seized based on an invalid search warrant.  Specifically, Petitioners contend that the Commonwealth intentionally and or recklessly withheld or misrepresented information material to the search warrant application.

On May 16, 2022, we held a hearing on Petitioners' Joint Omnibus Petition.  At the conclusion of the hearing, the Commonwealth requested 30 days to file a memorandum in support of its position.  We gave the parties 21 days to file briefs.  To date, the Commonwealth has not filed a brief in support of its position.

A petition for the return of property is governed by Pa.R.Crim.P. 588 which states:

---

[4] For the reasons set forth in our First 1925(a) Statement, Petitioners' Petition to Unseal Search Warrant is now moot.

11

(A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.

(B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

(C) A motion to suppress evidence under Rule 581 may be joined with a motion under this rule.

Pa.R.Crim.P. 588. Under this rule, the moving party must first establish that it is entitled to lawful possession of the property by a preponderance of the evidence. *Commonwealth v. Trainer*, 287 A.3d 960, 964 (Pa.Cmwlth. 2022)(citations omitted). Once that is established, the burden then shifts to the Commonwealth to show, by a preponderance of the evidence, that the property is either contraband per se, or derivative contraband, and should not be returned to the moving party. *Id.*(citations omitted). Contraband *per se* is property that is unlawful to possess, and derivative contraband is property that can be lawfully possessed, but is used in the perpetration of an unlawful act. *Commonwealth v. Irland*, 153 A.3d 469, 473 (Pa.Cmwlth. 2017), *aff'd,* 648 Pa. 380, 193 A.3d 370 (2018)(citations omitted).

The statute that makes gambling devices illegal, 18 Pa.C.S.A. § 5513, provides as follows:

Gambling devices, gambling, etc.

12

**(a) Offense defined.**--A person is guilty of a misdemeanor of the first degree if he:

(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards;

(2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;

(3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or

(4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.

*See* 18 Pa.C.S.A. § 5513(a).

Unlawful gambling is defined as "gambling not specifically authorized by the Commonwealth." *Com. v. Betres*, 237 Pa.Super. 361, 368, 352 A.2d 495, 498 (1975). It is undisputed that the devices at issue in the instant matter were not specifically authorized by the Commonwealth. However, the question remains as to whether the devices at issue are gambling devices.

A machine is a gambling device per se if it can be used for no purpose other than gambling. *Com. v. Irwin*, 535 Pa. 524, 527, 636 A.2d 1106, 1107 (1993) (citations omitted). The three elements of gambling are 1) consideration; 2) a result determined by chance rather than skill; and 3) reward. *Id.* (citations omitted). Where all three of these elements are present, the machine will be considered "so intrinsically connected with gambling" as to be a gambling device *per se*. *Id.* (citations omitted). The

13

Commonwealth has the burden of showing that the machines are per se gambling devices. *Id.* (citations omitted).

In determining whether a machine is a gambling device, the court must examine the characteristics of the machine itself and whether the three elements are present. *Com. v. Two Elec. Poker Game Machines*, 502 Pa. 186, 194, 465 A.2d 973, 977 (1983). With respect to the element of chance versus skill, Pennsylvania courts have employed the "predominant factor test" stating that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." *Com. v. Dent*, 2010 PA Super 47, 992 A.2d 190, 193 (Pa. Super. Ct. 2010) (citations omitted). Simply because a machine involves a large element of chance, without more, is insufficient to find the machine to be a gambling device *per se*. *Two Electronic Poker Game Machines*, 502 Pa. at 195. Moreover, the outcome of a game does not need to be wholly determined by skill in order for the machine to fall out of the *per* se gambling device category. *Id.* Rather, courts must determine whether chance or skill predominates in any given machine.

At the outset of the May 16th hearing, the parties stipulated that Petitioners were the lawful owners of the devices. Accordingly, the burden shifted to the Commonwealth to establish that the devices were illegal gambling devices. For purposes of their petition, Petitioners do not dispute that the devices satisfy the elements of consideration and reward. Consequently, the only issue before us was whether the Commonwealth had established that the devices constitute games of chance and not games of skill.

