Joshua J. Voss
jvoss@kleinbard.com
*Direct Dial 267.443.4114*



**KLEINBARD** llc

July 6, 2023

**VIA CM/ECF**

Hon. Michael M. Baylson
Eastern District of Pennsylvania

**RE:**   ***Greenwood Gaming & Entertainment, Inc. v. POM of Pennsylvania, LLC,
et al.,* No. 2:22-cv-4434-MMB**

Dear Judge Baylson:

On behalf of Defendants POM of Pennsylvania, Inc. and Pace-O-Matic, Inc., and in
follow up to Your Honor's request during the hearing in the above matter on April 12,
2023, I write to bring the Court's attention to new state-law authority relevant to this
dispute. On July 6, 2023, the Pennsylvania Commonwealth Court issued a published
opinion in an appeal regarding skill games owned by Pinnacle Amusement, LLC
(Exhibit A). The opinion affirmed a trial court decision (Exhibit B) finding that because
skill predominates over chance based on the record created regarding the games at issue,
the alleged "slot machines" did not violate Section 5513 of the Crimes Code, 18 Pa.C.S.
§ 5513. Critically, in footnote 3, the appeals court expressly noted that the Gaming Act,
found in Title 4, was not relevant to the analysis, stating:

> In the proceedings below, the trial court explicitly rejected BLCE's reliance
> on the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S.
> §§ 1101-1904 (Gaming Act) for the proposition that the seized machines were
> contraband. Trial Ct. Op. at 17. Rather, the instant controversy must be
> decided under the framework that stems from Section 5513 of the Crimes
> Code. *See* Trial Ct. Op. at 17 (citing *POM of Pa., LLC v. Dep't of Revenue*, 221
> A.3d 717, 731 (Pa. Cmwlth. 2019) ("[T]he Gaming Act does not apply to
> unlicensed and/or illegal slot machines."); *see also POM of Pa*, 221 A.3d at
> 736 ("[S]ection 5513 of the Crimes Code, rather than any relevant provision
> of the Gaming Act, remains the preeminent statute governing illegal and
> unlicensed slot machines in the Commonwealth.")). The trial court noted
> that, at the hearing, BLCE acknowledged the inapplicability of the Gaming
> Act to the instant controversy, but later attempted to re-raise those
> arguments. Trial Ct. Op. at 17. Regardless, BLCE has abandoned arguments
> regarding the Gaming Act on appeal before this Court.

Exhibit A at 4 n.3.

July 6, 2023
Page 2



This new, statewide, binding authority, plus the five county trial courts that have found the POM Skill Games to be lawful (*see* Doc. 39), rejects the predicate legal theory at the heart of the Parx Amended Complaint.

Respectfully submitted,

Joshua J. Voss

cc:     All parties (via CM/ECF)

# Exhibit A

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Pinnacle Amusement, LLC            :
                                   :
            v.                     :   Nos. 609 - 612 C.D. 2022
                                   :   Argued: April 3, 2023
Bureau of Liquor Control           :
Enforcement,                       :
                        Appellant  :


BEFORE:   HONORABLE ANNE E. COVEY, Judge
          HONORABLE LORI A. DUMAS, Judge
          HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


OPINION
BY JUDGE DUMAS                                    FILED: July 6, 2023


        The Bureau of Liquor Control Enforcement (BLCE) appeals from the
opinion and order entered in the Luzerne County Court of Common Pleas (trial
court) on May 18, 2022, granting Pinnacle Amusement, LLC's (Pinnacle) motions
for return of property as to all gaming machines seized by the BLCE and denying
BLCE's forfeiture petitions.  After careful review, we affirm.

## I. BACKGROUND[1]

        In 2019 and 2020, investigators from BLCE conducted cross-county
undercover operations at several liquor-licensed establishments.  The investigations
centered around several varieties of electronic gaming machines.  After BLCE's
investigations, which involved paying consideration, engaging in gameplay on the
devices, and receiving rewards in the form of vouchers that could be exchanged for

---

[1] Unless otherwise stated, we base the recitation of facts on the trial court's opinion filed
May 18, 2022.  *See* Trial Ct. Op., 5/18/22, at 1-27.

currency, 11 machines were seized from their respective establishments.  Ten of the 11 gaming devices were operated by Banilla Games and owned by Pinnacle.

The gaming machines are "nudge" or "hot swap" games, where a player inserts cash and receives digital credits on the machine.  The player then selects a theme, wager amount, and spins the reels.  Once the reels stop, the "nudge" player can rotate or "nudge" the reels to attempt aligning them in a winning pattern.  The "hot swap" player can substitute or swap one of the reel symbols with a symbol held in a pool outside the reels.  When a player has the possibility of creating a winning pattern, the machine will not allow a player to proceed to the next spin, but rather, forces the player to attempt a nudge or swap.  If a player successfully creates a winning pattern through nudging or swapping, they are rewarded with credits based on the wager, and can spin the reels again.  If the player cannot create a winning pattern, the game presents an on-screen option to engage in a secondary round of play called "Follow the Banana," which has its own rules and gameplay.  It is a memory game that displays an increasingly difficult pattern of bananas, and if the player does it successfully, he or she can recoup 104% of the last wager on the game of chance.

Pinnacle filed, in the Luzerne County Court of Common Pleas, a motion pursuant to 42 Pa.C.S. § 5806(a)(1) and Pa.R.Crim.P. 588 for the return of the gaming machines seized from one of the establishments.  BLCE filed an answer in opposition to the return of the property and a petition for forfeiture pursuant to 42 Pa.C.S. § 5803.  Subsequently, Pinnacle filed motions for the return of the gaming machines seized from the other establishments, some of which were filed in other jurisdictions.

All matters were consolidated in Luzerne County, and the trial court held an evidentiary hearing on February 18, 2022. At the hearing, Pinnacle presented testimony from several expert witnesses who described the gameplay experience available on the machines and opined that the Banilla games were skill games, rather than games of chance. For its part, BLCE provided testimony from officers involved in the investigation and whose testimony focused on wager amounts, awards available, and those elements of gameplay left to chance.

Concluding that Pinnacle's machines did not constitute gambling devices *per se*, the trial court issued an opinion and order granting Pinnacle's motions for return of property as to all gaming machines seized by BLCE and denying BLCE's forfeiture petitions. BLCE timely appealed to this Court. The trial court did not issue an order pursuant to Pa.R.A.P. 1925(b) but instead filed a statement and order in lieu of opinion pursuant to Pa.R.A.P. 1925(a)(1), citing its prior opinion. The matters were again consolidated in this Court.

## II. ISSUE

On appeal, the sole issue is whether Pinnacle's gaming machines are gambling devices *per se*. *See* BLCE's Br. at 4. According to BLCE, the machines are gambling devices *per se* because they offer reel games similar to slot machines, in that chance predominates over skill and that the "skill" portion of the game is only a pretext, designed to discourage players from pursuing it. *Id.* at 4, 15. Moreover, BLCE contends, the mere inclusion of purposely unappealing skill-based games to transform a gambling device into a game of skill creates a slippery slope that could allow others to circumvent Pennsylvania's prohibition on illegal gambling. *See id.* at 16.

3

## II. ANALYSIS[2]

To defeat Pinnacle's motion for return of property and to establish its right to forfeiture, BLCE sought to establish that the gaming machines were derivative contraband.[3]  "Derivative contraband is property innocent by itself, but used in the perpetration of an unlawful act.  An example of derivative contraband is a truck used to transport illicit goods."  *Commonwealth v. Irland*, 153 A.3d 469, 473 (Pa. Cmwlth. 2017), *aff'd*, 193 A.3d 370 (Pa. 2018) (citation omitted).  Further, "[p]roperty is not derivative contraband merely because it is owned or used by someone who has been engaged in criminal conduct.  Rather, the Commonwealth

---

[2] "In an appeal from a forfeiture proceeding, this Court reviews whether findings of fact made by the trial court are supported by substantial evidence, and whether the trial court abused its discretion or committed an error of law."  *Commonwealth v. 1997 Chevrolet*, 106 A.3d 836, 847 n.9 (Pa. Cmwlth. 2014).  "Our standard of review is deferential with respect to the trial court's findings of fact.  Whether the evidence, as a whole, is sufficient to support a legal conclusion is a question of law."  *See id.*  Our scope of review over questions of law is plenary.  *See id.*  The trial court as a factfinder is "the ultimate judge of credibility and resolves all conflicts in the evidence."  *See Lodge v. Robinson Twp. Zoning H'rg. Bd.*, 283 A.3d 910, 925 (Pa. Cmwlth. 2022).  As with any other witness, the factfinder "is free to accept or reject the credibility of expert witnesses, and to believe all, part, or none of the evidence."  *City of Phila., Bd. of Pensions & Ret. v. Clayton*, 987 A.2d 1255, 1262 (Pa. Cmwlth. 2009).  As long as sufficient evidence exists in the record "which is adequate to support the [factfinder's] determination, an appellate court is precluded from overturning these determinations."  *See id.*

