## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREENWOOD GAMING & ENTERTAINMENT, INC., | : | No. 2:22-cv-4434-MMB |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | |
| | : | |
| POM OF PENNSYLVANIA, LLC, | : | |
| PACE-O-MATIC, INC., and | : | |
| MIELE MANUFACTURING, INC., | : | |
| | : | |
| *Defendants.* | : | |

**POM OF PENNSYLVANIA, LLC AND PACE-O-MATIC, INC.'S SUR-REPLY BRIEF IN FURTHER OPPOSITION TO PARX'S MOTION FOR CLARIFICATION AND TO COMPEL**

The POM Defendants respectfully submit this short Sur-Reply Brief in order to inform the Court of recent developments in the two expedited appeals involving the POM Skill Game that will be heard by the Commonwealth Court in October 2023: *In re: Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containing $525.00 in U.S. Currency and Seven Receipts*, No. 707 CD 2023 and *In re: Four Pennsylvania Skill Amusement Devices and One Ticket Redemption Terminal Containing $18,692.00 in U.S. Currency*, No. 761 CD 2023.

Parx has previously suggested to this Court that the "*pari materia*" argument it lodges here—which Parx has described as "the legal issue that is at the core of Parx Casino's case against Defendants" (*see* Parx's Reply Brief in Further Support of Motion for Clarification and to Compel Compliance with the Court's May 5, 2023 Order, ECF No. 58, at 2-3)—will not be an issue addressed in the pending

Commonwealth Court appeals.[1] Briefs of the Appellants and *amicus curiae* were filed in the Commonwealth Court appeals on August 16, 2023, and these briefs make clear that the "*pari materia*" argument will be addressed in those appeals. In appeal No. 707 CD 2023, the appellant has asserted this exact argument in its brief. *See* Commonwealth's Brief for Appellant in appeal No. 707 CD 2023, at Argument § I(B)(2), p. 18-24, (a true and correct copy of the Commonwealth's Brief for Appellant is attached hereto as Exhibit "A"). Moreover, in appeal No. 761 CD 2023, notwithstanding its prior representations in this matter, Parx itself raised the "*pari materia*" argument in an amicus brief filed by it and numerous other casinos. *See* Brief of *Amici Curiae*, Greenwood Gaming and Entertainment, Inc., d/b/a Parx Casino, *et al.* in appeal No. 761  CD 2023, at § II(A)(3), p. 8-19 (a true and correct copy of Parx's *Amicus* Brief is attached hereto as Exhibit "B"). Thus, there is no doubt that the Commonwealth Court will soon be considering the "*pari materia*" argument raised by Parx in this case.

For this reason, as well as all of the reasons set forth in the POM Defendants' previous filings, the Court should deny Parx's Motion for Clarification and to

---

[1] *See* July 27, 2023 letter to Hon. Michael M. Baylson from William R. Cruse, ECF No. 55 ("None of the Commonwealth Court cases referenced by the POM Defendants in their letters are destined to decide the question of illegal 'slot machines' as defined in the 2017 amendments to the Gaming Act and, thus, criminalized by the Crimes Code under the rules of statutory construction."); *see also* Parx's Reply Brief in Further Support of Motion for Clarification and to Compel Compliance with the Court's May 5, 2023 Order, ECF No. 58, at 5 ("Neither the Commonwealth Court nor any other state or federal court applying Pennsylvania law has finally determined the question posed in this case regarding the illegality of Defendants' slot machines.").

Compel. However, should the Court be inclined to grant any relief, the Court should only order the parties to preserve but not exchange documents. All state law issues in this case will soon be resolved in state court; discovery in the interim is not needed.

Respectfully submitted,

Dated: August 21, 2023

/s/ Joshua J. Voss
Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Edward T. Butkovitz (No. 309565)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Eml: mhaverstick@kleinbard.com
jvoss@kleinbard.com
ebutkovitz@kleinbard.com
svance@kleinbard.com
szimmer@kleinbard.com

*Attorneys for the POM Defendants*

3

# EXHIBIT "A"

Received 8/17/2023 11:40:46 AM Commonwealth Court of Pennsylvania

Filed 8/17/2023 11:40:00 AM Commonwealth Court of Pennsylvania
707 CD 2023

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## 707 CD 2023

In re:  Three Pennsylvania Skill Amusement Devices,
One Green Bank Bag containing $525.00
in U.S. Currency and Seven Receipts

## COMMONWEALTH'S BRIEF FOR APELLANT

Appeal from the Order of the Honorable Andrew H. Dowling of the Court of Common Pleas of Dauphin County, Civil Division, 2022-CV-06333-MD, dated March 23, 2023, Granting Motion for Return of Property.

MICHELLE A. HENRY
Attorney General
MICHELE K. WALSH
Executive Deputy Attorney General
Criminal Law Division
RONALD EISENBERG
Chief Deputy Attorney General
HUGH BURNS
Assistant Chief Deputy Attorney General
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
Appeals Section
1000 Madison Ave., Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

# TABLE OF CONTENTS

Table of Contents ................................................................................................. i

Table of Authorities ......................................................................................... iii

Statement of Jurisdiction .................................................................................. 1

Order in Question ............................................................................................... 2

Scope and Standard of Review ......................................................................... 3

Statement of the Question Involved ................................................................ 4

Statement of the Case ....................................................................................... 5

Summary of the Argument .............................................................................. 13

Argument ........................................................................................................... 15

I.    The Crimes Code makes it illegal to make or use "slot machines"
      and the seized devices are slot machines. ....................................... 15

      A.    The Crimes Code states that "slot machines" are illegal. ....... 15

      B.    The seized devices are plainly slot machines. ........................ 17

            1.  Ordinary meaning applies. ................................................. 17

            2.  In any case, the Gaming Act definition is *in pari materia*. .... 18

      C.    This slot machine issue was raised in the lower court. .......... 24

II.   In the alternative, the seized slot machines are devices that were
      used "for gambling purposes." ......................................................... 25

      A.    The game is advertised as a slot machine. ............................ 26

      B.    "Follow me" is a secondary and insignificant feature that is
            hidden by the game's designers and unnoticed or ignored by
            potential players ..................................................................... 30

      C.    The Court should evaluate this game the same way petitioners
            do – by tracking only the slot machine aspect of the game. ... 33

      D.    "Follow me" is so tedious and difficult that the same player
            who is lured by an advertised slot machine would never play it. ... 34

      E.    Chance far outweighs skill when the game in its entirety
            is considered. .......................................................................... 36

i

III.    Even without recourse to the Crimes Code, the Gaming Act
         standing alone provides a sufficient basis to support the seizure
         of the slot machines at Champions bar.........................................................37

Conclusion ...........................................................................................................40

Certificate of Compliance .....................................................................................41

Certificate of Service ............................................................................................42

## TABLE OF AUTHORITIES

### Cases

*City of Philadelphia Fire Department v. Workers' Compensation Board*,
195 A.3d 197 (Pa. 2018) ...................................................................... 15, 17

*Commonwealth v. 9 Mills Mechanical Slot Machines*, 437 A.2d 67
(Pa. Commw. Ct. 1981)............................................................................ 16

*Commonwealth v. Dent*, 992 A.2d 190 (2010) ........................................... 19, 26, 28

*Commonwealth v. Irwin*, 636 A.2d 1106 (Pa. 1993) .............................................. 23

*Commonwealth v. Two Elec. Poker Game Machines*, 465 A.2d 973
(Pa. 1983) ............................................................... 16, 25, 28, 35, 36

*Hoffman v. Troncelliti*, 839 A.2d 1013 (Pa. 2003) ....................................................... 3

*Holland v. Marcy*, 883 A.2d 449 (Pa. 2005)........................................................... 19

*In re: One 1988 Toyota Corolla (Blue Two-Door Sedan) PA License 291*,
675 A.2d 1290 (Pa. Commw. Ct. 1996) ................................................. 1

*Phoenixville Hosp. v. W.C.A.B. (Shoap)*, 81 A.3d 830 (Pa. 2013)........................... 3

*POM of Pennsylvania, LLC v. Dept. of Revenue*, 221 A.3d 717
(Pa. Commw. Ct. 2019)........................................................................ 18, 38

### Statutes

1 Pa.C.S. § 1901 ........................................................................................ 20

1 Pa.C.S. § 1921 ........................................................................................ 20

1 Pa.C.S. § 1921(c)(4)................................................................................ 20

1 Pa.C.S. § 1921(c)(6)................................................................................ 21

1 Pa.C.S. § 1922 ........................................................................................ 21

1 Pa.C.S. § 1932 ........................................................................................ 19

4 Pa.C.S. § 1102 ................................................................. 20, 21, 38

4 Pa.C.S. § 1103 ....................................................................... 18, 22

4 Pa.C.S. § 1518(f) ......................................................................... 25

18 Pa.C.S. § 5513 ............................................... 15, 16, 18, 19, 20, 24, 25

18 Pa.C.S. § 5513(a) ............................................................... 15, 26, 40

18 Pa.C.S. § 5513(e.1)(4) .......................................................... 19, 38

*Rules*

Pa.R.A.P., Rule 2135 ..................................................................... 41

## STATEMENT OF JURISDICTION

This appeal is taken from a final order of the Dauphin County Court of Common Pleas, Civil Division, entered March 23, 2023, granting motions for return of property to petitioners (Capital Vending Company, Inc. ("Capital Vending") and Champions Sports Bar, LLC ("Champions Bar")).

Under this Court's precedent, jurisdiction is available in this Honorable Court. *In re: One 1988 Toyota Corolla (Blue Two-Door Sedan) PA License 291*, 675 A.2d 1290, 1296 (Pa. Commw. Ct. 1996) (holding that Commonwealth Court has jurisdiction over appeals from orders disposing of motions for the return of property and forfeiture orders).

1

## ORDER IN QUESTION

The Order at issue on appeal, entered March 23, 2023, by the Honorable

Andrew H. Dowling, directs in relevant part as follows:

> [I]t is hereby ORDERED and DECREED that the Petition for Return of Property is GRANTED. It is further ORDERED that, within five (5) days of the date of this Order, the Pennsylvania State Police, Bureau of Liquor Control Enforcement shall return to Champions Sports Bar, LLC the following:  1) three Pennsylvania Skill Amusement Devices, 2) one green bag containing $525.00 in U.S. Currency, and 3) seven receipts in the condition in which they were seized.

2

## SCOPE AND STANDARD OF REVIEW

This case involves the grant of a motion for return of property and the denial of a petition for forfeiture.

As to pure questions of law and interpretation of statutory provisions, the standard of review is *de novo* and the scope of review is plenary. *Phoenixville Hosp. v. W.C.A.B. (Shoap),* 81 A.3d 830, 838 (Pa. 2013); *Hoffman v. Troncelliti*, 839 A.2d 1013, 1015–16 (Pa. 2003).

3

<u>**STATEMENT OF THE QUESTION INVOLVED**</u>

I.    Are the seized devices "slot machines" and therefore illegal pursuant to the Crimes Code?

    (Not answered by the trial court)

II.    Does a slot machine become a "game of skill," and technically not a device "used for gambling purposes," by the mere addition of a tag-along secondary game that is so insignificant to the function of the game that the manufacturers do not even track its use?

    (Answered in the negative by the trial court)

III.    In the alternative, does the Gaming Act independently apply to gambling in Pennsylvania?

    (Answered in the negative by this Court.)

## STATEMENT OF THE CASE

On July 16, 2019, the Bureau of Liquor Control Enforcement began an investigation of slot machines that were in use in Champions Sports Bar in Dauphin County. N.T. 9/30/2022, 102. On that date, Liquor Enforcement Officer Daniel Wentsler went to the bar in an undercover capacity and observed two full-sized, stand-alone video gambling devices and one table-top video gambling device. *Id.* at 100. He used two of the three machines, playing each game. In the months that followed, Liquor Enforcement Officers visited Champions Bar on multiple occasions to observe the machines and to observe how bar patrons interacted with the games. *Id.* at 102.

On December 9, 2019, Liquor Enforcement Officers conducted an open inspection of Champions Bar. The officers examined the machines and seized them along with seven (7) payout slips and a green bank bag containing $525.00 U.S. currency. N.T. 9/30/2022, 74.

On August 16, 2022, Champions Bar and the owner of the seized devices, Capital Vending, jointly filed a motion for return of property in the Dauphin County Court of Common Pleas. Following an order of the Court, petitioners refiled the matter as a Petition for Return of Property on August 23, 2022. On September 8, 2022, the Commonwealth filed an Answer and New Matter in the Form of Petition

for Forfeiture and Condemnation, under both the Crimes Code and the Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act").

An evidentiary hearing was held over three days, providing evidence as to the nature of the games that were seized, as well as the observations by the officers who witnessed game play at Champions Bar. Additionally, the testimony of experts was provided to discuss the gaming capabilities of the machines and the nature of the games.

The structure of these games is largely undisputed. One of the devices was presented to the trial court, and the court was able to observe the play screens on the game. N.T. 9/30/2022, 30.

The machines that were seized from Champions Bar look very much like traditional slot machines.[1] On the main screen, a player is invited to choose from 4 games,[2] all of which present 3 reels that are spun. When each reel stops, the player

---

[1] Plaintiff's expert was previously the head of the games division of Mikohn Gaming. He explained that he had designed many slot machines. In describing that process, he explained that basic design decisions involved things like whether to use five-by-three reels or three-by-three reels. N.T. 11/22/2022, 300.

[2] Each of the four games appear to play in the same manner, but the artwork for each game is different. N.T. 9/30/2022, 47, 70. That is to say that the user interface is identical for each game with the exception of the art. It is not clear if the games truly play in the same manner – it could be that one game pays out at a higher rate than another, or other similar discrepancy. But the Commonwealth was not permitted access to this data, so these potentially troublesome discrepancies remain unknown. The petitioners' expert, however, explained that "hit frequency" and

can see a three-by-three grid of symbols.  The player's goal is to match three symbols in a row to win various percentages of the initial bet.

The game provides clear instructions for the player in advance of placing a bet.  The instructions explain that the machine functions like a traditional slot machine and a player will wager a set amount (either $.40, $.80, $1.20, $1.60, $2, or $4) on a single spin of the reels.  Each of the symbols will provide a different level of "payout" to the player.  For example, in some instances, a symbol may result in a complete win, i.e., the player gets a return of the money paid originally, plus an additional percentage of the original wager.  Matching other symbols, however, does not result in a "win," but rather only a return of part of the original wager (a "partial loss").[3]  The games, as advertised on the home screen, differ from a traditional slot machine in only one way.  The player must place a wild symbol to create the "three in a row" pattern.  There are three different ways that this happens.  N.T. 9/30/2022, 48-52; N.T. 11/22/2022, 198-201.

The player can play the game in a rapid mode.  In rapid play, the player hits a play button and the reels spin.  The player then immediately hits play again.  If there

---

"how often [the player] win[s] a big award" are each important factors in game design.  N.T. 11/22/2022, 300.

[3]  In testimony, the witnesses described this as a "hit," which is the technical term used in gambling parlance.  The phrase "partial loss" will be used in the brief for purposes of clarity.  N.T. 9/30/2022, 51.

is no place where the wild can be placed to create three in a row, a new bet is placed and the reels will spin again.  This can be repeated until the reels spin and reveal a layout where it is possible to place a wild symbol and create a three in a row pattern (either a win or a partial loss).  At that point, if the player hits play again, the reels will not respin.  The player is given 30 seconds to identify where to place the wild symbol to create three in a row.  N.T. 12/2/2022, 466-67, 486; N.T. 9/30/2022, 70-72; N.T. 11/22/2022, 235.

Alternatively, a player can be slightly more deliberate in play style.  The player can hit play, watch the reels stop and look at the three-by-three grid to see if there is any place to place a wild card.  The player is given 30 seconds to review the grid to see if there is a way to use the wild to create a three-in-a-row pattern.  N.T. 11/22/2022, 335.  Ultimately, however, this does not change the player's odds.  The reels still control the game.  Some games allow for a winning combination.  Others do not.  The player cannot control that aspect of the game.

