# EXHIBIT 2

Received 1/2/2024 3:10:57 PM Supreme Court Middle District
Filed 01/02/2024 Supreme Court Middle District

## SUPREME COURT OF PENNSYLVANIA

## DOCKET NO. _____

|  |  |
|---|---|
| IN RE: THREE PENNSYLVANIA SKILL AMUSEMENT DEVICES, ONE GREEN BANK BAG CONTAINING $525.00 IN U.S. CURRENCY, AND SEVEN RECEIPTS | : : : : |
|  | : |
| *Petition* OF: COMMONWEALTH OF PENNSYLVANIA | : : |

BRIEF OF *AMICI CURIAE*, GREENWOOD GAMING AND ENTERTAINMENT, INC., D/B/A PARX CASINO; GW CUMBERLAND OP CO., D/B/A PARX CASINO SHIPPENSBURG; DOWNS RACING, L.P., D/B/A MOHEGAN SUN POCONO; MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT PENN NATIONAL RACE COURSE, HOLLYWOOD CASINO MORGANTOWN AND HOLLYWOOD CASINO YORK; WASHINGTON TROTTING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT THE MEADOWS; CHESTER DOWNS AND MARINA, LLC, D/B/A HARRAH'S PHILADELPHIA CASINO & RACETRACK; WIND CREEK BETHLEHEM, LLC, D/B/A WIND CREEK BETHLEHEM HOLDINGS ACQUISITION CO. L.P. D/B/A RIVERS CASINO PITTSBURGH; SUGARHOUSE HSP GAMING, LP D/B/A RIVERS CASINO PHILADELPHIA; MOUNT AIRY #1, LLC D/B/A MOUNT AIRY CASINO RESORT; WOODLANDS FAYETTE, LLC D/B/A LADY LUCK CASINO; STADIUM CASINO RE, LLC D/B/A LIVE! CASINO & HOTEL PHILADELPHIA; and STADIUM CASINO WESTMORELAND RE, LLC D/B/A LIVE! CASINO PITTSBURGH, IN SUPPORT OF THE PETITION FOR ALLOWANCE OF APPEAL

On Petition for Allowance of Appeal from a Final Order of the Commonwealth Court, Docket No. 707 CD 2023, Affirming an Order of the Dauphin County Court of Common Pleas, entered March 23, 2023, Docket No. 2022-CV-06333-MD

| | |
|---|---|
| Stephen D. Schrier | Joel L. Frank |
| Rebecca D. Ward | John J. Cunningham, IV |
| Jeffrey N. Rosenthal | Scot R. Withers |
| Attorney ID Nos. 31488, 79547, 209334 | Attorney ID Nos. 46601, 70975, 84309 |

134059208

**BLANK ROME LLP**
One Logan Square, 130 N. 18th St.
Philadelphia, PA 19103
Tel. 215.569.5553
Fax 215.832.5553

Mark A. Aronchick
Jason A. Levine
Attorney ID Nos. 20261, 306446
**HANGLEY ARONCHICK**
**SEGAL PUDLIN & SCHILLER**
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel. 215.568.6933
Fax 215.568.0300

**LAMB McERLANE PC**
24 East Market St., P. O. Box 565
West Chester, PA 19381
Tel. 610.430.9000
Fax. 610.692.0877

*Counsel for Amici Curiae*

134059208

# TABLE OF CONTENTS

INTERESTS OF *AMICI CURIAE* ........................................................................1

SUMMARY OF THE ARGUMENT .....................................................................3

ARGUMENT .........................................................................................................6

    I.    THE POM MACHINE IS A GAMBLING DEVICE ...........................6

    II.   IF IT STANDS, *POM* WILL SEVERELY HARM THE LEGAL GAMING INDUSTRY AND THE COMMONWEALTH ...................8

        A.    Pennsylvania Has Developed a Successful Gaming Industry Over the Past Two Decades Through Targeted Legislation .......8

    III.  THE PROLIFERATION OF UNRGULATED GAMBLING MACHINES HAS HARMED AND, FOLLOWING THE DECISION IN *POM*, WILL ONLY CONTINUE TO HARM PENNSYLVANIA AND ITS RESIDENTS .................................................................10

        A.    Unregulated Gaming Machines Divert Revenue and Tax Dollars from Casinos and the Commonwealth .........................13

        B.    Unregulated Gaming Machines Are Unfair and Threaten Pennsylvania Consumers and Vulnerable Populations .............14

        C.    Unregulated Gaming Machines Are Associated with Criminal Activity ........................................................................16

        D.    Licensed, Pennsylvania Casinos Cannot Compete with Unregulated, Untaxed Gaming Machines ...............................17

    IV.  THIS COURT'S REVIEW IS NECESSARY TO RESOLVE A CONFLICT BETWEEN INTERMEDIATE APPELLATE COURTS ARISING FROM THE COMMONWEALTH COURT'S ERRONEOUS RULING THAT POM MACHINES ARE NOT "SLOT MACHINES" .....................................................................18

        A.    *POM* Allows Illegal Slot Machine Operators to Evade Criminal Repercussions by Flouting Overly Narrow Definitions of "Slot Machine." ...................................................................19

    V.   THIS COURT'S REVIEW IS NEEDED TO CLARIFY THE "PREDOMINANT FACTOR" TEST, OR, ALTERNATIVELY, UPDATE THIS 40-YEAR-OLD TEST TO ADDRESS THE EASE BY WHICH MODERN GAMES CAN BE DESIGNED TO SUBVERT THE CRIMES CODE ....................................................21

