# EXHIBIT 1

Received 1/2/2024 5:43:17 PM Supreme Court Middle District

Filed 1/2/2024 5:43:00 PM Supreme Court Middle District
7 MAL 2024

# IN THE SUPREME COURT OF PENNSYLVANIA
## MIDDLE DISTRICT

---

## No. _____ MAL 2023

---

In re:  Three Pennsylvania Skill Amusement
Devices, One Green Bank Bag containing $525.00
in U.S. Currency and Seven Receipts

Petition of: Commonwealth of PA

---

## **PETITION FOR ALLOWANCE OF APPEAL**

---

Petition to appeal the November 30, 2023 Commonwealth Court decision at 707 C.D. 2023, affirming the order of the Dauphin County Court of Common Pleas, Civil Division, 2022-CV-06333-MD, dated March 23, 2023.

MICHELLE A. HENRY
Attorney General
MICHELE K. WALSH
Executive Deputy Attorney General
Criminal Law Division
RONALD EISENBERG
Chief Deputy Attorney General
HUGH BURNS
Assistant Chief Deputy Attorney General
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
Appeals Section
1000 Madison Ave., Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ....................................................................................... ii

QUESTIONS PRESENTED ......................................................................................... 1

ORDER IN QUESTION ............................................................................................. 2

INTRODUCTION ...................................................................................................... 3

STATEMENT OF THE CASE ..................................................................................... 4

REASONS FOR GRANTING THE APPLICATION ..................................................... 17

    I.    A slot machine is an illegal gambling device, predominantly governed by chance, even when the machine's manufacturers slip in a so-called "skill" element that is almost entirely hidden from view and is almost impossible to complete. The published en banc decision below would effectively nullify this Court's "predominant factor" test. ............................ 19

    II.    As this Court and Superior Court have held, statutes regulating gambling interact and must be read *in pari materia*. The court below improperly refused to do so, and improperly refused to apply the legislative definition of a "slot machine." .................................... 24

    III.    This case is of compelling importance because thousands of similar devices are being distributed across the Commonwealth, giving rise to many pending legal actions that await this Court's guidance. ...................... 30

CONCLUSION ....................................................................................................... 34

CERTIFICATES OF COMPLIANCE ......................................................................... 35

CERTIFICATE OF SERVICE

APPENDIX A:  COMMONWEALTH COURT OPINION

APPENDIX B: TRIAL COURT OPINION AND ORDER

# TABLE OF AUTHORITIES

## *Cases*

*Commonwealth v. Bretz*, 433 A.2d 55 (Pa. Super. 1981) ........................................ 24

*Commonwealth v. Dent*, 992 A.2d 190 (Pa. Super. 2010) ...................................... 25

*Commonwealth v. Lindey*, 916 A.2d 703 (Pa. Cmwlth. 2006) ............................... 20

*Commonwealth v. Lund*, 15 A.2d 839 (Pa. Super. 1940) .................................. 20, 22

*Commonwealth v. Two Elec. Poker Game Machines*,
   465 A.2d 973 (Pa. 1983) .................................................................................. 19, 21

*Greenwood Gaming v. Department of Revenue*, 2023 WL 8723602
   (Pa. Dec. 19, 2023) ............................................................................... 20, 25, 27

*POM of Pennsylvania, LLC v. Department of Revenue*, 221 A.3d 717 (Pa.
   Commw. Ct. 2019) .............................................................................................. 32

## *Statutes*

4 Pa. C.S. § 1102(11) ................................................................................................ 26

4 Pa. C.S. § 1103 ...................................................................................................... 24

4 Pa. C.S. § 1518 ...................................................................................................... 26

18 Pa. C.S. § 5513 ........................................................................................ 19, 25, 31

18 Pa. C.S. § 5513(e.1) ............................................................................................. 26

## *Rules*

Pa. R. App. P. 1114(b) ......................................................................................... 17, 18

**QUESTIONS PRESENTED**

1.    Does an electronic slot machine cease to be an illegal "gambling device," governed predominantly by chance, if the machine's manufacturers embed into its programming a so-called "skill" element that is almost entirely hidden from view and is almost impossible to complete?

(Answered in the affirmative by the Commonwealth Court).

2.    Should gambling statutes governing "slot machines" be read *in pari materia* to supply an appropriate definition of the term?

(Answered in the negative by the Commonwealth Court).

1

## ORDER IN QUESTION

The November 30, 2023 order of the Commonwealth Court at 707 C.D. 2023, affirming the order entered March 23, 2023, in the Dauphin County Court of Common Pleas, granting the motion for return of property filed by Champions Sports Bar, LLC and Capital Vending, Inc.

## INTRODUCTION

In Pennsylvania, the legislature has determined that only licensed casinos can operate slot machines. Not even the state's own lottery system, let alone private parties, can do so. The machines at issue here are video recreations – simulations – of a traditional physical slot machine. They spin, play, and pay just like the modern electronic slot machines found in casinos today, as the photos and video links below demonstrate. Yet the Commonwealth Court insists the machines here are not slot machines, because they occasionally flash a tiny, faint link to a hidden peripheral game that most players would never even notice, a "game" that if played consists of a tedious, twelve-minute-long memory drill, and that if "won" delivers not a jackpot, but only the return of the last bet plus a "bonus" of, at most, 20 cents.

The Commonwealth Court's en banc decision will have sweeping effect in Pennsylvania, where thousands of these machines are proliferating across the state, in bars, in convenience stores, and even in casino-style gambling halls – all without any special licensing, regulation, or taxation. And under the lower court's ruling that these slot machines are not slot machines, they could be placed anywhere at all, even in middle school cafeterias.

The Commonwealth Court decision is wrong on two levels. One, it perverts this Court's well-established "predominant factor" test for assessing gambling devices under the Crimes Code. Two, it disregards the legislature's explicit

3

definition of a slot machine in the Gaming Act, which the court refused to read *in pari materia* with the Crimes Code's own explicit reference to slot machines.

Under this Court's precedent, if it acts like a slot machine and operates like a slot machine, it's a slot machine. The Commonwealth accordingly seeks review.

**STATEMENT OF THE CASE**

***Slot machines***

In the "old" days, a slot machine was a metal box with a window containing three reels that spun around vertically. On the reels were various symbols. There was



a lever on one side of the machine; to operate it, the player deposited a coin in the slot and pulled the lever. If the symbols on each reel matched up after a spin, the player won a jackpot. The odds of that happening were low. But the psychology was powerful, and many people traveled to casinos to stand in front of banks of the machines, sometimes for hours, pulling away until their bucket of coins was empty. Hence the phrase "one-armed bandit."

Typically, the symbols on the reels consisted of bars, lucky 7's, and varieties of fruit such as lemons and cherries. The fruit was there because gambling was generally illegal, and the "flavors" allowed operators an ostensible claim that the machines were just gum dispensers, not gambling devices:[1]



In more recent decades, as states began to legalize casino gambling, slot machines have gone electric. The lever has been replaced by a button, and the window has been replaced by a video screen that depicts the spinning of the reels. As a result, casinos can deploy a variety of machines with different symbols, sounds, and graphics, beyond fruit. This photo shows an assortment:[2]



---

[1] https://www.britannica.com/topic/slot-machine (Last visited 1/2/2024).  Miniature versions of such casino-style slot machines can still be purchased for home entertainment. https://www.walmart.com/ip/Home-Slot-Machine-Las-Vegas-Style-Casino-Coin-Bank-With-Winning-Light/953329600 (Last visited 1/2/2024).

[2] https://www.analyticsinsight.net/the-evolution-of-slot-machine-technology/ (Last visited 1/2/2024).

Despite these differences in façade, the gambling world acknowledges that "[c]asino slot games are essentially made up of two elements: Symbols and reels. While it's true to say that the vast array of online slots is incredibly diverse in terms of themes, graphics, animations and sounds, all of them are about landing symbols on the reels in the different combinations you need to win prizes."[3] As the MGM Casino explains, modern casino slot machines use "stunning graphics to keep players immersed and entertained…. Players are captivated by cinematic gameplay and engaging mini-games, with an endless variety of themes that cover everything from ancient myths and legends to imaginative visions of the future."[4]

*Pace-O-Matic*

This appeal arises out of the seizure of three such video gambling devices, along with payout slips and a bank bag containing U.S. currency, from Champions Sports Bar in Dauphin County. The machines were supplied to the bar by Capital Vending Company, Inc., which in turn received them from their developer, Pace-O-Matic, Inc. Pace-O-Matic sells the machines in select states, not to casinos, but to various businesses that have no gambling license.[5] By contract, Pace-O-Matic

---

[3] https://casino.betmgm.com/en/blog/everything-you-need-to-know-about-slot-symbols/ (Last visited 1/2/2024).

[4] https://casino.betmgm.com/en/blog/video-slots-vs-classic-slots/ (Last visited 1/2/2024).

[5] Pace-O-Matic is based in Georgia but has a substantial presence in Pennsylvania, one of its prime markets, where it is the leading distributor of these devices.
(continued)

provides (and controls) legal representation for any litigation that arises concerning the legality of its machines.

Pace-O-Matic's own website shows how the devices function, with video clips that can be viewed to see what a gambler sees when using one of the company's products. Ironically, the company refers to the machines as "skill games," in an apparent effort to veil their similarity to electronic casino slot machines.[6] Just like MGM and other casinos, however, Pace-O-Matic offers customers a variety of digital spinning-reel betting machines; and just like the casinos, the main difference among the products is merely in the symbols on the reels. Pace-O-Matic sells a traditional style with fruit symbols,[7] for example, but also a pirate-themed style,[8] with skulls, crossbones, and treasure maps in place of blueberries and watermelons.

The machines seized from the bar in this case provided gamblers with a choice of four of those digital styles: "Pirates," "Living Large," "Wild Beast," and "Amigos Locos." N.T. 9/30/2022 at 47. "Pirates" is typical of the group. After placing your

---

https://www.lehighvalleylive.com/news/2023/09/in-the-face-of-a-call-to-ban-skill-games-pas-biggest-player-is-pushing-back-hard.html (Last visited 1/2/2024). Several members of its executive team, including its chief legal officer, are current or former Pennsylvania residents. https://www.paceomatic.com/meet-our-team (Last visited 1/2/2024).

[6] https://www.paceomatic.com/skill-games (Last visited 1/2/2024).

[7] https://share.vidyard.com/watch/aXC5nwU8Am3r1VPqEsCntt? (Last visited 1/2/2024).

[8] https://share.vidyard.com/watch/xZg7SjareUbkFQYMtucQ9k? (Last visited 1/2/2024).

bet, you press the "Play" button and the reels spin. They even jiggle a bit when they stop, just like old mechanical slot machines did. And like all slot machines, if the symbols on the reels line up right, you win. Each spin requires a new bet, either 40¢, 80¢, $1.20, $1.60, $2, or $4 per spin. N.T. 9/30/2022 at 50. As in many modern electronic slots, the Pace-O-Matic Pirates machine translates the money into "points," to make it a bit less obvious how much you're losing. A dollar is worth 100 "points." N.T. 9/30/2022 at 46.

Here is a screenshot capture at the start of play:



*See* https://share.vidyard.com/watch/xZg7SjareUbkFQYMtucQ9k? (Last visited 1/2/2024) (video at 0:18).

8

And here is a jackpot shot; the word "congratulations" pops up in giant letters,

as golden doubloons cascade across the screen:



*Id.* (video at 0:08).

But such big wins are, of course, rare. The way to amass a significant return

is to re-spin the reels as much as possible, to increase the chance of hitting the elusive

jackpot, while piling up smaller wins in the meantime. The premium is on speed.