14

The Commonwealth called two witnesses to testify: Detective Thomas McMahon as a fact witness and David Schoppe as an expert witness in the analysis of game play of the devices at issue. Petitioners called Rick Goodling as an expert witness in the field of Pennsylvania law enforcement, gambling investigations, and operation of the devices at issue. Petitioners also called Dr. Olaf VanCura as an expert witness in gaming technologies, design, and mathematics.

Based upon the evidence presented, we found each of the devices at issue is a video game machine that utilizes POM of Pennsylvania, LLC (POM), software. The devices are puzzle based games consisting of three phases. The first phase consists of a preview feature. In this phase, the player may preview the next game puzzle. No payment or purchase is required for the player to exercise the ability to cause the electronic system to disclose the next game puzzle for the game theme and play level selected. The player can then choose to play the puzzle displayed or exit the game. The player also has the option to cycle through the dozens of other available game themes and play levels, preview the associated puzzles, and select which, if any, to play.

The second phase of the game is a "tic-tac-toe" style puzzle, featuring different graphical themes that a player can select. While the graphics and some award amounts differ among the various themes, the gameplay is functionally equivalent in all themes. When the tic-tac-toe phase of the game is initiated, nine reels arranged in a 3 x 3 grid are spun. When the wheels stop spinning, nine symbols based on the player's chosen theme are displayed. The pattern that is displayed is selected from a finite pool of puzzles. Once the reels are spun, the player has limited time to replace one of the

15

symbols with a "wild" symbol in order to complete one or more rows in the grid.  Failure to place the "wild" symbol at all within the time limit will result in a loss because the devices do not generate automatic wins.

The third phase of the game - the "follow me" phase can be triggered under certain circumstances by successful completion of the tic-tac-toe phase of the game.  If a player executes the necessary skill during the tic-tac-toe phase of the game and still fails to win at least 105% of the amount paid to play the game, the player is given the option of entering the "follow me" phase of play.  The "follow me" third phase of gameplay begins with a 3 x 3 grid of colored dots.  The dots flash in a random sequence that the player must repeat. The player needs to follow the sequences for multiple rounds of play, with each sequence adding another circle. If ultimately successful, the player is awarded with a combined total of 105% of the original amount spent to play.

Once gameplay is complete, a player has the option of redeeming any remaining credits by pressing the redeem button. Pressing this button will cause the machine to dispense a ticket, reflecting the dollar amount that is equivalent to the remaining credits. For instance, if a player has 1000 credits, pressing the redeem button, will result in a player getting a ticket for $10 which they can then exchange for cash. The devices only award whole dollar amounts. Thus, pressing the redeem button rounds the player's credits down to the nearest whole dollar and leaves any excess credits on the device. For instance, if a player has 1050 credits, pressing the redeem button will result in a player getting a ticket for $10. The excess 50 credits worth $.50

16

will remain on the machine and may be used by that player or another player on future gameplay.

Based upon the evidence that was presented at the hearing, we found that the devices at issue in this case are predominantly games of skill.  Specifically, we find that the Commonwealth has failed to meet its burden of establishing that the devices are predominantly games of chance.  Further, we find that the petitioners have established that the machines are predominantly games of skill.

With respect to the Petitioners' Petition for Return of Property, both of the Commonwealth's witnesses testified that the devices were games of chance based upon their own playing of the devices and their watching of others play the game.  The Commonwealth did not present any testimony whatsoever as to how the devices or their software are designed, but rather focused its presentation solely on how various individuals chose to play the games.   We do not find the Commonwealth's evidence compelling or even relevant as the central issue in this case is the design of the games, not how individuals may choose to play them.  The manufacturer, owner, or possessor of the devices cannot control how an individual chooses to play the game.  Admittedly, they can make certain aspects of the game more "tantalizing" to play, but ultimately have no control over how one chooses to play the devices.  Thus, while we find the testimony of the Commonwealth's witness, David Schoppe, to be truthful, his analysis was based only on his observations, was not performed to any scientific or professional standard, and is not relevant to our analysis.  In this regard, we adopt the reasoning of our brethren court, the Honorable Andrew H. Dowling of the Dauphin County Court of Common Pleas in *In re: Three Pennsylvania Skill Amusement Devices, One Green*

17

*Bank Bag Containing $525.00 in US Currency, and Seven Receipts*, 2022-CV-06333-MD.