[3] In the proceedings below, the trial court explicitly rejected BLCE's reliance on the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904 (Gaming Act) for the proposition that the seized machines were contraband.  Trial Ct. Op. at 17.  Rather, the instant controversy must be decided under the framework that stems from Section 5513 of the Crimes Code.  *See* Trial Ct. Op. at 17 (citing *POM of Pa., LLC v. Dep't of Revenue*, 221 A.3d 717, 731 (Pa. Cmwlth. 2019) ("[T]he Gaming Act does not apply to unlicensed and/or illegal slot machines."); *see also POM of Pa*, 221 A.3d at 736 ("[S]ection 5513 of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.")).  The trial court noted that, at the hearing, BLCE acknowledged the inapplicability of the Gaming Act to the instant controversy, but later attempted to re-raise those arguments.  Trial Ct. Op. at 17.  Regardless, BLCE has abandoned arguments regarding the Gaming Act on appeal before this Court.

must establish a specific nexus between the property and the alleged criminal activity." *See id.*

With regard to the instant case, a person is guilty of a first-degree misdemeanor if he "intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards." *See* 18 Pa.C.S. § 5513(a). Also prohibited are "electronic video monitors" which offer simulated gambling programs. *See* 18 Pa.C.S. § 5513(a.1). Any gambling device that is used in violation of the provisions of the statute shall be seized and forfeited to the Commonwealth. 18 Pa.C.S. § 5513(b).[4]

The inquiry to determine whether a device is a gambling device *per se* is whether the machine is "so intrinsically connected with gambling" as to constitute

---

[4] We briefly note the procedure and standards for petitions for forfeiture and return of property. Anyone aggrieved by a search and seizure may move for the return of the property by motion. 42 Pa.C.S. § 5806(a)(1); *see also* Pa.R.Crim.P. 588(a). If the motion is granted, "the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited." *See id.*

"[T]he moving party must establish by a preponderance of the evidence entitlement to lawful possession. Once that is established, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property." *Singleton v. Johnson*, 929 A.2d 1224, 1227 (Pa. Cmwlth. 2007). A claim can be defeated if an opposing party can establish that it is entitled to lawful possession of the property or if the Commonwealth can establish that the property is contraband. *See id.* at 1227 (citing *Commonwealth v. Crespo*, 884 A.2d 960 (Pa. Cmwlth. 2005)). "If the Commonwealth seeks to defeat the claim, it bears the burden to prove, by a preponderance of the evidence, that the items are either 'contraband *per se*' or 'derivative contraband,' and therefore should not be returned to the moving party." *Commonwealth v. Trainer*, 287 A.3d 960, 964 (Pa. Cmwlth. 2022).

"To meet its burden to defeat the motion for return of property, the Commonwealth must make out more than simply demonstrating that the property was in the possession of someone who has engaged in criminal conduct. It must establish a specific nexus between the property and the criminal activity." *Singleton*, 929 A.2d at 1227. "When the Commonwealth sustains that burden, the burden of proof shifts to the property owner to disprove the Commonwealth's evidence or establish statutory defenses to avoid forfeiture." *Commonwealth v. 1992 Chevrolet*, 844 A.2d 583 (Pa. Cmwlth. 2004).

a gambling device *per se*.  *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973, 977 (Pa. 1983).  We look to "the characteristics of the machine when read against" the elements necessary to gambling.  *See id.*  Pennsylvania courts have determined that there "are three elements to gambling: consideration, chance, and reward."  *Commonwealth v. Dent*, 992 A.2d 190, 192 (Pa. Super. 2010) (citing *Two Electronic Poker Game Machines*, 465 A.2d at 977).[5, 6]  Regarding the second factor, the Pennsylvania Supreme Court set forth the "predominate factor test," which states that, for a machine to constitute a gambling machine, it must be a game where chance predominates rather than skill.  *See Two Electronic Poker Game Machines*, 465 A.2d at 977.  When making this determination, the "court should determine the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game."  *See id.* at 978.  Therefore, the main issue in this case is whether we should interpret the evidence regarding the Banilla games as showing a predominance of skill, or a predominance of chance.[7]  If the

---

[5] "In general, Superior Court decisions are not binding on this Court, but they offer persuasive precedent where they address analogous issues."  *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

[6] The Crimes Code defines consideration associated with a related product, service, or activity, in the context of the statute, as "[m]oney or other value collected for a product, service or activity which is offered in any direct or indirect relationship to playing or participating in the simulated gambling program.  The term includes consideration paid for computer time, Internet time, telephone calling cards and a sweepstakes entry."  *See* 18 Pa.C.S. § 5513(f).  The Pennsylvania Supreme Court has observed that tokens and prizes do not necessarily rise to the level of a reward, but that players must be able to "win an amount of equal or greater value than the amount he played in the machine."  *Commonwealth v. Irwin*, 636 A.2d 1106, 1109 (Pa. 1993).  Regardless, neither the definitions of consideration nor reward are central to our disposition of this matter.

[7] Additionally, it should be noted that the courts have not defined "chance."  Here, the trial court appropriately turned to Black's Law Dictionary and used the definition as "the unforeseen, uncontrollable, or unintended consequences of an act."  *See* Trial Ct. Op. at 21 (citing *Chance*, Black's Law Dictionary (11th ed. 2019)).

games show a predominance of chance, then the games may be considered gambling devices *per se*.  *See id.* at 977-78.

BLCE contends that the court erred and abused its discretion in granting the motions for return of property, because the machines at issue are gambling devices *per se*.  BLCE's Br. at 4.  According to BLCE, the primary reel games offered on the machines constitute games of chance, and Pinnacle's reliance on an optional, secondary skill game to win is a pretext, only offered to conceal the true nature of the games as gambling devices.  *See id.* at 15.  BLCE contends that the "nudge" and "swap" are not skills and that the primary game is solely one of chance. *See id.* at 21.

Further, BLCE avers that the "Follow the Banana" phase was designed to discourage players from playing it and few players in real-life settings actually do play it.  *See id.* at 15.  According to BLCE, allowing the mere inclusion of purposely unappealing skill-based games to transform a gambling device into a game of skill creates a slippery slope that could allow others to circumvent Pennsylvania's prohibition on illegal gambling.  *See id.* at 16.  In BLCE's view, the illegal gambling occurs once the player inserts currency into the machine and plays a reel game that is a game of chance.  *See id.* at 20.

Pinnacle responds that BLCE is attempting to relitigate the policy arguments rejected by the trial court.  *See* Pinnacle's Br. at 21.  Rather, Pinnacle asserts, the devices were improperly seized as unlawful gambling devices *per se*, and the "slippery slope" arguments simply are not supported by the record.  *See id.*

Pinnacle contends that the "nudge" and "swap" phase has elements of both skill and chance, and that the player must interact with the game to make moves to create a winning arrangement of symbols.  *See id.* at 31-32.  Additionally, despite

the trial court's observation that this portion of the game could be said to be chance-based, a player is always able to obtain a winning result through the successful completion of "Follow the Banana," which is solely a skill game.  *See id.* at 32-33. According to Pinnacle, the gambling analysis must encompass the *entire* operation of the game, and BLCE's argument that gambling begins at the first instance is inconsistent with what it characterizes as a "total game analysis" framework utilized by Pennsylvania courts.  *See id.* at 33-34.  Pinnacle concludes that it is not suggesting that all reel games involving both skill and chance should be legal *per se*, simply that the games in question are predominated by skill in accordance with Pennsylvania case law.  *See id.* at 21-22.

At the hearing, Susan Hensel, Esq., a co-founder and partner in a gaming advisory firm and expert witness in the field of "gaming regulations," testified regarding the nature of the games.  She described the game play in detail and noted that if a player is unsuccessful in creating a winning pattern, they are presented with an on-screen option to engage in a secondary round of play called "Follow the Banana."  This is a memory game that displays an increasingly difficult pattern of bananas, and if the player does it successfully, he can recoup 104% of his last wager on the game of chance.  Hensel testified that various player skills are contemplated in both reel and pattern rounds, including pattern recognition, understanding and knowledge of rules of the game, dexterity, memory, and cognitive capabilities.  Due to the fact that these skill factors can determine the outcome of the games, Hensel opined that the Banilla games are skill games.  *See* N.T., 2/18/22, at 11-48.

Nick Farley, president of Nick Farley & Associates, Inc. d/b/a Eclipse Compliance Testing (NFA), testified as an expert in the field of game classification,

mechanics, and analysis.  Farley testified that an element of chance does dictate the prizes available in the reel round, in that there is a predetermined, finite pool of outcomes, but noted that this round still includes aspect of skill.  Farley testified that the Banilla games are winnable every time and a player can get better with practice. He opined that skill determines the outcome.  *See id.* at 49-75.

Finally, Albert Ceccoli testified that the "Follow the Banana" feature is enabled on the machines distributed to ensure that a player has the potential to "beat" Pennsylvania Coin monetarily every play.  *See id.* at 76-80.