Additionally, the player is given the opportunity to preview the next game at each wager level before choosing to play.  This preview allows the opportunity to see what will happen after the reel is spun before the player commits any money to playing.  So, players will know whether the first game is a winner or loser before they play.  The helpfulness of this screen, however, is limited.  Since a player has the opportunity to preview the "next screen" before they wager, there is every reason

8

to believe that the first spin available is always at least a partial loss. This "next screen" feature was also available to the player who played immediately before this player. A skillful player who is planning to "cash out" winnings would certainly preview any next screens to be sure not to leave any money on the table. Importantly, this preview screen will not change until the game previewed is played. So, the player cannot change the outcome by repeatedly reviewing the same "preview" screen. N.T. 9/30/2022, 52-55; N.T. 11/22/2022, 201-204; N.T. 12/2/2022, 460-61.

This is the entirety of the game that is advertised by the machines to a potential player. Game play is extensively described and the pay table is clearly laid out. There is no mention of anything else. But there is another piece to the game, which is wholly unadvertised and wholly unexplained until the player commits to playing that piece. It is called "Follow Me."

If a player chooses to play in a rapid style, he will never know that "Follow Me" even exists. The player hits play, the wager is made, the reels spin. If no possible match is available, the player hits play again, a second wager is made, the reels spin. At no time is the player advised that there is a game called "Follow Me" that he could opt to play. N.T. 12/2/2022, 467.

The picture of the slot machine reels dominates the screen, but under the reels (if the player does not immediately hit PLAY again) there is a line of text that provides direction. After the reels are spun, the text under the three reels states:

9

"PICK SPOT IN:" with a countdown clock for the 30 seconds allowed to place the wild symbol. If play results in only a partial loss, that same banner will toggle between the amount of the "win" (i.e., "Line wins 50") and the phrase "Touch Here to Follow Me." "Follow Me" is not explained in any way. The message "Touch Here to Follow Me" appears without explanation and then disappears, toggling back to the message about the partial loss. N.T. 11/22/2022, 285; N.T. 9/30/2022, 55.

If the player decides to touch the screen to see what "Follow Me" is, "Follow Me" is then explained. Unlike the slot-style play described above, "Follow Me" requires short-term memory of random information. The player is asked to remember an increasingly difficult pattern. It is very much like the game "Simon," but the screen contains nine colored circles arranged in three rows of three across. The game is played over twenty rounds. In the first round a single circle is illuminated and the player must select that color. In the second round, the first circle is repeated and a second circle is added. In the third round, the first two circles are repeated and a third circle is added. Each round, the player must mirror the pattern that the game generates, and each round adds an additional circle to the pattern. The game's difficulty is increased by the addition of "intermissions." After the fifth round, there is a required break that lasts approximately 14 seconds. N.T. 11/22/2022, 237. The sixth round begins after that break with the pattern from the first five rounds and the addition of a sixth new circle. After round ten there is a

10

second intermission.  And there is an intermission after each of the final five rounds (fifteen, sixteen, seventeen, eighteen, and nineteen).  N.T. 11/22/2022, 66.  None of the experts could complete the game without taking notes to keep track of the patterns.  N.T. 11/22/2022, 307.

Petitioners' expert stated that it took him about ten minutes to play "Follow Me."  N.T. 11/22/2022, 344.[4]  In contrast, it takes 2.5 seconds to play the slot machine game that was originally advertised.  Petitioners' Expert Report at 25.  In other words, a player can play no more than 6 games in one hour, if he chooses to keep trying to win his money back with "Follow Me."  Or he can play more than 1,000 games on the slot machine feature.  To be clear, even if a player is successful at "Follow Me," he is only able to win back 5% over the amount he just wagered.  So, if the player wagered $4 on each spin and he spun and lost ten times, and then on the eleventh spin, he successfully played "Follow Me," he would win back only his original $4 plus an additional 20 cents.  The $40 he had previously lost could not be recovered through that single game of "Follow Me."

During their undercover investigations, officers observed the way that patrons played the games.  Officer Schopee testified that in hundreds of investigations, he never saw the "Follow Me" game being played.  N.T. 12/2/2022, 412-13.  Typically,

---

[4]  The Commonwealth's expert stated that it took him more than twelve minutes to play "Follow Me."  N.T. 9/30/2022, 66.

in the field, he saw players using the "rapid" style of playing the game, which would mean that the players would never even be told about the "Follow Me" feature when they encountered a full loss on the reels. N.T. 12/2/2022, 460-61.

Access to the data in these gaming machines was strictly limited by petitioners, but the Commonwealth was able to determine that the machines do not even bother to track "Follow Me" play. Indeed, the machine is programed to track the slot machine-style game, but it ignores "Follow Me." N.T. 11/22/2022, 263, N.T. 12/2/2022, 489-90.

Following the evidentiary hearing, the parties provided the court with post trial briefing. On March 23, 2023, the court granted the Petition for Return of Property.

On April 23, 2023, the Commonwealth filed a notice of appeal to the Pennsylvania Superior Court. *See* 606 MDA 2023. On April 26, 2023, petitioners filed a Motion to Transfer to this Court. On June 12, 2023, the Superior Court granted the motion and this matter was transferred to this Court.

On July 7, 2023, petitioners filed an Application to Expedite. On July 19, 2023, this Court granted the Application in part, setting the matter for argument before the Court sitting *en banc* and setting an expedited briefing schedule. The present briefing followed.

12

## SUMMARY OF THE ARGUMENT

The facts here are largely undisputed.  The devices advertise a fast play slot machine game.  A largely hidden secondary game ostensibly allows a player to pause his game play for ten to twelve minutes to play a tedious memory game to win back the small amount of cash lost on the prior game.  The issue presented is a simple one – does a slot machine become something else merely because the gaming company has appended an unadvertised, tedious, and difficult "skill" game to follow the slot machine game?  There are two reasons that the answer is no.

First, and most simply, the Crimes Code states that "slot machines" are *per se* illegal.  As a particular type of illegal device, slot machines are illegal, without regard to the question of whether skill or chance predominates play.  The Gaming Act now provides an explicit definition of a slot machine, and the machines here are clearly slot machines. The fact that the General Assembly placed that definition in the Gaming Act, as opposed to the Crimes Code, is irrelevant.

Secondly, the Crimes Code separately prohibits any device "used for gambling purposes," whether or not it is a slot machine. The devices at issue here are also illegal because they were plainly designed to be used for gambling purposes. The device presents itself to a potential player as a slot machine whose outcome is almost entirely determined by chance.  The only real challenge that petitioners have

13

presented to this argument is the presence of the game "Follow Me."  But that does not shift the balance.

The Commonwealth asks the Court to take this "Follow Me" game only as seriously as the petitioners have.  The "Follow Me" game is nothing more than a cryptic scrolling message at the bottom of a screen, barely visible, and completely invisible in many instances.  The home screen tells the story of the essence of the game – a slot machine.  Indeed, the petitioners are so confident that no one will play "Follow Me" that the computer is not even programed to track "Follow Me" game play.

From a pure legal perspective, there are two ways to approach this analysis. First, these games are clearly slot machines, under the Gaming Act.  Second, these are games of chance, not games of skill.  The Commonwealth can establish both of these points, but it need only establish one to prevail.  Because these are illegal gambling devices, their return is inappropriate.  The devices and the proceeds should be forfeited.

Alternatively, the devices here are illegal under the Gaming Act alone, even without reference to the Crimes Code. If the devices are not found illegal under the Crimes Code, the Court should respectfully reconsider its decision in *POM* holding that the Gaming Act has no force outside casinos.

14

<u>**ARGUMENT**</u>

**I.    THE CRIMES CODE MAKES IT ILLEGAL TO MAKE OR USE "SLOT MACHINES" AND THE SEIZED DEVICES ARE SLOT MACHINES.**

The seized devices are illegal slot machines.  This fact, without regard to whether the devices were "used for gambling purposes," makes the devices illegal.  The lower court's analysis of whether the devices were "used for gambling purposes" was unnecessary.

**A. THE CRIMES CODE STATES THAT "SLOT MACHINES" ARE ILLEGAL.**

Section 5513 of the Crimes Code addresses "gambling devices" and "gambling."  It itemizes four distinct things that are illegal.  One of those things is a slot machine.  Accordingly, if these devices are "slot machines" they are illegal and seizure was proper.

The Crimes Code makes it illegal to make, use, or possess:  "any punch card, drawing card, slot machine or any device to be used for gambling purposes." 18 Pa.C.S. § 5513(a).  These are four *distinct* things.  The first three are obviously and *inherently* gambling devices; the statute requires no additional proof of their manner of use. They are *per se* illegal under the law. Only the final catch-all category requires proof of use, because it plainly applies to objects that are *not* inherently created for gambling purposes.

This Court may not assume that the "words are to be mere surplusage." *City of Philadelphia Fire Department v. Workers' Compensation Board*, 195 A.3d 197,

15

207 (Pa. 2018). A slot machine's illegality is not dependent on evidence that it was "used for gambling purposes." Further analysis of whether they were used for gambling purposes is beside the point. Accordingly, the Commonwealth need only demonstrate *either* that the devices are slot machines *or* that the devices were "used for gambling purposes." It need not demonstrate both.[5]

Petitioners urge a different outcome, insisting that the Commonwealth must demonstrate that the devices were "used for gambling purposes" for there to be a showing of illegality. But that is contrary to the plain language of the statute. Section 5513 does *not* say that "slot machines or *other* devices used for gambling purposes" are illegal. It states that "any" punch board, drawing card, or slot machine is illegal, *as well as* "any device used for gambling purposes." The words following the second "any" do not and grammatically cannot modify the words following the first "any." Rather, the double use of the word "any" clearly creates two distinct

---

[5] This Court implicitly recognized this in *Commonwealth v. 9 Mills Mechanical Slot Machines,* 437 A.2d 67, 70 (Pa. Commw. Ct. 1981). In that matter, several slot machines were seized along with two other electronic gambling devices. The Court concluded that the slot machines were properly seized under Section 5513, because the section states that slot machines are illegal. It was only as to the two other devices that the Court engaged in the chance verses reward analysis to determine if the devices were being illegally used for gambling purposes.

As is set forth in detail below, the slot machines seized here would violate the statute even if they were not illegal *per se*, because they are also "devices used for gambling purposes," as defined by the Pennsylvania Supreme Court in *Two Elec. Poker Game Machines,* 465 A.2d 973 (Pa. 1983). But that is an argument in the alternative, not a necessary element of the offense.

16

categories: 1) punch boards, drawing cards, and slot machines, and 2) devices that are not intrinsically gambling machines, but can sometimes be employed to that end. Petitioners' effort to fuse these distinct categories would render superfluous the legislature's explicit reference to "slot machines." But this Court must give meaning to every word in the statute. *City of Philadelphia Fire Department*, 195 A.3d at 207. Simply put, a "slot machine" is not just a generic object that may at times be put to "use for gambling purposes." Gambling is the essential purpose of the machine. The legislature therefore chose to make it illegal in itself.

### B. THE SEIZED DEVICES ARE PLAINLY SLOT MACHINES.

Whether under the commonly understood meaning of the words, or under the definition supplied by the legislature in the Gaming Act, the devices in question are exactly what they try to appear to be: "slot machines."

### 1. Ordinary meaning applies.

The Crimes Code does not specifically define the term "slot machine." But that simply means that courts must apply the standard meaning of the words. Merriam-Webster defines a slot machine as "an originally coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle; also: an electronic version of this machine." Petitioners do not even attempt to argue that their machines are not an electronic version of a slot machine. Instead, they argue only that their devices also include a skill element, and are therefore not

17

predominantly "used for gambling purposes." As explained above, however, they have misread § 5513. It does not require any such inquiry when the device in question is a slot machine. Under the plain language of the statute, the devices are contraband and were properly seized.

### 2. In any case, the Gaming Act definition is *in pari materia*.

Even if the ordinary meaning of the term were not dispositive, petitioners' machines would still qualify as slot machines, under the detailed definition provided by the General Assembly in 2017 in the Gaming Act, 4 Pa. C.S. § 1103. That definition explicitly includes slot machines that contain an element of "skill." The legislature thereby foreclosed precisely the defense that petitioners attempt to rely on. Indeed, this Court has already concluded that virtually identical games are "slot machines" under § 1103. *POM of Pennsylvania, LLC v. Dept. of Revenue,* 221 A.3d 717, 725 (Pa. Commw. Ct. 2019) (*en banc*).[6]

Petitioners argue that this definition of a slot machine is not relevant under the Crimes Code. That is incorrect.

---

[6] The *POM* Court was also asked to consider if the Gaming Act placed authority over all slot machines – licensed and unlicensed – into the hands of the Gaming Control Board. Ultimately, this Court concluded that detailed provisions of the Gaming Act were designed to regulate licensed gaming in the Commonwealth. But the Court noted that it was not expressing any opinion about the legality of these slot machines under 18 Pa.C.S. § 5513. *id.* at 737 n.19, let alone whether the Gaming Act definition of a slot machine may be read *in pari materia* with the Crimes Code provision.

18

The Superior Court was faced with a similar issue in *Commonwealth v. Dent,* 992 A.2d 190 (2010).  In defining the phrase "unlawful gambling," also found in Section 5513 of the Crimes Code, the Superior Court looked to the Gaming Act for its definition. *Id.* at 197.  As the Court explained, "[t]here would have been no reason for the legislature to act to authorize [the] playing of poker in certain facilities if playing poker did not constitute 'unlawful gambling' prior to said authorization." *Id.*  So too here.  There would have been no need to regulate "skill"-based slot machines under the Gaming Act, unless those machines were otherwise illegal under the Crimes Code.

The Superior Court's approach makes sense.   The Crimes Code and the Gaming Act necessarily go hand-in-hand.  1 Pa.C.S. § 1932. *Holland v. Marcy*, 883 A.2d 449, 455–56 (Pa. 2005) (noting the "statutes which apply to the same class of persons should be read where possible, *in pari materia*.").  Prior to the enactment of the Gaming Act, gambling was illegal in Pennsylvania, as was (and still is) stated in 18 Pa.C.S. § 5513.  The Gaming Act was drafted to permit that which was previously illegal, pursuant to 18 Pa.C.S. § 5513.  Indeed, Section 5513 cross-references the Gaming Act, noting that "[n]othing in [section 5513] shall be construed to prohibit any activity that is lawfully conducted under [the Gaming Act]."  18 Pa.C.S. § 5513(e.1)(4).  The Gaming Act is only necessary because the Crimes Code would

19

make the entire casino industry illegal, absent the exceptions set forth in the Gaming Act.

The General Assembly defined "slot machines" as a distinct device that was illegal under the Crimes Code. At the time of the enactment, that phrase spoke for itself. In 2017, the General Assembly provided a more precise definition of the phrase in the Gaming Act. That definition, contained in that specialized statute, should be used in understanding what it means to be an illegal "slot machine" under section 5513 of the Crimes Code.

The "object to be attained," 1 Pa.C.S. § 1921(c)(4), by the Gaming Act, was to create a structure where illegal gambling could occur legally. This should be considered in reading the statute, as the "manifest intent of the General Assembly" provides the relevant guidance. 1 Pa.C.S. § 1901; 1 Pa.C.S. § 1921. If the definition of a "slot machine" under the Crimes Code was different than under the Gaming Act, then skill based "slot machines with a "skill" element would only be illegal in licensed casinos. That construction would *limit* licensed casinos, which was the opposite of the original intention of the General Assembly. *See* 4 Pa.C.S. § 1102(2) (stating an intent to *authorize* limited slot machine gaming – not an intent to *restrict* such gaming beyond the restrictions of the Crimes Code).

Ultimately, the definition of "slot machine" in the Crimes Code must be at least as broad as the definition in the Gaming Act. As the General Assembly

20

explained, "[t]he primary objective of [the Gaming Act] to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of *all activities involving gaming and practices that continue to be unlawful.*" 4 Pa.C.S. § 1102(1).  Slot machines do not become illegal because they are placed in a regulated casino.  Slot machines are illegal by default, and become legal only because they are placed in a regulated casino.  Inconsistent reading of the phrase "slot machine" between these two statutes is contrary to the stated intent of the General Assembly.

Petitioners' position – that this Court must ignore the Gaming Act definition – leads to absurd results.  1 Pa.C.S. § 1921(c)(6) (directing this Court to look to the consequences of "a particular interpretation"); *see also* 1 Pa. C.S. § 1922 (noting the presumption that the legislature did not intend an absurd result).  The 2017 amendments to the Gaming Act were clearly designed to ensure the regulation of a new generation of slot machines with video capabilities that purport to allow for both chance and skill to play a role in the game.  Clearly, this was an attempt to ensure that "skill" slot machines be subject to the same regulations as traditional slot machines.  But if this definition did not carry over to the Crimes Code, the opposite would occur.  Traditional slot machines would remain illegal and be subject to regulation, but slot machines containing any "skill" element would be declared legal and free from regulation – unless they were found in a regulated casino.