CONCLUSION .....................................................................................................23

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Commonwealth v. Betres,*
352 A.2d 495 (Pa. Super. 1975) ........................................................................21

*Commonwealth v. Dent,*
992 A.2d 190 (Pa. Super. 2010) .................................................................... 20-21

*Commonwealth v. Gerulis,*
616 A.2d 686 (Pa. Super. 1992) ........................................................................20

*Commonwealth v. Lund,*
15 A.2d 839 (Pa. Super. 1940) ..........................................................................20

*Commonwealth v. Two Electric Poker Games Machs.,*
465 A.2d 973 (Pa. 1983) .............................................................................. 21-22

*Gracie Technologies, Inc. v. Commonwealth,*
2020 Pa. Commw. Unpub. LEXIS 160 (Pa. Cmwlth. Mar. 13,
2020). ...............................................................................................................20

*In re Three Pa. Skill Amusement Devices,*
2023 Pa. Commw. LEXIS 198 (Nov. 30, 2023).........................................*passim*

*Lindey v. Pennsylvania State Police, Bureau of Liquor Control
Enforcement,*
916 A.2d 703 (Pa. Cmwlth. 2006)....................................................................20

*Pinnacle Amusement, LLC v. Bureau of Liquor Control Enforcement,*
298 A.3d 447 (Pa. Cmwlth. 2023)....................................................................10

*Riley v. California,*
573 U.S. 373 (2014).........................................................................................23

**Statutes**

4 Pa. C.S. § 1101.................................................................................................3

4 Pa. C.S. § 1102(1)-(3).......................................................................................8

ii

4 Pa. C.S. § 1102(12.2) ...................................................................................9

4 Pa. C.S. § 1103 ...........................................................................................9

4 Pa. C.S. § 1207(8) .....................................................................................15

4 Pa. C.S. § 1207(f) ......................................................................................14

18 Pa. C.S. § 5513 ..........................................................................................1

**Rules**

Pa. R.A.P. Rule 531(b)(2) ..............................................................................1

**Pulbic Tesitmony**

J. Billhimer, Testimony at Senate Community, Economic &
    Recreational Development Committee Hearing (Oct. 2, 2023) ..........14

Jack Stollsteimer, Delaware County District Attorney, Testimony to
    Senate Democratic Policy Committee Hearing (Aug. 23, 2023) ........17

Kevin F. O'Toole, Executive Director Pennsylvania Gaming Control
    Board Testimony before the Senate Democratic Policy Committee
    on "Skill Games in Pennsylvania" (Aug. 23, 2023) ...........................10

**Other Authorities**

American Gaming Association, "Sizing the Illegal and Unregulated
    Gaming Markets in the United States" (Nov. 2022) ...........................13

American Gaming Association Press Release, "Unregulated "Skill"
    Machines are Games of Chance, Say Two-Thirds of Americans
    Familiar with Them" (Aug. 23, 2023) ...............................................15

Council on Compulsive Gambling of Pennsylvania, Inc., Helpline
    Data Report YTD 2023 ......................................................................16

Lockwood, Jim, "Owner of BYOB Strip Club in Old Forge Wants to
    Switch to Games of Skill," *The Times Tribune* (Nov. 2, 2023) ........13

Max Mitchell, "Magnet for Violent Crime:  Pa. Suit Links 'Skills'
    Games to Shooting Death," *The Legal Intelligencer*
    (Nov. 16, 2022) ..................................................................................17

134059208

New Jersey Division of Gaming Enforcement Atlantic City Gaming
    Industry Casino Revenue Fund Taxes and Fees Source Report
    (Dec. 29, 2023) .......................................................................................10

Pennsylvania Gaming Control Board Annual Report 2022-2023 ...........................10

Pennsylvania Lottery, "Pennsylvania 'Skill Machines' and Lottery
    Revenue," Impact Analysis Methodology and Results, 2022
    Update ....................................................................................................14

*The Technological And Business Evolution Of Machine-Based
    Gambling In America,* 14 WAKE FOREST J. BUS. & INTELL PROP. L.
    237 (2014)...............................................................................................23

*Video Gambling Devices,* 37 UCLA L. REV. 555 (1990) .......................................23

134059208

## INTERESTS OF *AMICI CURIAE*

*Amici Curiae*, operators of licensed and regulated Pennsylvania casinos, file this brief[1] in support of the *Petition for Allowance of Appeal* (the "Petition") filed by Appellant, the Commonwealth of Pennsylvania. *Amici* urge this Court to grant the Petition to review *In re Three Pa. Skill Amusement Devices*, 2023 Pa. Commw. LEXIS 198 (Nov. 30, 2023) ("*POM*"). There, the Commonwealth Court held that because the Pennsylvania Skill Amusement Devices at issue ("POM Machines"), manufactured by POM of Pennsylvania, LLC ("POM"), are so-called "skill games," they are not unlawful "slot machines" or unlawful "devices to be used for gambling" under Section 5513 of the Crimes Code., 18 Pa. C.S. § 5513. *Amici*—who filed an amicus brief in *POM*—believe *POM* was wrongly decided and that the Commonwealth's Petition should be granted.