On some spins, a player can substitute one of the symbols for a "wild card" in

order to create a three-in-a-row match. N.T. 9/30/2022 at 49-50. Alternatively, the

player can press a "Stop" button, hoping to halt the reels in mid-spin. These features

are akin to a contrivance in traditional slot machines called a "skill stop," which

allowed players to try to stop a reel at just the right moment to make a match. The

effect was to foster the illusion that the player had some degree of control over what

9

was actually a random process.[9] N.T. 9/30/2022 at 54. Or at least random from the point of view of the player. In reality, the device designers can program the machine's software for whatever win rate they choose. In licensed casinos, that rate is regulated by law and each device must be approved. That is not the case with machines like those at issue here.[10]

The Pace-O-Matic devices also include another feature like those in traditional slot machines. Occasionally a spin of the reels results in a "hit," meaning that the player does not lose the entire bet placed on that spin. In industry parlance, this is known as a "taste," or LDW (loss disguised as a win).[11] The player believes he is winning something, so he is induced to keep playing. In reality, a "hit" just means losing a little less. N.T. 9/30/2022 at 51.

### *"Follow Me"*

There is one final feature of note – the one that purportedly transforms these electronic slot machines into mere "skill games" that are not gambling devices at all. It is a memory test called "Follow Me." But it requires quite the eagle eye even to detect this feature, let alone to understand it, let alone to win anything by playing it.

---

[9] https://en.wikipedia.org/wiki/Slot_machine (Last visited 1/2/2024).

[10] https://casino.betmgm.com/en/blog/can-casinos-control-slots/ (Last visited 1/2/2024).

[11] https://en.wikipedia.org/wiki/Slot_machine (Last visited 1/2/2024).

This is a screenshot of the "Pirates" game, at 26 seconds into the online video:



*See* https://share.vidyard.com/watch/xZg7SjareUbkFQYMtucQ9k?
(Last visited 1/2/2024) (video at 0:26).

That screen presents the first and only reference to the "Follow Me" feature on Pace-O-Matic's devices. Hard to find? The clue is to look at the little horizontal black box squeezed directly underneath the spinning reels of pirate symbols. During the course of a gaming session, the machine displays various messages in that box, usually in reasonably legible white print. Occasionally, however, the device offers a different message, in faint, dark red letters against the jet black background. The

letters flash in the website video for a total of two seconds at a time. They say: "Touch Here to Follow Me."

Until that brief flicker, the machine makes no reference to "Follow Me" at all. There is no hint that the feature even exists, and absolutely nothing that explains why anyone should "Touch Here." N.T. 11/22/2022 at 223, 285.

Assuming a slot machine player did "Touch Here," this is what would happen. The player would be taken to an entirely new screen that looks nothing like the spinning reels that enticed him to bet his money in the first place. Instead, he would see an unadorned grid of nine colored circles. Curiously Pace-O-Matic, which places so much emphasis on "Follow Me" when conducting litigation, includes no graphics of this feature on the website promoting its products. But evidence in the record below described the operation of this marginal mini-game. N.T. 11/22/2022 at 227, 237-39, 240-41.

To "win," a player must complete twenty levels of the memory test. At the first level, one of the colored circles blinks on and off. The player must then touch the screen to duplicate the blinks. Easy. But there are 20 levels, and at each one another color is added to the sequence. The player must then recreate the pattern precisely, from memory. It works something like this internet challenge, which

12

viewers are welcome to attempt for themselves from the link below:[12]



Except that "Follow Me" has more than twice as many colors to remember. And, lest the player get into a good rhythm, the process freezes for about fifteen seconds after Level 5, and then again after Level 10, and then again after Levels 15, 16, 17, 18, and 19 – forcing the colors to fade from short term memory. Then there is another hurdle: once a new level begins and its sequence has been displayed, a player has only a matter of seconds to respond before the challenge times out. Even Pace-O-Matic's own expert (an astrophysicist who did his post-doctoral work at Harvard University) admitted that he could not complete the test without the aid of notes to keep track of the increasingly complicated pattern. N.T. 11/22/2022, 307.

As fruitless and frustrating as this "Follow Me" challenge may be, it is perhaps fortunate that it is not always available. In some cases, the cryptic "Follow Me"

---

[12] https://webgamesonline.com/color-sequence/ (Last visited 1/2/2024).

message is programmed to appear only after a message that says "Press PLAY to play the next game." But if you follow that direction, the previous bet is lost, and the reels immediately spin again, resetting the message box before "Follow Me" can display. N.T. 12/2/2022, 467. Since the only chance to make big money is to spin the reels as many times as possible, you will likely do just what the device invites you to do: keep pressing Play.

But *if* a player does happen to see the two-second "Follow Me" message blink on in dark red letters in the little black box, and *if* he "Touches Here" and manages to get all the way through the 20-level brainteaser, what does he get? As it turns out, the return on a bet for a successful round of "Follow Me" is only 5% above the amount of the bet. So a gambler who places the minimum 40-cent bet, and then successfully manages to work through the entire "Follow Me" process, just gets to keep his 40 cents – plus an extra two pennies for his trouble. N.T. 11/22/2022 at 224.

It gets worse. "Follow Me" only works for the immediately preceding spin of the reels. There is no way to win back wagers lost on *prior* spins. If you want to reclaim your money, you have to work through the whole "Follow Me" exercise *every time*. Which is quite a lot of time: the record shows that a complete round of "Follow Me" would require up to *twelve minutes*[13] – as compared to a few seconds

---

[13] N.T. 9/30/2022 at 66.

14

to press play and spin the reels. All for two cents. And even then there is a catch: you don't actually get the two cents. When a bettor is ready to cash in any earnings he may have, these machines pay out only in full dollar amounts. Any profit between one dollar and the next is lost; the devices do not round up. N.T. 12/2/2022 at 483.

It doesn't get any better by placing bigger bets. A high roller who bets the $4 max on each spin, and plays "Follow Me" after each loss, could only complete five bets an hour: five spins, each followed by a twelve-minute "Follow Me" round. Each full round is twenty levels, so 100 levels altogether. If that big bettor was perfect, he would at best walk away with a profit of 5% on each of those $4 bets, which means 20 cents, times five rounds – for a grand total of *one dollar* per hour. But if he slipped up even once, on any one of those 100 "Follow Me" levels, he would lose his $4 bet for that round, and even a full hour of otherwise perfect play on the other rounds would result in a net loss of several bucks.

Alternatively, a bettor could just skip the "Follow Me" rigamarole and keep spinning the reels, hundreds of times during that same hour, which would give him hundreds of chances to pile up some real winnings.

15

*Lower courts*

And yet the dubious promise of "Follow Me" has so far been enough to turn these electronic slot machines into "skill games" that supposedly aren't for gambling at all. After the seizure of the machines, the bar and the vending company, with representation through Pace-O-Matic, filed a petition for return of property in Dauphin County. The common pleas court granted it. The Commonwealth appealed to Commonwealth Court. The operators asked for an expedited appeal, arguing that the resolution of the issue "will have immediate statewide impact by ending multiple disputes among multiple parties, yielding a host of judicial efficiencies in several venues." Motion to Expedite at 1. Commonwealth Court granted the request and raised the stakes, sua sponte ordering the case to be heard en banc.

On November 30, 2023, in an opinion by the Honorable Lori A. Dumas, the court ruled that the slot machines were perfectly legal video games, not gambling devices. The court characterized the slot machine aspects of the devices – that is, everything about them except for the mostly hidden "Follow Me" appendage – as merely "the initial stage of the game." But "Follow Me," held the court, cured the machines of their illegal gambling essence, because in theory it "allowed a player to 'beat' the game every time." Slip op. at 15. All you would have to do is find the small print, "touch here," and concentrate perfectly through 20 levels of ever more

16

complex blinking color patterns. And do so again and again, after each spin of the reels.

Because the en banc opinion is contrary to case law and common sense, the Commonwealth now seeks this Court's review.

**REASONS FOR GRANTING THE APPLICATION**

This petition meets multiple standards governing allowance of appeal to this Court. Pa. R. App. P. 1114(b).

The holding of the intermediate appellate court conflicts with this Court's precedent, going back 40 years, holding that the legality of an apparent gambling device must be assessed according to the "predominant factors" of the game – not on the basis of largely hidden and superfluous add-ons that provide a pretext for a claim that skill, rather than chance, predominates. Pa. R. App. P. 1114(b)(2).

The holding of the intermediate appellate court also conflicts with this Court's very recent precedent holding that the legislature's careful demarcations of authority over particular types of gambling activity must be enforced, that statutory definitions of "slot machine" must be read *in pari materia*, and that games that simulate casino-style slot machines must be treated as what they are. Pa. R. App. P. 1114(b)(2).

The holding of the intermediate appellate court further conflicts with a holding of the other intermediate appellate court, which like this Court has explicitly ruled that legislative provisions on gambling devices must be read *in pari materia* – a

17

ruling that Commonwealth Court explicitly but summarily rejected as "unpersuasive." Pa. R. App. P. 1114(b)(1).

Finally, this is a matter of substantial public importance that warrants prompt and definitive resolution by this Court. Pa. R. App. P. 1114(b)(4). Thousands of substantially similar devices are cropping up in corner stores and bars throughout the state. Controversy over the status of the machines has spawned a host of pending forfeiture and criminal proceedings, as well as civil actions, including defamation suits, wrongful death litigation, and even a federal RICO complaint. Courts, Commonwealth and county officials, and private parties, all faced with the conflicting precedents noted above, need clear guidance on the application of the relevant Pennsylvania statutes. Only this Court can provide it.

**I.    A slot machine is an illegal gambling device, predominantly governed by chance, even when the machine's manufacturers slip in a so-called "skill" element that is almost entirely hidden from view and is almost impossible to complete. The published en banc decision below would effectively nullify this Court's "predominant factor" test.**

This case is a new chapter in an old story. For decades, operators of illegal enterprises have been trying to skirt the law by inserting "innocent" features into their gambling devices. "Follow Me" is much like the fruit symbols used in the past to disguise slot machines as chewing gum dispensers: a fig leaf providing scant cover over the reality that these are betting machines.

This Court has long addressed such attempted amalgams in the gambling sphere. The Crimes Code, 18 Pa. C.S. § 5513, prohibits trafficking in gambling devices, but does not define the term. In *Commonwealth v. Two Elec. Poker Game Machines*, 465 A.2d 973, 977 (Pa. 1983), this Court construed the statute and established what has come to be known as the "predominant factor" test. The Court rejected the argument that a machine qualifies as an illegal gambling device only if its results are entirely a matter of chance as opposed to skill. *Id.* at 977. Instead, the Court held, it is sufficient that "the element of chance predominates and the outcome is largely determined by chance." *Id.* at 978. Thus it is the essence of the device as actually played that matters. The insertion of a secondary or superficial element requiring "skill" does not make a gambling device legal.

19

Much more recently, and in a related context under the State Lottery Law, the Court has similarly held that the way to determine whether a game simulates a casino-style slot machine is by "focus[ing] on the overall appearance and the experience of play …, not the presence of any particular feature." *Greenwood Gaming v. Department of Revenue,* 2023 WL 8723602, *9 (Pa. Dec. 19, 2023). The analysis requires "a subjective assessment of the game's appearance and effect when in play." *Id.* at *1.

The Superior Court holds to the same effect. *See, e.g., Commonwealth v. Lund,* 15 A.2d 839, 840, 845 (Pa. Super. 1940) ("no matter how new the artifice it is within the condemnation of the law if it in effect embodies the principle of a lottery and operates as such …. [T]he system carried on by defendant is as a whole a gambling device") (internal quotation marks omitted). So has the Commonwealth Court, at least in the past. *See, e.g., Commonwealth v. Lindey,* 916 A.2d 703, 705-06 (Pa. Cmwlth. 2006) ("coupons" that ostensibly provided discounts for goods and services, but contained a rub-off portion offering the chance for cash prizes, were "simply a thinly disguised lottery … a subterfuge for the gambling scheme").