Moreover, while we found Mr. Schoppe's testimony to be truthful and based upon hours of watching game play – however irrelevant we find it to be, we did not find the testimony of Detective Thomas McMahon's to be relevant, trustworthy, or based upon any acceptable modicum of knowledge, observation, or experience. Detective Mc Mahon testified that his training with respect to determining whether a gaming device is an illegal gambling machine consisted of one course lasting somewhere between four and six hours in length, and informal discussions with members of another law enforcement department. He testified that prior to submitting the search warrant in this case, he watched individuals play the POM devices for 1 to 2 hours and played the device himself for "like one hour." Detective McMahon based all of his opinions and testimony about the devices upon less than 2 hours of observation of others playing the game and less than 1 hour of his own play. Detective McMahon knew of, but never played to completion, the follow me phase of the game. Instead, he played it "for like a couple seconds" and opined that because he did not see people play the follow me feature in the short time that he observed others, the devices were games of chance.

He acknowledged that the Commonwealth did not have an expert analyze the devices' software to determine how the devices are designed. He admitted that he was not interested in determining how the devices were designed or determining if they could be played to win utilizing skill, as opposed to chance. He stated, "I mostly just

18

went in there and I just wanted to play the slot machine style game."   May 16, 2022 Hearing N.T. page 64.

His testimony was also self-contradictory, at one-point testifying that the devices did not contain instructions on the follow me feature, but later acknowledging that the devices do in fact contain instructions on the feature. May 16, 2022 Hearing N.T. page 54, 58-9.  He testified that the devices contain a "knock-off" feature which renders them a gambling device, but later conceded that the devices do not "knock-off" points, May 16, 2022 Hearing N.T. page 60-1.  He also testified to knowing of the Beaver County Court of Common Pleas case which found POM devices to be legal, but testified that the Beaver County Case was not dispositive of this case because it involved a "different terminal and different software numbers" – only to acknowledge moments later that he did not know how the terminals differed.  May 16, 2022 Hearing N.T. page 69.

It was clear from the outset of Detective McMahon's testimony that the Commonwealth did not understand the design of the game, its software, the available options to play the devices, or even how the devices physically operated.  It was equally clear that counsel for the Commonwealth did not either.  Probably most telling of the Commonwealth's lack of knowledge regarding the devices was when Detective McMahon demonstrated the device functions in open court.  Upon questioning by the assistant district attorney, Detective McMahon inserted paper currency into the device multiple times in order to demonstrate its operation for the court, including how the preview feature worked.  It was clear to us that neither he nor the assistant district attorney knew that the device allows one to preview the games to play without inserting

19

any money into the machine.  This fact did not become known to the court until Attorney Lovecchio's summation with respect to Petitioners' suppression motion when Attorney Lovecchio pointed out the functionality to the court.

Additionally, we found the opinion of Petitioners' expert, Dr. Olaf Vancura, to be compelling.  Dr. Vancura has worked as a designer, inventor, and consultant in the gaming industry since 1995.  He testified that a skillful player that plays the POM devices can win, which is defined as making a net profit, on each and every play of the game.  Additionally, he opined that there is no feature or functionality of the game that could prevent a skillful and patient player from achieving that result in every single play.  He gave this opinion with 100% mathematical certainty.

Adding to the persuasive opinion of Dr. Vancura is the fact that all of the witnesses who testified, including the Commonwealth's two witnesses, agreed that it is possible for a patient and skillful player to win 105% of their wager on each play utilizing the follow me feature.  While the determination of which puzzle will be displayed is predominantly chance, the playing of the tic-tac-toe game requires some skill – however slight it may be.  Even though the determination of the puzzle may be by chance, the preview feature allows a player to elect to play a different, winning game, or not play at all for a full refund, thus eliminating the element of chance.  Moreover, it is undisputable that the follow me feature can only be completed by a skillful player who plays with skill and is not dependent on chance.  Further, the follow me feature is available every time a player wins the same as or less than their wager.  This, too, eliminates the element of chance by giving a player the opportunity to win more than they wagered by utilizing skill each and every play of the device.

20

For all of these reasons, we found that the Commonwealth did not meet its burden of proof to establish that the devices at issue – as designed – are games of chance, and we ordered the devices returned to Petitioners. We stand by our decision and ask to be affirmed.