Trooper Gabriel Gigliotti testified for BLCE that he engaged in gameplay on all of the machines and played the "Follow the Banana" feature. Trooper Gigliotti also testified that he had never encountered a game of skill and that he never observed anyone playing "Follow the Banana" during his investigations.  *See id.* at 81-96.  Officer Ross Homentosky testified regarding wager amounts and the maximum amount of "rewards" a player could have printed on a single prize voucher.  He demonstrated for the court his "rapid play" method of using the machines, as well as the machines' autoplay features.  *See id.* at 97-108.

Instantly, the trial court interpreted the above evidence as showing elements of both chance and skill in the games.  Trial Ct. Op. at 20-21.  Specifically, the testimony established that regardless of a player's skill, "(1) what combination of symbols are presented by the reels prior to a nudge or swap attempt; (2) what symbols are available to a player with which to attempt a nudge or swap; and (3) what prize is available to the player in any given round of reel play are left to chance."  *See id.*  However, the evidence also showed that "after having attempted to perform a nudge or swap—as may be appropriate for the theme of game selected—a player is always able, through the exercise of skill, to obtain a winning

9

result in every round of play on every Banilla game through the successful completion of the "Follow the Banana" task. Where a player, through the exercise of skill, is able to obtain a successful outcome in every single round played in every single game theme, there is little doubt that skill predominates over chance." *See id.* at 20. Thus, the trial court concluded that Pinnacle had proven by a preponderance of the evidence that the games were predominantly a game of skill, and thus, not gambling machines *per se*. *See id.*

BLCE heavily relies upon *Commonwealth v. Lund*, 15 A.2d 839 (Pa. Super. 1940), but this reliance is unavailing. In *Lund*, the defendant was convicted of maintaining a lottery by setting up and conducting a practice known as "Bank Night" in theatres he owned. The theatres hosted drawings, where patrons could put their name on a list for prize drawings; to claim the prize, the patron must have been present at the drawing. *See id.* at 842. However, patrons could also purchase a "proxy card" by buying admission to and attending an afternoon show at the theatre, and, if the name was drawn, the patron could still claim the prize due to being present in "proxy." *See id.* Additionally, some proxy cards were given away for free. *See id.* The parties conceded that a drawing conducted with closed participation is a lottery, even if the price or cost of the ticket was included in the original price of the theatre ticket. *See id.* at 842-43. However, the defendant argued that the element of consideration was not present in all situations, and thus did not constitute a lottery. *See id.* at 843. The Court determined that the whole of the operation must be examined, and that despite the defendant's attempts to offer occasional free admissions and chances, the overall effect of the scheme was that of a lottery. *See id.* at 845. Not only does *Lund* predate *Two Electronic Poker Game Machines* by 39 years, it has not been cited by an appellate court since 1955. Additionally, the

holding in *Lund* concerns lotteries, which are by nature games of chance, rather than gaming machines.  *See, e.g.*, *Commonwealth v. Lane*, 363 A.2d 1271, 1272 (Pa. Super. 1976) (basic elements of a lottery are a prize to be won, the winner is determined by chance, and the player must pay consideration).

BLCE also relies upon *Lindey v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 916 A.2d 703 (Pa. Cmwlth. 2006), which involved scratch-off coupons, to argue that the practical operation of a device is more important than the designed or theoretical operation of the device.  In *Lindey*, the "ad-tabs"—coupons sold offering discounts on products and containing scratch-off sections offering cash prizes—were considered illegal gambling devices, and the coupons were a "ruse."  *See id.  Lindey* is also inapposite because it involved a game of pure chance, with no elements of skill.

Similarly, BLCE relies upon an unpublished decision of this Court, *Gracie Technologies, Inc. v. Commonwealth* (Pa. Cmwlth., No. 627 C.D. 2019, filed March 13, 2020), 2020 WL 1231395 (unpublished memorandum), to argue that the Banilla machines are gambling devices *per se*.  That case involved a gaming machine with a reel spin and a "nudge" or "pick," and the trial court rejected Gracie's argument that skills such as speed, dexterity, task completion, prize recognition, and the knowledge of when to walk away, rendered the game one of skill rather than chance.  *See id.*, slip op. at 6.  However, because the ultimate outcome and reward were pulled from a finite pool of sequential outcomes generated by the game software, this was predominantly a game of chance.  *See id.*  This case is equally inapposite due to testimony and evidence introduced that the games at issue here have the "Follow the Banana" phase, which has the potential to be won every time.

Finally, regarding BLCE's argument that it never observed players playing "Follow the Banana," and that its inclusion is a ruse, the trial court did not address this argument directly.  *See* BLCE's Br. at 25, *see also* Trial Ct. Op. at 1-27.  BLCE suggests that Pinnacle did not provide evidence to contradict this argument.  *See id.*   However, Pinnacle's expert Susan Hensel did testify extensively that anecdotal player evidence is not useful in evaluating whether a game is one of skill or chance because players choose to play games in different ways.  *See* N.T. 2/18/22, at 26-27.  She testified that a game is properly evaluated based upon the four corners of the game.  *See id.* at 26.  Thus, BLCE's argument is not persuasive.  Indeed, by BLCE's same argument, it did not present expert witnesses to contradict Hensel's testimony, which the trial court clearly credited when making its determination.  *See, e.g.*, *1997 Chevrolet*, 106 A.3d at 847 n.9; *Lodge*, 283 A.3d at 925; *Clayton*, 987 A.2d at 1262.

Accordingly, the trial court's findings of fact were supported by substantial evidence, and the trial court did not err in granting Pinnacle's motions for return of property.  *1997 Chevrolet*, 106 A.3d at 847 n.9.

## IV. CONCLUSION

For the foregoing reasons, we affirm the trial court's order denying BLCE's motions for forfeiture and granting Pinnacle's motions for return of property.

_____
LORI A. DUMAS, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Pinnacle Amusement, LLC | : | |
| | : | |
| v. | : | Nos. 609 - 612 C.D. 2022 |
| | : | |
| Bureau of Liquor Control | : | |
| Enforcement, | : | |
| Appellant | : | |

## **O R D E R**

AND NOW, this 6th day of July, 2023, the order of the Court of Common Pleas of Luzerne County, entered May 18, 2022, is AFFIRMED.

_____
LORI A. DUMAS, Judge

# Exhibit B

PROTHONOTARY LUZERNE COUNTY
FILED MAY 18 '22 AM 11:44

| | | |
|---|---|---|
| PINNACLE AMUSEMENT, LLC, | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| Plaintiff/Petitioner, | : | CIVIL DIVISION |
| | : | |
| v. | : | NOs.: 2020-05529 |
| | : | 2020-05210 |
| BUREAU OF LIQUOR CONTROL | : | 2021-03722 |
| ENFORCEMENT, | : | 2021-10019 |
| | : | |
| Defendant/Respondent. | : | |

## OPINION

Before the trial court for adjudication in the above-consolidated matters are the motions

for return of seized property filed by Pinnacle Amusement, LLC (hereinafter referred to as

"Pinnacle") and related petitions for forfeiture filed by the Pennsylvania State Police – Bureau of

Liquor Control Enforcement (BLCE). The trial court now issues the instant opinion setting forth

the reasons for the order adjudicating these pending requests for relief.

## I.  SUMMARY OF PERTINENT FACTUAL HISTORY

On each of December 17, 2019, December 19, 2019, January 14, 2020, and January 24,

2020, undercover investigators from the BLCE entered a liquor-licensed establishment, known

as D & M Shumbris, Inc., t/a The Swizzle Stick (hereinafter referred to as "Swizzle Stick"), and

located in the Borough of Edwardsville, Luzerne County, Pennsylvania. On each such occasion,

one or more investigators played one or more electronic video entertainment machines present

within Swizzle Stick and owned by Pinnacle. The entertainment software housed within these

standalone terminals, each developed by a company called Banilla Games, Inc. (hereinafter

referred to as "Banilla"), included one model 'Keystone Ultra' (hereinafter referred to as "Ultra")

and one model 'Keystone Ultramax' (hereinafter referred to as "Ultramax"). Investigators

provided consideration for playing games on the machines, which then dispensed vouchers

redeemable by the investigators for United States currency. On January 27, 2020, during the

course of a 'routine inspection,' the BLCE seized one (1) Ultra and two (2) Ultramax machines

from Swizzle Stick.

On each of December 17, 2019, December 18, 2019, January 5, 2020, and January 24,

2020, agents of BLCE similarly played one or more of either an Ultra or Ultramax machine

located at a liquor-licensed establishment known as Park Market Six Packs To Go, LLC

(hereinafter referred to as "Park Market"), located in the City of Nanticoke, Luzerne County. On

January 27, 2020, during the course of a 'routine inspection,' BLCE seized from Park Market

one (1) Ultra and one (1) Ultramax machine, each also owned by Pinnacle.