21

While the games seized from Champions Bar were a relative few in a local bar, this Court's construction of the phrase "slot machine" has far wider implications. If petitioners' definition is accepted, then an individual could open a business that relies exclusively on wagering with these devices. That unlicensed individual could place thousands of slot machines in the hall – a space that in all ways would resemble a casino – but because it was an unlicensed casino, it would evade regulation. And that would be completely legal, in petitioners' self-interested view. These pseudo-casinos could exist across the street from a regulated casino. Players would have no idea that the regulations put in place for their protection were not present in these pseudo-casinos. This is no far-fetched hypothetical. Rather, it has become the reality in Pennsylvania. *See https://thekeystoneklub.com/*

Petitioners attempt to bolster their interpretation by suggesting that, if their devices are deemed illegal, then common children's arcade games would also be prohibited. That suggestion is a distraction. Games played on beach boardwalks or in entertainment establishments like Chuck E. Cheese or Dave and Buster's are not illegal slot machines. "Slot machines," under both the term's ordinary meaning and the Gaming Act definition, must dispense something "of value." *See* 4 Pa.C.S. § 1103 (definition of "slot machine" section (1)(i)(A)). A child sitting down to play a game of Pac Man is not playing on a slot machine. At best, he or she might win a free game. The child is not playing to win multiple times the amount wagered. The

22

cost of an arcade game is not a wager; it is simply the price paid for the fun of playing. Similarly, a child playing skee-ball or shooting hoops to win 1,000 tickets, redeemable for a stuffed bear, is not playing a slot machine. These are games that are played for fun. The chance of winning something like a stuffed bear is also fun. It is not gambling.

People play slot machines to win more money than they put into the machine. That is gambling. As the Supreme Court has already explained, gambling is "the staking of money or any other thing of value on an uncertain event. It involves chance and a hope of gaining something beyond the amount played." *Com. v. Irwin*, 636 A.2d 1106, 1108 (Pa. 1993) (*quoting P.L.E. Gambling and Lotteries, § 1 (1986)* (citing *Black's Law Dictionary*). It is that "hope of gaining something beyond the amount played which motivates people to gamble and creates the dangers associated with gambling." *Id.* The Gaming Act is about gambling. The Crimes Code is about gambling. And slot machines are about gambling. Where the "reward" is entertainment or a stuffed bear, none of these same restrictions apply. *Id.*

Petitioners' focus on children should, however, point the Court's attention to another concern. If these "skill" slot machines are deemed legal, then they would defy any regulation. They could exist in a convenience store across the street from a school, or even in the student lounge. There would be no basis upon which to

23

restrict their game play. Devices that the General Assembly has defined as "slot machines" could be played by anyone, anywhere, without restriction.

Ultimately, the rule is clear. Slot machine gambling is a special type of illegal gambling under the Crimes Code. The term is defined not only by its ordinary meaning but more specifically in the Gaming Act. This Court should join the Superior Court. It need look no further to define what it means to be an illegal slot machine.

### C. THIS SLOT MACHINE ISSUE WAS RAISED IN THE LOWER COURT.

The lower court did not discuss slot machines *per se* in its opinion. Rather in a footnote, the court concluded that the argument that the seized machines were illegal slot machines was not included in the Commonwealth's Answer or the Commonwealth's Forfeiture Petition. Trial Court's Opinion at 4, n. 2. This was plainly incorrect.

In its Answer, the Commonwealth stated that the seizure was premised on a violation of 18 Pa.C.S. § 5513. Answer at ¶ 7. Throughout the Answer, the Commonwealth relied *both* on the fact that the machines were "slot machines" and the argument that the devices were games of chance (and thus "devices used for gambling purposes"). Answer at ¶ 22, 24, 26, 27; New Matter at ¶ 60. In the Forfeiture Petition, the Commonwealth noted that the game looked just like a "traditional slot game" and the devices were seized under both 18 Pa.C.S. § 5513 (in

24

the Crimes Code) and 4 Pa.C.S. § 1518(f) (in the Gaming Act). Forfeiture Petition at ¶60, 60(k). This was enough to alert petitioners, and the court, that the Commonwealth planned to argue that the games are slot machines and are thus illegal *per se*.

Ultimately, the trial court focused exclusively on the question of whether the seized devices were devices "used for gambling purposes." But that was an incorrectly narrow approach. The claims presented to this Court are not waived. The matter is ripe for review.

## II.    IN THE ALTERNATIVE, THE SEIZED SLOT MACHINES ARE DEVICES THAT WERE USED "FOR GAMBLING PURPOSES."

There is a second reason that these devices were properly seized. Even if petitioners' electronic slot machines were not illegal *per se* as slot machines, they are devices "used for gambling purposes" that are prohibited under section 5513 of the Crimes Code. Players of these games are using the devices to obtain a result determined by chance. Any element of skill tacked on to the game is *de minimus* and certainly not enough for skill to predominate over chance.

The Pennsylvania Supreme Court has explained that "gambling" has three elements: consideration, a result predominately determined by chance rather than skill, and reward. *Commonwealth v. Two Elec. Poker Game Machines*, 465 A.2d 973, 977 (1983). The parties have consistently agreed that both consideration and reward are established here. The disagreement is on the second prong. Recognizing

25

that most games contain both an element of skill and an element of chance, the Supreme Court set forth the "predominate-factor test," explaining that the Commonwealth must establish by a preponderance of the evidence that the element of chance predominates over any element of skill. *Commonwealth v. Dent*, 992 A.2d 190, 193 (Pa Super. 2010) (describing the Supreme Court's decision).

### A. THE GAME IS ADVERTISED AS A SLOT MACHINE.

Under Section 5513 (a)(1), it is illegal if an individual "makes, assembles, sets up, maintains, sells, [or] lends"[7] a device *to be used* for gambling purposes.  It is clear from the statute that this phrasing is intended to have broad coverage, as the General Assembly took the time to indicate that playing cards were excluded from this category.  One way to determine how a device is expected to be used is to look at the way the game designer presents its game to a potential player.

On this point there is no dispute.  The game advertises itself as a game of chance.  Its welcome screen shows *only* a slot machine style game.  On the games found in Champions Bar, the player is invited to choose between 4 games that appear identical except for the art.

---

[7]  In its entirety the statute indicates that it is illegal to "intentionally or knowingly make[], assemble[], sets up, maintain[], sell[], lend[], lease[], give[] away, or offer[] for sale, loan, lease or gift… any device to be used for gambling purposes."  18 Pa.C.S. § 5513 (a)(1)

26

The player sees three reels that appear to spin independently from each other. When they stop, the player can see three lines, each with three symbols across. Where with a traditional slot machine, the goal is to spin the reels to get three cherries on a single line, with these games the player is trying to line up three red cars or three airplanes. But ultimately, the goal is identical: hope that the luck of the reels pays off and the player gets three in a row.

There is a twist with the game. A player is given thirty seconds to place a wild card to create the row of three matching symbols. N.T. 11/22/2022, 335. This arguably involves a small measure of modest "skill." But, ultimately, the spinning reels control the player's options. Not every game has the possibility of a three in a row match. Even when a three-in-a-row match is available, there is no guarantee that the match will result in a payout that exceeds the amount wagered.

Indeed, this element of chance predominates to such a degree that a player can play the game in a "rapid" mode where he can hit play repeatedly and any game that does not allow for a potential winning outcome will be skipped. Rapid-fire wagers can be entered – just like with a traditional slot machine – with the same value bet repeating automatically with each new spin. Though technology now allows the player to simply hit a button, as opposed to the traditional pulling of the large lever on the side of the machine.

27

There can be little doubt that chance predominates in this primary "phase" of the game.  Petitioners' own expert presented an excellent discussion of this, as he described video poker:  "I cannot make the outcome of video poker a win if I want to.  I can't do that because of the chance part."  N.T. 11/22/2022, 317.  Here, proper placement of the wild card "can improve the outcome," but "it cannot determine it." *Two Elec. Poker Game Machines*, 465 A.2d 973, 978 (1983).  The player is helpless before the spinning reels, which may produce favorable possibilities, or may not.

In *Two Electronic Poker Game Machines,* the Pennsylvania Supreme Court explained that even the skill required to play a poker game was not sufficient to tip the scale because chance ultimately "determines the cards dealt" and the options presented to the player.  465 A.2d 973, 978 (1983).  So too here.  Placement of the wild symbol requires *far less* skill than playing poker.  The real game lies in the luck of the spin.  *See also Commonwealth v. Dent,* 992 A.2d 190 (Pa. Super. 2010) (collecting cases and determining that Texas Hold 'Em Poker is gambling).

The game does offer a "preview" screen, which offers a slight twist of fate. This preview allows players a chance to see what will happen after the reels are spun before they commit to a wager.  So, they will know that the first game is a winner or a loser before they play.  The helpfulness of this screen, however, is limited.  The preview screen will not change until the game is played.  So, the player cannot change the outcome by repeatedly reviewing the same "preview" screen.  Since

players have the opportunity to preview the "next screen" before they wager, there is every reason to believe that the first spin available is always at least a partial loss. This "next screen" feature was also available to the player who played immediately before this player. A player who is planning to "cash out" her winnings would generally preview any next screens available to be sure not to leave any money on the table.

Ultimately, slot machine games are designed for rapid play. Each game takes seconds. While it might be an initial advantage to know that a player will win on her first spin of the reels, it matters very little. The first game is one of many. A player may be lured in by knowing he will get a win on the first game. Or the player may just decide that losing the first game is a path to the second game, where he may have more luck. The game is won or lost by a spin of the reels – in the first spin and the many that will follow.

Petitioners do not really fight this conclusion; they argue instead that this is only a small part of the game and not the part that predominates, because the game offers the chance to play "Follow Me," which is skill based. Surely "Follow Me" exists. And surely "Follow Me" involves a kind of skill. But conspicuously "Follow Me" is wholly unadvertised and wholly unexplained until a user blindly clicks on a box. There is no mention of it on the "help screens" that provide the pay table for the slot machine and explain game play.

29

The question for the Court is: was this device created to be used for gambling purposes? Undoubtedly the best evidence of the game's intended use is the way the game is advertised to and played by its customers. If that is so, then "Follow Me" is irrelevant to the game's intended use.

**B. "FOLLOW ME" IS A SECONDARY AND INSIGNIFICANT FEATURE THAT IS HIDDEN BY THE GAME'S DESIGNERS AND UNNOTICED OR IGNORED BY POTENTIAL PLAYERS.**

To answer the question – was this device created to be used for gambling purposes? – petitioners primarily point to "Follow Me." They allege that the player can "win on every spin." *See, e.g.*, N.T. 9/30/2022, 83-86; N.T. 11/22/2022, 272; N.T. 12/2/2022, 498. This catchy slogan is not merely conspicuously absent from advertising; "Follow Me" is hard to find and often completely hidden. Unsurprisingly, this aspect of the game is not used by players.

As has already been explained, a new player will begin game play with no awareness of "Follow Me." If a player chooses to play in a rapid style, he could go for long periods without even knowing that "Follow Me" exists. The player will hit play, the wager is made, the reels spin. If no possible match is available, the player will hit play again, a second wager is made, the reels spin. At no time is the player advised that there is a game called "Follow Me" that she could decide to play. Each time the player places a new bet, the "opportunity" to use "Follow Me" to win back the prior bet is lost. The message is clear. The game effectively ends if there is no

30

possible matching line on the slot machine feature. "Follow Me" is not relevant enough to mention.

Finally, if there's a partial loss available, a message about "Follow Me" will be visible to the player – but only barely. On the video monitor, the slot machine reels dominate the screen. After the reels spin, relatively small text under the three reels states: "PICK SPOT IN:" with a countdown clock for the 30 seconds allowed to place the wild symbol. If the game results in only a partial loss, that same text line will toggle between an explanation of the amount of the win (i.e., "Line wins 50") and the phrase "Touch Here to Follow Me."

Even when the game finally acknowledges the existence of "Follow Me," it is not explained in any way. The message "Touch Here to Follow Me" appears without explanation and then disappears, toggling back to the message about the partial loss. The notation, the text of which is far smaller than the size of the pictures on a given "pay line," is easy to miss and even easier to ignore in a world where pop-up banner ads are commonplace in the electronic space.

Ultimately, this rapid-fire playing speed is entirely consistent with what is expected from slot machine play. Slot machines, by design, are small stakes bets. The player typically repeats the game quickly. These games are no different. Petitioners' expert indicated that the slot machine component of the game takes approximately 2.5 seconds. The games seized from Champions Bar were all "rapid"

31

games, which means the player can always tap the play button repeatedly.  Any time the game is a complete loss, there will be no message about "Follow Me."  The reels will spin again and a new bet is placed.  Even if a player pauses long enough to place a wild symbol the banner will toggle between a message about the partial loss and a message to "Touch Here to Follow Me" (whatever that means).  The message is easy to miss, if it is seen at all.

This device was not created to be used to play "Follow Me."  It was created to be a slot machine where chance dominates.  And that is how it is played at Champions Bar and in other locations throughout the Commonwealth.  During undercover visits to Champions Bar, officers watched players who sat down at a game that looked like a slot machine and played like a slot machine.  Patrons played the game rapidly – as slot machines are designed to be played.  To no one's surprise, they did not play "Follow Me."

Interestingly, petitioners' expert made no effort to rebut these assertions. Indeed, he completely ignored them.  He created a computer simulation to play the game.  N.T. 11/22/2022, 306.  The program was designed to always play "Follow Me."  N.T. 11/22/2022, 315.  Clearly, the expert programmed different instructions than were given to a potential player.  Undoubtedly, the computer did what it was told.  But people are not computers.  And, even if they were, they were never told to

32

keep playing. Indeed, they were never told anything other than to play the slot machine.

It is interesting to look back at the statute. Playing cards are used for many games from Go Fish to Poker. But the General Assembly must have felt that they fit in the category of "devices created to be used for gambling purposes"; that is why they are excluded in the statute. Comparatively speaking, the slot machines seized from Champions Bar are far more predominately devices that were created for gambling purposes than an ordinary deck of cards.

In sum, even when "Follow Me" is mentioned, it is an afterthought. Rapid play completely bypasses "Follow Me" (without ever telling the player that is what is happening). And when "Follow Me" is revealed at all, it is done in a cryptic fashion that yields the outcome that is to be expected – "Follow Me" is simply not played. The luck of the reels dominates this game. The mysterious presence of "Follow Me" doesn't change that. The predominate factor to this game is clearly chance.

### C. THE COURT SHOULD EVALUATE THIS GAME THE SAME WAY PETITIONERS DO – BY TRACKING ONLY THE SLOT MACHINE ASPECT OF THE GAME.

There is a third aspect of the game's design that reveals that "Follow Me" is nothing more than a pretext that should be ignored by the Court.

Though petitioners urge this Court to consider "the whole game," when they evaluate their own game they do not track anything other than slot machine play.

33

This is further evidence that "Follow Me" is an insignificant, aspect of the overall gambit unworthy of legal consideration.

The machine is designed in a manner that can track its usage. Upon inspection, it was clear that the game's processing system could recall the number of previous slot machine games that were played. The game recorded the slot machine pattern that was presented to the player, the placement of the wild symbol by the player, and the winning outcome, if any. But the game was *not* capable of tracking how or if "Follow Me" is used at all. N.T. 11/22/2022, 263.

If "Follow Me" was as important as petitioners have indicated, it would be shocking that the outcome of the game is not tracked. Indeed, petitioners argue that "Follow Me" is the reason a player can "win every time." If "Follow Me" was played to success with any frequency, these devices would lose money. One would think that would be an element worth tracking. But "Follow Me" game play is not tracked, because the game designers are not at all worried that it will result in any loss of revenue.

The message continues to be clear. The game designers did not believe that "Follow Me" was significant enough to consider. This Court should not consider it either.

> **D. "FOLLOW ME" IS SO TEDIOUS AND DIFFICULT THAT THE SAME PLAYER WHO IS LURED BY AN ADVERTISED SLOT MACHINE WOULD NEVER PLAY IT.**

34

Finally, a discussion of "the whole game" would not be complete without a discussion of what happens if a player actually chooses to play "Follow Me." "Follow Me" is tedious and, by all accounts, not even possible to win without the aid of notes.