*Amici* submit this brief to protect their established property interest in their slot machine licenses and licensed casino facilities against the continued proliferation of unlicensed, unregulated, unlawful slot machines. *Amici* support the Commonwealth and its citizens—who benefit from Pennsylvania's licensed casino operations and are protected by its gaming regulations. The Commonwealth Court's ruling that POM Machines somehow fall *outside* Pennsylvania's regulatory

---

[1] Per Rule 531(b)(2), no person or entity other than *Amici* paid in whole or in part for the preparation of this brief, and no person or entity other than *Amici* and the undersigned counsel authored this brief in whole or in part.

1

gaming scheme is wrong. It not only harms *Amici*—who operate within the law—but endangers Commonwealth citizens by sanctioning violations of the Crimes Code and diminishing significant gaming taxes upon which the Commonwealth depends. This Court should grant the Petition and uphold the law.

2

134059208

## SUMMARY OF THE ARGUMENT

The Commonwealth Court's ruling opens the floodgates for unlicensed, unregulated, unlawful slot machines to dominate Pennsylvania's gaming landscape in a manner the General Assembly sought to prevent.  Under the guise of constituting so-called "skill" games—when they are anything but—the Commonwealth Court allowed the POM Machines to skirt the Crimes Code to effectively displace legal, taxed, highly-regulated gaming across Pennsylvania.

POM Machines are available to *anyone*—regardless of age, vulnerabilities, or criminal background—more than cigarettes, alcohol, and lottery tickets.  Any number of POM Machines can be played at or near Pennsylvania schools, parks, daycare centers, gas stations, convenience stores, grocery stores, restaurants, bars, and liquor stores—*tax-free and unregulated*, with no supervision.  Kids not yet old enough to drive a car can play a POM Machine for real money.  This is both wrong and inconsistent with the Legislature's intent when it authorized limited, regulated gaming.[2]  *See* Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. § 1101, *et seq.* (the "Gaming Act").

In *POM,* the Commonwealth Court first read the statutory term "slot machine" in Section 5513 of the Crimes Code too narrowly.  Pragmatism dictates

---

[2]  An unlicensed POM Machine "parlor" could operate with impunity next to a Gamblers' Anonymous meeting site; not even the Pennsylvania Gaming Control Board could intervene to protect the public.

3

134059208

the Crimes Code encompasses POM Machines. Then, it misapplied this Court's "predominant factor test"—designed to determine where, as here, contraband is so "intrinsically connected with gambling" it constitutes a gambling device *per se*. In committing these errors, the Commonwealth Court diverged from other Pennsylvania appellate court rulings that either: (a) looked past the surface to the *overall effect* of the gaming scheme; and/or (b) took guidance from gaming laws to inform the definition of "unlawful gambling" under the Crimes Code.

This Court—*and only this Court*—has the power to prevent nefarious game designers and manufacturers from dressing up "skill" games to circumvent the letter and intent of the Crimes Code, which expressly criminalizes unlawful "slot machines" like the POM Machines, and to clarify the proper application of the "predominant factor test." Without review, the harm from these illegal gambling machines will continue to proliferate. This Court should grant the Petition to restore proper meaning to the law the Commonwealth Court rendered meaningless.

*Amici* have followed the law. As slot machine licensees, *Amici* have a particular interest in protecting *legal* gambling in Pennsylvania since, only after careful vetting and testing, they are authorized to place and operate slot machines consistent with the Commonwealth's comprehensive regulatory scheme. *Amici* have invested heavily to offer compliant slot machine gaming in Pennsylvania, collectively paying hundreds of millions of dollars in slot machine license fees;

134059208

completing costly and extensive criminal background, financial and operational suitability reviews and application processes; and establishing robust problem gambling controls. Since 2004, *Amici*'s operations have generated *billions* for the Commonwealth and its citizens in the form of license fees, tax revenue, local share funding and fees, and other financial benefits—not to mention tens of thousands of Pennsylvania jobs. These benefits to the Commonwealth are now in jeopardy.

This Court should grant the Commonwealth's Petition and consider reversing *POM.* This is not only consistent with the intent of the Legislature but is in the interest of the Commonwealth and its citizens—who deserve this Court's review.

\*       \*       \*

5

134059208

## ARGUMENT

### I.    THE POM MACHINE IS A GAMBLING DEVICE.

The features/functionality of the POM Machine readily reveals its true nature as a gambling device.  The POM Machine is an electronic game with multiple "reel[s]."  Notes of Testimony (NT), 11/22/22, at 305-20.  Following a spin of the reels, possible outcomes include: (a) an award *equal* to 105% of risked value (win); (b) an award *less* than 105% of risked value (hit); or (c) no award (loss).  The device is thus *indistinguishable* from slot machines, and appears to the player as follows[3]:



---

[3]  Pace-O-Matic Inc., https://www.paceomatic.com/skill-games; "Pirates" *available at* https://share.vidyard.com/watch/xZg7SjareUbkFQYMtucQ9k? (last visited Dec. 18, 2023).

6

Following this initial, plainly slot-style game, the POM Machines *sometimes* offer players a second, *entirely optional* memory game called "Follow Me" in which the player can purportedly win back lost bets. *POM*, 2023 Pa. Commw. LEXIS 198, at \*5 ("player is offered *an opportunity* to recoup lost points with the 'Follow Me' feature") (emphasis added). Notably, Follow Me is never made available to the player if the initial slot-style game results in a "win." Even when made available following a "hit" or "loss," players often never see that playing Follow Me is an option. POM alleges this feature appears on a banner that says: "Touch Here to Follow Me." (R. 62a, 292a (NT); 643a, ¶ 48 (Answer)). But if the player elects to "rapidly engage the button instead of waiting for the POM Game to fully cycle," the "Follow Me" button "*does not have time to appear on screen.*" (R. 114a, 243a, 490a, 508a, 527a (NT) (emphasis added).