The precedents should easily have been enough to resolve this case. These machines look and act exactly like the electronic slot machines found in casinos. You put your money in, you press a button to spin the reels, and you collect a bounty if the symbols on the reels happen to line up right. Consideration, chance, reward –

the three fundamental elements of a gambling device. *Two Elec. Poker Game Machines*, 465 A.2d at 977. No one walks up to these things to play "Follow Me," because no one walking up even knows there *is* a "Follow Me." That feature is entirely hidden until well into the gambling process, and even then it is barely visible. And if players do try "Follow Me," they will almost certainly fail, given the number of colors, the number of levels, the forced breaks, the time-out limit – and waste time they could have been using to do what the machine, with every other aspect of its construction and design, entices them to do: *gamble*. "Follow Me" is exactly what the Commonwealth Court was formerly able to recognize: "a thinly disguised … subterfuge for the gambling device."

"Follow Me," in other words, is not really there for the players. If it were, the designers would have called attention to it; they certainly know how to do that. These devices are not subtle attractions. They have all the bells and whistles of any electronic slot machine. When they want you to notice something, you notice it. If someone hits the jackpot, giant gold coins literally fill the screen. Everything about "Follow Me," in contrast, is designed to *discourage* its use. If people actually played it they would be occupying the equipment for hours without placing any bets, which is how the machine makes money. "Follow Me" exists because it is a legal strategy, not a commercial one. And for that purpose, it has so far succeeded.

Indeed, the court below ruled that "Follow Me" was the only thing that really mattered. The opinion dismissed the slot machine features of the device – which is to say, virtually all the features of the device – as merely "a tic-tac-toe type puzzle." Slip op. at 2. "Follow Me," on the other hand, could allow a player to "beat the game" and win back his gambling losses. Slip op. at 15. Therefore, according to the court, these devices were predominantly a game of "skill," not luck. In fact, since the "Follow Me" feature could be employed "on each and every play," at least in theory, it didn't just *reduce* the role of chance; it "eliminated the chance element" entirely. Slip op. at 18.

But "in theory" is not how the predominant factor standard is applied. "The test by which to determine the answer is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual, practical operation." *Lund*, 15 A.2d at 849. Perhaps you could, theoretically, "beat the game" by playing "Follow Me" – *if* you were ever told it exists, or what it's for. Perhaps you could, theoretically, actually complete all 20 levels – *if* you had an eidetic memory, or took impeccable notes before the game timed out. Perhaps you could, theoretically, recoup all your losses – *if* you had all day to play a twelve-minute round of Follow Me after every single two-second spin of the reels.

But there is a more basic problem with the lower court's legal analysis. The whole premise of the opinion is that "skill" predominates because it can reverse the

ravages of the bettor's bad luck. But the only real-world effect of such a feature would be to reassure gamblers that they can play the slots without undue fear of indigency. "Follow Me," after all, is not some kind of standalone video game that can be undertaken independently. The only way to access it is to place failed wagers on Pace-O-Matic's spinning reels. If people who do that believe they can recover their investment, they have all the more inducement to bet. A feature on a gambling device that *encourages more gambling* does not – not even in theory – turn the machine into a game of skill. It just makes it a better, more lucrative gambling device.

If the en banc opinion stands, the game is effectively over for the predominant factor test. Just about any gambling activity could be legalized, by the simple expedient of affixing a so-called "skill" element, however illusory, that purports to return any ante. Take poker, a quintessential form of gambling. Suppose the dealer has a rule that, if anyone can do a handstand, in the middle of the gaming table, while the dealer shuffles and reshuffles and hands out all the cards for the next round, he'll give them their last bet back. But no one ever does the handstand, because the dealer never told them about it, and because none of the players can hold a handstand that long. *They came to play poker.* After the ruling below, though, it *isn't* poker. It's gymnastics.

**II.    As this Court and Superior Court have held, statutes regulating gambling interact and must be read *in pari materia*. The court below improperly refused to do so, and improperly refused to apply the legislative definition of a "slot machine."**

But even if these devices were predominantly about skill rather than chance, they would still be "slot machines" as Pennsylvania law defines them, and therefore would still be illegal under the Crimes Code.

Section 5513(a) of the Code makes it unlawful to manufacture or deliver a "punch board, drawing card, slot machine *or* any device to be used for gambling purposes." As Superior Court has recognized, the "or" separates these items into two distinct categories: punch boards, drawing cards, and slot machines, on the one hand, and "devices to be for gambling purposes" on the other. Both categories are illegal. *Commonwealth v. Bretz*, 433 A.2d 55, 58 (Pa. Super. 1981). Thus, whether or not the devices here are generic gambling devices under the predominant factor test, the question remains whether they are "slot machines" for purposes of the statute.

The Crimes Code does not define the term. But the Gaming Act does, and these devices clearly fit. The Act's Definitions provision defines a slot machine to include a "skill slot machine," which is in turn defined as "[a] slot machine in which the skill of the player, rather than the element of chance, is the predominant factor in affecting the outcome of the game." 4 Pa. C.S. § 1103. Pace-O-Matic's machines, therefore, inevitably fall under the alternative categories established by § 5513: if

24

chance predominates, they are "devices to be used for gambling purposes"; if skill predominates, they are "slot machines."

The court below refused to consider the Gaming Act definition. That was error, as this Court has recently made clear in the *Greenwood Gaming* case. The Court's task there was to construe a reference in the Lottery Law to slot machines. In doing so, the Court relied at length on "the General Assembly's expansive definition of a slot machine" in the Gaming Act. 2023 WL 8723602, at *9. The Court emphasized that statutory language must be considered "in its full context … and not in isolation or divorced from it." *Id.* at *7-*8. The Court explained that legislative enactments concerning gambling must be read together, that the Acts constitute "statutory schemes carefully crafted" in their interplay, and that it was the obligation of the courts to "honor this longstanding, carefully constructed" framework. *Id.*

Admittedly, the opinion below did not have the benefit of *Greenwood*, which had not yet been decided. But it did have the benefit of Superior Court precedent to the same effect as *Greenwood*. In *Commonwealth v. Dent*, 992 A.2d 190, 197 (Pa. Super. 2010), the court considered whether poker constituted illegal gambling under § 5513 of the Crimes Code. To resolve the question the court looked to the Gaming Act, which had recently legalized poker limited to licensed casinos. As the court noted, the legislature would have no need to legalize poker, even in limited fashion,

25

if it was already legal. The Crimes Code had to be read *in pari materia* with the Gaming Act.

Instead of following its sister court, however, the court below perfunctorily dismissed *Dent* as "unpersuasive." Slip op. at 11 n.9. The reason? Because, according to the court, the Crimes Code and the Gaming Act have nothing to do with each other: the Gaming Act only regulates *legal* gambling, and the Crimes Code only regulates *il*legal gambling. Slip op. at 10-11.

But that is simply false. The Gaming Act makes some gambling activities legal, but explicitly makes others illegal. *See, e.g.* 4 Pa. C.S. § 1518 (Prohibited Acts; Penalties). The Crimes Code makes some gambling activities illegal, but explicitly excludes others. *See, e.g.*, 18 Pa. C.S. § 5513(e.1) (lotteries, bingo, small games of chance, amusements). Both statutes address both legal and illegal gambling activities. They are different parts of a carefully constructed legislative scheme.

Within that scheme, there is only one place where the legislature has defined slot machines – the Gaming Act. And within that Act, the legislature has specifically stated its intent regarding slot machines. The Act's Legislative Intent provision declares: "It is necessary to maintain the integrity of the regulatory control and legislative oversight over the operation and play of slot machines … in this Commonwealth." 4 Pa. C.S. § 1102(11). It doesn't say "slot machines that happen to be in casinos." It says "slot machines … *in this Commonwealth*." The legislature

26

plainly intends to protect the integrity of slot machine activity throughout Pennsylvania. It was therefore incumbent on the court below to consult the Gaming Act definition of a slot machine, which is the only statutory definition of a slot machine.

Instead of honoring the legislative framework, the court below looked elsewhere, to dictionary definitions. Dictionary books, while not as apt as statute books, might still have led the court to a reasonable result; but they did not. The court noted that dictionaries define slots as a gambling machine, or an electronic version of such a machine, that pays off according to the matching of symbols on wheels. The devices here do that, acknowledged the court. But they also have "Follow Me," and none of the dictionaries say anything about "Follow Me." *Ipso facto*, held the court, if a slot machine has any additional feature like "Follow Me," then it must not be a slot machine. Slip op. at 9-10.

But on that logic, *nothing* would be a slot machine. As this Court observed in *Greenwood Gaming*, "with the development of video slot machines in the 1970s, slot machines began to evolve beyond" their traditional trappings. Today, "an essential component of video slot play is the bonus game, which is a game separate and apart from the slot play." 2023 WL 8723602, at *8. By ignoring that reality, the court below managed to reinforce and even expand the loophole it created with its "predominant factor" analysis. Armed with the lower court's opinion, it could hardly be easier to evade the laws governing slot machines.

27

The real-world results of this holding would be unrecognizable to anyone who thought gambling enterprises in the Commonwealth of Pennsylvania are closely regulated. If so-called "skill" slots aren't gambling devices because skill predominates, and they're not slot machines because slot machines can't have a skill component, then they are perfectly legal for everyone. Any operator, however unscrupulous or unsavory, has free, unregulated rein. Any operator, that is, except casino operators licensed under the Gaming Act. *They* are still subject to the entire regulatory structure established by the legislature for slot machine activity.

Everyone else can do whatever they want. They can program their machines with deceptive hit rates that start out high and then steadily decrease once customers have been lured in. They can aim their marketing directly at compulsive and problem gamblers, or alcoholics, or minors. They can set up casino-style gambling halls with rows and rows of machines. They can build those casino-style halls right next to real casinos – the lawfully licensed and regulated casinos that pay up to $50 million for an initial license and tax rates up to 50%, the proceeds of which support property tax relief, wage tax reduction, and economic development opportunities.

It's already beginning to happen. A new gambling parlor in Northumberland County calls itself "Little Vegas." It is solely dedicated to machines like those here and is open 24 hours a day, with unlimited free food and drink.[14] And outside Harrisburg is the new "Keystone Klub," a standalone building filled with similar machines. Here is a photo from its website:[15]



The website boasts that "[w]e have the latest software with the best payouts, the best graphics, and the best bonus features," and asks: why go to a casino?

---

[14] https://fox56.com/news/local/shamokins-first-dedicated-skilled-gaming-facility-little-vegas-brings-247-entertainment-to-town (Last visited 12/21/2023).

[15] https://thekeystoneklub.com/about/ (Last visited 1/2/2024).

### III. This case is of compelling importance because thousands of similar devices are being distributed across the Commonwealth, giving rise to many pending legal actions that await this Court's guidance.

The stakes here are high. The en banc opinion below affects a myriad of machines and a multitude of legal proceedings throughout Pennsylvania.