With respect to Petitioners' Suppression Motion, we granted the motion because we found that the Commonwealth had improperly withheld and misrepresented material evidence relative to the issuance of the search warrant in this matter, and that such conduct warrants the suppression of the seized property. We adopt the reasoning set forth by Attorney Lovecchio in his summation with regard to this issue.

Further, we find that Detective McMahon – and by extension the Commonwealth - either knowingly or recklessly misstated in his affidavit in support of the search warrant the law defining games of chance. Specifically, Detective McMahon wrote that the chance element of gambling is defined as "[t]he randomness of some act, e.g. the spinning of slot machine reels." This is not an accurate recitation of the law and is misleading to the issuing authority. To the extent this error should not be held against the Commonwealth because Detective McMahon is not an attorney, this argument fails because the warrant application was approved and signed for by an attorney – ADA Andrew Throckmorton.

In addition to the various factors discussed above, Detective McMahon knew that the devices contained a preview function – even though he did not know it could be operated without inserting currency. He did, however, know that if a player utilized the preview function but chose not to play the device at all, all currency that had

21

been inserted would be refunded in full.  The Commonwealth withheld all this information from the affidavit.

Detective McMahon also knew that any credits that are left on a device when one chooses to cash out are not cleared out or knocked off the device.  He testified that the credits remain on the device and may be played by the current player or the next player to use the device.  Again, the Commonwealth withheld all this information from the affidavit.

Moreover, Detective McMahon knew – or should have known – that players can – with skill - earn 105% of their bet every time by using the follow me function.  Once again, the Commonwealth withheld all this information from the affidavit. Further, at no time during the 18 months that this case was pending before this court did counsel for the Commonwealth ever make the court aware of this function, yet the Commonwealth continued to insist it was entitled to retain possession of the Petitioners' property.

Finally, we incorporate our comments stated above regarding the Commonwealth's lack of knowledge concerning the design of the game, its software, the available options to play the devices, and how the devices physically operate.  We find that the Commonwealth's application for a search warrant based upon inaccurate and incomplete facts, while also knowingly withholding critical facts, is reckless at best, intentional at worst, and warrants suppression.  We also find that the seizure by the Commonwealth of the Petitioners' property without adequate and accurate knowledge of the devices, their design, and function is even worse, and also warrants suppression. Simply put, the Commonwealth did not have adequate knowledge to determine the

22

devices were illegal, and it withheld critical information that it should have disclosed in its search warrant application.  For all of the reasons stated above, we believe our suppression order was properly entered and does not constitute error.

We respectfully request the Superior Court affirm our order February 8, 2023 order granting the Petitioners' Joint Omnibus Petition to Return Seized Property and to Suppress Evidence.

BY THE COURT:

**JENNIFER HARLACHER SIBUM, Judge**

**Dated:  May 18, 2023**

cc:    District Attorney (AT)
       George Westervelt, Esq.
       Matthew Haverstick, Esq.
       Edward Butkovitz, Esq.
       Marc Lovecchio, Esq.
       James Gorman, III, Esq.
       Court Administration

# Exhibit D

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**43rd JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

**COMMONWEALTH OF PENNSYLVANIA** :  NO. 1769 CRIMINAL 2022
                                     :
              **vs.**                   :
                                       :
**MIELE MANUFACTURING, INC.,**    :
            **Defendant**       :

### ORDER GRANING MOTION TO DISMISS

**AND NOW,** this 1st day of June, 2023, for the reasons summarized today on the record and under the law set forth in the hearing addendum, **IT IS ORDERED** that Defendant's Motion to Dismiss based on collateral estoppel is **GRANTED** and the charges in this case are **DISMISSED.** The Court finds that the Commonwealth is estopped by findings made in the parallel return of property case from proceeding with the charges in this matter and that the parties and the Court are estopped from re-litigating the finding set forth in a final order issued in the return of property case that the subject devices are games of skill and not games of chance.

In the alternative, to the extent it may be determined that collateral estoppel does not apply as to Defendant Miele since Miele is not a party in the parallel return of case, Defendant Miele is entitled to *habeas* relief and dismissal of all charges on the basis that the Commonwealth cannot establish a *prima facie* case of the crimes charged

since this Court has specifically found that the devices on which the charges are based are legal games of skill and not games of chance.