On each of July 29, 2020, August 11, 2020, and September 15, 2020, agents of BLCE

similarly played one or more of an Ultra, Ultramax, 'Keystone Ultramax Dual' (hereinafter

referred to as "Dual"), or 'Keystone Gold I' (hereinafter referred to as "Gold") machines located

at a liquor-licensed establishment trading as the Anthracite News Stand (hereinafter referred to

as "Anthracite"), located in the City of Wilkes-Barre, Luzerne County. Like the Ultra and

Ultramax, the Dual machine game software was provided by Banilla. The Gold game software

was provided by another company called 'Trestle Corporation' (hereinafter referred to as

"Trestle"). On September 30, 2020, BLCE seized from Anthracite one (1) Ultra, one (1)

Ultramax, one (1) Dual, and one (1) Gold machine belonging to Pinnacle.

On each of January 24, 2021, March 24, 2021, May 17, 2021, and June 29, 2021, agents of BLCE similarly played one or more of either an Ultra or Dual machine located at a liquor-licensed establishment known as the BW Saloon, inside the Quality Inn and Suites (hereinafter referred to as "BW Saloon"), located in the Township of McKean, Erie County, Pennsylvania. On July 20, 2021, BLCE seized from BW Saloon one (1) Ultra and one (1) Dual machine belonging to Pinnacle.

Instantly, therefore, BLCE has seized a total of eleven (11) machines belonging to Pinnacle, including three (3) Ultra, five (5) Ultramax, two (2) Dual, and one (1) Gold machine.

## II.     SUMMARY OF PERTINENT PROCEDURAL HISTORY

On June 3, 2020, Pinnacle filed to Luzerne County civil docket number 2020-05210 a motion pursuant to 42 Pa.C.S. § 5806(a)(1) and Pa.R.Crim.P. 588 for the return of the machines seized by BLCE from Swizzle Stick. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On September 18, 2020, BLCE, by and through the Commonwealth Office of Attorney General, filed an answer to the motion denying the return motion and raised by way of new matter a request pursuant to 42 Pa.C.S. § 5803 for forfeiture of the Swizzle Stick machines and one thousand five hundred twenty-six dollars ($1,526.00) in United States currency.[1] On October 1, 2020, the matter was assigned to the undersigned. On October 6, 2020, Pinnacle filed a reply to BLCE's new matter which contested BLCE's forfeiture petition. On November 6, 2020, pursuant to order issued October 1, 2020, a status conference was held after

---

[1] Our appellate courts have recognized under former Rule of Criminal Procedure 324—subsequently re-numbered and re-enacted in substance at Rule of Criminal Procedure 588—that a request for forfeiture may be set forth as new matter in response to a motion for return of property. *See Commonwealth v. Mosley*, 549 Pa. 627, 632, 702 A.2d 857, 859 (1997). *See also Matter of Kulbitsky*, 112 Pa.Cmwlth. 477, 536 A.2d 458, 459-60 (1988), appeal denied, 520 Pa. 609, 553 A.2d 971 (1988).

which the trial court issued an order scheduling a hearing on the return motion and forfeiture petition for February 2, 2021. The determinative hearing ultimately was continued by the parties on numerous occasions as the instant consolidated matters developed and respectively were subsumed; the procedural trajectory of each matter consolidated herewith is summarized herein.

On June 16, 2020, Pinnacle filed to Luzerne County civil docket number 2020-05529 a motion for the return of the machines seized by BLCE from Park Market. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On September 18, 2020, BLCE filed an answer denying the return motion and filed new matter requesting forfeiture of the Park Market machines and two hundred fifty-six dollars ($256.00) in United States currency. On October 6, 2020, Pinnacle filed a reply to BLCE's new matter which contested BLCE's forfeiture petition.

On April 9, 2021, Pinnacle filed to Luzerne County civil docket number 2021-03722 a motion for the return of the machines seized by BLCE from Anthracite. Pinnacle contests this seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On June 21, 2021, BLCE filed an answer thereto, but did not initiate a responsive request for forfeiture.

On August 2, 2021, Pinnacle similarly filed to Erie County civil docket number 2021-11674 a motion for the return of the machines seized by BLCE from BW Saloon, to which BLCE did not respond. Pinnacle contests the seizure and alleges its impropriety because it asserts the machines are not gambling devices and were seized in violation of its due process protections. On August 11, 2021, Pinnacle filed to each of the preceding Luzerne County dockets an Unopposed Petition to Transfer and Consolidate, requesting the Erie County matter be transferred to Luzerne County and consolidated for adjudication herein. On August 23, 2021, the

trial court issued an order scheduling a hearing on the transfer petition; said hearing was held as scheduled on September 16, 2021. On September 17, 2021, the trial court issued an order granting the transfer petition and directing that the Erie County case be transferred to Luzerne County for consolidated adjudication. On October 4, 2021, the trial court's order of September 17, 2021, was filed to the Erie County docket and the Erie County Prothonotary notated therein a transfer to Luzerne County. On October 7, 2021, the record of the Erie County matter was received by the Luzerne County Prothonotary and filed to Luzerne County civil docket number 2021-10019.

On November 2, 2021, after conferencing with the parties and having been assigned all of the instant matters for adjudication, the trial court issued an order scheduling an agreed-upon date of February 18, 2022, for consolidated resolution of all pending requests for relief.

On February 18, 2022, a dispositive hearing was held, at the conclusion of which the parties requested the trial court issue a briefing schedule dependent upon the date of filing of the transcript of said hearing. On March 15, 2022, the transcript was filed to the docket and the trial court issued an order establishing a briefing schedule. The briefing schedule was extended by agreement of the parties with final responsive briefs ordered to be filed by May 2, 2022. The parties timely filed affirmative and responsive post-hearing briefs, respectively.

The requests for relief consolidated herein now are ripe for adjudication and the trial court accordingly issues the instant opinion in support of the order hereto contemporaneously issued.

## III.    SUMMARY OF TESTIMONY AND OTHER RECORD EVIDENCE

The trial court heard testimony and received evidence at the hearing. The trial court observed the witnesses testify and—having considered their general bearing, conduct on the

stand, demeanor, and candor—finds the testimony summarized herein credible and determinative of the facts instantly in issue. *See In re Funds in Possession of Conemaugh Tp. Sup'rs.*, 562 Pa. 85, 89, 753 A.2d 788, 790 (2000) ("The finder of fact is sole judge of credibility and is free to believe all, part, or none of the evidence. This is true of a judge in a bench trial, as well as a jury.") *and In re Gaston's Estate*, 361 Pa. 105, 112, 62 A.2d 904, 908 (1949) ("In determining the weight to be attached to the testimony of a witness it is proper to consider his appearance, general bearing, conduct on the stand, demeanor, manner of testifying, such as candor or frankness, or the clearness of his statements, and even the intonation of his voice.").

A.    PINNACLE'S CASE

At the hearing, Pinnacle presented testimony from three (3) witnesses and submitted six (6) exhibits, all of which were admitted to the record.[2] The exhibits included the *curricula vitae* of two expert witnesses and reports issued thereby.

Susan Hensel, Esq.

Susan Hensel, Esq. (hereinafter "Hensel"), co-founder and partner in a gaming law advisory firm called Hensel Grad, P.C.,[3] was recognized as an expert in the field of 'gaming regulations'[4] and provided testimony in such capacity which herein is summarized.[5] Hensel provided a general description of the Banilla machines and the game software housed therein. She played Banilla models and games identical to those that had been seized by BLCE, but prior to the hearing had not interacted with the exact physical devices seized.

Hensel testified that the Banilla software on each machine include two slot machine-style, reel-based game types, referred to as either 'nudge' or 'hot swap' games, with varying

---

[2] The exhibits admitted to the record at the hearing are hereinafter referred to with the identifier "Hrg. Ex. [#]."
[3] Hrg. Ex. 1. Notes of Testimony, February 18, 2022, p. 12, ll. 3-4.
[4] Hrg. Ex. 1. *N.T.*, p. 14, ll. 7-8 and p. 19, ll. 7-10.
[5] *See N.T.*, pp. 11-48.

thematic presentations available for selection by the player. To play these machines, a player

inserts cash and in exchange is provided digital credits on the machine. The examination of

Hensel included her in-court demonstration of play on the Ultramax seized from Swizzle Stick.

Upon receiving their digital credits, a player selects a game theme to play. Regardless of theme,

the player then selects a wager amount and spins the reels. When the reels stop, the player in a

nudge game has the option to rotate or 'nudge' one of the reels in an effort to align the reels into

a winning pattern, and in a 'hot swap' game has the option to substitute or swap one of the reel

symbols with a symbol held in a pool outside the reels to do the same. Regardless of theme and

game type, where a player can create a winning pattern, the machine will not allow a player to

play through to the next spin of the reels, and instead forces the player to attempt a nudge or

swap. If a player successfully creates a winning pattern through nudging or swapping, the player

is rewarded with credits based on their wager and only then is able to again spin the reels.