In defining the term "gambling device," the Pennsylvania Supreme Court explained that "it cannot mean that the machine could not possibly be used for any activity other than gambling, because almost any machine . . . *can* be used for non-gambling." *Two Elec. Poker Game Machines,* 465 A.2d at 977. Here, the seized machines "can" be used to win back your money "every time." But they aren't. And that is by design.

"Follow Me" takes approximately ten minutes to play. If successful, the player will "win" 5% more than his initial bet (somewhere between 2 cents and 20 cents). Assuming that a player initially wagered the highest amount ($4) and she is an excellent "Follow Me" player who takes sufficient notes, she would need to play for 5 hours to earn $1. And if she stopped before accumulating $1, she would receive only her original money back, because the machine will only return whole dollar amounts, retaining any change for the "house."

Ultimately, though, maybe none of that matters. If this were a game, like something that we would see at Chuck E. Cheese, Dave and Buster's or a beachside boardwalk, a player would be happy to contribute his money and get no cash in

35

return.  Indeed, that is the very nature of those arcade games – it's not about the money; it's about the fun of playing the game.  But "Follow Me" is not a game.  It's a test.  A test that even petitioners' own expert (an astrophysicist who did his post-doctoral work at Harvard University) admitted he could not complete without taking notes.  N.T. 11/22/2022, 298, 307.

A potential player who sees a game of PacMan will see previews of the game on the screen before he puts his money in the device.  Here, the potential player sees previews of a fast play slot machine and various explanations of pay tables with the potential to win more than is wagered.  There is no mention of a tedious memory game.  "Follow Me" is not advertised, because it is not played.

### E. Chance far outweighs skill when the game in its entirety is considered.

It is the Commonwealth's burden to prove by a preponderance of the evidence that these machines were designed to be used for gambling purposes, i.e., that they are predominately games of chance.  *Two Elec. Poker Game Machines,* 465 A.2d at 975.  The trial court was wrong when it concluded that burden was not met.

Looking at the game as a whole, considering the slot machine aspect of the primary game and the secondary game that is present in "Follow Me," it is clear that, on balance, chance plays a more significant role than skill.  Certainly, the "Follow Me" segment of the game is dependent entirely on memory.  Similarly, the slot

machine segment of the game is dependent almost entirely on the luck of the spinning reels.

The "Follow Me" game is – at best – a tiny component of the complete game. It is unadvertised and unexplained.  If the player is playing in "rapid" mode, he will never even be told that "Follow Me" is an option.  The "Follow Me" game is designed to be as unappealing as possible to a prospective player.  The gaming designers are so confident that they have dissuaded users from playing "Follow Me" that they have not even attempted to track play on this feature.

These are slot machines.  Not just by the definition set forth in the Gaming Act, but also in practice.  Chance is the predominate factor in game play and it is clear that the games were designed to be used for gambling purposes.

## III.   EVEN WITHOUT RECOURSE TO THE CRIMES CODE, THE GAMING ACT STANDING ALONE PROVIDES A SUFFICIENT BASIS TO SUPPORT THE SEIZURE OF THE SLOT MACHINES AT CHAMPIONS BAR.

As is set forth above, this matter can be readily resolved through the Crimes Code.  The seized machines are "slot machines" and they were designed "to be used for gambling purposes."  In the interest of completeness and to promote the efficient resolution of this voluminous litigation, the Commonwealth also asserts that the Gaming Act, standing alone, provides sufficient basis for the forfeiture of these machines.

In 2019, an *en banc* panel of this Court determined that the General Assembly did not intend the Gaming Act to supplant the Crimes Code, but rather the specific regulations contained in the Gaming Act were designed to be a regulatory structure for only licensed gambling in the Commonwealth. *POM of Pennsylvania, LLC*, 221 A.3d at 735. The Commonwealth respectfully requests that this Court reconsider that determination.

Though much of the Gaming Act is concerned with the regulation of licensed gaming establishments, the General Assembly explained that the "primary objective" of the Gaming Act is to regulate and police "all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S.§ 1102(1). Accordingly, the Gaming Act is not just about the regulation of authorized gambling, but rather the regulation of all gaming in the Commonwealth.

The statute was designed to be "the general or exclusive system" defining gambling regulations in the Commonwealth. *POM of Pennsylvania, LLC*, 221 A.3d at 735. In enacting this system, the General Assembly was quite clear: the purpose of the Gaming Act was to make legal a portion of the activity that Section 5513 had previously declared illegal. The Gaming Act does not repeal Section 5513; it works in tandem with it. The Crimes Code provision was amended precisely to make clear this new interaction. 18 Pa. C.S. § 5513(e.1)(4).

38

Ultimately, the Court can certainly choose not to revisit this issue and still reach the same outcome. As is discussed in detail above, the seizure of these slot machines was proper under the Crimes Code – *both* because the devices were "slot machines" and because they are "devices used for gambling purposes." If the Court decides in the Commonwealth's favor on either of those points, it need not revisit this point. But, the Commonwealth submits the argument for the Court's consideration in the alternative, and to make sure that a complete record is present for this Court and for any potential appellate review of these legal issues.

39

## CONCLUSION

These devices were properly seized from Champions Bar for two reasons. They were slot machines and, under 18 Pa.C.S. § 5513(a)(1), slot machines are illegal. Additionally, the devices were being "used for gambling purposes," which is also illegal under 18 Pa.C.S. § 5513(a)(1). If the Court finds for the Commonwealth on either point, the trial court's decision should be reversed. The Commonwealth respectfully requests that the decision be reversed and the lower court be directed to grant the Commonwealth's Petition for Forfeiture.

Respectfully submitted,

*/s/ Susan E. Affronti*
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date: August 16, 2023

40

# CERTIFICATE OF COMPLIANCE

The undersigned certifies that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

The undersigned further certifies that this brief complies with the word count limit set forth in Pa.R.A.P., Rule 2135.

By: /s/ Susan E. Affronti
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date:  August 16, 2023

41

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| In re:  Three Pennsylvania Skill Amusement Devices, one green bank bag containing $525.00 in U.S. Currency, and Seven Receipts | : : : : : | No.  707 CD 2023 |
| | : | |
| Appeal of:  Commonwealth of Pennsylvania | : : : | *Electronically Filed Document* |

### CERTIFICATE OF SERVICE

I certify that I am this day serving the foregoing document via the PACFile System.

By:  */s/ Susan E. Affronti*
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date:  August 16, 2023

42

Exhibit A
Trial Court's Opinion and Order

IN RE:  THREE PENNSYLVANIA    :    IN THE COURT OF COMMON PLEAS OF
SKILL AMUSEMENT DEVICES, ONE    :    DAUPHIN COUNTY, PENNSYLVANIA
GREEN BANK BAG CONTAINING    :
$525.00 IN U.S. CURRENCY, AND    :    NO. 2022-CV-06333-MD
SEVEN RECEIPTS

## MEMORANDUM OPINION

Presently pending before this Court is a Petition for Return of Property that was

filed by Capital Vending Company, Inc. ("Capital Vending") and Champions Sports Bar, LLC

("Champions") (hereinafter referred to collectively as "Petitioners"). The background of the case

is as follows:  Capital Vending is a business that supplies games and other amusement

equipment/devices to bars and restaurants in central Pennsylvania and elsewhere.  Champions is a

restaurant/bar located at 300 Second Street, Highspire, Pennsylvania.  Champions holds a

restaurant liquor license issued by the Pennsylvania Liquor Control Board.  At all times relevant

hereto, Champions had three Pennsylvania Skill Amusement Devices (hereinafter referred to

collectively as the "POM Machines") in its establishment that were supplied by Capital Vending.

On December 9, 2019, at approximately 4:45 p.m., agents from the Pennsylvania

State Police, Bureau of Liquor Control Enforcement (BLCE), entered Champions and seized the

three POM Machines, one green bank bag containing $525.00 in U.S. currency (hereinafter "the

Cash"), and seven receipts (hereinafter "the Receipts").  BLCE seized this property based on

allegations that the POM Machines were gambling devices *per se*, and the Cash and Receipts were

derivative contraband.  No criminal charges were filed related to the seized property, but

Champions was issued an administrative citation on April 22, 2020 for permitting gambling.  This

citation is still pending.

On August 23, 2022, Petitioners filed a Petition for Return of Property pursuant to 42 Pa. C.S. §5806 and Pa. R.Crim. P. 588. In their filing, Petitioners claim that the POM Machines that were seized by BLCE are not gambling devices but are instead predominately skill games. The Petition also challenged the lawfulness of the seizure.[1] On September 8, 2022, the Commonwealth of Pennsylvania filed an answer to the Petition and included a new matter in the nature of a Petition for Forfeiture and Condemnation pursuant to 42 Pa. C.S. §5805. In its response, the Commonwealth claims that the POM Machines are games of predominant chance and are therefore subject to seizure and forfeiture as *per se* illegal gambling devices.

This Court held a hearing on the Petition for Return of Property over three days: September 30, 2022; November 22, 2022; and December 2, 2022. The Commonwealth called three witnesses: Dan Wentsler (liquor enforcement officer); Peter Nikiper (expert witness); and David Schoppe (supervisory liquor enforcement officer/expert witness). Petitioners only called Olaf Vancura as an expert witness. After the Hearing concluded, the Court invited the parties to submit proposed findings of fact and conclusions of law, which they did. This matter is now ripe for disposition.

A Petition for the Return of Property is governed by Pennsylvania Rule of Criminal Procedure which states, in relevant part:

> (A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
> (B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

---

[1] We did not hear testimony about the lawfulness of the seizure, and Petitioners did not address this issue in their Proposed Findings of Fact and Conclusions of Law. As such, we will not discuss it herein.

Pa. R.Crim. P. 588(A)(B).  Under this Rule, the moving party must first establish that it is entitled to lawful possession of the property by a preponderance of the evidence.  <u>Commonwealth v. Trainer</u>, 287 A.3d 960, 964 (Pa.Cmwlth. 2022) (citations omitted).  Once that is established, the burden then shifts to the Commonwealth to show, by a preponderance of the evidence, that the property is either contraband *per se* or derivative contraband and should not be returned to the moving party.  <u>Id.</u> (citations omitted).  Contraband *per se* is property that is unlawful to possess, and derivative contraband is property that can be lawfully possessed but is used in the perpetration of an unlawful act.  <u>Commonwealth v. Irland</u>, 153 A.3d 469, 473 (Pa.Cmwlth. 2017) (citations omitted).

In the instant matter, the parties stipulated that the three POM Machines are owned by Capital Vending.  The parties further stipulated that Champions owns the Cash and the Receipts and has a possessory interest in the three POM Machines pursuant to an agreement with Capital Vending.  As such, Petitioners are entitled to lawful possession of the three POM Machines, the Cash, and the Receipts unless the Commonwealth shows, by a preponderance of the evidence, that the POM Machines are contraband *per se* and the Cash and Receipts are derivative contraband.  The Commonwealth claims that the POM Machines are illegal gambling devices, and the money and receipts that were seized were derivative of the illegal gambling devices.

The Crimes Code states that it is a misdemeanor of the first degree if a person "(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards." 18 Pa. C.S.A. §5513(a)(1).  Unlawful gambling is defined as "gambling not specifically authorized by the Commonwealth." <u>Com. v. Betres</u>, 237 Pa.Super. 361, 368, 352 A.2d 495, 498 (1975).  It is undisputed that the POM games

3

in the instant matter were not specifically authorized by the Commonwealth. However, the question remains as to whether these machines are gambling devices.[2]

"A machine is a gambling device *per se* if it can be used for no purpose other than gambling." Com. v. Irwin, 535 Pa. 524, 527, 636 A.2d 1106, 1107 (1993) (citations omitted). "The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward." Id. (citations omitted). Where all three of these elements are present, the machine will be considered "'so intrinsically connected with gambling' as to be a gambling device *per se*." Id. (citations omitted). The Commonwealth has the burden of showing that the machines are *per se* gambling devices. Id. (citations omitted).

In determining whether a machine is a gambling device, the court must examine the characteristics of the machine itself and whether the three elements are present. Com. v. Two Elec. Poker Game Machines, 502 Pa. 186, 194, 465 A.2d 973, 977 (1983). With respect to the element of chance versus skill, Pennsylvania courts have employed the "predominate-factor test" stating that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." Com. v. Dent, 992 A.2d 190, 193 (Pa. Super. Ct. 2010) (citations omitted). Simply because a machine involves a large element of chance, without more, is insufficient to find the machine to be a gambling device *per se*. Two Elec. Poker Game Machines, 502 Pa. 186 at 195, 465 A.2d at 977. Moreover, the outcome of a game does not need to be wholly determined by skill in order for the machine to fall out of the *per se* gambling device category. Id. Rather, courts must determine whether chance or skill predominates in any given machine.

---

[2] In its post-hearing submission, the Commonwealth argues that the POM Machines are illegal slot machines regardless of whether they are skill games or games of chance. However, this claim was not included in the Commonwealth's Answer to the Petition for Return of Property, nor was it included in the Commonwealth's Counterclaim for forfeiture of property. As such, the sole issue for this Court's consideration is whether the POM Machines are gambling devices.

4

In the instant matter, there is no dispute as to the actual gameplay of the POM Machines. As set forth in Petitioners' Proposed Findings of Fact in Paragraphs 14 through 26, each of the POM Machines has a single game with multiple game themes available for selection, although the gameplay is the same regardless of theme. Gameplay on each of the POM Machines commences after the player has inserted cash into the machine. The cash is converted into points with $1.00 being equal to 100 points. The player can adjust how many credits to commit to a given play, ranging from 8 credits, which is equal to $0.08 up to 400 credits, which is equal to $4.00. However, before initiating gameplay, the POM Machines allow a player to see the upcoming puzzle by pressing the "Next Puzzle" button, which allows the player the opportunity to see if the upcoming puzzle is a winning puzzle before committing any funds.

Once gameplay has commenced, the player is presented with nine symbols arranged in rows of three. The object is to match three like symbols in a row on as many pay lines as possible, arranged vertically, horizontally, and/or diagonally, similar to tic-tac-toe. Specifically, if possible, a player must turn one of the nine symbols wild by pressing it within thirty (30) seconds in order to complete three matching symbols in a row. Once the puzzle appears, one of three things can happen: 1) the puzzle can be correctly solved, resulting in an award equal to at least 105% of the points that were committed to play, known as a "win;" 2) the puzzle can be correctly solved, resulting in an award less than 105% of the points that were committed to play, known as a "hit;" or 3) the puzzle is incapable of being solved, known as a "loss."

If a player gets a hit or a loss, the player is always offered the opportunity to continue gameplay through the "Follow Me" feature of the game. The Follow Me feature does not require any additional points from the player but gives the player a chance to win back the money that they lost during the puzzle portion of the game plus an additional 5%. The Follow Me

5

feature requires the player to repeat a pattern of multiple, multi-colored circles in the same order in which the circles are displayed, similar to the electronic game "Simon." If the player successfully completes the pattern, the player is awarded with a total of 105% of the points committed to play depending on whether the player received a hit or a loss in the puzzle portion. In other words, if a player bets $4.00 and only wins $2.00 in the puzzle portion, that player can play the Follow Me game and, if completed successfully, get $2.20 in addition to the $2.00 that they won on the puzzle portion for a total of $4.20.

Once gameplay is complete, a player has the option of redeeming any remaining credits by pressing the Redeem button. Pressing this button will cause the POM Machine to dispense a ticket reflecting the dollar amount that is equivalent to the remaining credits. For instance, if a player has 1000 credits, pressing the Redeem button will result in the player getting a ticket for $10.00 which they can then exchange for cash. The POM Machines only award whole dollar amounts. Thus, pressing the Redeem button rounds the player's credits down to the nearest whole dollar and leaves any excess credits on the device. For instance, if a player has 1050 credits, pressing the Redeem button will result in a player getting a ticket for $10.00. The excess 50 credits (worth $0.50) then remain on the machine and may be used by that player or another player on future gameplay.

As stated above, in order for the POM Machines to be gambling devices *per se*, they must have the three elements of gambling, namely: 1) consideration; 2) chance; and 3) reward. We find that the first and third elements are present in the POM Machines. Specifically, you cannot play the POM Machines without depositing money and committing some of that money to a game. Additionally, a player has the opportunity to win more than they bet, thus obtaining a reward. However, the question remains as to whether the POM Machines in the instant matter are

6

predominately games of skill or are predominately games of chance. Based on the evidence that was presented at the Hearing, we find that the POM Machines at issue in this case are predominately games of skill.