Even when Follow Me is available and the option to play is seen, this *does not* mean it is used. The design of "Follow Me" is tedious, difficult, time-consuming, and unfavorable to players. It is not mentioned in the game's "help" screens. The feature entails *20 rounds*, taking 12-15 minutes to play. Even if players "win," there is no guarantee they will receive 105% of their original wager—because if the total remaining is below \$.50, the machine rounds down to

the nearest dollar interval. *Id.* at 6. This undercuts any notion the POM Machines can "always" be won every time.[4]

As shown, the POM Machines were indisputably designed so players must first play the chance-based, slot-style game. The secondary "skill"-based Follow Me game—intended to be difficult and time-consuming—is not always available and entirely optional even when it is.

## II. IF IT STANDS, *POM* WILL SEVERELY HARM THE LEGAL GAMING INDUSTRY AND THE COMMONWEALTH.

### A. Pennsylvania Has Developed a Successful Gaming Industry Over the Past Two Decades Through Targeted Legislation.

In 2004, the General Assembly authorized gaming in Pennsylvania via the Gaming Act. The Act's primary purposes are to "protect the public through the regulation and policing of all activities involving gaming"; "enhance . . . entertainment and employment"; and "provide a significant source of new revenue to the Commonwealth." 4 Pa. C.S. § 1102(1)-(3).

In 2017, the General Assembly expanded gaming to generate additional revenue without harming the existing casino industry. Act 42 of 2017, P.L. 419 (Oct. 30, 2017). The 2017 legislation sought, among other things, to "ensure the sustainability and competitiveness of the commercial gaming industry . . . by

---

[4]  That players may "win" more than they wager actually *underscores* that the POM Machines are "gambling devices"; the opportunity for "reward" is one of the three essential pillars of gambling under Pennsylvania law.

8

authorizing interactive gaming, [and] the operation of multistate wide-area progressive slot machines, skill and hybrid slot machines." 4 Pa. C.S. § 1102(12.2). Said differently, the Legislature expanded gaming to include not just the traditional "chance"-based slot machines already in Pennsylvania casinos, *but also* skill slot machines—whereby "the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game." 4 Pa. C.S. § 1103.

The original Gaming Act and the 2017 expansion struck a balance between a high tax rate, substantial costs of entry, and robust regulatory oversight, on one hand, with a protected industry for those willing to invest millions of dollars into the Commonwealth, on the other. Each casino paid an initial slot machine license fee between $5-$50 million; each pays an effective tax rate of 54% on all slot machine revenue (a rate higher than any other industry); and each must meet rigorous standards of good character, integrity, and financial fitness. In exchange for these significant, ongoing investments, the General Assembly limited the number of casinos and provided robust enforcement.

This balance—and Pennsylvania gaming as a whole—was for many years an unqualified success. Relying on the barriers to entry and the level playing field established by the Gaming Act, Pennsylvania's 17 casinos have invested heavily in the Commonwealth. The industry now supports tens of thousands of jobs and

9

134059208

generates billions in tax revenue annually (more than any other state[5]).  Just last year, slot machines alone generated $1.36 billion for the Commonwealth.  Through Pennsylvania's Local Share Assessment of gaming taxes, the industry generated almost *$1 billion for counties and municipalities to support schools, recreation facilities, and other basic services.*[6]

Lastly, the industry protects the public through rigorous regulatory oversight by the Pennsylvania Gaming Control Board (the "Board") designed to ensure: (1) games are fair and transparent to the public; (2) casinos are safe; (3) anti-money laundering requirements are met; and (4) children, compulsive gamblers, and other vulnerable populations are kept away from casino floors.

## III.    THE PROLIFERATION OF UNRGULATED GAMBLING MACHINES HAS HARMED AND, FOLLOWING THE DECISION IN *POM*, WILL ONLY CONTINUE TO HARM PENNSYLVANIA AND ITS RESIDENTS.

*POM*—and the Commonwealth Court's related decision in *Pinnacle Amusement, LLC v. Bureau of Liquor Control Enforcement*, 298 A.3d 447 (Pa.

---

[5]    *Compare*    https://gamingcontrolboard.pa.gov/files/communications/2022-2023_PGCB_Annual_Report.pdf    at    24    (Pa    -    $2.23    billion)    *with* https://www.nj.gov/oag/ge/docs/Financials/CRFTF/CRFTFSourceReport.pdf at 2 (NJ - $504 million).

[6] Testimony of American Gaming Association Before Senate Democratic Policy Committee ("AGA Testimony"), and Testimony of Kevin F. O'Toole, Pa. Gaming Control Board, Hearing on "Skilled Games in Pennsylvania" (Aug. 23, 2023), *available    at*    https://www.senatormuth.com/wp-content/uploads/2023/08/PA-Gaming-Control-Board-Testimony.pdf.

134059208

Cmwlth. 2023)—which together effectively held "skill" gaming machines are neither "slot machines" nor "gambling devices," have put Pennsylvania's lawful gaming industry at risk. These decisions allow skill gaming machines to be placed anywhere, subject to no oversight, use restrictions, and/or taxation.