Because they are completely unregulated, the exact number of devices already in circulation is unknown. But the American Gaming Association estimates that there are approximately 67,000 such machines currently in operation in the Commonwealth of Pennsylvania. What is clear is that manufacturers, apparently encouraged by their ability to avoid regulation here to date, have placed particular focus on Pennsylvania as a marketplace. The number of machines in this state is substantially higher than in many other states. Pennsylvania now has almost twice as many as Georgia, and more than eight times as many as Virginia.[16]

This mountain of machines has engendered a slew of litigation. In the Motion to Expedite they filed in the Commonwealth Court, the device operators reported that there are related cases pending in at least nine courts of common pleas, in the Commonwealth Court, in the Superior Court, in the Third Circuit Court of Appeals, in the Middle District of Pennsylvania and in the Eastern District of Pennsylvania. Motion to Expedite, filed 7/7/2023, at 9. As the operators said, "the sooner the Court

---

[16] "Sizing the Illegal and Unregulated Gaming Markets in the United States, page 12 (https://www.americangaming.org/wp-content/uploads/2022/11/Sizing-the-Illegal-and-Unregulated-Gaming-Markets-in-the-US.pdf (last accessed Dec. 20, 2023).

resolves this appeal, the sooner these parties, related parties, and many courts can quickly move forward." *Id.* at 1.

The issue is particularly acute in matters arising, like this one, under the Crimes Code. Section 5513 contains both a criminal penalty concerning gambling devices, in subsection (a), and a forfeiture provision concerning gambling devices, in subsection (b). Appeals from a conviction under subsection (a) go to Superior Court. Appeals from a forfeiture under subsection (b) go to Commonwealth Court. Both appeals will likely turn on the same question: whether the machines at issue here are gambling devices. As discussed above, Commonwealth Court and Superior Court have taken opposite approaches in analyzing such questions. There should only be one answer, and it can only come from this Court.

Then there are the civil cases. These include, for example, a civil action filed by Pace-O-Matic in Commonwealth Court against numerous state agencies and individual employees. Represented by the same legal team as in the present case, Pace-O-Matic asserts that state officials have harmed its reputation by challenging the company's claims about the legality of its gambling devices. *POM of Pennsylvania, LLC v. BLCE, et al.,* 222 MD 2022. And Pace-O-Matic has sued not only the government lawyers who have litigated against it, but the expert witnesses who have testified against it, alleging tortious conduct. *POM of Pennsylvania, LLC v. BMM North American, Inc.,* No. 23-CV-00579-JPW (M.D.Pa.).

31

In addition, Pace-O-Matic's lawyers have brought two other actions seeking a declaratory judgment from Commonwealth Court concerning their devices: *POM of Pennsylvania, LLC v. Department of Revenue,* 418 MD 2018, and *POM of Pennsylvania, LLC v. Pennsylvania State Police*, 503 MD 2018. A three-judge Commonwealth Court panel issued an opinion favorable to the petitioners, *POM of Pennsylvania, LLC v. Department of Revenue,* 221 A.3d 717, 735 (Pa. Commw. Ct. 2019), but the company has fought the government's efforts to appeal the matter to this Court.

Also of note is a suit pending in federal court, in which licensed casino owners wish to litigate whether Pace-O-Matic can properly advertise its slot machines to the public as "legal." *Greenwood Gaming v. POM,* 22-cv-4434 (E.D. Pa.). And a wrongful death action is pending in the Philadelphia Court of Common Pleas, relating to similar machines and the question of their legality. *Edward M. Biggin, Esquire, as Personal Representative of the Estate of Ashokkumar Patel, deceased v. Shree Umiya of Hazelton, LLC*, No. 221101639 (C.P. Phila.).

Finally, there is also a petition for allowance of appeal pending before this Court, regarding substantially similar machines produced by a different company. *Pinnacle Amusement, LLC v. Bureau of Liquor Control Enforcement, petitioner*, 479 MAL 2023. The decision below rested on narrower grounds than the present case, and was the product of a three-judge Commonwealth Court panel, as opposed to the

en banc decision at issue here. The Commonwealth suggests that the Court may wish to place that matter on hold while it considers the petition in this case.

Throughout all this litigation, device operators have contended that casino owners and government officials have unfairly teamed up to put them out of business. They say they are performing a public service, for example by providing charities and social clubs the means to raise needed funds. But the General Assembly has already explicitly prohibited the use of slot machines for such purposes,[17] just as it has heavily regulated slots in other areas. Legislators are of course free to reconsider these policy issues at any time. Until they do, however, courts and citizens need to know whether a device that bets like a slot machine, spins like a slot machine, wins (or, much more commonly, loses) like a slot machine, and even jiggles like a slot machine, is in fact a slot machine. Review is warranted.

---

[17] Small Games of Chance Act, 10 P.S. § 328-103 (defining games of chance; "[n]othing in this act shall be construed to authorize games commonly known as 'slot machines'").

33

## CONCLUSION

For these reasons, the Commonwealth respectfully requests this Court to grant allowance of appeal.

Respectfully submitted,
MICHELLE A. HENRY
Attorney General

MICHELE K. WALSH
Executive Deputy Attorney General
Criminal Law Division

RONALD EISENBERG
Chief Deputy Attorney General
Appeals Section

HUGH BURNS
Assistant Chief Deputy Attorney General
Appeals Section

*/s/ Susan E. Affronti*
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date:  January 2, 2024

34

## CERTIFICATES OF COMPLIANCE

This petition complies with Pa. R.A.P. 127(a) and the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania*, which require that confidential information and documents be filed differently than non-confidential information and documents.

The undersigned further certifies that this petition complies with Pa.R.A.P. 1115(f), as it contains fewer than 9,000 words. *See* Pa.R.A.P. 2135(b) ("the cover of the brief and pages containing the table of contents, tables of citations, proof of service and any addendum containing opinions, signature blocks or any other similar supplementary matter … shall not count against the word count limitations").

By:  */s/ Susan E. Affronti*
SUSAN E. AFFRONTI
Senior Deputy Attorney General
Supreme Court No. 88010

Office of Attorney General
Criminal Law Division
1000 Madison Avenue, Suite 310
Norristown, PA 19403
(717) 437-6727
saffronti@attorneygeneral.gov

Date:  January 2, 2024

35

# Appendix A

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In re: Three Pennsylvania Skill  :
Amusement Devices, One Green  :
Bank Bag Containing $525.00 in  : No. 707 C.D. 2023
U.S. Currency, and Seven Receipts : Argued: October 11, 2023
            :
Appeal of: Commonwealth of   :
Pennsylvania         :

BEFORE: HONORABLE RENÉE COHN JUBELIRER, President Judge
    HONORABLE PATRICIA A. McCULLOUGH, Judge
    HONORABLE MICHAEL H. WOJCIK, Judge
    HONORABLE CHRISTINE FIZZANO CANNON, Judge
    HONORABLE ELLEN CEISLER, Judge
    HONORABLE LORI A. DUMAS, Judge
    HONORABLE STACY WALLACE, Judge

OPINION
BY JUDGE DUMAS        FILED:  November 30, 2023

    The Office of the Attorney General of the Commonwealth of Pennsylvania (the Commonwealth) appeals from the order entered in the Court of Common Pleas of Dauphin County (trial court) on March 23, 2023, granting the petition for return of property filed by Capital Vending Company, Inc. (Capital Vending) and Champions Sports Bar, LLC (Champions Bar) (collectively, Appellees).  After careful review, we affirm.

## I. BACKGROUND[1]

    On December 9, 2019, agents of the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), seized three amusement devices (POM

---

[1] We base the statement of facts on the trial court's opinion, which is supported by the record. *See* Trial Ct. Op., 3/23/23, at 1-2.

machines),[2] a green bag containing $525.00 in currency, and seven receipts from Champions Bar.  According to BLCE, the POM machines were gambling devices *per se*, and the $525.00 and receipts were derivative contraband.

The POM machines have a single game with multiple themes. Gameplay commences when a player inserts money into the machine.  The money is converted into points/credits,[3] with $1 equaling 100 points.  Following completion of gameplay, the player may redeem any remaining credits by pressing the "redeem" button, which generates a ticket that the player can exchange for currency.  The player can decide how many points to commit to a play, from 8 to 400 points, and can preview the upcoming puzzle before committing the points.  The first phase of the game is a "tic-tac-toe" type puzzle with nine symbols arranged in rows of three. The object of the game is for the player to match three similar symbols in a row on as many pay lines as possible, arranged horizontally, vertically, and/or diagonally.

There are three outcomes: (1) the puzzle can be solved, resulting in an award equal to 105% of the committed points (a win); (2) the puzzle can be solved, resulting in an award less than 105% of the committed points (a hit); and (3) the puzzle cannot be solved (a loss).  After a hit or loss, the player is offered an opportunity to recoup lost points with the "Follow Me" feature.  During the "Follow Me" portion of the game, the player tries to repeat a pattern of multiple, multi-colored circles.  If the player repeats the pattern correctly, the game restores the points lost, plus an additional five percent.

---

[2] The devices are electronic games developed by Pace-O-Matic, Inc.  Notes of Testimony (N.T.), 11/22/22, at 305.  Generally, these games have a "reel" or "tic tac toe" puzzle phase, as well as a secondary memory skill game in which the player can win back any money lost during the puzzle phase. *See id.* at 305-20.  The devices at issue were supplied to Champions Bar by Capital Vending.

[3] The trial court uses both terms interchangeably.

No criminal charges were filed related to the seizure, but the Commonwealth issued Champions Bar an administrative citation for permitting gambling. Appellees filed a petition for return of property pursuant to 42 Pa.C.S. § 5806 and Pennsylvania Rule of Criminal Procedure 588, Pa.R.Crim.P. 588, arguing that the POM machines are not gambling devices *per se* but are predominantly games of skill.

The trial court held evidentiary hearings after which the trial court invited the parties to submit proposed findings of fact and conclusions of law. On March 23, 2023, the trial court issued an opinion and order granting Appellees' petition for return of property. The trial court further ordered the Commonwealth to return the seized property within five days. The Commonwealth timely appealed to the Superior Court of Pennsylvania, which transferred the matter to this Court.

## II. ISSUES

The Commonwealth raises two issues for our review. First, the Commonwealth contends that the POM machines are "slot machines," which are prohibited under the Crimes Code, 18 Pa.C.S. § 5513(a). Second, the Commonwealth argues that the POM machines are gambling devices *per se*.[4]

---

[4] The Commonwealth purports to raise a third issue, namely, that the Pennsylvania Race Horse Development and Gaming Act (Gaming Act), 4 Pa.C.S. §§ 1101-1904, provides a sufficient basis for seizure of the POM machines. *See* Commonwealth's Br. at 37. We have rejected this exact argument previously and decline to revisit it. *See POM of Pa., LLC v. Dep't of Revenue*, 221 A.3d 717, 735 (Pa. Cmwlth. 2019) (*en banc*) (*POM*). Further, this argument was not raised before the trial court and is waived. *See* Pa.R.A.P. 302(a) (issues not raised before the trial court may not be raised for the first time on appeal).

3

## III. DISCUSSION[5]

## A. Introduction

## 1. Section 5513 of the Crimes Code

In this case, the parties dispute the proper interpretation of Section 5513 of the Crimes Code, which was relied upon by BLCE in seizing the POM machines. A person is guilty of a first-degree misdemeanor if he "intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards." 18 Pa.C.S. § 5513(a). Electronic versions of these devices that offer simulated gambling programs are also prohibited. *See* 18 Pa.C.S. § 5513(a.1). Any gambling device that is used in violation of the provisions of the statute shall be seized and forfeited to the Commonwealth. 18 Pa.C.S. § 5513(b).