The preservation of evidence protocol set forth in the order dated December 13, 2022 is made final and shall continue in effect unless and until the subject devices are returned to Defendants or until further order of this Court or an appellate court.

The Commonwealth's oral motion for recusal of the undersigned is **DENIED**.

The remaining motions are **DISMISSED** as moot and the subpoenas issued for today's hearing are discharged.

**BY THE COURT:**

_____
**JONATHAN MARK, JUDGE**

Filed
06/02/2023 11:05AM
Court of Common Pleas

cc:  District Attorney (MTR, CR, AT)
     Matthew Haverstick, Esquire
     Edward Butkovitz, Esquire
     Marc Lovecchio, Esquire
     George Westervelt, Esquire
     Steven P. Trialonas, Esquire
     Court Administration (LF)

COURT OF COMMON PLEAS OF MONROE COUNTY
43rd JUDICIAL DISTRICT
COMMONWEALTH OF PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA   :  NO. 1770 CR 2022
                      :
          v.           :
                      :
SMOKIN' JOE'S TOBACCO SHOP, INC.,:
         Defendant    :

ORDER GRANING MOTION TO DISMISS

**AND NOW,** this 1st day of June, 2023, for the reasons summarized today on the record and under the law set forth in the hearing addendum, **IT IS ORDERED** that Defendant's Motion to Dismiss based on collateral estoppel is **GRANTED** and the charges in this case are **DISMISSED.** The Court finds that the Commonwealth is estopped by findings made in the parallel return of property case from proceeding with the charges in this matter and that the parties and the Court are estopped from re-litigating the finding set forth in a final order issued in the return of property case that the subject devices are games of skill and not games of chance.

The preservation of evidence protocol set forth in the order dated December 13, 2022 is made final and shall continue in effect unless and until the subject devices are returned to Defendants or until further order of this Court or an appellate court.

The Commonwealth's oral motion for recusal of the undersigned is **DENIED**.

The remaining motions are **DISMISSED** as moot and the subpoenas issued for today's hearing are discharged.

BY THE COURT:

_____
JONATHAN MARK, JUDGE

Filed
06/02/2023 11:03AM
Court of Common Pleas

cc:  District Attorney (MTR, CR, AT)
     Matthew Haverstick, Esquire
     Edward Butkovitz, Esquire
     Marc Lovecchio, Esquire
     George Westervelt, Esquire
     Steven P. Trialonas, Esquire
     Court Administration (LF)

**COURT OF COMMON PLEAS OF MONROE COUNTY**
**43rd JUDICIAL DISTRICT**
**COMMONWEALTH OF PENNSYLVANIA**

COMMONWEALTH OF PENNSYLVANIA :   NO. 1771 CRIMINAL 2022
                                :
              v.                :
                                :
L&M MUSIC COMPANY, INC.,        :
              Defendant         :

### ORDER GRANING MOTION TO DISMISS

**AND NOW**, this 1st day of June, 2023, for the reasons summarized today on the record and under the law set forth in the hearing addendum, **IT IS ORDERED** that Defendant's Motion to Dismiss based on collateral estoppel is **GRANTED** and the charges in this case are **DISMISSED.** The Court finds that the Commonwealth is estoped by findings made in the parallel return of property case from proceeding with the charges in this matter and that the parties and the Court are estopped from re-litigating the finding set forth in a final order issued in the return of property case that the subject devices are games of skill and not games of chance.

The preservation of evidence protocol set forth in the order dated December 13, 2022 is made final and shall continue in effect unless and until the subject devices are returned to Defendants or until further order of this Court or an appellate court.

The Commonwealth's oral motion for recusal of the undersigned is **DENIED**.

The remaining motions are **DISMISSED** as moot and the subpoenas issued for today's hearing are discharged.

**BY THE COURT:**

_____
**JONATHAN MARK, JUDGE**

Filed
06/02/2023 11:07AM
Court of Common Pleas

cc: District Attorney (MTR, CR, AT)
    Matthew Haverstick, Esquire
    Edward Butkovitz, Esquire
    Marc Lovecchio, Esquire
    George Westervelt, Esquire
    Steven P. Trialonas, Esquire
    Court Administration (LF)