Where the player is unsuccessful in creating a winning pattern by either nudging or

swapping, the player is then presented on-screen with the option to engage in a secondary round

of play in a game referred to as "Follow the Banana." The on-screen option appears after a few

seconds in the form of an opt-in banner displayed at the bottom of the screen. In this second and

optional round of gameplay, a grid is displayed and the player is presented with a series of

sequential patterns, increasing incrementally in size, to replicate on the touchscreen grid. If the

player can successfully replicate the series of patterns displayed, the player is awarded credits

equivalent to one hundred and four percent (104%) of their wager. If the player is unsuccessful

in replicating the series of patterns, the player is returned to the staging screen for the reel game

and then is able to again spin the reels. This round-based gameplay can continue until the player

has depleted their credit pool or opted instead to 'cash out' by directing the machine to print a

voucher which is then redeemable by the player with the establishment at which the machine is located for the cash equivalent of the balance of credits cashed out.

Hensel testified that various player skills are contemplated in both the reel and pattern rounds of the game, including "pattern recognition, understanding and knowledge of rules of the game, dexterity, clearly memory to follow the banana, cognitive capabilities, and memory."[6] Hensel testified that these skill factors can determine the outcome of the game and opined that the Banilla games are, therefore, "skill games."[7]

### Nick Farley

Nick Farley (hereinafter "Farley"), president of Nick Farley & Associates, Inc. d/b/a Eclipse Compliance Testing (NFA),[8] was recognized as an expert in the field of 'game classification, mechanics, and analysis'[9] and in such capacity provided testimony which—along with the findings contained in his expert reports related to the Ultra, Ultramax, and Dual Banilla machines—is summarized herein.[10] NFA analyzed "representative examples"[11] of the Banilla machines from the player perspective—*i.e.*, engaged in the play of each game theme on each type of model seized—and from the operator perspective—*i.e.*, accessed the administrative functions of the software on the game machine housed within the terminal.

Farley testified that, regardless of theme and gameplay aside, an element of chance does dictate the prizes available to a player in the reel round of gameplay in that the prize selected by a machine for a given round of reel play is selected from a "finite pool" of prize determination outcomes.[12] This means that the game software has a predetermined, finite pool of prize

---

[6] *Id.* at p. 27, ll. 12-17.
[7] *Id.* at p. 27, ll. 20-24.
[8] Hrg. Ex. 3.
[9] *N.T.*, p. 53, l. 14—p. 54, l. 1.
[10] *See id.* at pp. 49-76 and Hrg. Exs. 3-5.
[11] *N.T.*, p. 51, ll. 7-17.
[12] *Id.* at p. 52, ll. 19-24.

outcomes and when gameplay is engaged, a random starting point in this prize pool is selected. Upon a player's successful nudge or swap in the reel round of gameplay, the game awards the prize which had been determined at the beginning of gameplay to be the starting point within the pool. The prize amount for each successive successful round of reel play is, in turn, equivalent to the successive prize in the pool's sequence.

Farley testified that the reel round of gameplay contemplates a player's exercise of various skills:

> There's many different skills that a player has to use. There is memory, cognitive things, they'll have to read the rules, become familiar with the pay schedule to identify what symbols can award what prizes. They will have to use symbol recognition when patterns come up to determine whether a potential win is there; and if so, which task to perform, whether it's a nudge up, nudge down, which reel, which symbol to choose in a hot swap. They would have to use hand-eye coordination, dexterity to touch the screen in the appropriate location to engage in the activity.[13]

Farley testified that the Banilla games are winnable by a player "every time" and that a player "can get better at it with practice."[14] Farley opined that, as a result, that "[s]kill definitely determines the outcome on all three of those models."[15]

Follow the Banana gameplay is available on every model and in every game theme tested on the Banilla machines. Follow the Banana is always available to the player on the Ultra. This feature comes from the factory as enabled on the Ultramax and Dual machines, but with administrative access privileges, however, the Ultramax and Dual machines allow Follow the Banana to be disabled. In order to access the administrative functions of the machine and disable the Follow the Banana gameplay on an Ultramax or Dual, one would require a key to access the physical cabinet of the terminal housing the game machine, toggle a switch, input a PIN code,

---

[13] *Id.* at p. 56, ll. 13-24.
[14] *Id.* at p. 58, ll. 6-12.
[15] *Id.* at ll. 13-17.

locate the appropriate game configuration page of the menu screen, and disable the feature. Farley's testimony indicated that he had been "informed that the Follow the Banana feature has been enabled in each of" the seized Banilla games.[16]

Farley testified that a person can intentionally fail at the nudge or swap reel game task and can intentionally fail at the Follow the Banana game.[17]

Albert Ceccoli

Albert Ceccoli (hereinafter "Ceccoli") is an employee of Pennsylvania Coin, a company in the vending business, and in such capacity provided testimony which is summarized herein.[18]

Pennsylvania Coin owns and operates vending and amusement equipment throughout Pennsylvania and New York, and has obtained from Pinnacle machines manufactured by Banilla, including the Ultra, Ultramax, and Dual, and by Trestle, including the Gold. Pennsylvania Coin markets the 'Keystone' machines only in Pennsylvania. Generally, when Pennsylvania Coin brings a gaming machine to an establishment, its employees set it up, test the functionality, clear the bookkeeping, and advise the establishment owner on the operation of the machine. This administrative configuration is accomplished by means described earlier in Farley's testimony. Pennsylvania Coin employees have the PIN code for administrative access to its machines but do not provide the PIN to the establishments where the machines are placed in commerce. Pennsylvania Coin set up the Banilla and Trestle machines at Swizzle Stick, Park Market, and Anthracite, and the machines at BW Saloon were set up by an affiliated amusement operator. Pennsylvania Coin employees, upon delivery and configuration of gaming machines, do not turn off the Follow the Banana feature and are instructed to ensure that the feature is enabled. Ceccoli

---

[16] *Id.* at p. 65, ll. 1-5.
[17] *Id.* at p. 74, ll. 7-11.
[18] *See id.* at pp. 76-80.

testified that this Pennsylvania Coin policy is aimed at curtailing the potential for criminal

prosecution for distribution of gambling devices. Ceccoli acknowledged that Pennsylvania Coin

is aware that ensuring the Follow the Banana feature is enabled on the machines it distributes

also ensures that a player has the potential to "beat" Pennsylvania Coin, monetarily, through

winning the game in every single round of play carried out on a given machine.[19]

>    B.    BLCE'S CASE

At the hearing, BLCE presented testimony from two (2) witnesses.

Trooper Gabriel Gigliotti

Gabriel Gigliotti (hereinafter "Trooper Gigliotti") is a Pennsylvania State Police Trooper

and previously served as an officer of BLCE, and in his capacity as a former BLCE officer

provided testimony which is summarized herein.[20]

Trooper Gigliotti was involved as an undercover investigator in the investigations

conducted by BLCE at Swizzle Stick, Park Market, and Anthracite in Luzerne County, but was

not involved in the investigation at BW Saloon in Erie County. Trooper Gigliotti investigated the

machines located at the Luzerne County establishments by engaging in their gameplay and

redeeming vouchers printed from the machines for cash at the respective establishments. He

engaged in both reel gameplay and Follow the Banana gameplay on one or more of the machines

at issue. Each of the machines in issue operate on similar principles and have similar gameplay.

On those machines, an individual voucher is limited to a maximum redeemable value of five

hundred dollars ($500.00), but the machines do not limit the number of vouchers that may be

printed where a player possesses in-game credits equivalent to a redeemable value of more than

the maximum value of a single voucher—that is to say that were a player to have the equivalent

---

[19] *Id.* at p. 80, ll. 5-17.
[20] *See id.* at pp. 81-97.

of six hundred dollars ($600.00) in in-game credit, the player to redeem all credits available on the machine would have to print a $500.00 voucher and a separate $100.00 voucher. Further, all vouchers are rounded down to the nearest whole dollar. He has played the Follow the Banana feature on one or more of the machines at issue and, in a laboratory setting on a machine including the same feature, has previously successfully completed the Follow the Banana round of gameplay. Trooper Gigliotti's incident report confirmed that he observed the Follow the Banana feature was enabled on the Ultramax seized by BLCE from Swizzle Stick.

Ross Homentosky

Ross Homentosky (hereinafter "Officer Homentosky") is an officer of BLCE, and in that capacity provided testimony which is summarized herein.[21]

Officer Homentosky was involved in the inspection of the machines seized from the Luzerne County establishments, but otherwise did not participate in the field portion of BLCE's Luzerne County investigations and was not involved in the Erie County matter. With respect to the Banilla machines, Homentosky testified that wager amounts available range from twenty-five cents ($0.25) to twenty dollars ($20.00). He also confirmed the maximum amount printable by the machines on a single voucher. Homentosky demonstrated on the Ultramax present in the courtroom the "rapid play" technique he utilized when previously operating in an undercover capacity for BLCE during unrelated investigations, in which he opted not to engage in the Follow the Banana rounds of gameplay after unsuccessful rounds of reel play. In this method of play, Officer Homentosky repeatedly spun the reels until a potential winning nudge or swap opportunity was presented. Further, Officer Homentosky demonstrated the available auto-play feature on the Ultramax in the courtroom, wherein a player can opt to enable the machine to

---

[21] *See id.* at pp. 97-109.

force the reel round of gameplay to move from one spin to the next automatically. With auto-play enabled, the Ultramax can and will continue its automatic spinning of the reels until the reels arrive at a pre-nudge or pre-swap alignment wherein a player's successful nudge or swap can produce a winning combination. In this mode, a player chooses to bypass the Follow the Banana game. He has previously successfully completed the Follow the Banana round of gameplay on similar machines offering the feature. Officer Homentosky testified that each of the machines in issue operate on similar principles and offer similar functionality. At the time he participated in the inspection of the machines seized from Swizzle Stick, Officer Homentosky believed they were in the same condition—that is, with the Follow the Banana feature enabled—as when they were seized.