All three of the Commonwealth witnesses opined that the three POM Machines were predominately games of chance. However, we do not find these opinions to be persuasive for a number of reasons. Initially, it is this Court's belief that the Commonwealth's investigation shows case bias. The Commonwealth is seeking to make all machines like the POM Machines into illegal gambling devices, and their whole approach and intent is to shut down the games regardless of the actual gameplay. The fact that Officer Wentsler never played the Follow Me feature while undercover is indicative of this. Thus, the Commonwealth as a whole is biased against the games, and their approach lacks case credibility.

Additionally, Officer Wentsler also showed case bias. He testified that he has conducted hundreds of investigations into these types of devices, and it is his opinion that every single machine that he investigated was a game of chance. This is not credible and shows that Officer Wentsler is biased towards finding that these machines are illegal gambling devices. It also shows that he was not objective in his investigation of the subject POM Machines. As such, we did not find his opinion persuasive.

We did find the opinion of Petitioners' expert, Olaf Vancura, to be persuasive. Dr. Olaf has worked as a consultant, author, and inventor in the gaming industry since 1995. He testified that a skillful player that plays the POM Machines can win, which is defined as making a net profit, on each and every play of the game. Furthermore, he opined that there is no feature or functionality of the game that could prevent a skillful and patient player from achieving that result in every single play. This opinion was rendered with 100% mathematical certainty.

7

Most importantly to our decision, all of the witnesses who testified, including the Commonwealth's expert witness, agreed that a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature. The puzzle portion of the game is predominately reliant on chance. Although a player has the opportunity to interact with the game to place a wild symbol, there is nothing that a player can do to ensure that the reels show a puzzle that can be correctly solved. However, it cannot be disputed that the Follow Me feature can only be completed by a skillful player, and it does not depend at all on chance. Additionally, the Follow Me feature shows up every time a player wins less than 105% of the amount played. This eliminates the element of chance that is present in the puzzle portion by giving a player the opportunity to win back the money that they lost by utilizing skill.

The Commonwealth argues that this Court should not look at the machines as a whole but should instead consider how players actually utilize the machines. The Commonwealth directs this Court's attention to the case of Commonwealth v. Lund, 15 A.2d 839 (Pa. Super. 1940) as supporting this argument.

In Lund, a theater operator held a "bank night" at his two theaters wherein the theater operator would maintain a register with a list of the names of those persons who would like to win a cash prize with a corresponding number next to their names. Id. at 841. It did not cost anything to have your name placed on this register. Id. The theater then held a drawing where a number was picked out of a hopper. Id. If the person whose number was chosen was present at the theater at the time of the drawing, that person would win a cash prize. Id. If that person was not present at either theater, then no winner was chosen, and the cash prize would roll over into the next week. Id. People could also purchase proxy cards in the afternoon of the day of the drawing and could win the cash by proxy even if they were not present at the theater when their

8

number was chosen. Id. at 842. The theater owner and managers occasionally gave out free proxy cards to people, but they did not advertise this feature. Id.

The question that the Superior Court had to answer was whether the element of consideration was present for these so-called bank nights.[3] Id. at 843. In reviewing this question, the Court stated:

> The primary question in these "bank night" cases is not whether any individual attending a theatre on "bank night," paying for admission, or admitted free, present in person or by proxy, is acting in concert with the owner in operating a lottery, but rather whether the owner is maintaining and operating a lottery. This is to be determined by the character and practical operation of the scheme as a whole, and not by rare instances of departure from the general scheme and practice. The general character of the system is not to be determined by splitting it up into individual contracts between the theater owner and his patrons. This theory applied in the cases hereinbefore considered is a misleading one, since it diverts attention from the general public effect of the practice which is the evil the law seeks to prevent. It is an impractical one in that it would render extremely difficult, if not impossible, the control of the practice, though manifestly a public nuisance in its operation and effect, by permitting a few exceptional instances of free admissions and free chances to afford immunity to the whole.

Id. at 845. The Court thus determined that the element of consideration was present, and that the theater owner was operating an illegal lottery. Id. at 850.

We find that Lund is inapposite to the instant matter. In Lund, the owner of the theater was the one who was attempting to legitimize his "bank night" by giving away free tickets and attempting to remove the necessary element of consideration. However, in the instant matter, neither Petitioner has any control over how a player utilizes a subject machine. To hold that a machine is either an illegal gambling machine when a player chooses not to engage with the Follow Me feature or is a skill game when a player plays the Follow Me feature is untenable. For instance, if a player plays the Follow Me feature once, does that make the entire machine a skill game for

---

[3] The elements of chance and reward were conceded by the parties. Id.

9

that player?  Or does it require the player to play Follow Me on every occasion?  If the player starts playing Follow Me and then stops playing it, does it go from a game of skill to a game of chance while that same player is playing?  The questions that would need to be asked to determine how the game is played by various players are endless.  Furthermore, Petitioners do not have any control over how a given player plays the game.  Rather, the chance is with the player rather than with the machine.  For this reason, we specifically find that the question of whether these machines are games of skill or games of chance depends solely on the machines themselves and not on how a player plays them.

Even if we were to find Lund persuasive, the Commonwealth did not provide sufficient evidence to support a finding that the majority of players do not play the Follow Me feature.  Officer Schoppe testified that there are approximately 10,000 of these types of machines in Pennsylvania.  He observed approximately 100 people playing the subject POM Machines.  Although we believe that Officer Schoppe did not observe any of those players playing the Follow Me Feature, we find that this is too small a sample size to make any determination as to how the average player plays these machines.  As such, we find that the POM Machines are not gambling devices *per se*, and Petitioners are entitled to have the POM Machines returned to them.  Additionally, since the Cash and Receipts are derivative of the legal POM Machines, they should also be returned to Petitioners.

For these reasons, we hereby enter the following Order:

10

Copies Distributed
Date 3-23-23    Initials



IN RE:  THREE PENNSYLVANIA     :   IN THE COURT OF COMMON PLEAS OF
SKILL AMUSEMENT DEVICES, ONE  :   DAUPHIN COUNTY, PENNSYLVANIA
GREEN BANK BAG CONTAINING    :
$525.00 IN U.S. CURRENCY, AND    :   NO.  2022-CV-06333-MD
SEVEN RECEIPTS

## ORDER

**AND NOW**, this _23ʳᵈ_ day of _March_, 2023, upon consideration of the

Petition for Return of Property that was filed by Petitioners Capital Vending Company, Inc. and

Champions Sports Bar, LLC, and any responses thereto, and having held a Hearing on September

30, 2022, November 22, 2022, and December 2, 2022, it is hereby ORDERED as follows:

For the reasons set forth in the attached Memorandum Opinion, it is hereby

ORDERED and DECREED that the Petition for Return of Property is GRANTED.  It is further

ORDERED that, within five (5) days of the date of this Order, the Pennsylvania State Police,

Bureau of Liquor Control Enforcement shall return to Champions Sports Bar, LLC the following:

1) three Pennsylvania Skill Amusement Devices, 2) one green bag containing $525.00 in U.S.

Currency, and 3) seven receipts in the condition in which they were seized.

BY THE COURT:

_____
Andrew H. Dowling, Judge

Distribution:
The Honorable Andrew H. Dowling
Christopher D. Carusone, Esquire, COHEN SEGLIAS PALLAS GREENHALL & FURMAN,
     P.C., 525 William Penn Place, Suite 3005, Pittsburgh, PA  15217
Matthew H. Haverstick, Esquire & Edward T. Butkovitz, Esquire, KLEINBARD, LLC, Three
     LoganSquare, 5ᵗʰ Floor, 1717 Arch Street, Philadelphia, PA  19103
Andrew J. Jarbola, IV, Esquire, OFFICE OF ATTORNEY GENERAL, 6400 Flank Drive, Suite
     1300, Harrisburg, PA  17112

Received 8/17/2023 11:40:46 AM Commonwealth Court of Pennsylvania

Filed 8/17/2023 11:40:00 AM Commonwealth Court of Pennsylvania
707 CD 2023

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| In re:  Three Pennsylvania Skill | : | |
| Amusement Devices, one green bank | : | |
| bag containing $525.00 in U.S. | : | |
| Currency, and Seven Receipts | : | No.  707 CD 2023 |
| | : | |
| Appeal of:  Commonwealth of | : | |
| Pennsylvania | : | *Electronically Filed Document* |
| | : | |

## CERTIFICATE OF SERVICE

I certify that I am this day serving the foregoing document via the PACFile System.

By:  /s/ *Susan E. Affronti*
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date:  August 16, 2023

Received 8/17/2023 11:40:46 AM Commonwealth Court of Pennsylvania

Filed 8/17/2023 11:40:00 AM Commonwealth Court of Pennsylvania
707 CD 2023

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Three Pennsylvania Skill Amusement Devices, One Green Bank Bag Containing $525.00 in U.S. Currency, and Seven Receipts | : | 707 CD 2023 |
| | : | |
| | : | |

Appeal of: Commonwealth of
Pennsylvania

## <u>PROOF OF SERVICE</u>

I hereby certify that this 17th day of August, 2023, I have served the attached document(s) to the persons on the date(s)

and in the manner(s) stated below, which service satisfies the requirements of Pa.R.A.P. 121:

**Service**

| | |
|---|---|
| Served: | Christopher D. Carusone |
| Service Method: | eService |
| Email: | ccarusone@cohenseglias.com |
| Service Date: | 8/17/2023 |
| Address: | 240 North 3rd Street |
| | 7th Floor |
| | 240 North Third Street, 5th floor, PA 17101 |
| Phone: | 717--23-4-5530 |
| Representing: | Appellee   Champions Sports Bar |

| | |
|---|---|
| Served: | Edward Thomas Butkovitz |
| Service Method: | eService |
| Email: | ebutkovitz@kleinbard.com |
| Service Date: | 8/17/2023 |
| Address: | Three Logan Square |
| | 1717 Arch Street, 5th Floor |
| | Philadelphia, PA 19103 |
| Phone: | 215-568-2000 |
| Representing: | Appellee   Capital Vending Company, Inc. |

**IN THE COMMONWEALTH COURT OF PENNSYLVANIA**

**<u>PROOF OF SERVICE</u>**

*(Continued)*

| | |
|---|---|
| Served: | Joshua John Voss |
| Service Method: | eService |
| Email: | jvoss@kleinbard.com |
| Service Date: | 8/17/2023 |
| Address: | Three Logan Sqaure, 5th Floor |
| | 1717 Arch Street |
| | Philadelphia, PA 19103 |
| Phone: | 267-443-4114 |
| Representing: | Appellee   Capital Vending Company, Inc. |

| | |
|---|---|
| Served: | Matthew Hermann Haverstick |
| Service Method: | eService |
| Email: | mhaverstick@kleinbard.com |
| Service Date: | 8/17/2023 |
| Address: | Three Logan Square, 5th Floor |
| | 1717 Arch Street |
| | Philadelphia, PA 19103 |
| Phone: | 215-568-2000 |
| Representing: | Appellee   Capital Vending Company, Inc. |

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## <u>PROOF OF SERVICE</u>

*(Continued)*

**Courtesy Copy**

| | |
|---|---|
| Served: | Brianne Bharkhda |
| Service Method: | eService |
| Email: | bbharkhda@cov.com |
| Service Date: | 8/17/2023 |
| Address: | 1499 Massachusetts Avenue NW |
| | Apt 906 |
| | Washington DC, DC 20005 |
| Phone: | 570--57-5-4727 |
| Representing: | Amicus Curiae   American Gaming Association |

| | |
|---|---|
| Served: | Chad Westcott Zimmermann |
| Service Method: | eService |
| Email: | cwzimmerma@pa.gov |
| Service Date: | 8/17/2023 |
| Address: | 303 Walnut Street |
| | 5th Floord |
| | Harrisburg, PA 17101 |
| Phone: | 717-265-8356 |
| Representing: | Amicus Curiae   Pennsylvania Gaming Control Board |

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## PROOF OF SERVICE

*(Continued)*

| | |
|---|---|
| Served: | John J. Cunningham IV |
| Service Method: | eService |
| Email: | jcunningham@lambmcerlane.com |
| Service Date: | 8/17/2023 |
| Address: | 24 East Market Street |
| | P.O.Box 565 |
| | West Chester, PA 19380 |
| Phone: | 610--43-0-8000 |
| Representing: | Amicus Curiae  DOWNS RACING, L.P., D/B/A MOHEGAN SUN POCONO |
| | Amicus Curiae  GREENWOOD GAMING AND ENTERTAINMENT, INC., D/B/A PARX CASINO |
| | Amicus Curiae  GW CUMBERLAND OP CO., D/B/A PARX CASINO SHIPPENSBURG |
| | Amicus Curiae  Harrah's Philadelphia Casino & Racetrack |
| | Amicus Curiae  Hollywood Casino at the Meadows |
| | Amicus Curiae  Hollywood Casino Morgantown |
| | Amicus Curiae  Hollywood Casino York |
| | Amicus Curiae  Lady Luck Casino |
| | Amicus Curiae  Live! Casino & Hotel Philadelphia |
| | Amicus Curiae  Live! Casino Pittsburgh |
| | Amicus Curiae  Mount Airy #1, LLC |
| | Amicus Curiae  Mount Airy Casino Resort |
| | Amicus Curiae  Parx Casino |
| | Amicus Curiae  Parx Casino Shippensburg |
| | Amicus Curiae  Rivers Casino Philadelphia |
| | Amicus Curiae  Rivers Casino Pittsburgh |
| | Amicus Curiae  Stadium Casino RE, LLC |
| | Amicus Curiae  STADIUM CASINO RE, LLC D/B/A LIVE! CASINO & HOTEL PHILADELPHIA |
| | Amicus Curiae  Stadium Casino Westmoreland RE, LLC |
| | Amicus Curiae  SUGARHOUSE HSP GAMING, LP D/B/A RIVERS CASINO PHILADELPHIA |
| | Amicus Curiae  WASHINGTON TROTTING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT THI |
| | Amicus Curiae  Wind Creek Bethlehem Holdings Acquisition Co. L.P. |
| | Amicus Curiae  Woodlands Fayette, LLC |

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

## PROOF OF SERVICE

*(Continued)*

| | |
|---|---|
| Served: | Scot Russel Withers |
| Service Method: | eService |
| Email: | swithers@lambmcerlane.com |
| Service Date: | 8/17/2023 |
| Address: | 24 East Market Street |
| | P.O. Box 565 |
| | West Chester, PA 19381 |
| Phone: | 610--43-0-8000 |
| Representing: | Amicus Curiae   Harrah's Philadelphia Casino & Racetrack |
| | Amicus Curiae   Hollywood Casino at the Meadows |
| | Amicus Curiae   Hollywood Casino Morgantown |
| | Amicus Curiae   Hollywood Casino York |
| | Amicus Curiae   Lady Luck Casino |
| | Amicus Curiae   Live! Casino & Hotel Philadelphia |
| | Amicus Curiae   Live! Casino Pittsburgh |
| | Amicus Curiae   Mount Airy #1, LLC |
| | Amicus Curiae   Mount Airy Casino Resort |
| | Amicus Curiae   Parx Casino |
| | Amicus Curiae   Parx Casino Shippensburg |
| | Amicus Curiae   Rivers Casino Philadelphia |
| | Amicus Curiae   Rivers Casino Pittsburgh |
| | Amicus Curiae   Stadium Casino RE, LLC |
| | Amicus Curiae   Stadium Casino Westmoreland RE, LLC |
| | Amicus Curiae   Wind Creek Bethlehem Holdings Acquisition Co. L.P. |
| | Amicus Curiae   Woodlands Fayette, LLC |

/s/  Susan Elizabeth Affronti
_____

*(Signature of Person Serving)*

| | |
|---|---|
| Person Serving: | Affronti, Susan Elizabeth |
| Attorney Registration No: | 088010 |
| Law Firm: | Pennsylvania Office of Attorney General |
| Address: | 1000 Madison Ave Ste 310 |
| | Norristown, PA 19403 |
| Representing: | Appellant   Commonwealth of Pennsylvania |

# EXHIBIT "B"

Received 8/16/2023 4:15:47 PM Commonwealth Court of Pennsylvania

Filed 8/16/2023 4:15:00 PM Commonwealth Court of Pennsylvania
761 CD 2023

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: FOUR PENNSYLVANIA SKILL AMUSEMENT DEVICES AND ONE TICKET REDEMPTION TERMINAL CONTAINING $18,692.00 IN U.S. CURRENCY | : : : : : | No. 761 CD 2023 |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA, MONROE COUNTY | : : : | |