These gaming machines are already pervasive. The American Gaming Association estimates there are at least 67,000 unregulated skill gaming machines in Pennsylvania alone—more than any other state. They are ubiquitous at corner stores, taverns, gas stations, pizza parlors, and laundromats. More recently, skill slot machine "parlors" *that present exactly like casinos* opened across the Commonwealth. One such parlor in Harrisburg, called the "Keystone Klub," advertises on its website *as if it were a casino*, using large, bright pictures of slot machines:



11

Customers are invited to play where they "don't have to sit at the back of a gas station or a loud smoke-filled bar *or casino*."[7]  Instead, they can play in the "game room," complete with complimentary "beverages and snacks" and the "best payouts." *Id.*

Another example, Pockets Game and Billiard Lounge—a skill gaming parlor in Waynesboro, *located immediately next to a daycare center*—unabashedly promotes its "*16 slot machines*" and other gambling devices on social media[8]:



_____

[7]  The Keystone Klub - Welcome, *available at* https://thekeystoneklub.com (last visited Dec. 12, 2023) (emphasis added).

[8]    Facebook, Pockets Game and Billiard Lounge, *available at* https://www.facebook.com/profile.php?id=61551820742902 (last visited Oct. 31, 2023) (emphasis added).

134059208

Similar slot machine parlors are being developed in Old Forge[9] and elsewhere.

These so-called "skill" gaming machines are estimated to comprise more than *60% of all slot machines* in Pennsylvania and generate an estimated *$1.9 billion* in annual revenue.[10]  None of this goes to the Commonwealth.  By endorsing the farce that these machines are not illegal gambling machines—though they are generally understood by the public as gambling machines; they are played like gambling machines; they are marketed as gambling machines; and they generate revenue like gambling machines—the Commonwealth Court's decisions, if left unchecked, will result in a continued propagation of these machines that will substantially harm the Commonwealth and its citizens, as further detailed below.

### A.    Unregulated Gaming Machines Divert Revenue and Tax Dollars from Casinos and the Commonwealth.

Last year alone, Pennsylvania was deprived of $1 billion in tax revenue it would have received if POM Machines were subject to the same tax as all other

---

[9] Lockwood, Jim, "Owner of BYOB Strip Club in Old Forge Wants to Switch to Games of Skill," *The Times Tribune* (Nov. 2, 2023), *available at* https://www.thetimes-tribune.com/news/owner-of-byob-strip-club-in-old-forge-wants-to-switch-to-games-of-skill/article_3f71e215-410f-56d7-95b7-dbf87b83dca6.html.

[10] AGA Testimony; American Gaming Association, "Sizing the Illegal and Unregulated Gaming Markets in the United States," at 12 (Nov. 2022), *available at* https://www.americangaming.org/wp-content/uploads/2022/11/Sizing-the-Illegal-and-Unregulated-Gaming-Markets-in-the-US.pdf.

13

134059208

slot machines.[11]  Moreover, POM Machines have diverted hundreds of millions of dollars in State Lottery revenue—as the machines have increasingly been put in stores that also participate in Pennsylvania's lottery retail network.[12]

This unmitigated diversion of tax revenue is reflected in the data published by the Board.  Over the past five years that skill games have proliferated, Pennsylvania slot machine revenue has remained stagnant; conversely, neighboring states (like New Jersey) saw double-digit revenue growth.[13]  More concerning, Pennsylvania opened five new casinos during this period.  Excluding these new casinos, Pennsylvania's slot machine revenues experienced a double-digit decline, unquestionably due in large part to diversion of revenue to "skill" games.

### B.    Unregulated Gaming Machines Are Unfair and Threaten Pennsylvania Consumers and Vulnerable Populations.

*Regulated* gaming machines are subject to extensive inspection and certification procedures to ensure fairness.  *Regulated* slot machines are required to pay out to customers a minimum of 85% of wagers.  4 Pa. C.S. § 1207(f).  And

---

[11]  AGA Testimony, *supra* note 6.

[12]  Pennsylvania Lottery, "Pennsylvania 'Skill Machines' and Lottery Revenue," Impact Analysis Methodology and Results, 2022 Update.  In April 2023, its Executive Director testified at a legislative hearing that the Lottery expects to lose $170 million next year because of skill games at locations that also house lottery products.

[13]  J. Billhimer's Testimony, Senate Community, Economic & Recreational Development Committee Hearing (Oct. 2, 2023), *available at* https://www.legis.state.pa.us/cfdocs/legis/CMS/ArchiveDetails.cfm?SessYear=2023&MeetingId=3210&Code=31&Chamber=S (1:22:15–1:22:52).

14

134059208

over the life of gaming in the Commonwealth, *regulated* slot machines have paid, on average, over 90% of wagers. This is well-documented because casino slot machines payouts must be reported to the Board, which publishes public reports. In contrast, *unregulated* gaming machines are not subject to testing of any kind; they can pay out to customers at substantially lower percentages with none the wiser.[14] Nor does the public know what percentage of wagers skill gaming machines keep because they are not subject to reporting in Pennsylvania.[15]

Casinos have responsible gaming protocols and restrictions to protect vulnerable populations. No one under 21 can use regulated gaming machines. 4 Pa. C.S. § 1207(8). Persons with problem gambling tendencies may register to be on Pennsylvania's "self-exclusion" list, meaning casinos will (and must) prohibit them from using regulated gaming machines. *Id.* § 1516.