---

[5] "Our review on this appeal [from a motion to return property] is limited to examining whether the trial court's factual determinations were supported by [substantial] evidence and whether the trial court abused its discretion or committed an error of law." *Commonwealth v. Morelli*, 55 A.3d 177, 179 (Pa. Cmwlth. 2012). The trial court as a factfinder is "the ultimate judge of credibility and resolves all conflicts in the evidence." *See Lodge v. Robinson Twp. Zoning Hr'g Bd.*, 283 A.3d 910, 925 (Pa. Cmwlth. 2022). As with any other witness, the factfinder "is free to accept or reject the credibility of expert witnesses, and to believe all, part, or none of the evidence." *City of Phila., Bd. of Pensions & Ret. v. Clayton*, 987 A.2d 1255, 1262 (Pa. Cmwlth. 2009). As long as sufficient evidence exists in the record, "which is adequate to support the [factfinder's] determination, an appellate court is precluded from overturning these determinations." *See id.* "On a motion for return of property, it is the movant's burden to establish by a preponderance of the evidence that he is entitled to lawful possession of the property at issue." *Morelli*, 55 A.3d at 180.

## 2. Forfeiture Proceedings in General

Anyone aggrieved by the seizure of property may move for the return of the property by motion. 42 Pa.C.S. § 5806(a)(1); *see also* Pa.R.Crim.P. 588(A). If the motion is granted, "the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited." Pa.R.Crim.P. 588(B).

"[T]he moving party must establish by a preponderance of the evidence entitlement to lawful possession. Once that is established, unless there is countervailing evidence to defeat the claim, the moving party is entitled to the return of the identified property." *Singleton v. Johnson*, 929 A.2d 1224, 1227 (Pa. Cmwlth. 2007). A claim can be defeated if an opposing party can establish that it is entitled to lawful possession of the property or if the Commonwealth can establish that the property is contraband. *See id.* at 1227 (citing *Commonwealth v. Crespo*, 884 A.2d 960 (Pa. Cmwlth. 2005)). "If the Commonwealth seeks to defeat the claim, it bears the burden to prove, by a preponderance of the evidence, that the items are either 'contraband *per se*' or 'derivative contraband,' and therefore should not be returned to the moving party." *Commonwealth v. Trainer*, 287 A.3d 960, 964 (Pa. Cmwlth. 2022).

"To meet its burden to defeat the motion for return of property, the Commonwealth must make out more than simply demonstrating that the property was in the possession of someone who has engaged in criminal conduct. It must establish a specific nexus between the property and the criminal activity." *Singleton*, 929 A.2d at 1227 (citations omitted). "When the Commonwealth sustains that burden, the burden of proof shifts to the property owner to disprove the Commonwealth's evidence or establish statutory defenses to avoid forfeiture." *See*

5

*id.* (citing *Commonwealth v. 1992 Chevrolet*, 844 A.2d 583, 585 (Pa. Cmwlth. 2004)).

### B. Whether the POM Machines are Slot Machines[6]

### 1. The Parties' Arguments

The Commonwealth contends that there are four distinct categories of devices prohibited under the Crimes Code: punch cards, drawing cards, slot machines, and "any device to be used for gambling purposes." Commonwealth's Br. at 15 (citing 18 Pa.C.S. § 5513(a)(1)). According to the Commonwealth, the first three are inherently gambling devices and *per se* illegal. *Id.* The final category, the Commonwealth suggests, is a catch-all category that requires proof of use because it may include objects that are not inherently created for gambling purposes. *Id.*

Within this framework, the Commonwealth asserts that the seized POM machines are plainly slot machines and, thus, illegal. *See id.* at 17-24. Noting that the Crimes Code has not defined the term "slot machine," the Commonwealth relies

---

[6] Prior to discussing the merits of this issue, we first address the trial court's assertion that the Commonwealth did not preserve this claim because it was not included in the Commonwealth's answer to the petition for return of property or the Commonwealth's counterclaim for forfeiture of property. *See* Trial Ct. Op. at 4 n.2. The trial court observed that the first time the Commonwealth brought the claim was in its post-hearing submission. In response, the Commonwealth states that its answer to the return of property petition stated that the seizure was premised on a violation of 18 Pa.C.S. § 5513 and that throughout the answer, the Commonwealth relied on both the fact that the machines were slot machines and that they were games of chance and, thus, devices used for gambling purposes. *See* Commonwealth's Br. at 24. An examination of the Commonwealth's answer reveals that the Commonwealth did not clearly state this issue in a manner that would have alerted the trial court and Appellees of its argument and, accordingly, risks waiver. *See* Pa.R.A.P. 302(a). However, because the answer does repeatedly discuss "simulated slot machine games," we hold this is sufficient preservation of the issue for purposes of our appellate review, and we will address the merits of the Commonwealth's argument.

6

on a standard dictionary definition but further directs our attention to a definition provided in the Gaming Act. *See id.* at 17-18.

According to the Commonwealth, it is appropriate to read the Crimes Code *in pari materia* with the Gaming Act because these acts "necessarily go hand-in-hand" and because the Gaming Act serves as a limited legislative exception to conduct otherwise deemed illegal. *See id.* 18-20. Thus, the Commonwealth argues, the definition of a slot machine under the Crimes Code must be the same as, or perhaps even broader than, the Gaming Act definition. According to the Commonwealth, a narrow definition of "slot machine" would undermine the "primary objective" of the General Assembly "to protect the public through regulation and policing of all activities involving gaming and practices that continue to be unlawful. *Id.* at 21 (quoting 4 Pa.C.S. § 1102(1)).

For these reasons, the Commonwealth urges that the POM machines are subject to seizure and forfeiture under 18 Pa.C.S. § 5513(b).

In response, Appellees reject the Commonwealth's interpretation of Section 5513(a). *See* Appellees' Br. at 35. According to Appellees, the statute does not proscribe slot machines in the abstract but only those slot machines manufactured or sold for gambling purposes. *See id.* at 35-38. Nevertheless, Appellees maintain that the POM machines are not slot machines under the Crimes Code, because they are games of skill with an additional "Follow Me" feature absent from slot machines. *See id.* at 61, 70. Further, Appellees contend that it is inappropriate to consider any principles of statutory interpretation because the Commonwealth has not alleged an ambiguity in the statute. *See id.* at 44-47. Finally, Appellees assert that it is inappropriate to read the Crimes Code and Gaming Act *in pari materia*, because they relate to different classes of things: the Crimes Code is

7

concerned with illegal gambling, while the Gaming Act regulates licensed, legal gambling. *See id.* at 47-48.

## 2. The POM Machines are not Slot Machines

"The touchstone of interpreting statutory language is to ascertain and effectuate the intent of the legislature." *Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 196 (Pa. Cmwlth. 2015); 1 Pa.C.S. § 1921(a). It is a "guiding principle of statutory construction that when the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." *Summit Sch., Inc.*, 108 A.3d at 196; 1 Pa.C.S. § 1921(b).

"Words and phrases shall be construed . . . according to their common and approved usage." 1 Pa.C.S. § 1903(a). "In giving effect to the words of the legislature, we should not interpret statutory words in isolation, but must read them with reference to the context in which they appear." *Giant Eagle, Inc. v. Workers' Comp. Appeal Bd. (Givner)*, 39 A.3d 287, 290 (Pa. 2012).

If a statute is unclear or ambiguous, then the courts may apply further principles of statutory construction to ascertain the intent of the legislature. *Summit Sch., Inc.*, 108 A.3d at 197; *see, e.g.*, 1 Pa.C.S. §§ 1921(c) (enumerating further considerations), 1922(1) (presuming, *inter alia*, that the legislature does not intend a result that is absurd), 1932 (providing that statutes relating to the same things or class of things, *i.e.*, *in pari materia*, "shall be construed together . . . as one statute"). A statute is ambiguous if there are two or more reasonable interpretations of the statutory language. *Herold v. Univ. of Pittsburgh - of Commonwealth Sys. of Higher Educ.*, 291 A.3d 489, 501 (Pa. Cmwlth. 2023), *appeal granted*, (Pa. No. 94 WAL 2023, filed Oct. 13, 2023).

Statutes are *in pari materia* "when they relate to the same persons or things or to the same class of persons or things." *See* 1 Pa.C.S. § 1932(a).  However, "the rule requiring statutes *in pari materia* to be construed together is only a rule of construction to be applied as an aid in determining the meaning of a doubtful statute, and [it] cannot be invoked where the language of a statute is clear and unambiguous." *Goodwin v. Goodwin*, 280 A.3d 937, 948 n.7 (Pa. 2022) (citing *In re McFarland's Est.*, 105 A.2d 92, 95-96 (Pa. 1954)).

Additionally, we note that there is a statutory mandate that penal statutes "shall be strictly construed." *See Commonwealth v. McCoy*, 962 A.2d 1160, 1168 (Pa. 2009); *see also* 1 Pa.C.S. § 1928(b)(1).  This does not override the "general principle that the words of a statute must be construed according to their common and approved usage and does not require this Court to give the words of a penal statute their "narrowest possible meaning." *See McCoy*, 962 A.2d at 1168 (cleaned up).  However, where there is ambiguity in the language of a statute, it should be interpreted in "the light most favorable to the accused." *See id.*

With these principles in mind, we readily reject the Commonwealth's arguments.  The Crimes Code does not define "slot machine" or the other specific categories of proscribed devices.[7]  However, a slot machine is commonly construed as a "coin-operated gambling machine that pays off according to the matching of symbols on wheels spun by a handle." *See* https://www.merriam-webster.com/dictionary/slot%20machine (last visited Nov. 29, 2023).  Although

---

[7] Section 5513 does provide definitions for other, related terms, *e.g.*, "consideration associated with a related product, service, or activity," "electronic video monitor," and "simulated gambling program." 18 Pa.C.S. § 5513(f).

9

originally a mechanical device, the definition includes "electronic version[s] of the machine." *Id.*[8]

This definition does not adequately describe the POM machines. While the first stage in gameplay may be analogous to the experience that a slot machine offers, the POM machines also integrate a memory game into the overall gameplay experience that requires a player to focus on a sequence of multicolored shapes and then recall the sequence correctly. *See, e.g.*, N.T. at 305-20. This additional feature of the POM machines distinguishes them from the common definition of a slot machine. *Cf.* https://www.merriam-webster.com/dictionary/slot%20machine (last visited Nov. 29, 2023); https://www.britannica.com/dictionary/slot-machine (last visited Nov. 29, 2023); https://www.thefreedictionary.com/slot+machine (last visited Nov. 29, 2023).

We further reject the Commonwealth's assertion that the Crimes Code must be read *in pari materia* with the Gaming Act, thus importing its broad definition of "slot machine" in order to give effect to the General Assembly's objective in the Gaming Act of protecting the public. Such an interpretation is inappropriate. Statutes are *in pari materia* "when they relate to the same persons or things or to the same class of persons or things." *See* 1 Pa.C.S. § 1932(a). Here, the statutes do not

---

[8] Here, we rely on the dictionary definition provided by the Commonwealth. *See* Commonwealth's Br. at 17-18. It is unclear from the Commonwealth's brief what edition or version of the Merriam-Webster Dictionary the Commonwealth cites here. However, the definition is identical to that provided on Merriam-Webster's website. https://www.merriam-webster.com/dictionary/slot%20machine (last visited Nov. 29, 2023). Appellees have provided additional dictionary definitions, including the Britannica Dictionary (defining slot machine as "a machine used for gambling that starts when you put coins into it and pull the handle or press a button") and the Free Dictionary (defining "slot machine" as "a gambling machine operated by inserting coins into a slot and often by pulling down on a long handle."). *See* Appellees' Br. at 46 (citing https://www.britannica.com/dictionary/slot-machine (last visited Nov. 29, 2023) and https://www.thefreedictionary.com/slot+machine (last visited Nov. 29, 2023)).

10

relate to the same class of things: the Crimes Code regulates illegal gambling devices, and the Gaming Act regulates licensed gambling in the Commonwealth.