## IV.    **DISCUSSION**

### A.    ANALYTICAL FRAMEWORK

BLCE seized the machines at issue pursuant to purported violations of Section 5513 of the Crimes Code, 18 Pa.C.S. §§ 101-9546, which reads, in pertinent part, as follows:

> (a) Offense defined.—A person is guilty of a misdemeanor of the first degree if he:
> (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any ... slot machine or any device to be sued for gambling purposes, except playing cards;
> (2) allows persons to collect and assemble for the purpose of unlawful gambling at any place under his control;
> (3) solicits or invites any person to visit any unlawful gambling place for the purpose of gambling; or
> (4) being the owner, tenant, lessee or occupant of any premises, knowingly permits or suffers the same, or any part thereof, to be used for the purpose of unlawful gambling.
> ...
> (b) Confiscation of gambling devices.—Any gambling device possessed or used in violation of the provisions of subsection (a) shall be seized and forfeited to the Commonwealth. The forfeiture shall be conducted in accordance with 42 Pa.C.S. § 5803 (relating to asset forfeiture), 5805 (relating to forfeiture procedure), 5806 (relating to motion for return of property), 5807 (relating to restrictions on use)

5807.1 (relating to prohibition on adoptive seizures) and 5808 (relating to exceptions).

18 Pa.C.S. § 5513.

Having asserted violations of Section 5513 of the Crimes Code, BLCE seized the 11 machines and cash under the authority of Section 5513(b) and Section 5803 of the Judicial Code, 42 Pa.C.S. §§ 101-9913, which states, in pertinent part, as follows:

(a) Applicability.—Notwithstanding any law to the contrary, this section shall apply to forfeitures conducted under the following:
...
(7) 18 Pa.C.S. § 5513 (relating to gambling devices, gambling, etc.).
...
(b) Process and seizure of money and personal property.—Property subject to forfeiture may be seized by a law enforcement authority if any of the following apply:
(1) The seizure is incident to an arrest or a search under a search warrant or inspection under an administrative inspection warrant and there is reason to believe the property is subject to forfeiture.
...[22]
(4) There is probable cause to believe that the property has been used or is intended to be used in violation of the act of April 14, 1972 (P.L. 233, No. 64),[] known as The Controlled Substance, Drug, Device and Cosmetic Act, or another offense for which forfeiture is expressly authorized as a sanction.
(5) There is a warrant issued by a court of common pleas with appropriate jurisdiction.
(6) There is probable cause to believe that the property is subject to forfeiture and exigencies are likely to result in the destruction or removal of the property.

42 Pa.C.S. 5803(a)-(b).

Pinnacle's motions for return of property are filed pursuant to 18 Pa.C.S. § 5513(b), set forth above, and 42 Pa.C.S. § 5806 and Pa.R.Crim.P. 588, which provide, respectively and in pertinent part, as follows: "A person aggrieved by a search and seizure may move for the return

---

[22] Subsections (b)(2)-(3) are explicitly inapplicable to the instant matter, but provide as follows:
(2) The property subject to seizure has been the subject of a prior judgment in favor of the Commonwealth in a criminal injunction or forfeiture proceeding under this chapter.
(3) There is probable cause to believe that the property is dangerous to health and safety and exigencies are likely to result in the destruction or removal of the property or in the property otherwise being made unavailable for forfeiture.
42 Pa.C.S. § 5803(b)(2)-(3).

of property seized by filing a motion in the court of common pleas in the judicial district where the property is located," 42 Pa.C.S. § 5806(a)(1), and:

> (A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
>
> (B) A judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

Pa.R.Crim.P. 588.

Thus, "Pennsylvania Rule of Criminal Procedure No. 588 requires the moving party to demonstrate lawful possession of the property. Then the burden shifts to the Commonwealth to defeat the motion by showing that the property is contraband or derivative contraband." *Com. v. Wintel, Inc.*, 829 A.2d 753, 756 (Pa. Commw. Ct. 2003) (citing *Com. v. Pomerantz*, 393 Pa.Super. 186, 573 A.2d 1149 (1990)). As has been recognized by Pennsylvania jurisprudence, motions for return of property are often subject to consideration as either responsive to or precipitous of petitions for forfeiture:

> It is well settled "that a proceeding for return of property under [Rule] 588 is simply a mirror image of a forfeiture action under the [Controlled Substances] Forfeiture Act." ...
> Nonetheless, because these proceedings necessarily entail some criminal conduct, they have been described as "civil in form, but quasi-criminal in nature." ... [O]ur courts have required the Commonwealth to prove its forfeiture case by a preponderance of the evidence, rather than the beyond a reasonable doubt standard applicable in criminal cases. ...

*In Re $300,000 in U.S. Currency*, 259 A.3d 1051, 1059-60 (Pa. Commw. Ct. 2021) (citations omitted). Thus, both in contesting Pinnacle's return motions and in responsively seeking the forfeiture of the Swizzle Stick and Park Market personalty, the burden is on BLCE to

demonstrate by a preponderance of the evidence[23] whether the machines are "gambling devices," and thus subject to forfeiture. *See In re: Petition of District Attorney of Wyoming County Seeking Forfeiture of One 1986 Oldsmobile Sedan*, 165 Pa.Cmwlth. 61, 65, 644 A.2d 240, 242 (1994) (citing *Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super. 431, 288 A.2d 919 (1972)).

The term 'gambling devices' is not defined by the legislature and the ambit of the term instead has been left to the courts of this Commonwealth to discern. In its opinion in *Com. v. Irwin*, 535 Pa. 524, 636 A.2d 1106 (1993), the Supreme Court of Pennsylvania reiterated the relevant definitional standard through which the law of this Commonwealth has been expressed:

> A machine is a gambling device *per se* if it can be used for no purpose other than gambling. *Commonwealth v. Two Electronic Poker Game Machines*, 502 Pa. 186, 465 A.2d 973 (1983). The proper inquiry is "whether the machine is so intrinsically connected with gambling as to constitute a gambling device *per se*." *Id*. at 194, 465 A.2d at 977 (quoting *Nu-Ken Novelty, Inc. v. Heller*, 220 Pa.Super. 431, 433, 288 A.2d 919, 920 (1972)).
> The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward. *Commonwealth v. Twelve Video Poker Machines*, 517 Pa. 363, 366, 537 A.2d 812, 813 (1988). Where these three elements are present, the machine will be "so intrinsically connected with gambling" as to be a gambling device *per se*. *Two Electronic Poker Game Machines*, 502 Pa. at 194, 465 A.2d at 977. The Commonwealth has the burden of proving the *per se* nature of the machines. *Id*. at 190, 465 A.2d at 975.

*Id.*, 636 A.2d at 1107. The standards established by the jurisprudence of our Commonwealth also make clear that BLCE's entitlement to forfeiture of the cash seized from Swizzle Stick and Park Market is contingent upon BLCE's success in establishing that the machines are 'gambling devices':

> Cash may be forfeited to the Commonwealth as derivative contraband of an illegal gambling operation. ... Cash will be found derivative contraband of an illegal gambling operation where

---

[23] As set forth by the Commonwealth Court of Pennsylvania in its opinion in *Com. v. McJett*, 811 A.2d 104 (Pa. Commw. Ct. 2002), "[p]reponderance of the evidence is tantamount to a 'more likely than not' standard. ... Proof by a preponderance of the evidence is 'often alluded to as a weighing of the evidence and a determination based upon which way the mythical scales are tipped.'" *Id*. at 110 (citations omitted).

*it is clearly apparent that the money formed an integral part of the illegal gambling
operation ... .*

*In re: Return of Property Confiscated October 30, 1999 from 411 East Mac Dade Boulevard,*

856 A.2d 238, 246 (Pa. Commw. Ct. 2004) (emphasis in original).[24]

Finally in reviewing the instantly-appropriate analytical framework, the trial court notes

that, to the extent raised in post-hearing briefs by BLCE, BLCE's reliance on the Pennsylvania

Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101-1904 (hereinafter referred to as

the "Gaming Act"), for the proposition that the seized machines are contraband is misplaced and

the instant controversy must be decided under the framework that stems from Section 5513 of

the Crimes Code as previously summarized herein.[25] *See POM of Pennsylvania, LLC v.*

*Department of Revenue*, 221 A.3d 717, 731 (Pa. Commw. Ct. 2019) ("[T]he Gaming Act does

not apply to unlicensed and/or illegal slot machines."); *also id.*, 221 A.3d at 736 ("[S]ection 5513

of the Crimes Code, rather than any relevant provision of the Gaming Act, remains the

preeminent statute governing illegal and unlicensed slot machines in the Commonwealth.").