BRIEF OF *AMICI CURIAE,* GREENWOOD GAMING AND ENTERTAINMENT, INC., D/B/A PARX CASINO; GW CUMBERLAND OP CO., D/B/A PARX CASINO SHIPPENSBURG; DOWNS RACING, L.P., D/B/A MOHEGAN SUN POCONO; MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT PENN NATIONAL RACE COURSE, HOLLYWOOD CASINO MORGANTOWN AND HOLLYWOOD CASINO YORK; WASHINGTON TROTTING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT THE MEADOWS; CHESTER DOWNS AND MARINA, LLC, D/B/A HARRAH'S PHILADELPHIA CASINO & RACETRACK; WIND CREEK BETHLEHEM, LLC, D/B/A WIND CREEK BETHLEHEM HOLDINGS ACQUISITION CO. L.P. D/B/A RIVERS CASINO PITTSBURGH; SUGARHOUSE HSP GAMING, LP D/B/A RIVERS CASINO PHILADELPHIA; MOUNT AIRY #1, LLC D/B/A MOUNT AIRY CASINO RESORT; WOODLANDS FAYETTE, LLC D/B/A LADY LUCK CASINO; STADIUM CASINO RE, LLC D/B/A LIVE! CASINO & HOTEL PHILADELPHIA; and STADIUM CASINO WESTMORELAND RE, LLC D/B/A LIVE! CASINO PITTSBURGH

Appeal from the Order of the Court of Common Pleas of Monroe County, entered February 8, 2023, at No. 6673 CV 2021

**LAMB McERLANE PC**

Joel L. Frank, I.D. No. 46601
John J. Cunningham, IV, I.D. No. 70975
Scot R. Withers, I.D. No. 84309
24 East Market Street, Box 565
West Chester, PA 19381-0565
(610) 430-8000

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

TABLE OF CITATIONS ................................................................................ iii

I.   STATEMENT OF INTEREST ...................................................................1

II.  ARGUMENT..........................................................................................4

    A.   Because The POM Machines Are Slot Machines, The Trial
        Court Erred In Holding That Appellees Did Not Violate Section
        5513 Of The Crimes Code  ...................................................................4

        1.   Under the Crimes Code, all slot machines are illegal *per
              se* unless legalized elsewhere under Pennsylvania law ..............4

        2.   The common law "skill versus chance" test cannot be
              used to determine whether a device is a slot machine ...............6

        3.   The Legislature's definition of "slot machine" in the
              Gaming Act informs the definition of "slot machine" in
              the Crimes Code, and the POM Machines satisfy that
              definition .................................................................................8

              a.   The Statutory Construction Act requires the
                    Crimes Code and the Gaming Act to be read *in
                    pari materia* .......................................................9

              b.   The Statutory Construction Act requires Section
                    5513 of Crimes Code and the Gaming Act to be
                    read together because both relate to the same
                    things and class of things.................................11

              c.   The Pennsylvania Supreme Court has sanctioned
                    the use of *in pari materia* to fill a void in a
                    statutory scheme ............................................13

               d.   The Gaming Act and the Crimes Code explicitly
                    modify each other ...........................................16

i

e.     The holding urged here is consistent with this Court's decision in *POM v. Revenue* .............................. 16

f.     Failing to read the Crimes Code and the Gaming Act *in pari materia* would cause an absurd result .......... 18

4.     In the alternative, the POM Machines are "slot machines" under the term's plain meaning when Section 5513 was drafted in 1972 ......................................................................... 19

B.     Affirming the Trial Court's Decision Will Eviscerate The Statutory Scheme Legislatively Mandated To Regulate And Tax Gaming In The Commonwealth ...................................................... 23

1.     If this Court were to rule that games such as the POM Machines are legal, nothing would limit such games to corner stores and neighborhood bars ......................................... 23

2.     Taxed, regulated gaming would be unable to compete with unregulated untaxed slot parlors ....................................... 24

3.     Permitting statewide unregulated slot machines to displace regulated, taxed gaming will hurt the Commonwealth and its citizens ............................................... 25

III.    CONCLUSION ......................................................................................... 28

## TABLE OF CITATIONS

**CASES**

*Bruno v. Erie Insurance Co.*, 106 A.3d 48 (Pa. 2014) ..............................................20

*Chamberlain v. Unemployment Comp. Bd. of Review*,
114 A.3d 385 (Pa. 2015) ..............................................................................................20

*City of Philadelphia Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek)*,
195 A.3d 197 (Pa. 2018) ................................................................................................6

*Commonwealth v. 9 Mills Mech. Slot Machs.*, 437 A.2d 67
(Pa. Cmwlth. 1981) .......................................................................................................8

*Commonwealth v. Betres*, 352 A.2d 495 (Pa. Super. 1975) ....................................10

*Commonwealth v. Bretz,* 433 A.2d 55 (Pa. Super. 1981) ..........................................7

*Commonwealth v. Dabney*, 274 A.3d 1283 (Pa. Super. 2022) ................................11

*Commonwealth v. Dent*, 992 A.2d 190 (Pa. Super. 2010).....................................6, 10

*Commonwealth v. Dodge*, 599 A.2d 668 (Pa. Super. 1991)....................................11

*Commonwealth v. Gamby*, 283 A.3d 298 (Pa. 2022) .........................................19, 20

*Commonwealth v. Gerulis*, 616 A.2d 686 (Pa. Super. 1992)....................................7

*Commonwealth v. Guilford*, 861 A.2d 365 (Pa. Super. 2004)................................11

*Commonwealth v. Hart*, 28 A.3d 898 (Pa. 2011) ...................................................20

*Commonwealth v. Jezzi*, 208 A.3d 1105 (Pa. Super. 2019)....................................11

*Commonwealth v. Office of Open Records*, 103 A.3d 1276 (Pa. 2014) .................13

*Commonwealth v. Two Elec. Poker Game Machs.*, 465 A.2d 973
(Pa. 1983).......................................................................................................................6

*DeForte v. Borough of Worthington*, 212 A.3d 1018 (Pa. 2019) ............9, 10, 14, 15

*Fogle v. Malvern Courts, Inc.*, 722 A.2d 680 (Pa. 1999) .......................................20

*Gavin v. Loeffelbein*, 205 A.3d 1209 (Pa. 2019) ...................................................19

*Greenwood Gaming & Entm't, Inc. v. Commonwealth*,
263 A.3d 611 (Pa. 2021) .................................................................................19

*Hutskow v. Washowich*, 628 A.2d 1202 (Pa. Cmwlth. 1993)................................13

*In re 171.481 Acres to Borough of Millersville, Lancaster County*,
290 A.2d 102 (Pa. 1972) ..................................................................................11

*In re Estate of Belefski*, 196 A.2d 850 (Pa. 1964) .....................................................4

*In re J.W.B.*, 232 A.3d 689 (Pa. 2020).....................................................................19

*Moonlight Café, Inc. v. Department of Health*, 23 A.3d 1111
(Pa. Cmwlth. 2011) ..........................................................................................16

*Oliver v. City of Pittsburgh*, 11 A.3d 960 (Pa. 2011) ......................................13, 14

*Pennsylvanians Against Gambling Expansion Fund, Inc. v.
Commonwealth*, 877 A.2d 383 (Pa. 2005)................................................................16

*POM of Pa., LLC v. Commonwealth of Pa., Dep't of Revenue*,
221 A.3d 717 (Pa. Cmwlth. 2019) ................................................................*passim*

*Snyder Bros. v. Pennsylvania Pub. Util. Comm'n*, 198 A.3d 1056
(Pa. 2018) ...........................................................................................................5

*State Ethics Comm'n v. Cresson*, 597 A.2d 1146 (Pa. 1991) ...........................13, 14

*Walker v. Eleby*, 842 A.2d 389 (Pa. 2000) .............................................................16

## STATUTES

1 Pa.C.S. §§ 1501 *et seq.* ("Statutory Construction Act")................................*passim*

1 Pa.C.S. § 1903 ("Words and phrases").........................................................5, 19

1 Pa.C.S. § 1921 ("Legislative intent controls")............................................6, 9, 20

1 Pa.C.S. § 1922 ("Presumptions in ascertaining legislative intent") ...............16, 18

1 Pa.C.S. § 1932 ("Statutes in pari materia") .......................................................9, 11

1 Pa.C.S. § 1937 ("References to statutes and regulations")..................................12

4 Pa.C.S. §§ 1101 *et seq.* ("Pennsylvania Race Horse Development and Gaming Act") ......................................................................................*passim*

4 Pa.C.S. § 1102 ("Legislative intent") ...........................................................11, 12

4 Pa.C.S. § 1103 ("Definitions") ...................................................................................9

4 Pa.C.S. § 1903 ("Repeals")...................................................................................13, 16

18 Pa.C.S. § 104 ("Purposes")..................................................................................11

18 Pa.C.S. § 5512 ("Lotteries, etc.") .......................................................................10

18 Pa.C.S. § 5513 ("Gambling devices, gambling, etc.") ................................*passim*

## RULES

Pa.R.A.P. 531 ("Participation by *Amicus Curiae*") ...................................................3

**OTHER**

MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary......................22

*The Technological And Business Evolution Of Machine-Based Gambling In America,* 14 WAKE FOREST J. BUS. & INTELL. PROP. L. 237 (2014)........................21

*Video Gambling Devices*, 37 UCLA L. REV. 555 (1990)........................................21

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961)..........................20, 21

# I. STATEMENT OF INTEREST

*Amici Curiae* are the operators of licensed and regulated Pennsylvania casinos, who file this *amicus curiae* brief in support of the Brief of the Appellant, the Commonwealth of Pennsylvania, Monroe County, and to oppose the position of Appellees, L&M Music Company, Inc. and Smokin' Joes Tobacco Shop, Inc., that the four Pennsylvania Skill Amusement Devices at issue, manufactured by POM of Pennsylvania, LLC ("POM") (hereinafter the "POM Machines") are so-called skill games and not unlawful slot machines and/or unlawful devices to be used for gambling under Section 5513 of the Crimes Code, 18 Pa.C.S. § 5513.

*Amici Curiae* further file this brief due to their specialized interest in protecting legal gambling in Pennsylvania. As slot machine licensees, *Amici Curiae* are authorized by law to place and operate slot machines consistent with the Commonwealth's mandated comprehensive legal and regulatory scheme. *Amici Curiae* have heavily invested in order to legally offer slot machine gaming in Pennsylvania, each paying multi-million dollar slot machine license fees,[1] completing a costly and extensive criminal background, financial and operational suitability review and application process, and further investing hundreds of

---

[1] The Category 1 and Category 2 properties paid license fees of $50,000,000; the Category 3 properties paid license fees of $30,000,000; and the Category 4 properties paid license fees ranging between $7,500,000 and $50,100,000. Thus, collectively *Amici Curiae* have paid hundreds of millions of dollars in license fees.

1

millions of dollars in the development and expansion of their casinos in order to offer state-of-the-art, compliant facilities.

Since the enactment of the Pennsylvania Race Horse Development and Gaming Act, 4 Pa.C.S. §§ 1101 *et seq.* (the "Gaming Act"), in 2004, which authorized slot machine gaming for the first time in Pennsylvania, Pennsylvania's licensed casinos have been an unqualified boon to the Commonwealth and its citizens. Their operations have generated billions of dollars for the Commonwealth and its citizens, in the form of license fees, tax revenue, local share funding and fees, and other financial benefits, as well as tens of thousands of jobs for Pennsylvania residents.

Despite the Crimes Code criminalizing the offering of any slot machine except those authorized by the Gaming Act, POM has facilitated the offering of such unlawful slot machines, hidden in plain sight behind the self-created "skill games" misnomer, in restaurants, social clubs, convenience stores, gas stations and similar establishments across the Commonwealth, including that operated by the Appellee here. A far cry from Appellee Smokin' Joes Tobacco Shop's seemingly isolated mom-and-pop operation, the POM Machines are found in hundreds—possibly thousands—of establishments across Pennsylvania, each brazenly flouting the Gaming Act's comprehensive regulatory framework and tax generation scheme. This both threatens the continued vitality of the legal gaming industry our

2

Legislature so carefully crafted and permitted in 2004, and clearly violates prohibitions of the Crimes Code that same Legislature established as far back as 1972.

*Amici Curiae* submit this brief in order to protect their established property interest in their slot machine licenses and licensed casino facilities, as well as protect the Commonwealth and its citizens—which benefit extensively from Pennsylvania's licensed casino operations—against the continued proliferation of unlicensed, unregulated, unlawful slot machines in Pennsylvania.

Pursuant to the requirements of Pa.R.A.P. 531(b)(2), *Amici Curiae* hereby advise the Court that no person or entity other than *Amici Curiae* paid in whole or in part for the preparation of this *amicus curiae* brief, and no person or entity other than *Amici Curiae* and undersigned counsel for *Amici Curiae* authored in whole or in part this *amicus curiae* brief.

## II. ARGUMENT

A.   **Because The POM Machines Are Slot Machines, The Trial Court Erred In Holding That Appellees Did Not Violate Section 5513 Of The Crimes Code**

   1.   **Under the Crimes Code, all slot machines are illegal *per se* unless legalized elsewhere under Pennsylvania law**

The Pennsylvania Crimes Code makes it a misdemeanor of the first degree if a person

> (1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, **any** punch board, drawing card, **slot machine** or any device to be used for gambling purposes, except playing cards;

18 Pa.C.S. § 5513(a)(1) (emphasis added). The Crimes Code makes an exception for conduct made lawful by other Pennsylvania statutes, such as the lottery and licensed gaming under the Gaming Act. 18 Pa.C.S. § 5513(e.1) ("Nothing in this section shall be construed to prohibit activity that is lawfully conducted under … (4) [the Gaming Act].").

Section 5513 broadly declares that it is unlawful to assemble, sell, maintain or make available "any ... slot machine". The term "any" is all-inclusive. "The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive." *In re Estate of Belefski*, 196 A.2d 850, 855 (Pa. 1964). The Supreme Court has also recognized that "any" has two commonly accepted alternative meanings in the English language: "any" could mean "all" or "every",

as well as "one", and has held that the meaning of the term "any" is dependent on the context in which it is used in the particular statute under review. *Snyder Bros. v. Pennsylvania Pub. Util. Comm'n*, 198 A.3d 1056, 1072 (Pa. 2018). Here, when viewed in the context of the Crimes Code, the term "any" is not ambiguous: the General Assembly intended for unauthorized conduct involving all slot machines to be unlawful, as opposed to targeting a singular slot machine. Thus, reading Sections 5513(a) and (e.1) together, the prohibited conduct with respect to **any** slot machine is illegal unless it is made legal elsewhere under Pennsylvania law, including in the Gaming Act.

Section 5513 does contain certain definitions, but it does not define the term "slot machine". Section 5513 does, however, contain a provision relating to "construction" that specifically exempts from the crimes established in Section 5513(a) any activity that is lawfully conducted under the Gaming Act. 18 Pa.C.S. § 5513(e.1)(4). In addition, before lawful gaming was exempted from the Crimes Code under Section 5513(e.1), the original Gaming Act contained a provision that expressly repealed Section 5513(a) of the Crimes Code if it is "inconstant with this part." 4 Pa.C.S. § 1903(a)(2). Therefore, the Crimes Code's prohibitions relating to "**any** … slot machine" must include those slot machines defined by the General Assembly in the Gaming Act or the cross-referenced exemption would be unnecessary.

**2.    The common law "skill versus chance" test cannot be used to determine whether a device is a slot machine**

As quoted above, the Crimes Code applies to "any . . . **slot machine** or any **device to be used for gambling purposes**". 18 Pa.C.S. § 5513(a)(1), (e.1) (emphasis added). Pursuant to the Statutory Construction Act, 1 Pa.C.S. §§ 1501 *et seq.*: "Every statute shall be construed, if possible, to give effect to all its provisions." 1 Pa.C.S. §1921(a). Thus, when construing a statute, a court "must attempt to give meaning to every word in a statute, as we cannot assume that the legislature intended any words to be mere surplusage." *City of Philadelphia Fire Dep't v. Workers' Comp. Appeal Bd. (Sladek)*, 195 A.3d 197, 207 (Pa. 2018). Accordingly, the test to determine whether an object is a "slot machine" under Section 5513 may not be the same as that used to determine whether an object is a "device to be used for gambling purposes",[2] as the alternative would render the words "slot machine" "mere surplusage" within the statute.