None of these restrictions or oversight apply to unregulated gaming machines. Children can walk into a convenience store down the street from their school and gamble. The 20,000 self-excluded people face the temptation to

---

[14] Or they may not pay out even when "won," as evidenced by complaints received by the Board about "skill" game proprietors who refuse to pay their winnings.

[15] A study showed unregulated machines across the country keep, on average, 25% of wagers—more than 2.5x Pennsylvania's regulated casinos. American Gaming Association Press Release, "Unregulated "Skill" Machines are Games of Chance, Say Two-Thirds of Americans Familiar with Them" (Aug. 23, 2023), *available at* https://www.americangaming.org/new/unregulated-skill-machines-are-games-of-chance-say-two-thirds-of-americans-familiar-with-them/.

15

gamble at gas stations. Under the landscape created by *POM*, these same people can walk into any grocery store, bar, or restaurant with a POM Machine and compulsively gamble—despite their self-imposed ban. This is no hypothetical. During the first ten months of 2023, 110 people called the Council on Compulsive Gambling's helpline and identified "skill gaming" machines as the "gambling activity that the caller/subject has the most time controlling."[16]

### C.    Unregulated Gaming Machines Are Associated with Criminal Activity.

Casinos are subject to stringent reporting, licensing, surveillance, and security requirements to inhibit illegal activity. Casinos must report suspicious transactions to identify and prevent money laundering and are vetted to ensure no connection to criminal activity. Moreover, casino operators maintain a heavy security presence—including security personnel, cameras, and well-lit parking lots and driveways.

Unregulated gaming machines, and their operators, are not subject to *any* requirements or regulatory scrutiny. This has led to increased crime. Worse yet, these machines are played with cash in locations conducive to criminal activity.

Over the past few years alone, there were multiple thefts—including armed robberies—from retail stores and gas stations with skill gaming machines,

---

[16]    *See* Council on Compulsive Gambling of Pennsylvania, Inc., Helpline Data Report YTD 2023 at 7.

16

134059208

including in Carlisle, throughout Lancaster County, and throughout Philadelphia. Hundreds of thousands of dollars were stolen.[17] Most tragically, a store clerk at a mini-mart in Hazelton was killed by an armed patron who knew there would be significant cash on hand to pay out on the skill gaming machines there.[18]

**D.    Licensed, Pennsylvania Casinos Cannot Compete with Unregulated, Untaxed Gaming Machines.**

Pennsylvania casinos face an existential threat if the Commonwealth Court's decisions legalizing unregulated skill gaming machines stand. The continued spread of these machines topples the balance the General Assembly struck in the Gaming Act in 2004 (and 2017 expansion). This will inevitably drive casinos and their partners to switch to unregulated skill gaming machines, as it is already happening. At least one truck stop that previously offered regulated, taxed video gaming terminals returned its license to the Board; it now offers only unregulated, untaxed "skill" games.

Similarly, casinos are now faced with the choice of expanding their gaming floors and updating their regulated slot machines—for which they pay more than

---

[17] Testimony of Jack Stollsteimer, Delaware County District Attorney, to Senate Democratic Policy Committee Hearing (Aug. 23, 2023), *available at* https://www.senatormuth.com/wp-content/uploads/2023/08/DA-Jack-Stollsteimer-Testimony.pdf.

[18] Max Mitchell, "Magnet for Violent Crime: Pa. Suit Links 'Skills' Games to Shooting Death," *The Legal Intelligencer* (Nov. 16, 2022), *available at* https://www.law.com/thelegalintelligencer/2022/11/16/magnet-for-violent-crime-pa-suit-links-skills-games-to-shooting-death/.

17

134059208

50% of gross revenue to the Commonwealth—or opening new "skill" gaming parlors, at which they will not pay any of the slot machine tax, and there will be substantially less expense than those associated with a highly-regulated casino. Unfortunately, this is an easy choice for businesses trying to stay competitive. That business decision, inevitable if *POM* stands, will further exacerbate these problems, and erode public confidence in Pennsylvania's legal gaming system.

## IV.    THIS COURT'S REVIEW IS NECESSARY TO RESOLVE A CONFLICT BETWEEN INTERMEDIATE APPELLATE COURTS ARISING FROM THE COMMONWEALTH COURT'S ERRONEOUS RULING THAT POM MACHINES ARE NOT "SLOT MACHINES."

Setting aside the deleterious effects *POM* will have on legal gaming, the Commonwealth, and its citizens, the decision itself is fundamentally flawed.

In *POM*, the Commonwealth Court expressly acknowledged *"the first stage in [POM Machine] gameplay may be analogous to the experience that a slot machine offers*[.]" 2023 Pa. Commw. LEXIS 198, at *12 (emphasis added). Critically, it was the "integrat[ion]" of an "additional feature" consisting of a "memory game"—*i.e.,* Follow Me—into "the overall gameplay experience" that, in the Commonwealth Court's view, served to "distinguish[ POM Machines] from the common definition of a slot machine." *Id.* at *13. This was reversible error.

18

### A. *POM* Allows Illegal Slot Machine Operators to Evade Criminal Repercussions by Flouting Overly Narrow Definitions of "Slot Machine."

The Commonwealth Court, in deciding whether POM Machines are "slot machines," was too easily taken in by Appellees' argument regarding an obscure, after-the-fact gameplay feature *that is not always available to*, and often goes *unused and unknown by*, players. *POM* essentially means anyone can convert an illegal "slot machine" into a legal game by *sometimes* adding some unrelated, ambiguous, and otherwise hidden "skill" component following the primary slot game. This absurd result flies in the face of the Crimes Code and common sense.