Additionally, the rule requiring *in pari materia* statutory construction applies only in instances of ambiguous statutory language. *See Goodwin*, 280 A.3d at 948 n.7. The Commonwealth does not allege that Section 5513 is ambiguous, nor do we discern any ambiguity therein. *See* Commonwealth's Br. at 18-24. Thus, we decline to employ this principle of statutory construction.[9] *See Goodwin*, 280 A.3d at 948 n.7; *In re McFarland's Est.*, 105 A.2d at 95-96. Further, even if there did exist an ambiguity, the Crimes Code is a penal statute that should be construed strictly, and any ambiguities resolved in favor of the accused. *See, e.g., McCoy*, 962 A.2d at 1168.

In summary, the POM machines are not slot machines as commonly defined, and we decline to import a broad definition used to regulate legal gambling into this criminal statute. *See Goodwin*, 280 A.3d at 948 n.7; *In re McFarland's Est.*, 105 A.2d at 95-96; *see also Pinnacle Amusement, LLC v. Bureau of Liquor Control Enf't*, 298 A.3d 447, 452 (Pa. Cmwlth. 2023), *reargument denied* (Aug. 21, 2023).

---

[9] The Commonwealth also relies upon *Commonwealth v. Dent*, 992 A.2d 190 (Pa. Super. 2010), to argue that we should read the Crimes Code and Gaming Act *in pari materia*. In *Dent*, the Superior Court was asked to determine whether the playing of Texas Hold 'Em poker, in an unlicensed garage, constituted unlawful gambling under the Crimes Code. *See id.* at 192. The Superior Court looked to the Gaming Act for the definition of "unlawful gambling" and determined that there would be no reason for the legislature to authorize the playing of poker in certain facilities if playing did not constitute unlawful gambling prior to that authorization. *See id.* We may rely on Superior Court decisions as persuasive authority where they address analogous issues, but they are not binding precedent. *See Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018). In our view, *Dent* is unpersuasive on this point, particularly in light of this Court's decision in *POM*, which declined to apply the Gaming Act to POM games similar to those at issue here and held that the Gaming Act is *solely* intended to regulate licensed gambling and not to supplant the Crimes Code. *POM*, 221 A.3d at 735.

11

Finally, as noted, the parties also dispute the proper interpretation of the phrase "to be used for gambling purposes." The Commonwealth asserts that it modifies only the catch-all category in Section 5513(a), whereas Appellees suggest it necessarily modifies each category. In light of our conclusion that the POM machines are not slot machines under the Crimes Code, we need not resolve this further dispute of the parties. Regardless of which interpretation is proper, because the POM machines are not slot machines, the POM machines are not illegal *per se*.

## C. Whether the POM Machines are Gambling Devices *Per Se*

In forfeiture proceedings, if an item is not *per se* illegal, it may be considered derivative contraband, or "property innocent by itself, but used in the perpetration of an unlawful act." *See Commonwealth v. Irland*, 153 A.3d 469, 473 (Pa. Cmwlth. 2017), *aff'd*, 193 A.3d 370 (Pa. 2018). Essentially, the Commonwealth must establish a specific nexus between the property and alleged criminal activity. *Pinnacle*, 298 A.3d at 450-41 (citing *Irland*, 153 A.3d at 473).

Here, we consider the POM machines under the catch-all category defined at Section 5513(a) of the Crimes Code. Thus, we must determine whether they are devices "used for gambling purposes." *See* 18 Pa.C.S. § 5513(a). In other words, in order for the Commonwealth to prove that the POM machines are derivative contraband, it must establish a specific nexus between the POM machines and illegal gambling. *See Irland*, 153 A.3d at 473; *Pinnacle*, 298 A.3d at 450-51.

### 1. The Parties' Arguments

The Commonwealth contends that the seized POM machines are devices "used for gambling purposes" and thus prohibited under Section 5513(a) of the Crimes Code. *See* Commonwealth's Br. at 25. According to the Commonwealth, players use these machines to obtain a result determined by chance,

12

and any element of skill "tacked on to the game is *de minimus* [sic]." *See id.* The Commonwealth points to a number of reasons in support of this assertion, including (1) the game is advertised as a slot machine; (2) the "Follow Me" feature is secondary, insignificant, and hidden by the game's designers; (3) Appellees allegedly do not track game data[10] other than the slot machine play, indicating that the "Follow Me" feature is secondary in importance; (4) "Follow Me" is so tedious and difficult that anyone interested in playing a slot machine would never play it; and (5) chance far outweighs skill when the game in its entirety is considered. *See id.* at 25-36.

Appellees reply that substantial evidence supports the trial court's legal conclusion that skill predominates over chance. *See* Appellees' Br. at 64-68. Appellees argue that the POM games are not slot machines and are not advertised as such. *See id.* at 68-72. Appellees further respond that the "Follow Me" phase is not secondary, insignificant, or hidden, and that the Commonwealth's arguments about this phase are factually untrue. *See id.* at 72-80. Further, Appellees argue that the Commonwealth produced no competent evidence that "Follow Me" is not tracked. *See id.* at 80-83. Appellees argue that this Court should ignore the Commonwealth's speculative argument regarding what a hypothetical player of the "Follow Me" feature may think or do. *See id.* at 83-87.

## 2. The Predominate Factor Test

Recently, this Court clarified the appropriate analysis in resolving whether alleged contraband constitutes a gambling device *per se.* *Pinnacle*, 298

---

[10] The Commonwealth implies that this lack of tracking data means that the "Follow Me" game is an "insignificant aspect" of the game as a whole. *See* Commonwealth's Br. at 33-34. Appellees argue that the Commonwealth did not conclusively prove, one way or another, that the game does not track "Follow Me" data. *See* Appellees' Br. at 26-27.

13

A.3d at 451-52.  In *Pinnacle*, investigators from BLCE seized numerous electronic gaming machines following a cross-county investigation in liquor-licensed establishments.  *Id.* at 449-50.  However, following an evidentiary hearing, the trial court disagreed with BLCE's contention that the machines were gambling devices *per se* and ordered their return.  *Id.* at 451.  Upon further review and relying on precedent from our Supreme Court, the *Pinnacle* Court applied the predominate factor test to ascertain the nature of the alleged contraband.  *Id.* at 451-52 (citing *Commonwealth v. Two Electronic Poker Game Machines*, 465 A.2d 973 (Pa. 1983)).

The fundamental inquiry in the predominate factor test is whether the machine is so "intrinsically connected with gambling" that it constitutes a gambling device *per se*.  *Id.*  To answer this, a reviewing court must look to "the characteristics of the machine when read against" the elements necessary to gambling: consideration, chance, and reward.[11]  *Id.*  To constitute a gambling machine, the *Pinnacle* Court focused on the element of chance.[12]  *See id.*  The Court instructed that a reviewing court must consider "the relative amount of chance and skill present in the game; and if the element of chance predominates, the game is a gambling game."  *Id.*

---

[11] The Crimes Code defines consideration associated with a related product, service, or activity, in the context of the statute, as "[m]oney or other value collected for a product, service or activity which is offered in any direct or indirect relationship to playing or participating in the simulated gambling program.  The term includes consideration paid for computer time, Internet time, telephone calling cards and a sweepstakes entry."  *See* 18 Pa.C.S. § 5513(f).  The Pennsylvania Supreme Court has observed that tokens and prizes do not necessarily rise to the level of a reward, but that players must be able to "win an amount of equal or greater value than the amount he played in the machine."  *Commonwealth v. Irwin*, 636 A.2d 1106, 1109 (Pa. 1993).  The definitions of neither consideration nor reward are central to our disposition of this matter.

[12] Additionally, it should be noted that the courts have not defined "chance."  Black's Law Dictionary defines "chance" as (1) "a hazard or risk," (2) "the unforeseen, uncontrollable, or unintended consequences of an act," or (3) "an accident."  *Chance*, Black's Law Dictionary (11th ed. 2019).

14

Applying this test, the *Pinnacle* Court observed first that gameplay had elements of both skill and chance: while the initial stage of the game was random and chance-based, the latter stage included a memory game feature that allowed a player to "beat" the game every time. *See Pinnacle*, 298 A.3d at 454. The Pinnacle Court reasoned that if a player could exercise skill to obtain a winning result with every play, the game was a predominantly skill-based game. *See id.* Therefore, based upon the credited evidence, the *Pinnacle* Court concluded that the electronic gaming machines were not gambling devices *per se*. *See id.* at 455.

### 3. The POM Machines are not Gambling Devices *Per Se*

The *Pinnacle* Court's analysis is instructive.[13]  Similar to the games therein, the POM machines include multiple stages of gameplay incorporating elements of both chance and skill.  *See id.* at 449-50.  Therefore, we consider the evidence credited by the trial court and review its legal determination that the POM machines are not gambling devices *per se* and should be returned to Appellees. *See id.* at 455.

---

[13] The Commonwealth's brief, filed more than a month after the publication of *Pinnacle*, did not cite or discuss that case.  When questioned about this lapse at oral argument, the Commonwealth's attorney, Susan Affronti, Esq., stated to the Court, "First off, if we go with the statutory analysis, *Pinnacle* didn't address that point.  So, that's simple, if we go in that direction. And the second point, respectfully [to the Court,] we believe *Pinnacle* was wrongly decided.  And we will continue to argue that as we did in our allocator.  They are substantially similar cases . . . ." The Commonwealth's opinion of the Court's analysis in *Pinnacle* aside, if the Commonwealth was aware of adverse legal authority, it was required to cite and distinguish it. *See C,f. cf the Dist. Att'y cf Phila. v. Bagwell*, 155 A.3d 1119, 1142 n.21 (Pa. Cmwlth. 2017); Pa.R.P.C. 3.3(a)(2) (stating that a lawyer shall not fail to disclose directly adverse authority).  Instead, Attorney Affronti admitted that she was aware of the authority but intentionally omitted it from the arguments filed with this Court.  We caution the Commonwealth that the Pennsylvania Rules of Professional Conduct require candor toward the tribunal and, specifically, the disclosure of directly adverse authority. *See Bagwell*, 155 A.3d at 1142 n.21.

15

The Commonwealth presented the testimony of Dan Wentsler, a BLCE officer who conducts investigations in licensed establishments related to alcohol and gambling crimes. *See* N.T.[14] at 29-30. At the hearing, Wentsler brought in one of the POM machines to demonstrate gameplay for the trial court's observation. *See id.* at 30-72.

Wentsler testified that he has participated in hundreds of investigations and inspected over a hundred gaming machines. *See id.* at 76. In the course of those inspections, he has observed approximately a hundred people playing POM machines. *See id.* at 88. In his opinion, all of those machines were gambling machines *per se*. *See id.* at 78. Wentsler also testified to the specifics of this investigation. *See id.* at 30. While undercover, he visited the Champions Bar and played the POM machines. *See id.* at 73. However, Wentsler conceded that he did not play the "Follow Me" feature on the machines. *See id.* at 103-04.

The Commonwealth also presented expert testimony from Peter Nikiper, a computer engineer and the director of technical compliance for BMM Testlabs. *See* N.T. at 141-43, 149. BMM is an accredited game testing facility and as part of his duties, Nikiper conducts gaming equipment testing and analysis. *See id.* at 143, 149. Generally, his reviews are limited to machines regulated under the Gaming Act. *See id.* at 195.

Nikiper examined the POM gaming machines, both the machines seized from Champions Bar as well as others. *See id.* at 163-65. According to Nikiper, the initial phase of the game requires "less than 50[%]" skill, but the "Follow Me" feature "take[s] skill to complete[.]" *Id.* at 212, 248. Nikiper testified

---

[14] Although the evidentiary hearing was held over the course of three days, the pages are numbered contiguously throughout.