---

[24] The case of *Return of Property Confiscated October 30, 1999* was adjudicated under a previously-enacted version of 18 Pa.C.S. § 5513. *See* Act of 1996, July 11, (P.L. 552, No. 98, § 3), imd. effective. That version of Section 5513, in subsection (b), did not explicitly incorporate a specific statutory forfeiture procedure, as does the current version by reference to Sections 5803, *et. seq.*, of the Judicial Code, *see* 18 Pa.C.S. § 5513(b). Instead, the then-current version of Section 5513 incorporated by reference "[a]ll provisions of law relating to the seizure, summary and judicial forfeiture, and condemnation of intoxicating liquor shall apply to seizures and forfeitures under the provisions of this section." The trial court recognizes that decisions issued by our courts prior to Section 5513(b)'s explicit incorporation of the forfeiture provisions of the Judicial Code were analyzed under, *inter alia*, the framework codified in Section 602 of the Liquor Code, Act of 1951, April 12 (P.L. 90), *as reenacted and amended*, 47 P.S. §§ 1-101—10-1001. *See* 47 P.S. § 6-602(e); *see also, e.g., Return of Property Confiscated October 30, 1999*, 856 A.2d at 246 ("The procedure to be applied in a gambling forfeiture case is set forth in Section 602(e) of the Liquor Code, 47 P.S. § 6-602(e); *Commonwealth v. McDermond*, 127 Pa.Cmwlth. 17, 560 A.2d 901 (1989).")." Nonetheless, the trial court relies upon the principles espoused by our appellate courts in the context of 47 P.S. § 6-602(e) with respect to derivative contraband as remaining viable and sound when applied in the context of the instant analysis under 42 Pa.C.S. § 5803.

[25] Parenthetically, the trial court notes that, at the hearing, BLCE acknowledged the inapplicability of the Gaming Act to the instant controversy. Counsel for BLCE argued against Pinnacle's proffer for recognition of Hensel as an expert witness in the field of 'gaming regulations,' stating: "These machines are not regulated. They're not—they don't fall under Title 4 of the Gaming Board which is Section 5513. It's a different animal altogether." *N.T.* at p. 18, ll. 21-24.

B.  APPLICATION AND ANALYSIS

1.  Propriety of the Seizures

Having considered the facts of record, as summarized above, the trial court first

reviews—in light of Pinnacle's assertions that BLCE "improperly seized" Pinnacle's

machines[26]—the propriety of the manner in which the seizures at issue occurred. Section 5513 of

the Crimes Code mandates that gambling devices used in violation thereof shall be seized and

the forfeiture of such devices shall be conducted in accordance with the requirements set forth in

the forfeiture provisions of the Judicial Code. *See* 18 Pa.C.S. § 5513(b). Section 5803 of the

Judicial Code, in turn, provides, as instantly pertinent, that seizure under those forfeiture

provisions may only occur after an arrest or a favorable probable cause determination of varying

potential provenance. *See* 42 Pa.C.S. § 5803(b). As Sections 5513 of the Crimes Code and 5803

of the Judicial Code explicitly reference each other in relation to the potential forfeiture of

'gambling devices,' the trial court concludes as a matter of law that they relate to the same

subject matter. Accordingly, the trial court reads these statutory provisions *in pari materia* to

conclude that the instant seizures, where mandated by 18 Pa.C.S. § 5513(b), must have

comported with the procedural prerequisites set forth in 42 Pa.C.S. § 5803(b). *See, e.g., Cozzone*

*ex rel. Cozzone v. W.C.A.B. (Pa Municipal/East Goshen Tp.)*, 621 Pa. 23, 39, 73 A.3d 526, 536

(2013) ("[A]s a fundamental principle, where two parts of a statute relate to the same persons or

things, those statutory parts are to be construed and considered concurrently, whenever possible.

They are not to be construed as if one part operates to nullify, exclude or cancel the other, unless

the statute expressly says so. 'If they can be made to stand together, effect should be given to

both as far as possible.'").

---

[26] *See, e.g.*, Motion for Return of Seized Property, 2020-05210, Jun. 3, 2020, ¶ 9.

Here, no testimony, evidence, averment, or argument was made by BLCE that any of the instant seizures were undertaken in relation to an arrest or subsequent to BLCE having been afforded authority in consequence of a favorable probable cause determination. Rather, the only reference in the record to the manner in which any of the instant seizures occurred can be found in the new matter filed by BLCE in response to Pinnacle's return motions with respect to the Swizzle Stick and Park Market machines, wherein BLCE avers that each respective seizure occurred "while troopers conducted a routine inspection."[27] Accordingly, the trial court finds preliminarily that the instant seizures were improper and for that reason, all personalty of Pinnacle—or other persons aggrieved by the improper seizures—which is not contraband must be disgorged from the Commonwealth's possession. To determine however, whether the machines and associated cash are not contraband and, therefore, capable of lawfully being returned, the trial court must adjudge whether the machines are gambling devices *per se* and whether, as a result, the cash seized is derivative contraband.

In the alternative, if the seizures were to be deemed not improper, the trial court must nonetheless reach a conclusion as to the nature of the machines and the associated cash in the context of the return motions and forfeiture requests now being adjudicated. Accordingly, and regardless of whether the seizures offended Pinnacle's procedural protections, the trial court now turns to an analysis of whether the machines are 'gambling devices' *per se*.

    2.    <u>Determination of Status as 'Gambling Devices' *per se*</u>

As noted, the threshold inquiry into resolving the heart of the instant controversy is dictated by Pa.R.Civ.P. 588 to be whether Pinnacle has proven by a preponderance of the evidence that it is entitled to lawful possession of the seized machines. To sustain this burden,

---

[27] *See* <u>Commonwealth's Answer to Motion for Return of Seized Property</u>, 2020-05210, Sep. 18, 2020, ¶ 23(b), and <u>Commonwealth's Answer to Motion for Return of Seized Property</u>, 2020-05529, Sep. 18, 2020, ¶ 23(b).

Pinnacle must have demonstrated that said machines are not gambling devices *per se*; that is to say that they are not intrinsically connected to gambling. *Irwin*, 636 A.2d at 1107. The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward. *Id.* (*citing Twelve Video Poker Machines*, 537 A.2d 812, 813 (1988)). Here, Pinnacle does not contest that the elements of consideration and reward exist. Accordingly, to satisfy the initial burden, Pinnacle must have proven that it is more likely than not that the results of games played on the instant machines are determined by skill rather than chance. *See id.* In adjudicating this precise issue under other factual scenarios previously presented, Pennsylvania's appellate courts have determined that the outcome is to be determined by application of the 'predominate-factor test,' wherein "the court should determine the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game." *Com. v. Dent*, 2010 Pa.Super. 47, ¶ 11, 992 A.2d 190, 193 (2010) (*citing Two Electronic Poker Game Machines*, 465 A.2d at 978). Because in response, in the two cases in which BLCE seeks forfeiture, BLCE's burden is the mirror image of Pinnacle's, *In Re $300,000 in U.S. Currency*, 259 A.3d at 1059-60, and because Pinnacle must sustain this burden in the two cases where BLCE does not seek forfeiture, *Wintel, Inc.*, 829 A.2d at 756, resolution of the predominate-factor test will be determinative of the legality of possession for all 11 of the seized machines.

Here, the evidence bears out that elements of both chance and skill exist in the games housed within Pinnacle's Banilla machines. The testimony and exhibits show that, regardless of a player's skill: (1) what combination of symbols are presented by the reels prior to a nudge or swap attempt; (2) what symbols are available to a player with which to attempt a nudge or a swap; and (3) what prize is available to the player in any given round of reel play are left to

chance. The evidence also shows, however, that after having attempted to perform a nudge or swap—as may be appropriate for a given selected game theme—a player is always able, through the exercise of skill, to obtain a winning result in every round of play on every Banilla game through the successful completion of the Follow the Banana task. Where a player, through the exercise of skill, is able to obtain a successful outcome in every single round played in every single game theme, there is little doubt that skill predominates over chance.

The evidence here shows that a player has the ability to choose how to play these games. A given player may ignore completely the available Follow the Banana function and another player may take up the gauntlet of the pattern replication round of gameplay at every opportunity.  In essence, BLCE argues: (1) because a player may choose to disregard their opportunity to skillfully obtain a successful result in each and every round of play; or (2) because the skill of pattern replication may be difficult to obtain or exercise, that chance predominates. Given the zero-sum burden of proof between the parties, this position fails to carry the day.