That the Legislature intended "slot machine[s]" and "device[s] to be used for gambling purposes" to require different inquiries is further supported by its choice to include the disjunctive "or" between them. 18 Pa.C.S. § 5513(a)(1)

---

[2] In determining whether a device is one "to be used for gambling purposes," Pennsylvania courts look to the "three elements of gambling: consideration, chance, and reward." *Commonwealth v. Dent*, 992 A.2d 190, 192 (Pa. Super. 2010) (citing *Commonwealth v. Two Elec. Poker Game Machs.*, 465 A.2d 973, 977 (Pa. 1983)). Regarding the second element, a machine constitutes a gambling device if chance predominates rather than skill. *Two Elec. Poker Game Machs.*, 465 A.2d at 977. It is the latter inquiry that is sometimes referred to as the "skill versus chance" test and drove the decision being appealed.

6

(criminalizing the offering of any "slot machine **or** any device to be used for gambling purposes"). In the phrase "slot machine **or** any device to be used for gambling purposes" of Subsection 5513(a)(1) 'or' is a disjunctive particle and means one or the other of two propositions; never both." *Commonwealth v. Bretz*, 433 A.2d 55, 58 (Pa. Super. 1981) (internal citations omitted). Because "slot machine" and the catchall phrase are separated by the disjunctive "or", the catchall phrase does not modify the term "slot machine". *See id.* (distinguishing between a "slot machine", which "need not" be in "actual use in a gambling operation" versus "any device to be used for gambling purposes", which is a catchall phrase that refers to all other gambling devices not specifically named in Section 5513(a)).[3]

Cases applying Section 5513 have agreed, interpreting the phrase "slot machine **or** any device to be used for gambling purposes" in the disjunctive. For example, in *Commonwealth v. Gerulis*, 616 A.2d 686, 693-94 (Pa. Super. 1992), the Superior Court held that the Commonwealth need only prove that the device in question was a slot machine; it need not also show "actual use in a gambling operation." Similarly, this Court has held that mere possession of a slot machine,

---

[3] *Bretz* involved a defendant accused of possessing slot machines that he used to lure a child into his apartment. 433 A.2d at 57. The Superior Court held that the defendant's mere possession of the slot machines did not constitute any of the prohibited acts in Section 5513(a), including the prohibition against "maintaining" a slot machine. Nevertheless, the defendant's slot machines could still be seized and forfeited, as Section 5513(b) permits forfeiture proceedings based solely on possession, regardless of whether the slot machines were used for gambling purposes.

regardless of why it is possessed, is sufficient grounds for seizure and forfeiture, and "the legality or propriety of the seizure is not dependent upon the conviction of the owner under Section 5513(a)." *Commonwealth v. 9 Mills Mech. Slot Machs.*, 437 A.2d 67, 69-70 (Pa. Cmwlth. 1981); *see also* 18 Pa.C.S. § 5513(b) (although mere possession of a slot machine is not criminal under subsection (a), possession is enough for a slot machine to "be seized and forfeited to the Commonwealth," even if not used for gambling).

Accordingly, the trial court erred by evaluating the legality of the POM Machines under Section 5513 based solely upon the skill versus chance test, therefore only analyzing whether those machines were "devices to be used for gambling devices", without also analyzing whether the POM Machines were "slot machines" within the purview of the Crimes Code.

> **3.    The Legislature's definition of "slot machine" in the Gaming Act informs the definition of "slot machine" in the Crimes Code, and <u>the POM Machines satisfy that definition</u>**

While the Crimes Code does not define "slot machine," the Gaming Act does. Under the Gaming Act's definition, a slot machine includes any computerized terminal that upon payment of consideration is available to be played and "**<u>whether by reason of skill or application of the element of chance or both</u>**" may entitle the player to cash or credits to be exchanged for cash as well as **<u>any</u>** "**<u>skill slot machine, hybrid slot machine</u>** and the devices or associated

8

equipment necessary to conduct the operation of a skill slot machine or hybrid slot machine." 4 Pa.C.S. § 1103.[4]

This Court in *POM of Pa., LLC v. Commonwealth of Pa., Dep't of Revenue*, 221 A.3d 717, 725 (Pa. Cmwlth. 2019) (*en banc*) ("*POM v. Revenue*"), found that, based on POM's own averments, the POM Machines met the definition of a "skill slot machine", a type of "slot machine" under the Gaming Act.

### a.    The Statutory Construction Act requires the Crimes Code and the Gaming Act to be read *in pari materia*

"When interpreting the Gaming Act [the] paramount objective must be to ascertain and effectuate the intention of the General Assembly." *POM v. Revenue*, 221 A.3d at 730 (citing 1 Pa.C.S. §1921(a) ("The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly.")). The Statutory Construction Act codifies the doctrine of *in pari materia* (meaning "upon the same subject"), a tool of statutory construction which states: "Statutes in pari materia shall be construed together, if possible, as one statute", and "[s]tatutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. § 1932(a)-(b). Thus, "[l]aws which apply to the same persons or things or the same

---

[4] Because the Gaming Act includes both "skill slot machines" and "hybrid slot machines" under the broader term "slot machine", a slot machine is a slot machine, regardless of whether skill or chance predominates.

class of persons or things ... should be read together where reasonably possible."
*DeForte v. Borough of Worthington*, 212 A.3d 1018, 1022 (Pa. 2019).

This doctrine of statutory construction has been used in prior cases to construe undefined terms in Section 5513. In *Commonwealth v. Betres*, the Superior Court was tasked with construing the terms "unlawful gambling" and "unlawful gambling place" in Sections 5513(a)(2), (a)(3) and (a)(4) of the Crimes Code. 352 A.2d 495 (Pa. Super. 1975). In construing the term "unlawful" in those provisions, the Superior Court utilized the definition of "unlawful" from Section 5512 of the Crimes Code, 18 Pa.C.S. § 5512:

> When the term **unlawful gambling** was used by the legislature they **could have intended no other meaning than gambling not specifically authorized by the Commonwealth**. This reasonable common sense interpretation is supported by Section 5512 of the Crimes Code. That section which deals with lotteries defines the term 'unlawful' as follows, 'As used in this section the term 'unlawful' means not specifically authorized by law.' There is no reason why the legislature would have intended 'unlawful' to have any different meaning in Section 5513 than it was given in Section 5512.

*Id.* (footnote omitted) (single quotation marks in original) (emphasis added); *see also Commonwealth v. Dent*, 992 A.2d 190, 197 (Pa. Super. 2010) (noting that "use of slot machines" is among the forms of gambling regulated by the Legislature, specifically in Title 4, and among the forms of unlawful gambling falling within the holding in *Betres*).

**b.    The Statutory Construction Act requires Section 5513 of Crimes Code and the Gaming Act to be read together <u>because both relate to the same things and class of things</u>**

Under the Statutory Construction Act, "[s]tatutes or parts of statutes are in pari materia when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. § 1932. There is little doubt that Section 5513 of the Crimes Code and the Gaming Act relate to the same things and class of things.[5]

Broadly speaking, the purpose of the Crimes Code is "[t]o forbid and prevent conduct that unjustifiably inflicts or threatens substantial harm to individual or public interest." 18 Pa.C.S. § 104(1). Similarly, the Gaming Act states that its "primary objective ... to which all other objectives and purposes are secondary is to protect the public through the regulation and policing of all activities involving gaming and practices that continue to be unlawful." 4 Pa.C.S. § 1102(1). The Gaming Act also grants the "authorization of limited gaming by the installation and operation of slot machines" to "enhance live horse racing, breeding programs, entertainment and employment in this Commonwealth", to "provide a

---

[5] Pennsylvania Courts apply this doctrine regardless of whether the statutes in question are criminal statutes, civil statutes, or a combination or both, so long as both statutes relate to the same class of persons. *Commonwealth v. Guilford*, 861 A.2d 365, 374-75 (Pa. Super. 2004) (both criminal statutes relate to the same class of persons and shall be construed together); *In re 171.481 Acres to Borough of Millersville, Lancaster County*, 290 A.2d 102, 105 (Pa. 1972) (reading two civil statutes i*n pari materia* to apply definition of "freeholders" from one to the other); *Commonwealth v. Dodge*, 599 A.2d 668, 672 (Pa. Super. 1991) (using definition of "firearm" from a different section of the Crimes Code to interpret statute in which "firearm" was not defined); *Commonwealth v. Jezzi*, 208 A.3d 1105, 1114 (Pa. Super. 2019) (reading in harmony the criminal Controlled Substance Act and Vehicle Code with the civil Medical Marijuana Act); *Commonwealth v. Dabney*, 274 A.3d 1283, 1291 (Pa. Super. 2022) (same).

significant source of new revenue to the Commonwealth to support property tax relief, wage tax reduction, economic development opportunities and other similar initiatives", and to "maintain the integrity of the regulatory control and legislative oversight over the operation and play of slot machines, table games and interactive gaming in this Commonwealth." 4 Pa.C.S. § 1102(2), (3), (11).

Specifically, Section 5513 of the Crimes Code makes it a crime to sell, lease, or maintain "any ... slot machine" and otherwise outlaws gambling. The Gaming Act, through its licensing scheme, authorizes the limited and highly regulated use of slot machines at certain approved locations.

Simply put, the Crimes Code makes it illegal to sell, lease, or maintain "any ... slot machine", and the Gaming Act instructs how to legally sell, lease, or maintain any slot machine. One cannot be read without the other. Indeed, Section 5513 of the Crimes Code broadly outlaws most conduct concerning "any ... slot machine" except if such conduct is "lawfully conducted under any of the following": (1) "the State Lottery Law"; (2) "the Bingo Law"; (3) "the Local Option Small Games of Chance Act"; and (4) "4 Pa.C.S.," which includes the Gaming Act and all its amendments.[6] 18 Pa.C.S. § 5513(e.1). Thus, to determine

---

[6] "A reference in a statute to a statute or to a regulation issued by a public body or public officer includes the statute or regulation with all amendments and supplements thereto and any new statute or regulation substituted for such statute or regulation, as in force at the time of application of the provision of the statute in which such reference is made ...." 1 Pa.C.S. § 1937(a). Therefore, the Crimes Code's reference to the Gaming Act includes all its amendments.

whether conduct is permitted under the Crimes Code, the Gaming Act necessarily must be read.

When construing a statute, "statutory language must be read in context, that is, in ascertaining legislative intent, every portion of statutory language is to be read together and in conjunction with the remaining statutory language," as well as "construed with reference to the entire statute as a whole." *Commonwealth v. Office of Open Records*, 103 A.3d 1276, 1285 (Pa. 2014) (citation and quotations omitted). Moreover, there is a legal presumption that the Legislature, when enacting a statute, "does so with full knowledge of existing statutes relating to the same subject." *Hutskow v. Washowich*, 628 A.2d 1202, 1207 (Pa. Cmwlth. 1993). Given that the Crimes Code explicitly references Title 4 of the Pennsylvania Code, which contains the Gaming Act, and because the Gaming Act explicitly references Section 5513(a) of the Crimes Code, *see* 4 Pa.C.S. § 1903(a)(2), the Gaming Act should be consulted when construing the Crimes Code in the absence of a Crimes Code definition of "slot machine".

### c.    The Pennsylvania Supreme Court has sanctioned the use of *in pari materia* to fill a void in a statutory scheme

Our Supreme Court has used *in pari materia* "to fill what it perceived to be a procedural void in a statutory scheme." *Oliver v. City of Pittsburgh*, 11 A.3d 960, 965 (Pa. 2011). The Supreme Court in *Oliver* cited its prior decision in *State Ethics Comm'n v. Cresson*, 597 A.2d 1146 (Pa. 1991), where the State Ethics

13

Commission sought to set aside nomination petitions because the candidates did not file statements of financial interests as required by the Ethics Act. *Oliver*, 11 A.3d at 965. Although the Commission filed its challenges nearly a month after they were due as required by the Election Code, the Commission argued that it was subject only to the Ethics Act. *Cresson*, 597 A.2d at 1148. The Supreme Court rejected this argument, finding that: (1) the Ethics Act was "silent" on when petitions to set aside must be filed; (2) the Ethics Act and Election Code were *in pari materia* because "aspects of these statutes relate to the same subject matter, i.e., requirements for filing of nomination petitions"; and (3) "in light of the expressed time limit contained within the provision of the Election Code with respect to challenging nomination petitions, and the absence of a temporal framework in the Ethics Act, there is no conflict and the Election Code must apply." *Id.* at 1149.

Likewise, in *DeForte v. Borough of Worthington*, 212 A.3d 1018 (Pa. 2019), two police officers brought suit under the Borough Code and Police Tenure Act for being dismissed without process. The borough argued that the officers had no cause of action under the Borough Code, as the code did not offer protections to borough police departments with fewer than three full-time "members" of the police force, and the Borough of Worthington had only four part-time officers. *Id.* at 1022. However, the Police Tenure Act gave protections to officers employed by

14

boroughs with fewer than three "members". The Supreme Court found that "[t]hese close similarities suggest the General Assembly intended for the Tenure Act to fill the gap created by virtue of the Borough Code's failure to extend its protections to borough police forces with fewer than three members ...." *Id.* at 1023. The Supreme Court in *DeForte* also found that, "while meaning of 'member' is not given in the Tenure Act, recognition of the *in pari materia* status of the two enactments allows us to resolve any uncertainty along these lines by consulting the definition of 'member' under the Borough Code." *Id.* at 1026. The Supreme Court further stated:

> As a general matter, where, as here, statutory language is not explicit, resort to precepts of statutory construction is warranted. In the present matter, the most salient rule is contained in Section 1932(b) of the Statutory Construction Act, setting forth the mandate to construe, "as one statute," multiple pieces of legislation which are *in pari materia*.

*Id.* at 1026 n.10. This analysis applies here.

Thus, the lack of a definition of "slot machine" in the Crimes Code could be characterized as such a "void" or "gap" in the Crimes Code that can only be filled by reading the Gaming Act and the Crimes Code *in pari materia*. Reading those statutes *in pari materia* makes clear that the reference to "any slot machine" in Section 5513 of the Crimes Code encompasses the slot machines defined in the Gaming Act.

15

### d.     The Gaming Act and the Crimes Code explicitly modify each other

The Gaming Act contains a provision that expressly **repealed** Section 5513(a) of the Crimes Code if it is "inconstant with this part." 4 Pa.C.S. § 1903(a)(2).[7] Under well-established statutory construction principles, the repealer provision cannot be construed to be unnecessary surplusage. *Moonlight Café, Inc. v. Department of Health*, 23 A.3d 1111, 1114 (Pa. Cmwlth. 2011) ("Thus, no provision of a statute shall be 'reduced to mere surplusage.'") (quoting *Walker v. Eleby*, 842 A.2d 389, 400 (Pa. 2000)). Unless the "slot machines" referenced in Section 5513 include and/or are the same "slot machines" defined in the Gaming Act, the repealer provision would have been without effect, a result that Pennsylvania's statutory construction principles do not countenance. *See* 1 Pa.C.S. § 1922(2) (when construing a statute, it is presumed that "the General Assembly intends the entire statute to be effective and certain.").

### e.     The holding urged here is consistent with this Court's decision in *POM v. Revenue*

This Court's 2019 decision in *POM v. Revenue* concerned the Department of Revenue's application for summary relief in the nature of a motion for partial judgment on the pleadings. The Department claimed that: (1) the POM Machines

---

[7] The Gaming Act's Section 1903 repealer provision was expressly upheld by the Supreme Court in *Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth*, 877 A.2d 383, 412 (Pa. 2005). In a subsequent amendment, lawful gaming was exempted from the Crimes Code under Section 5513(e.1)(4).

16

are slot machines under the Gaming Act; (2) POM is a manufacturer and/or a supplier of slot machines under the Gaming Act; and (3) POM is in violation of the Gaming Act. This Court denied the Department's request for relief, and *Amici Curiae* anticipate that Appellees will use that decision to argue that the Gaming Act does not apply to the POM Machines. However, this Court's holding in *POM v. Revenue* clearly is much more limited and nuanced than that.