Two practical examples prove this point. First, if a player "wins" the first chance-based game—which, again, the Commonwealth Court concedes is likely "analogous to the experience [of] a slot machine"[19]—the player never gets to the second "skill" game. How is the POM Machine not a "slot machine" in that instance? Under *POM*'s reasoning, the "additional" *second* game retroactively transforms the *first*. But in so ruling, *POM* overlooked that if adding the second game is *required* to make the first *not* a "slot machine," then, logically, the device *is* a "slot machine" anytime the second game is not offered and/or played. The device thus remains illegal under the Crimes Code so long as that is a possibility. Second, if a player only utilizes "rapid play," Follow Me *never manifests*. This is

---

[19] *POM*, 2023 Pa. Commw. LEXIS 198, at *12.

134059208

not a bug; it is a feature. By ignoring the realities of how players *actually interact* with the POM Machine, *POM* erred in defining slot machine too narrowly. *POM* thus conflicts with multiple Superior Court decisions.

For example, in *Commonwealth v. Gerulis*, 616 A.2d 686, 693-94 (Pa. Super. 1992), the Superior Court held the Commonwealth need only prove the device in question was a "slot machine"; it need not also show "actual use in a gambling operation." So too has the Superior Court long held *how a game is actually played* matters. *Commonwealth v. Lund*, 15 A.2d 839 (Pa. Super. 1940) (declaring event an illegal lottery). In *Commonwealth v. Dent*, 992 A.2d 190 (Pa. Super. 2010), the Superior Court branded live Texas Hold 'Em Poker a game of "chance" whereby a poker player "is always subject to defeat at the turn of a card, an instrumentality beyond his control." *Id.* at 196-97. This was true for the Superior Court even though a skillful player was more likely to win over the course of an evening, whereas a lucky player may win a hand or two. *Id.* The same analysis applies equally here, where a player is also indisputably subject to an "instrumentality beyond his control"—*i.e.*, the initial spin of the slot-style reels in the "first stage [of] gameplay." *POM*, 2023 Pa. Commw. LEXIS 198, at *12.[20]

---

[20]  The Commonwealth Court also neglected its own rulings that focused on a device's *practical*—rather than theoretical—operation. *Lindey v. Pennsylvania State Police, Bureau of Liquor Control Enforcement*, 916 A.2d 703 (Pa. Cmwlth. 2006); *Gracie Technologies, Inc. v. Commonwealth*, 2020 Pa. Commw. Unpub. (continued) . . .

134059208

A second conflict, acknowledged by *POM*, exists between intermediate appellate courts with respect to their willingness to read the Crimes Code and Gaming Act in tandem. On one hand, in *Dent*, the Superior Court looked to the Gaming Act to determine what constitutes "unlawful gambling" under Section 5513 of the Crimes Code. 992 A.2d at 197 (citing *Commonwealth v. Betres*, 352 A.2d 495, 498-99 (Pa. Super. 1975)). Conversely, *POM* improperly *refused* to allow the Gaming Act—which defines "slot machine"—to inform the Crimes Code. 2023 Pa. Commw. LEXIS 198, at *13-14.

The approach in *POM* (and before it, *Pinnacle*) conflicts with Superior Court precedent. This Court's guidance is needed to resolve these conflicts.

## V. THIS COURT'S REVIEW IS NEEDED TO CLARIFY THE "PREDOMINANT FACTOR" TEST, OR, ALTERNATIVELY, UPDATE THIS 40-YEAR-OLD TEST TO ADDRESS THE EASE BY WHICH MODERN GAMES CAN BE DESIGNED TO SUBVERT THE CRIMES CODE.

*POM* also "conflicts with a holding of the Pennsylvania Supreme Court," namely, *Commonwealth v. Two Electric Poker Games Machs.*, 465 A.2d 973 (Pa. 1983).

Here, as in *Two Electric*, it is undisputed the first stage of gameplay is subject to randomness, and thus, "the outcome is largely determined by chance."

---

. . . (continued)

LEXIS 160 (Pa. Cmwlth. Mar. 13, 2020) (machines with gameplay near identical to POM Machines, but-for the Follow Me game, were unlawful gambling devices).

21

*Id.* at 978. Much the same way "chance ultimately determined the outcome" in *Two Electric*, based on "the cards dealt and the cards from which one can draw," *id.*, chance determines the result of the POM Machine's reels, as well as whether the secondary "skill"-based game is even available. Because of this, "a large random element is always present" in both instances. *Id.*

*POM* barely mentions *Two Electric*—instead relying on *Pinnacle*. 2023 Pa. Commw. LEXIS 198, at *18-19. Had a more fulsome analysis occurred, the Commonwealth Court would have been compelled to find, as did this Court, that ever-present elements of "chance" in the "overall experience" "predominate" over any scant instances of so-called "skill" that, for most players, never even materialize. *POM*, 2023 Pa. Commw. LEXIS 198, at *12; *see also id.* at *22 (recounting trial court's observation that "*the puzzle portion of the [POM Machine] game was predominantly a game of chance*[.]") (emphasis added).

Properly applied, the "predominant factor test" requires evaluation across *all* potential gameplay and would not allow a single tag-along feature like Follow Me to drive the analysis. After *POM*, *any* game of chance—including Roulette or Blackjack—can easily be converted to a game of "skill" with nominal tweaks.