16

that he could not say with 100% certainty that the games were predominantly skill. *See id.* at 268.

David Schoppe, a BLCE enforcement officer, testified on behalf of the Commonwealth. *See* N.T. at 363-443. He is part of the compliance, auditing, and gambling enforcement unit. *See id.* at 363-64. Schoppe testified that he has participated in about 100 investigations involving POM machines. *See id.* at 367.

In the course of his investigations, Schoppe has observed people playing the POM machines and also engaged in gameplay himself.[15] *See id.* at 369, 503. In Schoppe's opinion, these are games of chance because he is "not getting better at these games" despite playing them frequently. *See id.* at 462. Schoppe testified that he does not play the "Follow Me" feature because, in his opinion, most players utilize rapid play, which does not offer the "Follow Me" option. *See id.* at 463-64. Nevertheless, Schoppe agreed that "Follow Me" is determined by skill and can be won on every single play by a skillful player. *See id.* at 497-98.

Dr. Olaf Vancura, a gaming industry consultant, testified on behalf of Appellees. *See id.* at 298-321. He described the testing that he performed on the particular POM machines at issue, which included both personal play as well as the simulation of 10 million games. *See id.* at 305-16. In his expert opinion, the POM machines were predominantly games of skill. *See id.* at 304-05, 308. Specifically, Dr. Vancura opined, a skillful player can "win" by making a net profit on each and every play of the game. *See id.* at 310, 317-18. Additionally, a player that wishes to learn and improve his play on a POM machine can do so. *See id.* at 318.

Considering this evidence, the trial court made several findings and credibility determinations. The trial court did not credit the Commonwealth's

_____

[15] None of the players Schoppe witnessed playing the games testified at the evidentiary hearing. *See* N.T. at 503.

17

experts as persuasive. *See* Trial Ct. Op. at 7. Specifically, the trial court noted that the Commonwealth's investigation and Wentsler's testimony both showed case bias. *See id.* Regarding the Commonwealth's investigation, the trial court opined that the "whole approach and intent is to shut down the games regardless of game play." *See id.* The trial court also pointed to Wentsler's testimony that he had not played the "Follow Me" feature while undercover. *See id.* Additionally, the trial court expressed concern that Wentsler had conducted hundreds of investigations into the devices and had never found one to be a game of skill: to the trial court, this showed a bias towards finding the games were illegal gambling devices. *See id.* On the contrary, the trial court found Dr. Vancura's testimony persuasive. *See id.*

Finally, the trial court concluded that all of the witnesses who had testified, including the Commonwealth's expert, agreed that "a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature." *See id.* at 8. Therefore, even though the puzzle portion of the game was predominantly a game of chance, the fact that the Follow Me feature could be won every time and showed up every time a player won less than 105% of the amount played eliminated the chance element. *See id.*

These findings and credibility determinations are supported by the record. We will not overturn them. *Lodge*, 283 A.3d at 925; *Clayton*, 987 A.2d at 1262. Further, based on this evidence, we discern no legal error in the trial court's determination that the POM machines are primarily games of skill and, thus, not gambling devices *per se*. *See Pinnacle*, 298 A.3d at 450-52. Finally, because the Commonwealth was unable to establish that the POM machines constitute derivative contraband, the trial court properly ordered the Commonwealth to return Appellees' property. *See id.* at 455; *Singleton*, 929 A.2d at 1227; Pa.R.Crim.P. 588(B).

18

## IV. CONCLUSION

The POM machines at issue in this case are not slot machines as commonly defined. Accordingly, these electronic games are not illegal *per se*. Further, applying the predominant factor test adopted by this Court in *Pinnacle*, these POM machines are not gambling devices *per se* and, therefore, do not constitute derivative contraband. For these reasons, the trial court's order entered March 23, 2023, and granting Appellees' petition for return of property, is affirmed.

_____

LORI A. DUMAS, Judge

19

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: Three Pennsylvania Skill | : | |
| Amusement Devices, One Green | : | |
| Bank Bag Containing $525.00 in | : | No. 707 C.D. 2023 |
| U.S. Currency, and Seven Receipts | : | |
| | : | |
| Appeal of: Commonwealth of | : | |
| Pennsylvania | : | |

# **O R D E R**

AND NOW, this 30th day of November, 2023, the order entered March 23, 2023, in the Dauphin County Court of Common Pleas granting the motion for return of property filed by Champions Sports Bar, LLC and Capital Vending, Inc., is AFFIRMED.

_____
LORI A. DUMAS, Judge

# Appendix B

IN RE:  THREE PENNSYLVANIA      :    IN THE COURT OF COMMON PLEAS OF
SKILL AMUSEMENT DEVICES, ONE   :    DAUPHIN COUNTY, PENNSYLVANIA
GREEN BANK BAG CONTAINING      :
$525.00 IN U.S. CURRENCY, AND      :    NO. 2022-CV-06333-MD
SEVEN RECEIPTS

## MEMORANDUM OPINION

Presently pending before this Court is a Petition for Return of Property that was filed by Capital Vending Company, Inc. ("Capital Vending") and Champions Sports Bar, LLC ("Champions") (hereinafter referred to collectively as "Petitioners"). The background of the case is as follows:  Capital Vending is a business that supplies games and other amusement equipment/devices to bars and restaurants in central Pennsylvania and elsewhere.  Champions is a restaurant/bar located at 300 Second Street, Highspire, Pennsylvania.  Champions holds a restaurant liquor license issued by the Pennsylvania Liquor Control Board.  At all times relevant hereto, Champions had three Pennsylvania Skill Amusement Devices (hereinafter referred to collectively as the "POM Machines") in its establishment that were supplied by Capital Vending.

On December 9, 2019, at approximately 4:45 p.m., agents from the Pennsylvania State Police, Bureau of Liquor Control Enforcement (BLCE), entered Champions and seized the three POM Machines, one green bank bag containing $525.00 in U.S. currency (hereinafter "the Cash"), and seven receipts (hereinafter "the Receipts").  BLCE seized this property based on allegations that the POM Machines were gambling devices *per se*, and the Cash and Receipts were derivative contraband.  No criminal charges were filed related to the seized property, but Champions was issued an administrative citation on April 22, 2020 for permitting gambling.  This citation is still pending.

On August 23, 2022, Petitioners filed a Petition for Return of Property pursuant to 42 Pa. C.S. §5806 and Pa. R.Crim. P. 588. In their filing, Petitioners claim that the POM Machines that were seized by BLCE are not gambling devices but are instead predominately skill games. The Petition also challenged the lawfulness of the seizure.[1] On September 8, 2022, the Commonwealth of Pennsylvania filed an answer to the Petition and included a new matter in the nature of a Petition for Forfeiture and Condemnation pursuant to 42 Pa. C.S. §5805. In its response, the Commonwealth claims that the POM Machines are games of predominant chance and are therefore subject to seizure and forfeiture as *per se* illegal gambling devices.

This Court held a hearing on the Petition for Return of Property over three days: September 30, 2022; November 22, 2022; and December 2, 2022. The Commonwealth called three witnesses: Dan Wentsler (liquor enforcement officer); Peter Nikiper (expert witness); and David Schoppe (supervisory liquor enforcement officer/expert witness). Petitioners only called Olaf Vancura as an expert witness. After the Hearing concluded, the Court invited the parties to submit proposed findings of fact and conclusions of law, which they did. This matter is now ripe for disposition.

A Petition for the Return of Property is governed by Pennsylvania Rule of Criminal Procedure which states, in relevant part:

> (A) A person aggrieved by a search and seizure, whether or not executed pursuant to a warrant, may move for the return of the property on the ground that he or she is entitled to lawful possession thereof. Such motion shall be filed in the court of common pleas for the judicial district in which the property was seized.
> (B) The judge hearing such motion shall receive evidence on any issue of fact necessary to the decision thereon. If the motion is granted, the property shall be restored unless the court determines that such property is contraband, in which case the court may order the property to be forfeited.

---

[1] We did not hear testimony about the lawfulness of the seizure, and Petitioners did not address this issue in their Proposed Findings of Fact and Conclusions of Law. As such, we will not discuss it herein.

Pa. R.Crim. P. 588(A)(B).  Under this Rule, the moving party must first establish that it is entitled to lawful possession of the property by a preponderance of the evidence.  Commonwealth v. Trainer, 287 A.3d 960, 964 (Pa.Cmwlth. 2022) (citations omitted).  Once that is established, the burden then shifts to the Commonwealth to show, by a preponderance of the evidence, that the property is either contraband *per se* or derivative contraband and should not be returned to the moving party.  Id. (citations omitted).  Contraband *per se* is property that is unlawful to possess, and derivative contraband is property that can be lawfully possessed but is used in the perpetration of an unlawful act.  Commonwealth v. Irland, 153 A.3d 469, 473 (Pa.Cmwlth. 2017) (citations omitted).

In the instant matter, the parties stipulated that the three POM Machines are owned by Capital Vending.  The parties further stipulated that Champions owns the Cash and the Receipts and has a possessory interest in the three POM Machines pursuant to an agreement with Capital Vending.  As such, Petitioners are entitled to lawful possession of the three POM Machines, the Cash, and the Receipts unless the Commonwealth shows, by a preponderance of the evidence, that the POM Machines are contraband *per se* and the Cash and Receipts are derivative contraband.  The Commonwealth claims that the POM Machines are illegal gambling devices, and the money and receipts that were seized were derivative of the illegal gambling devices.

The Crimes Code states that it is a misdemeanor of the first degree if a person "(1) intentionally or knowingly makes, assembles, sets up, maintains, sells, lends, leases, gives away, or offers for sale, loan, lease or gift, any punch board, drawing card, slot machine or any device to be used for gambling purposes, except playing cards." 18 Pa. C.S.A. §5513(a)(1).  Unlawful gambling is defined as "gambling not specifically authorized by the Commonwealth." Com. v. Betres, 237 Pa.Super. 361, 368, 352 A.2d 495, 498 (1975).  It is undisputed that the POM games

3

in the instant matter were not specifically authorized by the Commonwealth. However, the question remains as to whether these machines are gambling devices.[2]

"A machine is a gambling device *per se* if it can be used for no purpose other than gambling." Com. v. Irwin, 535 Pa. 524, 527, 636 A.2d 1106, 1107 (1993) (citations omitted). "The three elements of gambling are (1) consideration; (2) a result determined by chance rather than skill; and (3) reward." Id. (citations omitted). Where all three of these elements are present, the machine will be considered "'so intrinsically connected with gambling' as to be a gambling device *per se*." Id. (citations omitted). The Commonwealth has the burden of showing that the machines are *per se* gambling devices. Id. (citations omitted).

In determining whether a machine is a gambling device, the court must examine the characteristics of the machine itself and whether the three elements are present. Com. v. Two Elec. Poker Game Machines, 502 Pa. 186, 194, 465 A.2d 973, 977 (1983). With respect to the element of chance versus skill, Pennsylvania courts have employed the "predominate-factor test" stating that "for a game to constitute gambling, it must be a game where chance predominates rather than skill." Com. v. Dent, 992 A.2d 190, 193 (Pa. Super. Ct. 2010) (citations omitted). Simply because a machine involves a large element of chance, without more, is insufficient to find the machine to be a gambling device *per se*. Two Elec. Poker Game Machines, 502 Pa. 186 at 195, 465 A.2d at 977. Moreover, the outcome of a game does not need to be wholly determined by skill in order for the machine to fall out of the *per se* gambling device category. Id. Rather, courts must determine whether chance or skill predominates in any given machine.