If anything, the fact that a player has a choice—and the fact that that choice contemplates a player's election to disregard an opportunity to exercise skill—belies the assertion that chance predominates. 'Chance' is defined by the Black's Law Dictionary as "the unforeseen, *uncontrollable*, or unintended consequences of an act." Chance Definition, *Black's Law Dictionary*, (11th ed. 2019), *available at* Westlaw (emphasis added). The machines vest in the player choice and control over the manner in which they choose to utilize their wager and the manner in which, therefore, they try to win—a player chooses whether to engage in reel play only or to engage in the pattern replication task inherent to Follow the Banana. Where choice and control avail the player, without exception, of the opportunity to obtain a successful result through the exercise of skill, chance—as an element of play—is rendered subservient to that

element of play brought to bear by a player's skill. Whether a player opts to engage in the available post-reel play simply is, therefore, inapposite to the outcome of the predominate-factor test. Likewise, whether a player can or has obtained the necessary proficiency in the exercise of the skill required is similarly inapposite. A player's disregard of choice and degree of skill do not, by themselves, neither obviate the existence of skill nor determine whether the element of skill looms larger than the element of chance in a given round of play.

In its opinion in the very case in which the Supreme Court of Pennsylvania crystalized and set forth the governing 'predominate-factor test,' *Two Electronic Poker Machines*, *supra*, our high court recognized the validity of a critical and pervasive factual proposition, as set forth by the intermediate appellate court, which is inescapable in an analysis such as that instantly undertaken. There, our high court affirmed the understanding of our courts that the law of Pennsylvania contemplates and accepts the proposition that skill and chance each have a role to play in many of the competitive games to which a person may resort for entertainment:

> A peculiar combination of luck and skill is the *sine qua non* of almost all games common to modern life. It is hard to imagine a competition or a contest which does not depend in part on serendipity. It cannot be disputed that football, baseball and golf require substantial skill, training and finesse, yet the result of each game turns in part upon luck or chance.

*Id.*, 465 A.2d at 977 (*quoting Com. v. One Electro-Sport Draw Poker Machine, Serial No. 258*, 297 Pa.Super. 54, 60, 443 A.2d 295, 298 (1982)). In light of our high court's recognition of the continued validity of the factual principle that elements of chance and skill both almost always have a hand to play in the outcome of a given competitive game, the trial court, of course, recognizes that elements of both skill and chance exist in the play of those machines whose nature the trial court instantly must discern.

Page **22** of **27**

The player of a Banilla gaming machine is presented options with which to attempt to obtain a successful gameplay result in a given round. Upon a spin of the reels, the Banilla software indiscriminately places a player in a pre-determined position within the confines of the finite prize pool; this starting position is left largely to an element of chance. The outcome of any given spin of the reels on these Banilla gaming machines could be said to be predominated by chance, as though elements of skill can be brought to bear, the machine's software governs the available outcomes. An unsuccessful nudge or swap after a spin of the reels, however, does not demarcate the end of a round of gameplay.

Upon a player's entry into the Follow the Banana feature, the player is in complete control of the ultimate outcome of that round of gameplay in which the reels did not provide success. Both whether a player chooses to access the pattern replication feature and how proficient our player may be in carrying that choice through to success are not predominated by chance, but rather by the player and that player's skill alone. A player could elect to merely hope for an opportunity to nudge or swap for a winning combination in the reel round of gameplay by, for example, employing a 'rapid play' technique, and thereby choose to forego all opportunity to meaningfully employ their skill in the pattern replication task. A player may ignore the Follow the Banana game subsequent to every single spin of the reels. In opting, however, to enter the Follow the Banana round of the gameplay, the player instead chooses to foreclose the potential that anything other than their individual skill may predominate in dictating the outcome of that round.

The critical determinative fact is that on every single play throughout the entire duration of the Banilla game—where the reels have not resulted in a successful outcome and a player is in danger of not obtaining a successful result predominately through chance—the player may

always dictate that they be afforded an opportunity to win the round and receive a reward through the exercise of skill. The evidence of record mandates a factual finding of the banana game's perpetual availability. Where the Banilla player may continuously affix the outcome of each distinct reel-and-pattern round of play firmly within their control, BLCE's burden is rendered incapable of satisfaction. On those machines instantly at issue before the trial court, the player's exercise of skill can deliver a successful outcome in each and every play of each and every reel-and-pattern round—without exception.

The player of a Banilla gaming machine at issue—given the appropriate level of skill and through the exercise of choice and control to employ the same—could win every single round of play; and so, skill predominates. The outcome of every round of play on the instant machines is not predominated by chance as it, ultimately, is neither a matter purely of fate nor is it even dictated by the source code of the gaming software encoded within the machines. The outcome of every round of play, instead, is predominated by a player's choice over their election to utilize—and their exercise of—skill, to whatever degree it may have been honed.

Pinnacle, therefore, has met their burden to prove by a preponderance of the evidence that skill predominates over chance in the gameplay on the Ultra, Ultramax, and Dual machines which house the Banilla gaming software. BLCE has failed to meet their burden that chance predominates over skill in the same. Further, with no evidence of record other than the unrefuted assertions that the Trestle machine operates on similar principles and with similar play and functionality to the Banilla games, the trial court concludes that BLCE has similarly failed to meet its burden that chance predominates over skill in the game(s) contained therein and that Pinnacle has, instead, sustained its burden with respect to the Gold machine in which Trestle game software is housed. Accordingly, the 11 machines are not gambling devices *per se* and

therefore are not contraband. As a result, the cash seized by BLCE cannot be found to be derivative contraband.

## V.   **CONCLUSION**

For the reasons set forth above, the trial court this day enters the order in support of which this opinion has been issued.

BY THE COURT:

_____

HON. FRED A. PIERANTONI, III, J.

[END OF OPINION. ORDER APPENDED AS PAGES 26-27.]

Copies:          Ryann D. Loftus, Esq.
                 Danielle Mulcahey, Esq.
                 Donald P. Shiffer, III, Esq.
                 148 Adams Avenue
                 Scranton, PA 18503

                 Joseph O. May, Esq.
                 Deputy Attorney General
                 Pennsylvania Office of Attorney General
                 680 Baltimore Drive
                 Wilkes-Barre, PA 18702

PROTHONOTARY LUZERNE COUNTY
FILED MAY 18 '22 AM 11:44

| | | |
|---|---|---|
| PINNACLE AMUSEMENT, LLC, | : | IN THE COURT OF COMMON PLEAS |
| | : | OF LUZERNE COUNTY |
| Plaintiff/Petitioner, | : | CIVIL DIVISION |
| | : | |
| v. | : | NOs.: 2020-05210 |
| | : | 2020-05529 |
| BUREAU OF LIQUOR CONTROL | : | 2021-03722 |
| ENFORCEMENT, | : | 2021-10019 |
| | : | |
| Defendant/Respondent. | : | |

## ORDER

AND NOW, this __18th__ day of May, 2022, after consolidated hearing upon the Motion

for Return of Seized Property of Plaintiff, Pinnacle Amusement, LLC, filed to each of the above-

captioned dockets and the requests for forfeiture filed by Defendant, Bureau of Liquor Control

Enforcement, as new matter to dockets 2020-05529 and 2020-05210, after review and

consideration of the pleadings, evidence, and respective briefs of the parties, and for all of the

reasons set forth in the opinion issued in support of the instant order, it is hereby ORDERED,

ADJUDGED, and DECREED as follows:

1. The motion for return of property filed by Plaintiff, Pinnacle Amusements, LLC,

at each of docket numbers 2020-05210, 2020-05529, 2021-03722, and 2021-10019, is

GRANTED.

2. The request for forfeiture filed as new matter by Defendant, Bureau of Liquor

Control Enforcement, at each of docket numbers 2020-05210 and 2020-05529, is DENIED.

Page **26** of **27**

3.      The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to Plaintiff, Pinnacle Amusements, LLC:

      a.      three (3) Keystone Ultra-model gaming machines;

      b.      five (5) Keystone Ultramax-model gaming machines;

      c.      two (2) Ultramax Dual-model gaming machines; and

      d.      one (1) Keystone Gold I-model gaming machine.

4.      The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to D & M Shumbris, Inc., t/a The Swizzle Stick: one thousand five hundred twenty-six dollars ($1,526.00) in United States currency.

5.      The following seized property shall be returned by Defendant, Bureau of Liquor Control Enforcement, to Park Market Six Packs To Go, LLC: two hundred fifty-six dollars ($256.00) in United States currency.

6.      The Prothonotary shall serve notice of the entry of this Order and the Opinion issued in support hereof pursuant to Pa.R.C.P. 236.

BY THE COURT:

_____
HON. FRED A. PIERANTONI, III, J.

Copies:      Ryann D. Loftus, Esq.
                Danielle Mulcahey, Esq.
                Donald P. Shiffer, III, Esq.
                148 Adams Avenue
                Scranton, PA 18503

                Joseph O. May, Esq.
                Deputy Attorney General
                Pennsylvania Office of Attorney General
                680 Baltimore Drive
                Wilkes-Barre, PA 18702