In *POM v. Revenue*, this Court looked to the Gaming Act to determine whether the body given power to regulate licensed gaming, the Pennsylvania Gaming Control Board (the "PGCB"), had jurisdiction over the POM Machines. After reviewing the entire Gaming Act, this Court held that "the Gaming Act does not give the [PGCB] the jurisdiction or authority it now claims." *POM v. Revenue*, 221 A.3d at 731. This Court found that several sections in the Gaming Act indicated that it "was intended to license slot machine operations at racetracks, casinos, hotels, and established resort hotels", and the legislative history behind the Gaming Act also demonstrated "that the General Assembly only intended the Gaming Act to regulate legal and licensed gaming." *Id.* at 732. Further, the Gaming Act bestowed upon the PGCB powers related to the granting and denial of slot machine licenses, not law enforcement authority. *Id.* at 732-33.

Thus, the Commonwealth Court's decision in *POM v. Revenue* only concerned the PGCB's jurisdiction, **not** whether the Gaming Act's definition of

17

"slot machines" should be used to interpret whether the POM Machines are "slot machines" under the Crimes Code. Indeed, this Court unequivocally confirmed that it did "not answer the separate question of whether the [POM Machines] qualif[y] as [] illegal gambling device[s] under section 5513 of the Crimes Code ...." *Id.* at 735 n.17.

### f.   Failing to read the Crimes Code and the Gaming Act *in pari materia* would cause an absurd result

Because this Court ruled in *POM v. Revenue* that the PGCB lacks jurisdiction over the POM Machines, only law enforcement can hold Appellees accountable pursuant to the Crimes Code. Thus, if "slot machine" under the Crimes Code does not include "slot machine" as provided under the Gaming Act, the POM Machines would be completely unregulated, allowing an operator to evade **both** the Gaming Act's regulatory framework and prosecution under the Crimes Code simply by not obtaining a license to make, sell or operate the slot machine. In construing statutes, it is presumed that "the General Assembly does not intend a result that is absurd, impossible of execution or unreasonable." 1 Pa.C.S. § 1922(1). Given the broad prohibition on all gambling devices in the Crimes Code, the highly-regulated licensing scheme in the Gaming Act, and the Gaming Act's extremely broad definition of "slot machine", it would be absurd to find that the legislature intended to allow slot machines that would be subject to a

18

54 percent tax inside the highly regulated atmosphere of licensed casino to also be operated untaxed and unregulated at the convenience store next door.

### 4. In the alternative, the POM Machines are "slot machines" under the term's plain meaning when Section 5513 was drafted in 1972

If this Court finds that the Gaming Act and Section 5513 of the Crimes Code should not be read *in pari materia* in order to inform the definition of slot machine within the latter, this Court nonetheless still cannot apply the skill versus chance test to determine whether the POM Machines are slot machines. *In re J.W.B.*, 232 A.3d 689, 699 (Pa. 2020) ("When interpreting a statute, 'we must always read the words of a statute in context, not in isolation, and give meaning to each and every provision' and 'our interpretation **must not render any provision extraneous** ....'") (quoting *Gavin v. Loeffelbein*, 205 A.3d 1209, 1221 (Pa. 2019) (emphasis added).

Rather, in the absence of a definition provided by the Legislature, the Court is to then turn to the ordinary meaning of the phrase when it was used by the Legislature in enacting the statute. 1 Pa.C.S. § 1903(a) (directing courts to construe words and phrases "according to rules of grammar and according to their common approved usage."). As stated by the Supreme Court:

> To discern the legislative meaning of words and phrases, this Court has on numerous occasions engaged in an examination of dictionary definitions. *See, e.g., Greenwood Gaming & Entertainment, Inc. v. Commonwealth*, 263 A.3d 611, 620-21 (Pa. 2021) (consulting dictionary definitions to ascertain meaning of phrase "personal

19

property"); *Chamberlain v. Unemployment Compensation Board of Review*, 114 A.3d 385, 394 (Pa. 2015) (determining meaning of term "incarcerated" by use of dictionaries); *Bruno v. Erie Insurance Co.*, 106 A.3d 48, 75 (Pa. 2014) (offering that, in determining a term's meaning, it is proper to consult dictionaries); *Commonwealth v. Hart*, 28 A.3d 898, 909 (Pa. 2011) (exploring meaning of "lure" through review of various dictionaries); *Fogle v. Malvern Courts, Inc.*, 722 A.2d 680, 682 (Pa. 1999) (approving of use of dictionaries to determine common and approved usage of a term)).

*Commonwealth v. Gamby*, 283 A.3d 298, 307 (Pa. 2022). If the meaning of a word is clear, that meaning controls. *See* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

As recently directed by the Supreme Court in *Gamby*, the dictionary to be used in examining the Legislature's meaning in enacting the Crimes Code in 1972,[8] is the then-current dictionary, Webster's Third New International Dictionary. 283 A.3d at 307 n.11 ("In defining a statutory term, we strive to determine its meaning at the time the General Assembly enacted the legislation."). In that tome, "slot machine" is defined as: "A coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle – called

---

[8] The language at issue—"slot machine"—is unchanged from the statute's original enactment.

also a one-armed bandit." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1961).[9]

Given the long history of illegal slot machine operators such as POM knowingly evading criminal repercussions for their illicit slot operations through various pretenses designed to dodge too narrow definitions of "slot machine",[10] the Legislature may have intentionally and wisely chosen not to specifically define the term in order to allow the statute the flexibility to adapt to innovation over time. In

---

[9] The second definition of "slot machine" found in Webster's Third New International Dictionary ("A machine (as a vending machine) whose operation is started by dropping a coin into a slot.") can be disregarded, as it reflects a usage that was obsolete by the time the Crimes Code was written in 1972. *Video Gambling Devices*, 37 UCLA L. REV. 555, 559 (1990).

[10] *See Video Gambling Devices*, 37 UCLA L. REV. 555, 559 (1990) ("Most interesting, however, were the ways in which gambling operators disguised or modified their machines in order to stay one step ahead of the legislature's definition of gambling devices . . . . Slot machine manufacturers would create and market new devices that technically did not fall within the existing legal definition of gambling devices. In response, legislators passed new laws aimed at covering the new devices. Thus, the manufacturers and lawmakers played a game of "leap frog," with new legislation continually being directed at recently modified gambling devices.); *The Technological And Business Evolution Of Machine-Based Gambling In America,* 14 WAKE FOREST J. BUS. & INTELL. PROP. L. 237, 254-60 (2014) ("Thus, slot machine manufacturers maintain a long history of tailoring their devices to respond to changes in the gaming environment that may occur from statutes or regulations that attempt to limit their existence[.]").

Ironically, a summary of the history of this innovative evasion reads like an account of POM's own conduct in Pennsylvania over the course of the last decade:

> While the authorities ultimately succeeded in eliminating these "disguised" machines, machine operators realized great profit in the interim. As soon as authorities took action to close them down, slot machine operators would customarily apply to the local courts for injunctions against seizure. The operators would then flood the territory with the targeted devices while their lawyers fought all the way through the appellate process. Presumably, the profit derived during the course of litigation more than offset the loss incurred once the devices were ultimately confiscated.

*Video Gambling Devices*, 37 UCLA L. REV. at 561-62; *see also generally id.* at 558-62. The Casinos urge this Court to likewise "ultimately succeed[]" here in eliminating POM's slot-machines-disguised-as-skill-games.

21

its most current edition, Webster continues to define "slot machine" using substantially the same language, but also adding a note reflecting that "slot machines" may today be electronic and accept forms of currency other than coin. *Slot Machine,* MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/slot%20machine (last visited Aug. 15, 2023) ("An originally coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle; also: an electronic version of this machine.").

Webster's Third's definition, combined with its contemporary update, gives the Legislature's clear meaning in including the term "slot machine" in Section 5513 in 1972 and therefore controls the inquiry into whether a device is a "slot machine" today. Combining these sources, "slot machines" are: (1) machines; (2) operated via the insertion of currency or an equivalent; (3) as part of which there is a wheel or electronic equivalent (e.g. a video display) bearing symbols; (4) that when matched or manipulated; (5) may "pay off" (i.e., deliver currency or other property of value back to the player).[11]

The record evidence below demonstrates that the machines seized from Appellees most certainly are "slot machines" according to this ordinary meaning

---

[11] Utilizing this definition avoids the fearmongering by POM that applying the definition of "slot machine" to its games would also outlaw classic games of skill and other small amusements traditionally found in arcades, restaurants, and bars (e.g. pinball, skee-ball, and video games such as Ms. Pac-Man), as such games do not include a "payoff" when won. Even those that may award a winning player tickets or credits that can be exchanged for prizes fail to meet this definition, as the *de minimus* token value of those prizes is not a "payoff".

22

definition. They are indisputably: (1) machines; (2) into which players insert currency or currency equivalents; (3) in order to play a game on a video display bearing symbols; (4) that, when matched three in a row in the first round and when matched in sequence in the second round; (5) entitle the player to a pay out of currency or currency equivalents. Thus, these machines are unlawful slot machines, the offering of which is criminalized under Section 5513(a).

**B.    Affirming the Trial Court's Decision Will Eviscerate The Statutory Scheme Legislatively Mandated To Regulate And Tax Gaming In The <u>Commonwealth</u>**

**1.    If this Court were to rule that games such as the POM Machines are legal, nothing would limit such games to corner stores and <u>neighborhood bars</u>**

Legalizing these machines would allow unlimited skill games much like the POM Machines to be placed anywhere. Nothing will prevent unregulated casinos and slot machines from being set up wherever a profit can be made throughout the Commonwealth, from small towns to large cities.

This is already happening. As seen on the website www.thekeystoneklub.com, there are already two unregulated mini-casinos near the Commonwealth's capital filled with what that website calls "skilled games". That website advertises that customers don't have to "sit at the back of a gas station or a loud smoke filled bar or casino" and can instead play these games in the Keystone Klub's "game room". The website advertises "progressive jackpots"

23

(linked slot machines with pooled jackpots that pay significant sums), offers patron complimentary beverages and snacks, and claims to have the "best payouts." Similar slot parlors have been established in New Castle, Scranton and elsewhere in the Commonwealth.

## 2.     Taxed, regulated gaming would be unable to compete with unregulated untaxed slot parlors

Casinos operating under the Gaming Act could not compete with an industry that pays no gaming tax when legal casinos pay more than fifty cents of every dollar to the Commonwealth. On top of gaming taxes, legal casinos absorb the cost of complying with the Gaming Act's regulatory protections (e.g. property-wide surveillance, security personnel to prevent underage persons and self-excluded patrons from gambling, anti-money laundering procedures, internal audits, licensing of casino employees, vendors and owners). If unregulated casinos are allowed to proliferate, operating under the Gaming Act would become so significantly less profitable than operating unregulated slot machines that casinos could face the choice of either closing or joining the business of operating untaxed unregulated slot machines.

This is already happening. At least one truck stop that previously offered regulated and taxed video gaming terminals  ("VGTs") has given up its VGT license to offer unregulated and untaxed skill games instead.

24

**3.     Permitting statewide unregulated slot machines to displace regulated, taxed gaming will hurt the Commonwealth and its <u>citizens</u>**

The Commonwealth's tax coffers will be hurt if statewide unregulated slot machines are permitted to continue operating. Pennsylvania currently collects the highest amount of tax revenue from gaming over any other state in the country. These funds are used for property tax relief, open space preservation in rural Pennsylvania through support of the racing industry, and senior citizen programs. The funding of these programs would cease if legalized gaming is replaced with untaxed skill game machines, and the Commonwealth will lose billions.

Pennsylvania's consumers will be hurt. No governmental testing of any kind is required for unregulated skill games, unlike the extensive inspection and certification procedures required for current legal slot machines to ensure that they are fair to the customer. Unlike licensed slot machines which are required to pay a minimum of 85% of moneys taken to customers, skill slots, if left to proliferate, could be manipulated to benefit the operator, and no one—the Commonwealth or the customer—would know or have any recourse against it. Similarly, there is no agency dedicated to resolve disputes between operator and customer or to force a skill slots operator to actually pay out a player's winnings.

Pennsylvania's' vulnerable populations will be hurt. If the Court determines the POM Machines are legal, no law or oversight prevents children from playing

25

them, like any video game or pinball machine. In addition, Pennsylvania's legal gambling regulatory scheme allows those with problem gambling tendencies to sign up for the state's self-exclusion list, the result of which prohibits an individual from gaming in licensed casinos. Not only would there be no law to prevent skill slot operators from welcoming and taking advantage of these problem players if this Court declares the POM Machines to be lawful, but operators of unregulated "skills games" by definition could not comply with the protections afforded to individuals who are excluded or self-excluded from gambling in Pennsylvania, as only licensed and regulated casinos have access to those lists. Absent this Court's intervention, every time they have the misfortune of unknowingly entering a convenience store with a POM machine inside, those vulnerable individuals would be subjected to the very temptation they carefully sought to avoid. Further, advertising for skill slot parlors would proliferate with no regulation. The 1-800-GAMBLER help line that is required on casino ads would not be required, and people who need help will not know where to turn.[12]

No regulations are in place to address the criminal element and other bad actors in unregulated gambling. To the contrary, licensed casinos are subject to reporting requirements regarding suspicious transactions to help identify money

_____

[12] The Council on Compulsive Gambling of Pennsylvania (CCGP)'s Year-to-Date Helpline Data Report indicates that CCGP has received 71 calls in the first half of 2023 alone from individuals identifying "skill machines" as their "most problematic gambling" or the "gambling activity that the caller/subject has the most difficult time controlling."

26

laundering and are required to withhold federal taxes from any jackpot exceeding $3,000. Without such procedures, those who have income from illegal sources can launder their money more easily in skill slot parlors with no similar oversight. Today, operators and vendors of legal gaming are thoroughly vetted to ensure that organized crime is not profiting from gaming in our Commonwealth. Licensing is an intrusive investigative process that ensures the money is not flowing to unsavory individuals. Because skill operators are not investigated for suitability, nothing would prevent organized crime or individuals subject to improper financial pressures from operating slot parlors or otherwise having unfettered access to reap the money from this cash business. Pennsylvania could become a beacon for this illegal activity if the law is not found to prevent it.

This Court must give force to what the Legislature wrote when it enacted the Gaming Act nearly two decades ago and three decades before that when it enacted the Crimes Code—all slot machines, of any kind or character whatsoever, are unlawful under Section 5513, except for those slot machines made legal and lawfully operated under the Gaming Act.

27

## III. <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, *Amici Curiae* respectfully request that the Commonwealth Court of Pennsylvania VACATE the February 8, 2023 Order of the Court of Common Pleas of Monroe County, and REMAND for the entry of an Order DENYING the Joint Omnibus Petition to Return Seized Property and to Suppress Evidence filed by Appellees, L&M Music Company, Inc. and Smokin' Joe's Tobacco Shop, Inc.

Respectfully submitted,

**LAMB McERLANE PC**

Dated: August 16, 2023        By: */s/ Joel L. Frank*

Joel L. Frank
John J. Cunningham, IV
Scot R. Withers
I.D. Nos. 46601; 70975; 84309
24 E. Market Street, Box 565
West Chester, PA 19381-0565
(610) 430-8000

*Counsel for Amici Curiae*

28

## <u>Pa.R.A.P. 531(b)(3) and 2135(d) CERTIFICATE OF COMPLIANCE</u>

It is hereby certified that the foregoing Brief of *Amicus Curiae* complies with the word count limit contained in Pa.R.A.P. 531(b)(3) because it contains 6,969 words, as computed by the "Word Count" function in Microsoft Word 2013, excluding the parts exempted by Pa.R.A.P. 2135(b).

**LAMB McERLANE PC**

Dated: August 16, 2023                 By: */s/ Joel L. Frank*

                                        Joel L. Frank
                                        John J. Cunningham, IV
                                        Scot R. Withers
                                        I.D. Nos. 46601; 70975; 84309
                                        24 E. Market Street, Box 565
                                        West Chester, PA 19381-0565
                                        (610) 430-8000

                                        *Counsel for Amici Curiae*

## Pa.R.A.P. 127(a) CERTIFICATE OF COMPLIANCE

It is hereby certified by the undersigned that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**LAMB McERLANE PC**

Dated: August 16, 2023          By: */s/ Joel L. Frank*

Joel L. Frank
John J. Cunningham, IV
Scot R. Withers
I.D. Nos. 46601; 70975; 84309
24 E. Market Street, Box 565
West Chester, PA 19381-0565
(610) 430-8000

*Counsel for Amici Curiae*