Finally, to prevent such conflicts and avoid abuses in enforcing the Crimes Code, this Court should consider revising the "predominant factor test." As

22

technology develops, and bad actors find new ways to circumvent existing laws,[21] it is eminently appropriate for this Court to revise a test to better reflect the purposes of Pennsylvania's gaming laws and ensure legislative protections. *See, e.g., Riley v. California*, 573 U.S. 373, 400 (2014) (revising presumption that data on cellphones could be searched like pen registers based on new "technology nearly inconceivable just a few decades ago"). This case presents an opportunity to empower reviewing courts to protect Pennsylvanians from the modern realities and increased threat of illegal gambling the POM Machines represent.

## CONCLUSION

WHEREFORE, for the foregoing reasons, *Amici Curiae* respectfully request the *Petition for Allowance of Appeal* of Appellant be GRANTED.

Respectfully submitted,

**BLANK ROME LLP**

Dated: January 2, 2024

By: */s/ Jeffrey N. Rosenthal*
Stephen D. Schrier
Rebecca D. Ward
Jeffrey N. Rosenthal
Attorney ID Nos. 31488, 79547, 209334
One Logan Square, 130 N. 18th St.
Philadelphia, PA 19103
Tel. 215.569.5553

---

[21] *See also Video Gambling Devices*, 37 UCLA L. REV. 555, 559 (1990); *The Technological And Business Evolution Of Machine-Based Gambling In America*, 14 WAKE FOREST J. BUS. & INTELL. PROP. L. 237, 254-62 (2014).

134059208

Fax 215.832.5553

**HANGLEY ARONCHICK
SEGAL PUDLIN & SCHILLER**

Mark A. Aronchick
Jason A. Levine
Attorney ID Nos. 20261, 306446
One Logan Square, 27th Floor
Philadelphia, PA 19103
Tel. 215.568.6933
Fax 215.568.0300

**LAMB McERLANE PC**

Joel L. Frank
John J. Cunningham, IV
Scot R. Withers
Attorney ID Nos. 46601, 70975,
84309
24 East Market St., P. O. Box 565
West Chester, PA 19381
Tel. 610.430.9000
Fax. 610.692.0877

*Counsel for Amici Curiae*

24

134059208

## Pa.R.A.P. 531(b)(3) and 2135(d) CERTIFICATE OF COMPLIANCE

It is hereby certified that the foregoing Brief of *Amicus Curiae* complies with the word count limit contained in Pa.R.A.P. 531(b)(3) because it contains 4,498words, as computed by the "Word Count" function in Microsoft Word® for Microsoft 365 MSO, excluding the parts exempted by Pa.R.A.P. 2135(b).

**BLANK ROME LLP**

Dated: January 2, 2024    By: */s/ Jeffrey N. Rosenthal*
Stephen D. Schrier
Rebecca D. Ward
Jeffrey N. Rosenthal
Attorney ID Nos. 31488, 79547, 209334
One Logan Square, 130 N. 18th St.
Philadelphia, PA 19103
Tel. 215.569.5553
Fax 215.832.5553

*Counsel for Amici Curiae*

134059208

## Pa.R.A.P. 127(a) CERTIFICATE OF COMPLIANCE

It is hereby certified by the undersigned that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**BLANK ROME LLP**

Dated: January 2, 2024       By:   */s/ Jeffrey N. Rosenthal*
                                     Stephen D. Schrier
                                     Rebecca D. Ward
                                     Jeffrey N. Rosenthal
                                     Attorney ID Nos. 31488, 79547, 209334
                                     One Logan Square, 130 N. 18th St.
                                     Philadelphia, PA 19103
                                     Tel. 215.569.5553
                                     Fax 215.832.5553

                                     *Counsel for Amici Curiae*

134059208

## SUPREME COURT OF PENNSYLVANIA

### DOCKET NO. _____

| | |
|---|---|
| IN RE: THREE PENNSYLVANIA SKILL AMUSEMENT DEVICES, ONE GREEN BANK BAG CONTAINING $525.00 IN U.S. CURRENCY, AND SEVEN RECEIPTS | : <br> : <br> : <br> : *Electronically Filed Document* <br> : |
| APPEAL OF: COMMONWEALTH OF PENNSYLVANIA | : <br> : <br> : |

### CERTIFICATE OF SERVICE

I, Jeffrey N. Rosenthal, hereby certify that on this **2nd day of January 2024,**

caused a true and correct copy of the foregoing Amici Curiae Brief to be served via

the Court's PACFile system, upon the following:

Susan E. Affronti (No. 88010)
Pennsylvania Office of
Attorney General
1000 Madison Avenue, Suite 310
Norristown, PA 19403
***Attorney for Appellant***

Matthew H. Haverstick (No. 85072)
Joshua J. Voss (No. 306853)
Edward T. Butkovitz (No. 309565)
Shohin H. Vance (No. 323551)
Samantha G. Zimmer (No. 325650)
Kleinbard LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
***Attorneys for Appellee***

134059208

Christopher D. Carusone, Esquire (No. 71160)
Cohen Seglias Pallas Greenhall & Furman, PC
525 William Penn Place, Suite 3005
Pittsburgh, PA 15219
*Attorney for Appellee*

/s/ Jeffrey N. Rosenthal
Jeffrey N. Rosenthal
Attorney ID No. 209334
**BLANK ROME LLP**

*Counsel for Amici Curiae*

134059208