---

[2] In its post-hearing submission, the Commonwealth argues that the POM Machines are illegal slot machines regardless of whether they are skill games or games of chance. However, this claim was not included in the Commonwealth's Answer to the Petition for Return of Property, nor was it included in the Commonwealth's Counterclaim for forfeiture of property. As such, the sole issue for this Court's consideration is whether the POM Machines are gambling devices.

4

In the instant matter, there is no dispute as to the actual gameplay of the POM Machines. As set forth in Petitioners' Proposed Findings of Fact in Paragraphs 14 through 26, each of the POM Machines has a single game with multiple game themes available for selection, although the gameplay is the same regardless of theme. Gameplay on each of the POM Machines commences after the player has inserted cash into the machine. The cash is converted into points with $1.00 being equal to 100 points. The player can adjust how many credits to commit to a given play, ranging from 8 credits, which is equal to $0.08 up to 400 credits, which is equal to $4.00. However, before initiating gameplay, the POM Machines allow a player to see the upcoming puzzle by pressing the "Next Puzzle" button, which allows the player the opportunity to see if the upcoming puzzle is a winning puzzle before committing any funds.

Once gameplay has commenced, the player is presented with nine symbols arranged in rows of three. The object is to match three like symbols in a row on as many pay lines as possible, arranged vertically, horizontally, and/or diagonally, similar to tic-tac-toe. Specifically, if possible, a player must turn one of the nine symbols wild by pressing it within thirty (30) seconds in order to complete three matching symbols in a row. Once the puzzle appears, one of three things can happen: 1) the puzzle can be correctly solved, resulting in an award equal to at least 105% of the points that were committed to play, known as a "win;" 2) the puzzle can be correctly solved, resulting in an award less than 105% of the points that were committed to play, known as a "hit;" or 3) the puzzle is incapable of being solved, known as a "loss."

If a player gets a hit or a loss, the player is always offered the opportunity to continue gameplay through the "Follow Me" feature of the game. The Follow Me feature does not require any additional points from the player but gives the player a chance to win back the money that they lost during the puzzle portion of the game plus an additional 5%. The Follow Me

5

feature requires the player to repeat a pattern of multiple, multi-colored circles in the same order in which the circles are displayed, similar to the electronic game "Simon." If the player successfully completes the pattern, the player is awarded with a total of 105% of the points committed to play depending on whether the player received a hit or a loss in the puzzle portion. In other words, if a player bets $4.00 and only wins $2.00 in the puzzle portion, that player can play the Follow Me game and, if completed successfully, get $2.20 in addition to the $2.00 that they won on the puzzle portion for a total of $4.20.

Once gameplay is complete, a player has the option of redeeming any remaining credits by pressing the Redeem button. Pressing this button will cause the POM Machine to dispense a ticket reflecting the dollar amount that is equivalent to the remaining credits. For instance, if a player has 1000 credits, pressing the Redeem button will result in the player getting a ticket for $10.00 which they can then exchange for cash. The POM Machines only award whole dollar amounts. Thus, pressing the Redeem button rounds the player's credits down to the nearest whole dollar and leaves any excess credits on the device. For instance, if a player has 1050 credits, pressing the Redeem button will result in a player getting a ticket for $10.00. The excess 50 credits (worth $0.50) then remain on the machine and may be used by that player or another player on future gameplay.

As stated above, in order for the POM Machines to be gambling devices *per se*, they must have the three elements of gambling, namely: 1) consideration; 2) chance; and 3) reward. We find that the first and third elements are present in the POM Machines. Specifically, you cannot play the POM Machines without depositing money and committing some of that money to a game. Additionally, a player has the opportunity to win more than they bet, thus obtaining a reward. However, the question remains as to whether the POM Machines in the instant matter are

6

predominately games of skill or are predominately games of chance. Based on the evidence that was presented at the Hearing, we find that the POM Machines at issue in this case are predominately games of skill.

All three of the Commonwealth witnesses opined that the three POM Machines were predominately games of chance. However, we do not find these opinions to be persuasive for a number of reasons. Initially, it is this Court's belief that the Commonwealth's investigation shows case bias. The Commonwealth is seeking to make all machines like the POM Machines into illegal gambling devices, and their whole approach and intent is to shut down the games regardless of the actual gameplay. The fact that Officer Wentsler never played the Follow Me feature while undercover is indicative of this. Thus, the Commonwealth as a whole is biased against the games, and their approach lacks case credibility.

Additionally, Officer Wentsler also showed case bias. He testified that he has conducted hundreds of investigations into these types of devices, and it is his opinion that every single machine that he investigated was a game of chance. This is not credible and shows that Officer Wentsler is biased towards finding that these machines are illegal gambling devices. It also shows that he was not objective in his investigation of the subject POM Machines. As such, we did not find his opinion persuasive.

We did find the opinion of Petitioners' expert, Olaf Vancura, to be persuasive. Dr. Olaf has worked as a consultant, author, and inventor in the gaming industry since 1995. He testified that a skillful player that plays the POM Machines can win, which is defined as making a net profit, on each and every play of the game. Furthermore, he opined that there is no feature or functionality of the game that could prevent a skillful and patient player from achieving that result in every single play. This opinion was rendered with 100% mathematical certainty.

Most importantly to our decision, all of the witnesses who testified, including the Commonwealth's expert witness, agreed that a patient and skillful player could win at least 105% of the amount played on each and every play by utilizing the Follow Me feature. The puzzle portion of the game is predominately reliant on chance. Although a player has the opportunity to interact with the game to place a wild symbol, there is nothing that a player can do to ensure that the reels show a puzzle that can be correctly solved. However, it cannot be disputed that the Follow Me feature can only be completed by a skillful player, and it does not depend at all on chance. Additionally, the Follow Me feature shows up every time a player wins less than 105% of the amount played. This eliminates the element of chance that is present in the puzzle portion by giving a player the opportunity to win back the money that they lost by utilizing skill.

The Commonwealth argues that this Court should not look at the machines as a whole but should instead consider how players actually utilize the machines. The Commonwealth directs this Court's attention to the case of Commonwealth v. Lund, 15 A.2d 839 (Pa. Super. 1940) as supporting this argument.

In Lund, a theater operator held a "bank night" at his two theaters wherein the theater operator would maintain a register with a list of the names of those persons who would like to win a cash prize with a corresponding number next to their names. Id. at 841. It did not cost anything to have your name placed on this register. Id. The theater then held a drawing where a number was picked out of a hopper. Id. If the person whose number was chosen was present at the theater at the time of the drawing, that person would win a cash prize. Id. If that person was not present at either theater, then no winner was chosen, and the cash prize would roll over into the next week. Id. People could also purchase proxy cards in the afternoon of the day of the drawing and could win the cash by proxy even if they were not present at the theater when their

8

number was chosen. Id. at 842. The theater owner and managers occasionally gave out free proxy cards to people, but they did not advertise this feature. Id.

The question that the Superior Court had to answer was whether the element of consideration was present for these so-called bank nights.[3] Id. at 843. In reviewing this question, the Court stated:

> The primary question in these "bank night" cases is not whether any individual attending a theatre on "bank night," paying for admission, or admitted free, present in person or by proxy, is acting in concert with the owner in operating a lottery, but rather whether the owner is maintaining and operating a lottery. This is to be determined by the character and practical operation of the scheme as a whole, and not by rare instances of departure from the general scheme and practice. The general character of the system is not to be determined by splitting it up into individual contracts between the theater owner and his patrons. This theory applied in the cases hereinbefore considered is a misleading one, since it diverts attention from the general public effect of the practice which is the evil the law seeks to prevent. It is an impractical one in that it would render extremely difficult, if not impossible, the control of the practice, though manifestly a public nuisance in its operation and effect, by permitting a few exceptional instances of free admissions and free chances to afford immunity to the whole.

Id. at 845. The Court thus determined that the element of consideration was present, and that the theater owner was operating an illegal lottery. Id. at 850.

We find that Lund is inapposite to the instant matter. In Lund, the owner of the theater was the one who was attempting to legitimize his "bank night" by giving away free tickets and attempting to remove the necessary element of consideration. However, in the instant matter, neither Petitioner has any control over how a player utilizes a subject machine. To hold that a machine is either an illegal gambling machine when a player chooses not to engage with the Follow Me feature or is a skill game when a player plays the Follow Me feature is untenable. For instance, if a player plays the Follow Me feature once, does that make the entire machine a skill game for

---

[3] The elements of chance and reward were conceded by the parties. Id.

that player?  Or does it require the player to play Follow Me on every occasion?  If the player starts playing Follow Me and then stops playing it, does it go from a game of skill to a game of chance while that same player is playing?  The questions that would need to be asked to determine how the game is played by various players are endless.  Furthermore, Petitioners do not have any control over how a given player plays the game.  Rather, the chance is with the player rather than with the machine.  For this reason, we specifically find that the question of whether these machines are games of skill or games of chance depends solely on the machines themselves and not on how a player plays them.

Even if we were to find Lund persuasive, the Commonwealth did not provide sufficient evidence to support a finding that the majority of players do not play the Follow Me feature.  Officer Schoppe testified that there are approximately 10,000 of these types of machines in Pennsylvania.  He observed approximately 100 people playing the subject POM Machines.  Although we believe that Officer Schoppe did not observe any of those players playing the Follow Me Feature, we find that this is too small a sample size to make any determination as to how the average player plays these machines.  As such, we find that the POM Machines are not gambling devices *per se*, and Petitioners are entitled to have the POM Machines returned to them.  Additionally, since the Cash and Receipts are derivative of the legal POM Machines, they should also be returned to Petitioners.

For these reasons, we hereby enter the following Order:

10



Copies Distributed
Date 3-23-23    Initials

| | |
|---|---|
| IN RE:  THREE PENNSYLVANIA | :   IN THE COURT OF COMMON PLEAS OF |
| SKILL AMUSEMENT DEVICES, ONE | :   DAUPHIN COUNTY, PENNSYLVANIA |
| GREEN BANK BAG CONTAINING | : |
| $525.00 IN U.S. CURRENCY, AND | :   NO. 2022-CV-06333-MD |
| SEVEN RECEIPTS | |

## ORDER

**AND NOW**, this 23RD day of March , 2023, upon consideration of the

Petition for Return of Property that was filed by Petitioners Capital Vending Company, Inc. and

Champions Sports Bar, LLC, and any responses thereto, and having held a Hearing on September

30, 2022, November 22, 2022, and December 2, 2022, it is hereby ORDERED as follows:

For the reasons set forth in the attached Memorandum Opinion, it is hereby

ORDERED and DECREED that the Petition for Return of Property is GRANTED.  It is further

ORDERED that, within five (5) days of the date of this Order, the Pennsylvania State Police,

Bureau of Liquor Control Enforcement shall return to Champions Sports Bar, LLC the following:

1) three Pennsylvania Skill Amusement Devices, 2) one green bag containing $525.00 in U.S.

Currency, and 3) seven receipts in the condition in which they were seized.

BY THE COURT:

_____
Andrew H. Dowling, Judge

Distribution:
The Honorable Andrew H. Dowling
Christopher D. Carusone, Esquire, COHEN SEGLIAS PALLAS GREENHALL & FURMAN,
    P.C., 525 William Penn Place, Suite 3005, Pittsburgh, PA  15217
Matthew H. Haverstick, Esquire & Edward T. Butkovitz, Esquire, KLEINBARD, LLC, Three
    LoganSquare, 5th Floor, 1717 Arch Street, Philadelphia, PA  19103
Andrew J. Jarbola, IV, Esquire, OFFICE OF ATTORNEY GENERAL, 6400 Flank Drive, Suite
    1300, Harrisburg, PA  17112